## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **XAVIER INGRAM,**<br><br>    **Plaintiff,**<br><br>  vs.<br><br>**COUNTY OF CAMDEN, CAMDEN COUNTY POLICE DEPARTMENT, JEREMY MERCK, ANTONIO GENNETTA, NICHOLAS MARCHIAFAVA, JOHN SCOTT THOMSON, ORLANDO CUEVAS, JOHN DOE(S) 1-50, and ABC ENTITIES 1-10.**<br><br>    **Defendants.** | CIVIL ACTION NO. 1:14-CV-05519 |

---

**PRETRIAL MEMORANDUM ON BEHALF OF THE COUNTY OF CAMDEN, CAMDEN COUNTY POLICE DEPARTMENT, JOHN SCOTT THOMSON, AND NICHOLAS MARCHIAFAVA**

---

**BROWN & CONNERY, LLP**
William M. Tambussi, Esq.
William F. Cook, Esq.
360 Haddon Avenue
Westmont, New Jersey 08108
(856) 854-8900
*Attorneys for the County of Camden, Camden County Police Department, John Scott Thomson, and Nicholas Marchiafava*

7AF395001

## INTRODUCTION

This trial memorandum is respectfully submitted on behalf of the County of Camden, the Camden County Police Department ("CCPD"), CCPD Chief Scott Thomson, and CCPD Officer Nicholas Marchiafava.

On June 12, 2014, Plaintiff Xavier Ingram was arrested by CCPD on weapons charges and other offenses. Ingram alleges that Marchiafava, CCPD Sergeant Jeremy Merck, and CCPD Officer Antonio Gennetta used excessive force and failed to provide medical assistance. Ingram further alleges that he is paralyzed from these actions.

As will be explained at trial, Plaintiff's claims are without merit and Defendants are entitled to qualified immunity. Plaintiff's version of events is not correct or credible. The facts in this matter show that there was no excessive force in the arrest of Ingram. Moreover, there was no failure to render medical aid. An ambulance was summoned immediately once it was clear that aid was needed. Finally, CCPD provides superior training in use of force and related areas, and it properly investigates all citizen complaints of alleged police misconduct.

For all of these reasons, as well as those that will be advanced at trial, Defendants are entitled to a full dismissal of this action.

## FACTUAL BACKGROUND

Xavier Ingram was arrested at approximately 9:45 P.M. on June 12, 2014 in the area of 7th and Chestnut Streets in Camden. Ingram was charged with unlawful possession of a weapon (N.J.S.A. 2C:39-5B), possession of a weapon for an unlawful purpose (N.J.S.A. 2C:39-4A), resisting by flight (N.J.S.A. 2C:29-2A), and other charges.

The CCPD Incident Report, written by Sgt. Jeremy Merck, states as follows:

On June 12th, 2014, I was assigned to the Community Safety Team uniformed proactive patrol as a city wide supervisor. The primary focus of my unit is to

1

detect and deter the commission of dangerous and violent crimes including but [not] limited to homicides, robberies, weapons offenses and drug offenses, with the purpose of increasing the quality of life of the residents of Camden City. At approximately 2140 I responded to the area of Sycamore and Chestnut Court Apartments, 7th and Sycamore, to meet with Officer Gennetta #357, who was specifically assigned to that area. The area of Sycamore/Chestnut Courts is a well known and documented location where the commission of drug related and violent crimes occur. Upon meeting with Officer Gennetta I advised him that we were going to conduct a complex sweep of the apartment complex on foot. Officer Marchiafava #374 who was also in the area assisted with the complex sweep.

Upon entering the courtyard of Chestnut Court Apartments from the Sycamore Street side, I observed a group of approximately 8 subjects huddled together standing in the center of the court yard. Once the subjects observed the police in the area, one of subjects yelled "YURP" and they all immediately began to walk off in different directions. One subject, later found to be Xavier Ingram, grabbed his front waist band with both hands, turned away from me and quickly began to walk towards Chestnut Street. Ingram's actions were consistent with someone carrying a weapon. As I followed the Ingram I observed him turn left into the parking lot in between two vehicles. At that time I heard the sound of metal object strike the pavement coming from the area Ingram was observed. Ingram emerged from the two vehicles, no longer holding his waistband and walked towards Eddies Liquor Store at the corner of Chestnut Street and 7th Street. Before entering the store Ingram turned towards me and stated "Whats up Sgt Merck?" At that time I immediately identified Ingram from past dealings I have had him. Once I immediately identifying him I walked back the area where I observed Ingram in between the two vehicles and the same area where I heard a metal object strike the ground. At that time I observed a large black and silver hand gun (Match Combat Sport 10mm serial EA93801), on ground under the front wheel of a parked vehicle. I instructed Officer Gennetta and Officer Marchiafava of findings and to arrest Ingram. When Officer Gennetta and Marchiafava attempted to arrest Ingram, he fled on foot north on 7th Street towards Mt Vernon Street. At that time I secured the firearm and proceeded to the area of foot pursuit. Once I turned the corner onto 7th Street. I observed Officer Gennetta and Officer Marchiafava effecting the arrest of Ingram at the corner of 7th Street and Mt Vernon. Ingram was lying face down while officers secured him in handcuffs. During search incident to arrest Officer Marchiafava located 4 bags of suspected heroin stamped MIA on in Ingram's front right pants pocket. Once in handcuffs Ingram yelled "Yo Sgt Merck I am sorry, it's mine" He also began to complain of neck and shoulder pain. He stated that he could not feel his legs. At that time I called for Emergency Medical Services to respond to the scene. Emergency Medical Services responded and transported Ingram to Cooper Hospital with a police escort. The firearm was made safe and found to have 12 10mm ball ammunition in the magazine and one 10mm round in the chamber.

2888175.v1

I responded to the Police Administration Building with the firearm to start processing. Upon arrival I advised Det Divito of my findings. The handgun was found to be stolen out of Gloucester Township. Camden County, on 1/30/2014 under case number 2014-0415. Ingram charged with Unlawful Possession of Weapon, Possession of a Weapon for Unlawful Purpose, Certain Persons not to have weapons, Receiving Stolen Property, Possession of CDS, and Resisting by Flight under warrant 0408-W-2014-005654 with $65,000 bail. By the completion of this report Ingram was still being treated at Cooper Hospital under police guard.

Officer Marchiafava completed a Field Interview Report for the incident, stating as

follows:

On Thursday, June 13, 2014, I was assigned to the Camden County Metro Police Department's Neighborhood Response Team.  My primary focus was to address quality of life issues and criminal activity in the southern district of Camden City. While on proactive patrol in the area of S. 7th Street and Chestnut Street I was asked by Sgt. Merck and Officer Gennetta to assist them on a property sweep of Sycamore Court Apartments.  As we entered the open area in the middle of the apartments I observed 8 black males standing in a large group near the corner of the middle building.  One of the males looked up as we approached the area and yelled out "Yurp" which is a sound that is used as warning to other drug dealers that the police are in the area.  At this time all the males started to walk in different directions, and I noticed one of the black male who was later identified a Mr. Xavier Ingram.  I observed Mr. Ingram who was wearing tan khaki pants with a light blue hoodie sweatshirt adjust a bulge in his waist band and ducked between two vehicles in the parking lot next to the liquor store on Chestnut Street.  Mr. Ingram noticed Sgt. Merck and I approach the vehicles that he was standing by and started to walk to the front of the liquor store.  Sgt. Merck and I followed behind Mr. Ingram as he entered the liquor store on Chestnut Street.  The male turned around and said something to Sgt. Merck before he entered the building. Sgt. Merck and I walked back to the area were Mr. Ingram ducked between the two vehicles.  Sgt. Merck told Officer Gennetta and I to go arrest Mr. Ingram because he found a hand gun between the two vehicles.  Officer Gennetta and I walked back to the Liquor to intercept Mr. Ingram as he came out of the liquor store.  Mr. Ingram looked at me as he left the liquor store and said, "Fuck you metro" as he took off running.  Mr. Ingram started to run down S. 7th Street towards Mount Vernon.  Officer Gennetta and I engaged in a foot chase with Mr. Ingram.  Mr. Ingram started to cut across the dirt parking lot next to El Nuevo located at 643 S. 7th Street in order to get on to Mount Vernon Street.  As I closed the distance on him he made a juke move in order to avoid me.  Mr. Ingram then started running back through the dirt parking lot towards S. 7th Street.  Officer Gennetta's position caused him to run toward Mount Vernon heading towards S. 8th Street.  I was four to five paces behind Mr. Ingram when he was crossing the street on S. 7th Street.  At this time Mr. Ingram slipped and fell on the wet surface

of the street.  I then ran up to Mr. Ingram and placed one knee on the ground next to him and the other on the small of his back in order to place him to handcuffs. Officer Gennetta then came in doing the same thing mirroring me from the opposite side of Mr. Ingram.  I reached down and grabbed Mr. Ingram's arm to get it out from under his body.  At this time Officer Gennetta had a cuff on Mr. Ingram's left wrist and was bringing his arm towards me in order to cuff his other wrist.  I held his arm in position as Officer Gennetta cuffed his right wrist.  Once Mr. Ingram was properly handcuffed Officer Gennetta and I stood up from the kneeling position.  At this time Mr. Ingram stated that his shoulder and back were messed up from falling.  He told Officer Gennetta that he could not feel his legs or feet.  Officer Gennetta immediately supported Mr. Ingram's head and neck in order to prevent him from moving it.   Sgt. Merck notified dispatch that an ambulance was need to transport Mr. Ingram to the hospital.  Once the ambulance arrived on scene Officer Gennetta continued to stabilize Mr. Ingram's head and neck so that the EMT's could place a neck brace on him.  Mr. Ingram was placed on a backboard and placed on a stretcher to be moved into the ambulance to be transported to Coper Hospital for medical attention.

The events leading to the arrest of Ingram are captured on surveillance footage from the Chestnut Court Apartment Complex, Eddie's Liquor Store, and CCPD's Eye-in-the-Sky Footage ("EIS Footage").[1]

In the Courtyard Footage, and based on Plaintiff's admissions regarding same, Ingram is huddling with several other individuals in the courtyard prior to police arrival.  A man in the area of the group walks into the courtyard, glances to his left, and then walks to the group where Ingram is standing.  At time marker 09:37:19, Ingram starts walking towards the parking lot.  It is undisputed that, at this time, Ingram knew that Merck and other CCPD officers were approaching, which is why Ingram started walking away.  Two Camden County police officers (Merck and Marchiafava), and then a third (Gennetta), then come into view in the lower right hand corner of the camera field walking through the courtyard towards the parking lot, and several individuals disperse.

---

[1] The Sycamore Court Apartment Complex has an outside courtyard and a parking lot.  One could walk from the courtyard into parking lot through an open passageway.

In the Parking Lot Footage, Ingram comes into the parking lot between 00:30 and 00:37[2], after which he goes between two cars and bends down.  Ingram does not dispute that he went between the two cars and bent down to hide from the police, and he further admits that the police saw him do this (Ingram Deposition Transcript ("Ingram Dep."), at 29:10-12 ("So I walked between the cars like to hide, but they seen me.  So I walked out the cars."); 31:7-14 (admitting that he bent down between two cars); 38:19 to 29:1 ("I bent down, seen the cops had seen me.  I got up, I walked between the cars.   They was right behind me.")).   Ingram then stands up between the two cars and starts walking through the parking lot, followed by Merck and Marchiafava.  When walking through the parking lot, Ingram puts his hands up in the air, after which all three go out of view.  CCPD officers continued to follow Ingram as he walked towards Eddie's Liquor Store.

At 21:48:05 on the Eddie's Liquor Store Footage, Ingram, with a hooded sweatshirt, comes into view, after which he turns towards Sgt. Merck.  Ingram knew that the police officers were behind him, and that one of the officers was Merck.   Meanwhile, on the Parking Lot Footage, police officers re-enter the parking lot, where a crowd is gathering.  From 1:37 to 1:38, Merck is seen activating his flashlight towards the two vehicles Ingram walked between earlier.  From 1:38 to 2:07, Merck goes between the two vehicles, comes back out, and converses with Marchiafava, after which Marchiafava walks quickly back out of the parking lot.  From 2:07 to 2:13, Merck converses with Gennetta, after which Gennetta also starts to walk out of the parking lot.

At 21:49:11 on the Eddie's Liquor Store Footage, Ingram comes out of the store, faces Officer Marchiafava, and then starts running across the street.  Ingram admitted to his sister, Ashley Ingram, that when he exited the store, one of police officers said something to Ingram

---

[2] 0:00 on the time marker represents when the viewer hits the "play" button on the video.

"about a gun or something, or one of the cops said that they heard something metal drop or something like that, or whatever.  [Ingram] said that he ran and he said they got mad because he was outrunning him".  Ingram told another family member, Muneerah Abdur-Rahmaan, that when he came out of the liquor store, he heard someone say "don't move" or "freeze", at which point Ingram started running.

CCPD's EIS Footage, contained in three video files, captures the subsequent pursuit and arrest of Ingram.  In the first segment of EIS Footage, between 8:39 and 8:44[3], Ingram is seen running through the intersection of 7th and Chestnut Street as he is chased by Officers Marchiafava and Gennetta.  Between 8:44 and 8:52, Ingram runs into a dark area, followed by police, and then emerges running left to right across the street.  Between 8:52 and 8:55 on the EIS Footage, Ingram slips and falls on the ground, after which Marchiafava and Gennetta attempt to restrain him.  Ingram does not dispute that the streets were wet at the time.  As to how Ingram fell:

- Ingram stated in his Second Amended Complaint and in interrogatory responses that he went to the ground face down with his hands in front of him (Second Amended Complaint, ¶ 16 (Ingram "laid down onto the street with his hands out in front of him"); Plaintiff's Response to Interrogatory No. 9 ("Realizing the police officers were right behind him, plaintiff ran back into the street and went down to the ground face down with his hands out in front of him.")).

- Ingram told a family member, Hameemah Abdur-Rahmaan, that he slipped and fell because it was wet, and that he fell on his face (Hameemah Abdur-Rahmaan Dep., at 53:23 to 54:14).

- Ingram told a family member, Muneerah Abdur-Rahmaan, months later that he fell down face first (Muneerah Abdur-Rahmaan Dep., at 42:13 to 43:1).

- Ingram told a family member, Tonya Adams, that when he was running from the police, he ran through mud, and so when he came back into the street, he slid (Tonya Adams Dep., at 65:2-12).  Ingram then fell forward like Superman (id. at 65:13-67:23).

---

[3] 0:00 on the time marker represents when the viewer hits the "play" button on the video.

- Ingram told a family member, Anaya Young, that he tripped and fell (Anaya Young Dep., at 33:8 to 37:22).

- Contrary to the above, Ingram testified at his deposition that he landed on his left side on his stomach (Ingram Dep., at 12:7-8; 56:1-8).

Ingram admits that *before* he was handcuffed, he had pain in his neck/shoulder, could not breathe, and could not feel his legs. Merck was not on scene at this time, as he does not arrive until *after* Ingram was handcuffed.

From 9:10 to 9:59 on the EIS Footage (first segment), officers are securing Ingram and conducting a pat-down. At no point is there any sign of punching, kicking, stomping, kneeing, or any improper physical force by the officers. In the second segment of EIS Footage, from 0:00 and 0:06[4], the officers are completing a pat-down, after which one of the officers lifts Ingram's handcuffed arms and places them back down, with no signs of punching, kicking, or improper physical force by the officers. At 0:06, one of the officers starts to roll Ingram, who is on his stomach, in order to sit Ingram up. From 0:06 to 0:13, Ingram is placed into a seated position, after which he falls on his left side. At 6:53, an ambulance arrives on scene to render aid. At no point is there any sign of punching, kicking, stomping, kneeing, or any improper physical force by the officers.

CCPD audio transmissions reveal that, upon initiating pursuit of Ingram, Marchiafava requested a "Code 5" to clear the air and describes the suspect. Merck, who is Unit 911, announces the location of the incident and states it is a "32-60", which is police code for a gun arrest, and Marchiafava (who is Unit W67) requests assistance of another unit. At 9:48 PM, the Code 5 is lifted at the request of Merck. Less than a minute later, Merck requests that a "52 respond," which is police code for an ambulance.

---

[4] 0:00 on the time marker represents when the viewer hits the "play" button on the video.

University Hospital-Camden EMS responded to the scene to take Ingram to Cooper Hospital. Ingram has no memory of an ambulance arriving or taking him to the hospital. In addition, he blacked out twice during the arrest.[5] Ambulance personnel noted that police were applying a manual C-spine stabilization (Ambulance Report, at 2). Ingram complained to ambulance personnel of loss of feeling in his extremities, that he had used marijuana, that he had back pain, but he had no loss of consciousness, head pain, or neck pain (id.). Ingram provided his past medical history, including surgical repair to his right hand and left foot, and that he was taking Percocet. Ingram was placed in a neck collar, secured onto a cot, and put into the ambulance. Once in the ambulance, emergency medical personnel conducted a trauma exam and noted no deformities, wounds, or abrasions. Id.

Plaintiff was subsequently admitted to Cooper Hospital for cervical injuries (Cooper Emergency Room Intake Evaluation). His physical exam was negative for injuries to his face, nose, ears, or teeth (id. at 19-20). He had no visible contusions, abrasions, or wounds to his neck, back, chest, or abdomen (id.). After further evaluation, it was determined that Plaintiff sustained internal cervical injuries and is now a quadriplegic (Plaintiff's Response to Interrogatory No. 21).

Plaintiff filed this lawsuit on September 4, 2014. In his Second Amended Complaint, Plaintiff alleges that Officers Marchiafava, Gennetta, and Merck used excessive force in the course of Ingram's arrest in violation of 42 U.S.C. § 1983 ("Section 1983") (Count I); failure to provide adequate medical care (Count II); supervisory and bystander liability as to Merck (Count III); that the County of Camden is liable under a Monell theory for inadequate policies, procedures, and customs (Count IV); that the County of Camden is liable under a Monell theory for inadequate training and supervision (Count V); that Defendant Officers are liable for

---

[5] He had also smoked marijuana earlier that day (Ingram Dep., at 15:7-17).

common law assault and battery (Count VI); that Defendant Officers are liable for common law negligence (Count VII); that the County of Camden, Chief Thomson, and Assistant Chief Cuevas are liable on a common law theory of negligent training and supervision (Count VIII); and that Defendant Officers are liable for false arrest and imprisonment (Count IX).

On March 29, 2019, Chief Judge Jerome Simandle granted in part and denied in part Defendants' motion to dismiss.  Chief Judge Simandle:

(1)     dismissed all claims against former CCPD Assistant Chief Cuevas;

(2)     dismissed all claims against the County and Police Department alleging *respondent superior*;

(3)     dismissed Count One (Section 1983 Excessive Force) against the County and Police Department;

(4)     dismissed Count Two (Section 1983 Failure to Provide Medical Care) against the County and Police Department;

(5)     dismissed Count Three (Section 1983 Supervisory and Bystander Liability) against the County and Police Department;

(6)     reserved decision until the <u>Daubert</u> motion on Plaintiff's liability expert Christopher Chapman (Plaintiff's police practices expert) is decided on County and Police Department's motion to dismiss Count Four (<u>Monell</u> claim re Inadequate Policies, Procedures and Customs);

(7)     reserved decision until the Chapman motion is decided on County and Police Department's motion to dismiss Count Five (<u>Monell</u> claim re Inadequate Training and Supervision);

(8)     denied Marchiafava, Gennetta and Merck's motions in their entirety;

(9)     denied Ingram's motion in its entirety (alleging failure to provide medical aid);

(10)    denied dismissal of state law claims;

(11)    denied in part the <u>Daubert</u> motion as to Plaintiff's orthopedist James Yue and denied the motion as to Plaintiff's biomechanical expert Ivancic;

(12)    reserved decision on the <u>Daubert</u> motion as to Chapman; and

(13)    denied summary judgment in the companion <u>Dickerson</u> matter which has since been settled.

Following the summary judgment decision, Chief Judge Simandle passed away, after which the case was assigned to District Judge Noel Hillman.  The parties proceeded to prepare the proposed Joint Final Pretrial Order ("JFPO").  The matter was subsequently assigned from Judge Hillman to Chief Judge Sanchez in May 2020.

On August 20, 2020, the parties submitted their proposed Joint Final Pretrial Order (ECF No. 334).  The parties have completed briefing on multiple motions *in limine* which are scheduled to be heard on August 24, 2020.  In the meantime, the remainder of Defendants' summary judgment motion must be decided as set forth in Chief Judge Simandle's opinion.

As of this writing, this matter remains in the Court's trial pool for October 13, 2020 trial pool (ECF No. 303, June 26, 2020 Order).

## <u>LAW</u>

## <u>COUNT I</u>
## <u>EXCESSIVE FORCE</u>

Section 1983 provides a civil remedy against any person who, acting under color of state law, deprives another of rights protected by the U.S. Constitution.  Section 1983 does not create substantive rights; it merely provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws.  <u>Graham v. Connor</u>, 490 U.S. 386, 393-394 (1989); <u>Ewing v. Cumberland Cty.</u>, 152 F. Supp. 3d 269, 289 (D.N.J. 2015); <u>Kneipp v. Tedder</u>, 95 F.3d 1199, 1204 (3d Cir. 1996).  Plaintiff must demonstrate a violation of a right secured by the Constitution and laws of the United States and that the deprivation was committed by a person acting under color of state law.  <u>West v. Atkins</u>, 487 U.S. 42, 48 (198); <u>Kneipp</u>, 95 F.3d at 1204 (quotation omitted).

2888175.v1

**Fourth Amendment Seizure**

As an initial matter, there is no Fourth Amendment "seizure" of Ingram until after the pursuit, slip, and fall.  It is well-settled that a police pursuit itself is not a "seizure" within the meaning of the Fourth Amendment. See County of Sacramento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); California v. Hodari D., 499 U.S. 621, 626, 111 S.Ct. 1547, 1550–1551, 113 L.Ed.2d 690 (1991) (police pursuit in attempting to seize a person does not amount to a "seizure" within the meaning of the Fourth Amendment); Florida v. Royer, 460 U.S. 491, 497, 103 S. Ct. 1319, 1323-24, 75 L. Ed. 2d 229 (1983) (mere approach by law enforcement officers, identified as such, does not constitute seizure); Marcano v. City of Schenectady, 38 F. Supp. 3d 238, 252 (N.D.N.Y. 2014) (suspect who fled from police on foot was not "seized" until after the pursuit ended and police brought him within their control); Jones v. Norton, 3 F. Supp. 3d 1170, 1194 (D. Utah 2014), aff'd, 809 F.3d 564 (10th Cir. 2015) (where suspect fled police by car and on foot, suspect was not seized until in handcuffs); James v. Chavez, 830 F.Supp.2d 1208, 1243 (D.N.M.2011) ("[W]ithout evidence that a person has submitted to a show of authority, even an officer pointing a gun directly at a person's head does not constitute a seizure.").

Here, Ingram was not "seized" for Fourth Amendment purposes until after his foot pursuit.  Until Ingram was handcuffed on the ground, Ingram was not within police control.  He cannot recover any damages under Section 1983 for injuries sustained prior to police control. See, e.g. Jackson v. Hamilton Twp., No. CIV. 10-3989, 2014 WL 1217662, at *4 (D.N.J. Mar. 24, 2014) (attached as Exhibit A) (no damages available for alleging injuries sustained during pursuit or prior to seizure; no seizure occurred until Plaintiff was actually stopped by police).

2888175.v1

## Probable Cause

Next, Plaintiff will argue at trial that the officers lacked probable cause to arrest Ingram at all.  To determine whether an officer has probable cause to arrest, "we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause."  Maryland v. Pringle, 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003) (quoting Ornelas v. United States, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)).  It depends on the totality of the circumstances.  Illinois v. Gates, 462 U.S. 213, 230, 103 S. Ct. 2317, 2328, 76 L. Ed. 2d 527 (1983) ("These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.") (quotations omitted). Probable cause "is not a high bar."  D.C. v. Wesby, 138 S. Ct. 577, 586, 199 L. Ed. 2d 453 (2018) (quoting Kaley v. United States, 571 U.S. 320, 134 S.Ct. 1090, 1103, 188 L.Ed.2d 46 (2014)).

Probable cause is established based on Ingram's undisputed actions prior to arrest.  In Illinois v. Wardlow, 528 U.S. 119, 125, 120 S. Ct. 673, 676, 145 L. Ed. 2d 570 (2000), the Supreme Court held that unprovoked flight in a high crime area is sufficient for probable cause. As stated in Wardlow:

> In this case, moreover, it was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police. Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. United States v. Brignoni—Ponce, 422 U.S. 873, 885, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); Florida v. Rodriguez, 469 U.S. 1, 6, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984) (per curiam); United States v. Sokolow, [490 U.S. 1, 8-9, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)].  Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such. In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from

judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior. See United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). We conclude Officer Nolan was justified in suspecting that Wardlow was involved in criminal activity, and, therefore, in investigating further.

Such a holding is entirely consistent with our decision in Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), where we held that when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business. Id., at 498, 103 S.Ct. 1319. And any "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." Florida v. Bostick, 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). ***But unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not "going about one's business"; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning.***

Wardlow, 528 U.S. at 124–25, 120 S. Ct. at 676 (emphasis added).

Here, there is nothing to dispute the officers' assertions that they were conducting a complex sweep in a high crime area, nor is it disputed that Ingram ran from the police in that area. On these facts alone, probable cause existed for Ingram's seizure once he fell to the ground. See also Sibron v. New York, 392 U.S. 40, 66, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) ("deliberately furtive actions and flight at the approach of ... law officers are strong indicia of *mens rea*").

Probable cause was also independently established through the undisputed facts leading to Ingram's flight. Ingram admits that, when he first saw Sergeant Merck in the courtyard, Ingram and others started walking away from police towards the parking lot. Ingram then comes into the parking lot, goes between two cars, and bends down. Merck states in his report that he "heard the sound of metal object strike the pavement coming from the area Ingram was observed". Ingram continued walking away from the officers, and then goes into a liquor store,

13

knowing all the while that the police were behind him.[6]  Merck went back to the area of the two cars in the parking lot, activated his flashlight, located a handgun, and directed Marchiafava and Gennetta to arrest Ingram for unlawful possession.  Ingram then fled from the police.  As will be argued, these facts establish probable cause for the seizure of Ingram after the foot pursuit. Gates, 462 U.S. at 230.[7]

### Excessive Force

Plaintiff alleges that, once he was on the ground, the officer used excessive force.  The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons ... against unreasonable ... seizures."  To prevail on a Fourth Amendment excessive-force claim, a plaintiff must show that a seizure occurred and that it was unreasonable under the circumstances.  Lamont v. New Jersey, 637 F.3d 177, 183 (3d Cir. 2011) (citing Brower v. County of Inyo, 489 U.S. 593, 599 (1989); Graham, 490 U.S. at 395–96)).  "[R]easonableness is always the touchstone of Fourth Amendment analysis," Birchfield v. North Dakota, 136 S.Ct. 2160, 2186, 195 L.Ed.2d 560 (2016), and reasonableness is generally assessed by carefully weighing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  Tennessee v. Garner, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (internal quotation marks omitted).

---

[6] Merck states in his report that he recognized Ingram from prior interactions.

[7] For purposes of the probable cause analysis, it should be noted that Ingram was indicted by a grand jury on the weapons charges that precipitated his seizure.  The issuance of the indictment alone establishes probable cause for Ingram's seizure and arrest on these charges.  Kaley v. United States, 571 U.S. 320, 329, 134 S. Ct. 1090, 1098, 188 L. Ed. 2d 46 (2014) (if a person is arrested without a warrant, an indictment eliminates her Fourth Amendment right to challenge probable cause for her detention);  Knight v. Borough of Penns Grove, 50 F. App'x 92, 94 (3d Cir. 2002) (affirming District Court's finding of probable cause for arrest based on issuance of grand jury indictment; the issues of the indictment "establishes probable cause by definition") (quoting Trabal v. Wells Fargo Armored Serv. Corp., 269 F.3d 243, 251 (3d Cir. 2001)).

In determining whether excessive force was used in effecting an arrest, the Fourth Amendment's "objective reasonableness" test is applied. Sharrar v. Felsing, 128 F.3d 810, 820–21 (3d Cir. 1997) (citing Graham, 490 U.S. at 396). The use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. "Excessive force claims ... are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." Saucier, 533 U.S. at 207. "That inquiry is dispositive: When an officer carries out a seizure that is reasonable, taking into account all relevant circumstances, there is no valid excessive force claim." Cty. of Los Angeles, Calif. v. Mendez, 137 S. Ct. 1539, 1547, 198 L. Ed. 2d 52 (2017). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Graham, 490 U.S. at 396-97 (internal quotations and citations omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation. Id.

Because the determination of reasonableness is "[in]capable of precise definition or mechanical application," it requires "careful attention to the facts and circumstances of each particular case." Graham, 490 U.S. at 396-97. The decision should be based on the totality of the circumstances, with special consideration for the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.[8] Id. "Other relevant factors include the possibility that the persons subject to the police action are themselves violent or

---

[8] One factor identified by the Supreme Court as being irrelevant is the officer's intent or motivation in using force. Graham 490 U.S. at 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional[.]").

2888175.v1

dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." Sharrar, 128 F.3d at 822. The fact of whether the plaintiff was injured is a relevant, but not determinative, consideration as to excessive force. Sharrar, 128 F.3d at 822. The jury can consider "the fact that the physical force applied was of such an extent as to lead to injury" in determining whether an officer's use of force was objectively reasonable. Id.

### Qualified Immunity

Defendants assert that their actions are protected by qualified immunity. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Reichle v. Howards, 566 U.S. 658, 132 S. Ct. 2088, 2093 (2012). To determine whether a government official is entitled to qualified immunity, two questions are asked: (1) has the plaintiff alleged or shown a violation of a constitutional right, and (2) is the right at issue "clearly established" at the time of the defendant's alleged misconduct? Pearson v. Callahan, 555 U.S. 223, 236 (2009); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).[9]

In assessing qualified immunity, the issue is whether 'it would [have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Lamont v. New Jersey, 637 F.3d 177, 182 (3d Cir. 2011) (quoting Saucier v. Katz, 533 U.S. 194, 201–02 (2001); citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)). "[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials-like other officials who act in

---

[9] Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." Pearson, 555 U.S. at 236.

ways they reasonably believe to be lawful-should not be held personally liable." Anderson, 483 U.S. at 641. "The qualified immunity standard 'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'" Gilles v. Davis, 427 F.3d 197, 203 (3d Cir.2005) (quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991)); Kelly v. Borough of Carlisle, 622 F.3d 248, 254 (3d Cir. 2010).  The burden is on the defendant to establish qualified immunity.  Kopec v. Tate, 361 F.3d 772 (3d Cir. 2004).

Here, qualified immunity must be granted to Marchiafava and all officers.  Based on what was known to the officers at the time, none of their actions can be considered as so plainly incompetent that no reasonable police officer would have done the same.  Ingram ran from the police, in a high-crime area, after which he slipped and fell on the street.  The officers had no knowledge that Ingram may be paralyzed.  The officers engaged in the regular handcuffing process for a fleeing suspect.  Ingram offers no competent evidence to dispute the officers' description of events.  See Rodriguez v. Panarello, 119 F. Supp. 3d 331, 339 (E.D. Pa. 2015) (no excessive force where plaintiff was paralyzed after falling off of the roof of a car from officer's use of a Taser; officers' actions were appropriate based on information known at the time); Pena v. Bexar Cty., Texas, 726 F. Supp. 2d 675, 692 (W.D. Tex. 2010) (no excessive force where officers moved suspect without knowledge that suspect was paralyzed).

## COUNT II
## FAILURE TO RENDER MEDICAL AID

Failure to provide medical care to an arrestee or a post-arrest detainee can rise to the level of a constitutional violation under Section 1983 and subject the officer to direct liability "only if that failure rises to the level of deliberate indifference to that person's serious medical needs."[10]

---

[10] The "deliberate indifference" standard in "failure to provide medical care" claims for arrestees and post-arrest detainees under the Fourteenth Amendment is the same standard the Third Circuit, including this Court, has used in assessing "failure to provide medical care" claims for

Mantz v. Chain, 239 F. Supp. 2d 486, 504 (D.N.J. 2002); Hill v. Algor, 85 F. Supp. 2d 391, 409 (D.N.J. 2000); Groman v. Twp. of Manalapan, 47 F.3d 628, 637 (3d Cir. 1995). The deliberate indifference standard governs claims "arising out of one's arrest and post-arrest detention." Mantz, 239 F. Supp. 2d at 504; Hill, 85 F. Supp. 2d at 409. To demonstrate deliberate indifference to serious medical needs, a plaintiff must show (i) a serious medical need, (ii) acts or omissions by law enforcement officers that indicate deliberate indifference to that need, and (iii) a causal connection between the indifference and the plaintiff's injury. Smith v. Gransden, 553 F. App'x 173, 177 (3d Cir. 2014)..

As per the first prong, a medical need is serious if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Monmouth Co. Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir. 1987); see also Hill, 85 F. Supp. 2d at 409–10 (recognizing that a gash to plaintiff's head along with blood on his head, hands, and clothing "is the type of injury that a lay person easily would recognize as requiring medical treatment.").

Moreover, deliberate indifference is a "subjective standard of liability consistent with recklessness as that term is defined in criminal law." Gransden, 553 F. App'x at 177; Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003); see also Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999) ("It is well-settled that claims of negligence [], without some more culpable state of mind, do not constitute 'deliberate indifference.'"). Accordingly, holding a police officer liable for failure to provide medical care requires proof that the officer knows of and disregards an excessive risk to health or safety. Davis v. Twp. of Paulsboro, 421 F. Supp. 2d

post-conviction inmates under the Eighth Amendment. See Reynolds v. Wagner, 128 F.3d 166, 174 (3d Cir. 1997); Snyder v. Baumecker, 708 F. Supp. 1451, 1460 (D.N.J. 1989); see also Taylor v. Plousis, 101 F. Supp. 2d 255, 261 (D.N.J. 2000) ("[C]ourts have applied the same standard to claims of 'deliberate indifference' asserted under the Due Process Clause as those under the Eighth Amendment.").

2888175.v1

835, 856-57 (D.N.J. 2006); Mantz, 239 F. Supp. 2d at 504; Gransden, 553 F. App'x at 177. The officer must be both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and... draw the inference." Natale, 318 F.3d at 582 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

If an officer offers to provide the person in custody with medical care and that person refuses, the officer is not deliberately indifferent to the person's medical needs. See Groman, 47 F.3d at 637; Mantz, 239 F. Supp. 2d at 504. Similarly, if an officer lacked the requisite knowledge or training to provide effective aid to the person in custody, a prompt call for an ambulance and efforts to clear a path for its arrival have been shown to demonstrate a timely response to the person's medical need. Gransden, 553 F. App'x at 177–78. Also, if the person in custody did not show clear signs of requiring serious medical attention, the officer is not deliberately indifferent to the person's medical needs. See Walmsley v. City of Philadelphia, 872 F.2d 546, 552 (3d Cir. 1989); Miller v. City of Philadelphia, 174 F.3d 368, 375 (3d Cir. 1999) (recognizing that "a much higher fault standard is proper when [an officer] [] is acting instantaneously and making pressured decisions without the ability to fully consider their risks. In such circumstances, liability will only be applied when a 'purpose to cause harm' is demonstrated."); Giles v. Kearney, 571 F.3d 318, 330 (3d Cir. 2009) (noting that the key inquiry is whether the officer "responded reasonably to the risk.").

The final prong requires that there be a causal connection between officer's deliberate indifference and the plaintiff's injury. Gransden, 553 F. App'x at 177; Natale, 318 F.3d at 582. Thus, where a plaintiff presents no evidence that any injury he suffered was the result of the alleged delay or denial of medical care, as opposed to the alleged excessive force, his claim for failure to provide medical care will fail. See Mantz, 239 F. Supp. 2d at 504 (granting

19

defendant's motion for summary judgment where plaintiff failed to provide any medical evidence that the officer's "alleged delay in responding to his demands for an ambulance caused him to suffer harm which he would not have suffered had an ambulance been immediately called to the scene.").

**COUNT III**
**SUPERVISORY/BYSTANDER LIABILITY - MERCK**

This count is not directed to the Defendants that are the subject of this brief. Nevertheless, it is noted that 42 U.S.C. § 1983 provides a civil remedy against any person who, acting under color of state law, deprives another of rights protected by the U.S. Constitution. Section 1983 does not create substantive rights; it merely provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws.  Ewing v. Cumberland Cty., 152 F. Supp. 3d 269, 289 (D.N.J. 2015); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To establish a § 1983 claim, a plaintiff "must demonstrate a violation of a right secured by the Constitution and laws of the United States and that the deprivation was committed by a person acting under color of state law." Kneipp, 95 F.3d at 1204 (quotation omitted).

"[A] police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force, even if the excessive force is employed by a superior."  Merman v. City of Camden, 824 F. Supp. 2d 581, 600 (D.N.J. 2010); Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002).  Consequently, "[i]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983." Merman, 824 F. Supp. 2d at 600; Mensinger, 293 F.3d at 650; Skevofilax v. Quigley, 586 F. Supp. 532, 543 (D.N.J. 1984).

However, this Court has made clear that "liability does not attach in all cases." Ewing, 152 F. Supp. 3d at 309.  In order to establish a claim for failure to intervene, a plaintiff must

establish that the officer "observe[d] or had reason to know: (1) that excessive force [was] being used; (2) that a citizen was being unjustifiably arrested; or (3) that any constitutional violation [was being] committed by a law enforcement official."  Merman, 824 F. Supp. 2d at 600; Bryant v. City of Philadelphia, 518 F. App'x 89, 93 (3d Cir. 2013) ("In the absence of demonstrating that any of the Defendants engaged in excessive force or committed another constitutional violation, [plaintiff] [] also cannot succeed on a claim of failure to intervene").

Moreover, an officer will only be liable "if there is a realistic and reasonable opportunity to intervene."  Merman, 824 F. Supp. 2d at 600; Mensinger, 293 F.3d at 651.  Such opportunity exists only if it can be shown that the officer "knew of and acquiesced in the treatment the [plaintiffs] were receiving at the hands of the other officers."  Mensinger, 293 F.3d at 651 (quoting Baker v. Monroe Twp., 50 F.3d 1186, 1193 (3d Cir. 1995)); Garbacik v. Janson, 111 F. App'x 91, 94 (3d Cir. 2004).  Thus, "[g]enerally, the constitutional violation must have occurred in the officer's presence."  Ewing, 152 F. Supp. 3d at 309.

Nevertheless, even if an officer is present during the excessive force incident, he will not be held liable if the evidence is insufficient to show he had a "reasonable and realistic opportunity to intervene."  Ewing, 152 F. Supp. 3d at 309; Mensinger, 293 F.3d at 651; McKenna v. City of Philadelphia, 582 F.3d 447, 460 (3rd Cir. 2009) (holding that an officer's presence "in the vicinity of the arrest at some point after [plaintiff] was handcuffed ... is not a legally sufficient evidentiary basis" to find knowledge and acquiescence); La v. Hayducka, 269 F.Supp.2d 566, 581–82 (D.N.J.2003) (finding that it was unrealistic to assume defendant had reasonable opportunity to intervene, even though parties were in "close proximity," due to rapid nature of events and "tense and dangerous" situation); Merman, 824 F. Supp. 2d at 601 (summary judgment should be granted when "a reasonable jury could not possibly conclude"

that an officer "had sufficient time to intercede or was capable of preventing the harm being caused by another officer").

## COUNT IV – <u>MONELL</u> CLAIM
### <u>INADEQUATE POLICIES, PROCEDURES AND CUSTOMS</u>

## COUNT V – <u>MONELL</u> CLAIM
### <u>INADEQUATE TRAINING AND SUPERVISION</u>

A public entity is not subject to liability under Section 1983 on a *respondeat superior* theory.  <u>Monell v. Department of Social Services</u>, 436 U.S. 658, 691 (1978); <u>Fagan v. City of Vineland</u>, 22 F.3d 1283, 1291 (3d Cir. 1994) (same). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  <u>Monell</u>, 436 U.S. at 694 (1978).  A public entity may be liable under Section 1983 only in three specific instances: (1) if it adopts an official policy that deprives citizens of their constitutional rights (<u>Monell</u>, 436 U.S. at 694)); (2) if it tolerates or adopts an unofficial custom that results in constitutional deprivations (<u>Natale v. Camden County Correctional Facility</u>, 318 F.3d 575 (3d Cir. 2003)); or (3) if it fails to trains, supervises, or disciplines its employees to prevent constitutional deprivations.  <u>City of Oklahoma v. Tuttle</u>, 471 U.S. 808 (1985).  "A municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" <u>Connick v. Thompson</u>, 131 S. Ct. 1350, 1359 (2011) (citation omitted).

### <u>Failure to Investigate</u>

A custom of failing to investigate citizen complaints may provide a basis for municipal liability if "a policy-maker (1) had notice that a constitutional violation was likely to occur, and (2) acted with deliberate indifference to the risk."  <u>Hernandez v. Borough of Palisades Park</u>

Police Dept., 58 Fed. Appx. 909, 912 (3d Cir. 2003).  Plaintiff must show that "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'"  Natale, 318 F.3d at 584 (internal citations omitted).

A case alleging a "need to take some action to control the agents" differs from a wholesale failure to investigate case.  Jackson v. Hamilton Twp., No. CIV. 10-3989, 2014 WL 1217662, at *3 (D.N.J. Mar. 24, 2014) (attached as Exhibit A) (distinguishing Beck v. City of Pittsburgh, 89 F.3d 966 (3d Cir.1996).  In Beck, the Internal Affairs office did not pursue any complaints against an officer even though the officer received four excessive force complaints and a total of six citizen complaints in a three-year period.  Beck, 89 F.3d 966 at 969–70.  In contrast, if Internal Affairs attempts to follow up on complaints and has procedures in place that are generally followed, no Monell liability attaches.  Jackson, 2014 WL 1217662, at *3 (dismissing Monell failure to investigate theory on summary judgment; opinions of Christopher Chapman did not create triable issue).  Katzenmoyer v. Camden Police Department, C.A. No. 08–1995 (RBK/JS), 2012 WL 6691746, at *4 (D.N.J. Dec. 21, 2012) (attached as Exhibit B) (no Monell liability where target officer had only one prior excessive force complaint and other target officer had no prior excessive force complaints; statistical evidence standing alone, "isolated and without further context," is generally not enough to "justify a finding that a municipal policy or custom authorizes or condones the unconstitutional acts of police officer"; where only one complaint out of 641 were sustained between 2003 and 2009, summary judgment was still warranted as to Camden City Police Department); Brice v. City of York, 528 F.Supp.2d 504, 520-21 (M.D.Pa. 2007) (even if Plaintiff alleges that a small number of complaints were not

handled correctly, this does not show a sterile and shallow investigation procedure; summary judgment dismissal of failure to investigate claim was warranted even where municipality failed to adhere to the letter of its policies, as such failure did not rise to the level of deliberate indifference necessary for a violation of Fourth Amendment rights);[11] Payano v. City of Camden, No. CV 13-2528 (NLH), 2016 WL 386040, at *7-8 (D.N.J. Feb. 1, 2016) (attached as Exhibit C) (even if departmental internal affairs department was allegedly in disarray, this would not be enough to survive summary judgment; plaintiff did not show that the department adopted a policy of not investigating or not punishing excessive force).

### Failure to Train

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." Connick v. Thompson, 563 U.S. 51, 61, 131 S. Ct. 1350, 1359 , 179 L. Ed. 2d 417 (2011). A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. See Oklahoma City v. Tuttle, 471 U.S. 808, 822–823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' " is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in Monell"). A municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." Canton v. Harris, 489 U.S. 378, 388,

---

[11] In Brice, plaintiff pointed to various alleged defects in the internal investigation procedure, including the unexplained absence of several hundred complaint forms, the failure of the Inspectional Services Division to keep a discipline log independent of the records in officer's personnel files, the failure of supervisors to address the intricacies of the seven-page citizen complaint policy with the promoted Inspector of Internal Affairs, and the department's failure to document the discharge of the target officer's weapon after plaintiff's arrest. Brice, 528 F.Supp.2d at 520-21. While such evidence may demonstrate that the York City Police Department did not adhere to the letter of its policies, it did not show deliberate indifference. Id.

109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).  Only then "can such a shortcoming  be properly thought of as a city 'policy or custom' that is actionable under § 1983." Id., at 389, 109 S.Ct. 1197.

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Connick, 131 S.Ct. at 1360.  "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  Connick, 131 S.Ct. at 1360.  See also BeersCapitol v. Whetzel, 256 F.3d 120, 137 (3d Cir. 2001) ("a successful deliberate indifference claim requires showing that the defendant knew of the risk to the plaintiff before the plaintiff's injury occurred."); Colburn v. Upper Darby Twp., 946 F.2d 1017, 1030 (3d Cir.1991) (emphasizing that plaintiff "must identify a failure to provide specific training that has a causal nexus with his or her injury and must demonstrate that the failure to provide that specific training can reasonably be said to reflect a deliberate indifference to whether constitutional deprivations of the kind alleged occur").

## COUNT VI
## COMMON LAW ASSAULT AND BATTERY

In New Jersey, "a person is subject to liability for the common law tort of assault if: '(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension.'" Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 591 (2009) (quoting Wigginton v. Servidio, 324 N.J. Super. 114, 129 (App.Div.1999) (quoting Restatement (Second) of Torts § 21 (1965))).

2888175.v1

"The tort of battery rests upon a nonconsensual touching." Leang, 198 N.J. at 591 (citing Perna v. Pirozzi, 92 N.J. 446, 461 (1983)).  Battery is established by "proof of an unauthorized invasion of the plaintiff's person, even if harmless.... Any non-consensual touching is a battery." Russo Farms, Inc. v. Vineland Bd. of Educ., 144 N.J. 84, 105 (1996) (quoting Perna, 92 N.J. at 460-61).

**COUNT VII**
**NEGLIGENCE**

"The fundamental elements of a negligence claim are a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, injury to the plaintiff proximately caused by the breach, and damages." Shields v. Ramslee Motors, 240 N.J. 479, 487 (2020) (quoting Robinson v. Vivirito, 217 N.J. 199, 208 (2014)).

Negligence claims against a public employee is subject to the requirements, conditions, and immunities of the New Jersey Tort Claims Act ("Tort Claims Act" or "TCA"), N.J.S.A. 59:1-1 *et seq.* The requirements of the Tort Claims Act are "stringent," and place a "heavy burden" on plaintiffs seeking to establish public entity liability. Charney v. City of Wildwood, 732 F. Supp. 2d 448, 452–53 (D.N.J. 2010) (quoting Bligen v. Jersey City Hous. Auth., 131 N.J. 124 , 619 A.2d 575, 581 (1993)), aff'd, 435 F. App'x 72 (3d Cir. 2011).  "Generally, immunity for public entities is the rule and liability is the exception." Charney, 732 F. Supp. 2d at 453 (quoting Fluehr v. City of Cape May, 159 N.J. 532, 732 A.2d 1035, 1039-40 (1999)).

Here, Defendants assert various immunities to Plaintiff's negligence claim (and his state law claims generally), including but not limited to good faith immunity (see N.J.S.A. 59:3-3 ("A public employee is not liable if he acts in good faith in the execution or enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment.")), New Jersey's qualified immunity (see Morillo v. Torres, 222 N.J. 104, 117

26

(2015), and the TCA's pursuit immunity (see N.J.S.A. 59:5-2 ("Neither a public entity nor a public employee is liable for . . . any injury caused by . . . a person resisting arrest or evading arrest", or for any injury "resulting from or caused by a law enforcement officer's pursuit of a person.").

## COUNT VIII
## NEGLIGENT FAILURE TO TRAIN, SUPERVISE, AND PROMULGATE POLICIES

Plaintiff sues Camden County and Chief Thomson on a theory of negligent training and supervision. Chief Judge Simandle already dismissed Plaintiff's Section 1983 supervisory liability claim against Camden County. This claim is a common law claim for negligent training and supervision.

The New Jersey Supreme Court recently defined this claim as follows:

> Unlike respondeat superior, negligent hiring, supervision, and training are not forms of vicarious liability and are based on the direct fault of an employer. See [Schultz v. Roman Catholic Archdiocese, 95 N.J. 530, 534-535 (1984)]; Hoag v. Brown, 397 N.J. Super. 34, 54, 935 A.2d 1218 (App. Div. 2007) ("[A] claim based on negligent hiring or negligent supervision is separate from a claim based on respondeat superior."). To be found liable for negligent hiring, the plaintiff must show: (1) that the employer "knew or had reason to know of the particular unfitness, incompetence or dangerous attributes of the employee and could reasonably have foreseen that such qualities created a risk of harm to other persons" and (2) "that, through the negligence of the employer in hiring the employee, the latter's incompetence, unfitness or dangerous characteristics proximately caused the injury." Di Cosala v. Kay, 91 N.J. 159, 173, 450 A.2d 508 (1982). To be found liable for negligent supervision or training, the plaintiff must satisfy what is essentially the same standard, but framed in terms of supervision or training. See ibid. That is to say, the plaintiff must prove that (1) an employer knew or had reason to know that the failure to supervise or train an employee in a certain way would create a risk of harm and (2) that risk of harm materializes and causes the plaintiff's damages. See ibid.

> G.A.-H. v. K.G.G., 238 N.J. 401, 415–16, reconsideration denied, 239 N.J. 76 (2019).

Plaintiff has previously conceded in this matter that he is not pursuing a claim of negligent hiring. As of this writing, the Court's summary judgment decision on the Monell

liability claims remains pending.  Since there is overlap between the <u>Monell</u> claim and this claim, the disposition of the <u>Monell</u> claim should control this claim.

**COUNT IX**
**<u>FALSE ARREST AND IMPRISONMENT</u>**

Finally, Plaintiff alleges false arrest and imprisonment.  Unlike Plaintiff's Section 1983 claims, Plaintiff makes no reference to Section 1983 or the U.S. Constitution.  As such, Defendants interpret this claim as a common law claim for false arrest and imprisonment.

Under the New Jersey Model Civil Jury Charges, false arrest and false imprisonment follow the same form.  <u>See</u> New Jersey Model Civil Jury Charge 3.2 (1989).  This is consistent with long-standing New Jersey precedent.  <u>Price v. Phillips</u>, 90 N.J. Super. 480, 484 (App. Div. 1966) (noting these are the same torts).  "The gist of false imprisonment is mere unlawful detention without more".  <u>Lakutis v. Greenwood</u>, 9 N.J. 101, 106 (1952) (quoting <u>Altana v. McCabe</u>, 132 N.J.L. 12, 38 A.2d 192, 193 (Sup.Ct. 1944)).  Police officers may be held liable for false imprisonment if they acted outside their authority.  <u>Lakutis</u>, 9 N.J. at 106.  "False imprisonment is a wrong akin to the wrongs of assault and battery, and consists in imposing, by force or threats, unlawful restraint upon a man's freedom of locomotion."  <u>Earl v. Winne</u>, 14 N.J. 119, 128, 101 A.2d 535, 539 (1953) (citations omitted).

As to false arrest, the New Jersey Supreme Court provided in <u>Earl</u>:

Now, as to false arrest it has been repeatedly held in this State and elsewhere that the use of physical force is not altogether necessary. The essential thing is the constraint of the person. This constraint may be caused by threats as well as by actionable force, and the threats may be by conduct or by words. If the words or conduct are such as to induce a reasonable apprehension of force and the means of coercion is at hand, a person may be as effectually restrained and deprived of liberty as by prison bars. Unless it is clear that there is no reasonable apprehension *128 of force, it is a question for the jury whether the submission was a voluntary act, or brought about by fear that force would be used. No doubt cases may arise where it will be a question of difficulty to determine how far the free will of the plaintiff was overcome but that determination rests with the jury.

28

Hebrew v. Pulis, 73 N.J.L. 621, 624, 64 A. 121, 7 L.R.A.,N.S., 580 (E. & A.1906).

Earl, 14 N.J. at 127-128.

As further explained by the New Jersey Appellate Division:

A basis for a suit for false arrest arises where the aggrieved party is arrested without legal authority, as where he is arrested pursuant to process that is void. Fair Oaks Hosp. v. Pocrass, 266 N.J. Super. 140, 153, 628 A.2d 829 (Law Div.1993). False arrest, or false imprisonment, is the constraint of the person without legal justification. Pine v. Okzewski, 112 N.J.L. 429, 431, 170 A. 825 (E. & A.1934). The tort requires an arrest or detention of the person against his or her will; and lack of proper legal authority or "legal justification." Barletta v. Golden Nugget Hotel Casino, 580 F.Supp. 614, 617 (D.N.J.1984).

Whether probable cause exists in a given case is essentially a decision for the trial judge who must balance the individual's interest in "being free from police interference" and society's interest in "effective law enforcement." State v. Dilley, 49 N.J. 460, 468, 231 A.2d 353 (1967); Pantalone v. Bally's Park Place Casino Hotel, 228 N.J.Super. 121, 127, 549 A.2d 55 (App.Div.1988). The existence of probable cause is a defense to false arrest if it serves to validate the arrest. Bauer v. Borough of Cliffside Park, 225 N.J.Super. 38, 47, 541 A.2d 719 (App.Div.), certif. denied, 113 N.J. 330, 550 A.2d 447 (1988).

The Act does not immunize law enforcement officials from charges of false arrest or false imprisonment. N.J.S.A. 59:3–3; Pisano v. City of Union City, 198 N.J.Super. 588, 590, 487 A.2d 1296 (Law Div.1984). A plaintiff need not prove the lack of probable cause, but the existence of probable cause will nevertheless defeat the action. See Hayes v. Mercer County, 217 N.J.Super. 614, 623, 526 A.2d 737 (App.Div.), certif. denied, 108 N.J. 643, 532 A.2d 226 (1987). The probable cause needed to defend a false arrest action uses the objective standard of a reasonable and prudent person in like circumstances. Ibid.; Henry v. Shopper's World, 200 N.J.Super. 14, 18, 490 A.2d 320 (App.Div.1985).

Mesgleski v. Oraboni, 330 N.J. Super. 10, 24–25 (App. Div. 2000).

For the same reasons set forth above as to Plaintiff's federal claims, Defendants seek dismissal of this claim, as their actions were reasonable, appropriate, and with probable cause. Defendants' actions are further subject to qualified and good faith immunity.

## ADDITIONAL MATTERS

Defendants will address additional legal aspects of this case in connection with their proposed jury charges, as well as in connection with evidentiary motions.  Defendants will, *inter alia*, specifically request application of the special interrogatory procedure for excessive force and qualified immunity cases as set forth by the Third Circuit under Curley v. Klem, 298 F.3d 271, 274 (3d Cir.2002) ("Curley I") and Curley v. Klem, 499 F.3d 199 (3d Cir. 2007) ("Curley II").  This is critically necessary to define the course of trial and streamline the case.


                                            **BROWN & CONNERY LLP**

DATED:        August 23, 2020        By:     *s/ William F. Cook*
                                             William F. Cook

# EXHIBIT A

Case 1:14-cv-05519-JRS-AMD   Document 336   Filed 08/23/20   Page 33 of 53 PageID: 14096
Jackson v. Hamilton Tp., Not Reported in F.Supp.3d (2014)
2014 WL 1217662

2014 WL 1217662
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Sonny JACKSON, Plaintiff,

v.

HAMILTON TOWNSHIP,
et al., Defendants.

Civ. No. 10–3989.
|
Filed March 24, 2014.

**Attorneys and Law Firms**

Shelley Lynn Stangler, Springfield, NJ, for Plaintiff.

Jared James Monaco, Thomas E. Monahan, Gilmore & Monahan PA, Toms River, NJ, for Defendants.

**OPINION**

THOMPSON, District Judge.

**\*1** The present matter comes before the Court on the motion of Defendant Hamilton Township and others (hereinafter, "Defendants") for summary judgment, (Doc. No. 63). The Court has issued the Opinion below based upon the written submissions and without oral argument pursuant to Federal Rule of Civil Procedure 78(b). For the reasons stated herein, Defendants' motion is denied in part and granted in part.

BACKGROUND

The present factual scenario stems from the police chase and subsequent arrest of Plaintiff Sonny Jackson (hereinafter, "Plaintiff"). While investigating a string of thefts, Defendant Michael Everett of the Hamilton Township Police Department noticed Plaintiff, a suspect in the thefts, driving a car. (Doc. No. 70 at 2). Defendant Everett pulled Plaintiff over. (*Id.*). After stopping temporarily, Plaintiff drove away. (*Id.*). Defendant Everett began to chase Plaintiff. (*Id.*).

Once the chase began, Defendant Officer Thomas Clugsten, Defendant Officer Joseph Wilk, and Defendant Officer Mark

Horan joined in the pursuit. (Doc. No. 70 at 3). Eventually, Plaintiff stopped his car and exited. (*Id.*). Testimony differs as to whether Plaintiff then began to kneel or began to flee. (*See* Doc. No. 70 at 3; Doc. No. 63 at 1). Additionally, testimony differs as to whether Plaintiff resisted or complied with police attempts to handcuff and subdue him. (Doc. No. 70 at 3). Plaintiff contends that, though he was kneeling down, the officers hit him with a car and then proceeded to kick and beat him. (*Id.* at 14). Plaintiff sustained various injuries during the event. In response to the above incident, Plaintiff brought the present suit, claiming violations of his constitutional rights and a conspiracy to violate his constitutional rights.

DISCUSSION

The Court will first note the applicable legal standard before examining each issue raised by the summary judgment motion.

*1. Legal Standard*

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A fact is "material" if it will "affect the outcome of the suit under the governing law [ ... ]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Id.* When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983). The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.' " *Anderson,* 477 U.S. at 250 (quoting Fed.R.Civ.P. 56(e)). The non-movant's burden is rigorous: it "must point to concrete evidence in the record;" mere allegations, conclusions, conjecture, and

Jackson v. Hamilton Tp., Not Reported in F.Supp.3d (2014)

2014 WL 1217662

speculation will not defeat summary judgment. *Orsatte v. N.J. State Police,* 71 F.3d 480, 484 (3d Cir.1995); *Jackson v. Danberg,* 594 F.3d 210, 227 (3d Cir.2010) (citations omitted) ("[S]peculation and conjecture may not defeat summary judgment.").

### 2. *Analysis*

**\*2** Defendants' motion brings up five issues: (1) township liability under *Monell;* (2) Plaintiff's § 1983 claims (during the pursuit and during apprehension); (3) the New Jersey Civil Rights Act; (4) qualified immunity of Defendants; and (5) Plaintiff's § 1985 claims.

### a. **Township Liability**

A municipality "can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue ." *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Monell v. Dept. of Soc. Servs., New York City,* 436 U.S. 658, 694–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). District Courts must review claims of municipal liability "independently of the § 1983 claims against the individual police officers." *Kneipp v. Tedder,* 95 F.3d 1199, 1213 (3d Cir.1996); *Fagan v. City of Vineland,* 22 F.3d 1283, 1294 (3d Cir.1994).

A municipality may be held liable where its policies or customs are "the moving force [behind] the constitutional violation." *Polk Cnty. v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981). Therefore, a plaintiff must identify a municipal policy or custom that amounts to "deliberate indifference" to the rights of people with whom the police come into contact. *City of Canton,* 489 U.S. at 388. In order to show deliberate indifference in a "failure to train, discipline or control" claim, a plaintiff must "show both contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." *Montgomery v. De Simone,* 159 F.3d 120, 127 (3d Cir.1998) (citations omitted)

After proving deliberate indifference, a plaintiff must then demonstrate that the inadequate training caused the constitutional violation. *See Grazier v. City of Philadelphia,* 328 F.3d 120, 124–25 (3d Cir.2003). There must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Brown v. Muhlenberg Township,* 269 F.3d 205, 214 (3d Cir.2001) (citations

omitted). However, "[a]s long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *Bielevicz v. Dubinon,* 915 F.2d 845, 851 (3d Cir.1990).

Plaintiff's claims can be broken into two categories: failure to train police officers on use of force and failure to adequately investigate Internal Affairs claims. The Court will deal with each in turn.

### i. *Failure to Train Police Officers*

Plaintiff alleges that the municipality and Chief Collins are directly responsible for his injuries on the grounds that each failed to train and supervise police officers on the use of force. "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson,* ––– U.S. ––––, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011). However, a municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. *See Oklahoma City v. Tuttle,* 471 U.S. 808, 822–823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' " is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell.* "). Therefore, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train ." *Connick,* 131 S.Ct. at 1360; *see also Bryan Cty. v. Brown,* 520 U.S. 397, 407, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (policymaker's "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'— necessary to trigger municipal liability").

**\*3** Here, Plaintiff fails show deliberate indifference with respect to the harm alleged. Plaintiff alleges that the mandatory semi-annual training in Use of Force and Pursuit was "wholly deficient." (Doc. No. 71 at 30). The training consisted of "brief" presentations on the policies on excessive force that lasted roughly five minutes. (*Id.* at 31). While each officer read the policies and attested that he read and understood the policies, (*id.* at 30), Plaintiff argues that simply reading the policies is insufficient and that several officers did not understand the policies on force, (Doc. No. 70 at 33). Despite these allegations, Plaintiff fails to provide proof of

a pattern of excessive force or even proof that Defendants knew the training was inadequate.[1] *See Connick,* 131 S.Ct. at 1360 ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.").

[1]    Plaintiff submits a Public Safety Report that criticizes the leadership and supervisory capabilities of certain Chief Collins and other officers; however, Plaintiff has failed to show that this Report or a report of this kind is sufficiently probative to the issue of whether Defendants had notice that any deficiency in training presented a sufficient risk of constitutional violations of the kind alleged here. *See* FRE 401; FRE 403.

Taking the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff has not shown the existence of a genuine issue of material fact as to whether Defendant Collins or the municipality acted with deliberate indifference. *See BeersCapitol v. Whetzel,* 256 F.3d 120, 137 (3d Cir.2001) ( "a successful deliberate indifference claim requires showing that the defendant knew of the risk to the plaintiff before the plaintiff's injury occurred"). Accordingly, summary judgment is granted in Defendants' favor.

*ii. Failure to Take and Investigate Civilian Complaints and Complaints Regarding Use of Force*

Similarly, a custom of failing to investigate citizen complaints may provide a basis for municipal liability if "a policy-maker (1) had notice that a constitutional violation was likely to occur, and (2) acted with deliberate indifference to the risk." *Hernandez v. Borough of Palisades Park Police Dep't,* 58 Fed. Appx. 909, 912 (3d Cir.2003).

Here, Plaintiff alleges that the municipality failed to investigate civilian complaints and use of force claims. (Doc. No. 71 at 21) ("citizen complaints of force were not investigated or adequately considered"). Plaintiff claims that on a few occasions officers failed to write "use of force complaints" and Internal Affairs complaints were not completely investigated. (Doc. No. 71 at 24). Specifically, Plaintiff alleges that Defendant Officer Wilk was accused of excessive force on one occasion, but his Internal Affairs file was misplaced and there is no proof that he gave an interview. (Doc. No. 70 at 28).[2]

[2]    Expert testimony also argues that failure to properly take and investigate civilian complaints led to a tacit approval

of the use of excessive force, which ultimately caused the excessive force used against Plaintiff. (Doc. No. 71 at 24). However, the Court does not reach the causation question.

However, Plaintiff fails to allege sufficient facts upon which a jury could find deliberate indifference. Since Plaintiff is not alleging an affirmative policy or custom that prevented adequate investigation, Plaintiff must show that "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.' " *Natale v. Camden County Corr. Facility,* 318 F.3d 575, 584 (3d Cir.2003) (internal citations omitted). The "need to take some action to control the agents" in this case differs considerably from the "seminal" failure to investigate citizen complaints case, *Beck v. City of Pittsburgh,* 89 F.3d 966 (3d Cir.1996). In *Beck,* the Internal Affairs office did not pursue any complaints against an officer even though the officer received four excessive force complaints and a total of six citizen complaints in a three-year period. *Beck,* 89 F.3d 966 at 969–70. In contrast, the "cursory investigation of citizen complaints" in *Beck,* the Internal Affairs agents in this case attempted to follow up on complaints and had procedures in place that were generally followed. *See also Brice v. City of York,* 528 F.Supp.2d 504, 520 (M.D.Pa.2007). Though, Plaintiff alleges that a small number of complaints were not handled correctly, the allegations here "do [ ] not depict a 'sterile and shallow ... investigation' procedure." *Id.*

**\*4**  Since no reasonable jury could find deliberate indifference, summary judgment is granted in Defendants' favor. *Anderson,* 477 U.S. at 250 ("the adverse party 'must set forth specific facts showing that there is a genuine issue for trial' ").

**b. Plaintiff's § 1983 Claims**

For the purposes of this motion, Plaintiff's claims for damages can be divided into two segments: (1) damages suffered when "eluding" officers; and (2) damages suffered during and after apprehension.

*i. Damages While Eluding Officers*

Plaintiff alleges that several officers violated Plaintiff's rights under the Fourth and Fourteenth Amendments when they pursued him and he was injured as a result of the pursuit.

2014 WL 1217662

Defendants claim that Plaintiff cannot bring these claims because the pursuit does not constitute a search or seizure in violation of the Fourth Amendment and the actions that occurred during the pursuit do not rise to the level of a substantive due process violation under the Fourteenth Amendment. The Court agrees with Defendants.

"To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." *Estate of Smith v. Marasco,* 318 F.3d 497, 515 (2003). It is well established that a police pursuit is not a "seizure" within the meaning of the Fourth Amendment. *See County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Since no seizure occurred until Plaintiff was actually stopped by the police, Plaintiff cannot recover damages under a Fourth Amendment claim for injuries during the pursuit.

To prevail under the Fourteenth Amendment claim, Plaintiff must show a substantive due process violation. To show such a violation, Plaintiff must prove that the governmental conduct was so arbitrary, brutal or offensive that it "shocks the conscience." *County of Sacramento,* 523 U.S. at 845–847. "[H]igh speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment." *Id.* at 854.

Here, Plaintiff has alleged that the pursuit was unlawful; however, Plaintiff has not shown that the actions that occurred *during* the initial chase and *before* actual contact rise to the level of a substantive due process violation. The Court grants the motion for summary judgment to the extent that it precludes recovery for injuries that occurred during the car chase.[3]

[3]   Moreover, Plaintiff appears to now concede that the pursuit did not rise to the level of a substantive due process violation. (*See* Doc. No. 70 at 19–20).

### ii. Injuries During Apprehension

Plaintiff's claims for damages during his apprehension stem from alleged Fourth and Fourteenth Amendment violations. The Court will first examine the standards for both violations in the contexts of an actual seizure.

Determining whether the force used to effect a seizure is "reasonable" under the Fourth Amendment requires a careful balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the countervailing governmental interests at stake. *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (citations omitted). The right to make an arrest carries with it the right to use some degree of physical coercion. *See Terry v. Ohio,* 392 U.S. 1, 22–27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application,[ ] its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *see Garner,* 471 U.S. at 8–9 (the question is "whether the totality of the circumstances justifie[s] a particular sort of ... seizure").

**\*5** In order to find a substantive due process violation under the 14th Amendment, a plaintiff must prove that the officer's conduct was "arbitrary, or conscience shocking, in a constitutional sense." *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (citations omitted). "What is shocking to the conscience inevitably depends to a degree on whose conscience is being tested; so, to put it mildly, the standard has some give in it." *Evans v. Sec'y Pennsylvania Dep't of Corr.,* 645 F.3d 650, 660 (3d Cir.2011); *see also Lewis,* 523 U.S. at 847 (noting that the measure of what "shocks the conscience" is not precise); *Kaucher v. County of Bucks,* 455 F.3d 418, 426 (3d Cir.2006) (noting that "[t]he question of whether a given action shocks the conscience has an elusive quality to it") (internal quotation marks and citation omitted).

"[C]onduct intended to injure" is the "most likely to rise to the conscienceshocking level." *Lewis,* 523 U.S. at 849 (citations omitted). "Conscience-shocking behavior may also arise in the form of injuries produced by deliberate indifference, although, where the conduct was not intentional, it is a 'closer call.' " *Evans v. Sec'y Pennsylvania Dep't of Corr.,* 645 F.3d 650, 660 (3d Cir.2011) (citations omitted).

Here, there are genuine issues of material fact as to the amount of force necessary to subdue Plaintiff, the amount of force used on Plaintiff, and the reason force was used on Plaintiff. Therefore, summary judgment with respect to this claim is inappropriate. *See e.g., Abraham,* 183 F.3d at

290 ("reasonableness under the Fourth Amendment should frequently remain a question for the jury").

### c. New Jersey Civil Rights Act

Plaintiff alleges that the conduct of Defendants violated the New Jersey Civil Rights Act, ("NJCRA"). N.J.S.A. 10:6–1. "NJCRA was intended to serve as an analog to [§ 1983]; it was intended to 'incorporate and integrate seamlessly' with existing civil rights jurisprudence." *Slinger v. New Jersey,* 2008 WL 4126181 (D.N.J. Sept.4, 2008) *rev'd in part,* 366 F. App'x 357 (3d Cir.2010). Accordingly, all claims under NJCRA are treated the same as the comparable § 1983 claims. Therefore, Plaintiff's NJCRA claims for damages that occurred prior to seizure fail to the same extent that Plaintiff's claims for damages that occurred prior to seizure under § 1983. *See Baklayan v. Ortiz,* 2012 WL 1150842 (D.N.J. Apr.5, 2012).

### d. Qualified Immunity

Qualified immunity is intended to shield government officials performing discretionary functions, including police officers, "from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). A defendant has the burden to establish that he is entitled to qualified immunity. *See Beers–Capitol v. Whetzel,* 256 F.3d 120, 142 n. 15 (3d Cir.2001).

**\*6** A ruling on qualified immunity must be undertaken using a two-step process. *See Saucier v. Katz,* 533 U.S. 194, 200–01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). First, the court must consider whether the facts alleged, taken in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right. *See id.* at 201. "If the plaintiff fails to make out a constitutional violation, the qualified immunity inquiry is at an end; the officer is entitled to immunity." *Bennett v. Murphy,* 274 F.3d 133, 136 (3d Cir.2002).

If, however, "a violation could be made out on a favorable view of the parties' submissions, the next sequential step is to ask whether the right was clearly established." *Saucier,* 533 U.S. at 201. "The relevant dispositive inquiry" in making this determination is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. "If it would not have been clear to a reasonable officer what the law required under the facts

alleged, then he is entitled to qualified immunity." *Kopec v. Tate,* 361 F.3d 772, 776 (3d Cir.2004)

Here, the accounts of both Parties differ materially. Taking the facts in the light most favorable to Plaintiff, it is clear that a reasonable officer would know that the kicking and beating of the kind alleged here was unlawful. *See Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Estate of Smith v. Marasco,* 430 F.3d 140, 150 (3d Cir.2005). Since issues of material fact remain, summary judgment is denied.

### e. § 1985

42 U.S.C. § 1985 provides a cause of action for individuals deprived of their federal rights by conspiracies. *Rogin v. Bensalem Township,* 616 F.2d 680, 696 (3d Cir.1980). The elements of a § 1985(3) claim are the following: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Farber v. City of Paterson,* 440 F.3d 131, 134 (3d Cir.2006) (internal quotations and citations omitted).

Here, Plaintiff's arguments for conspiracy under § 1985 fail. Plaintiff claims that Defendants were acting under color of state law and subjected him to excessive force. However, Plaintiff fails to show an agreement made for the purpose of depriving Plaintiff's rights.

Plaintiff also fails to show that an agreement was entered for the purposes of violating Plaintiff's federal rights. Plaintiff alleges that the Mobile Video Recorder on a police car was intentionally disabled or tampered. (Doc. No. 70 at 15–17). Plaintiff also alleges that an Officer named Frank Burger was involved in the chase but did not fill out a Pursuit Form in connection with this event. (Doc. No. 70 at 11). However, Plaintiff must show that the Officers reached an agreement *before* the violation, the excessive force, occurred. *See Mazloum v. D. C.,* 442 F.Supp.2d 1, 10–11 (D.D.C.2006) (plaintiff must prove "facts which would indicate that either of the officers had *previously* devised a plan"). Plaintiff also alleges that the officers communicated and coordinated with each other during the chase. Plaintiff does not show that this coordination constituted an agreement, much less an agreement to violate Plaintiff's rights.

2014 WL 1217662

**\*7** Also, with respect to Defendants' purpose, Plaintiff argues that the entire incident "smacks" of racial animus. Plaintiff shows that Plaintiff is African American and the officers are Caucasian. However, Plaintiff provides insufficient information to support a reasonable inference that Plaintiff was injured *because* he was black. *See Gatling v. Atlantic Richfield Co.,* 577 F.2d 185, 188 (2d Cir.1978) (mere fact that plaintiff is black and defendants are white is insufficient to support a finding of racial animus). Accordingly, this claim fails.

CONCLUSION

For the reasons stated above, Defendants' motion is granted in part and denied in part.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1217662

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

Case 1:14-cv-05519-JRS-AMD   Document 336   Filed 08/23/20   Page 40 of 53 PageID: 14103
Katzenmoyer v. Camden Police Dept., Not Reported in F.Supp.2d (2012)

2012 WL 6691746

KeyCite Yellow Flag - Negative Treatment

Distinguished by Castellani v. City of Atlantic City, D.N.J., July 21, 2017

2012 WL 6691746
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Ginger KATZENMOYER, as
Administratrix of the Estate of Brett
Katzenmoyer, Deceased, Plaintiff,
v.
CAMDEN POLICE DEPARTMENT,
and City of Camden, et al., Defendants.

Civil No. 08–1995 (RBK/JS).
|
Dec. 21, 2012.

**Attorneys and Law Firms**

Jean White Jones, Butera & Jones, Wayne, PA, Ezra Wohlgelernter, John M. Dodig, Thomas B. Martin, Feldman Shepherd Wohlgelernter Tanner Weinstock & Dodig, LLP, Philadelphia, PA, for Plaintiff.

John C. Eastlack, Jr., Weir & Partners LLP, Cherry Hill, NJ, Jay J. Blumberg, Blumberg and Lindner, LLC, Jean Sharon Chetney, Law Offices Of Jay J. Blumberg, Esq., Woodbury, NJ, for Defendants.

**OPINION**

KUGLER, District Judge.

**\*1** This matter arises out of Plaintiff Ginger Katzenmoyer's ("Plaintiff") suit on behalf of her deceased son Brett Katzenmoyer against multiple defendants belonging to the law enforcement community of Camden, New Jersey. Plaintiff alleges that the defendants violated Brett Katzenmoyer's civil rights under color of state law and are therefore liable to his estate under 42 U.S.C. § 1983 (2006). Further, Plaintiff seeks recovery under the New Jersey Wrongful Death Act, N.J.S.A. § 2A:31–1 et seq., and the New Jersey Survival Act, N.J.S.A. § 2A:15–3 et seq. Currently before the Court is Defendants City of Camden and Camden Police Department's ("Defendant")[1] motion for summary

judgment on Plaintiff's Complaint (Doc. No. 78). For the reasons stated herein, the Court finds that Plaintiff has failed to offer evidence sufficient to create a genuine issue for trial regarding Defendant's liability to Plaintiff under 42 U.S.C. § 1983. Thus, Defendant's motion on Plaintiff's federal claim will be granted. However, Plaintiff has created a disputed issue of material fact as to Defendant's liability under the New Jersey Wrongful Death and Survival statutes. Accordingly, Defendant's motion for summary judgment on those claims will be denied.

[1] Although Plaintiff named both the City of Camden and the Camden Police Department as separate Defendants in her complaint, the City notes, and Plaintiff acknowledges, that the two are not distinct legal entities for purposes of this lawsuit. Def.'s Br. in Support of Mot. for S.J. 3 n. 1; Pl.'s Opp. Br. 1 n. 1; see also Franks v. Cape May County, No. 07–6005, 2010 WL 3614193 at *7 (D.N.J. Sept.8, 2010) (citing numerous cases for the proposition that "[i]n New Jersey, a municipal police department is not an entity distinct from the municipality"). Accordingly, the Court will dismiss the Camden Police Department from this case and will refer the City of Camden as "Defendant" throughout this opinion.

**I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY**[23]

[2] When considering a defendant's motion for summary judgment, the Court views the facts underlying the claim in the light most favorable to the plaintiff. See Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., Inc., 998 F.2d 1224, 1230 (3d Cir.1993).

[3] The parties vigorously dispute many of the facts underlying plaintiff's claim. However, given that the instant summary judgment motion involves only Defendant City of Camden, the Court may generally limit its factual recitation to events involving this particular party.

On August, 18, 2008, Brett Katzenmoyer went to see the band O.A.R. perform at the venue known at that time as the Tweeter Center in Camden, New Jersey. Def.'s SUMF ¶ 86. Brett Katzenmoyer was taken to the hospital where he was placed on a ventilator and diagnosed with acute renal failure, anoxic brain injury including cardiac arrest, and other conditions. Id. at ¶¶ 89–90. Finally, on August 23, Mr. Katzenmoyer was removed from life support and pronounced dead. Id. at ¶ 91.

Katzenmoyer v. Camden Police Dept., Not Reported in F.Supp.2d (2012)

2012 WL 6691746

The Camden Police Department's Internal Affairs Division opened an investigation into Mr. Kaztenmoyer's arrest. *Id.* at ¶ 104. Sometime thereafter, the Camden County Prosecutor's Office took the lead on the investigation but did not bring criminal charges against either officer. *Id.* at ¶¶ 109–10. Plaintiff offers the deposition testimony of Internal Affairs investigator Vincent McCalla in which he admits to both not including in his draft report the statements of a witness who reported that Officer McCardle repeatedly beat Brett Katzenmoyer, and failing to interview the friends of Brett Katzenmoyer who were with him at the Tweeter Center at the time of his arrest. McCalla Deposition, pp. 55, 68–69.

Regarding the civilian complaint investigation process in general, Plaintiff avers that from 2003 through 2009, the Camden Police Internal Affairs Department sustained only one complaint against police officers out of 641 that were filed. Pl.'s SUMF B. ¶ 1. Further, it appears that prior to the incident involving Brett Katzenmoyer, defendant Officer Lattanzio had had nine complaints filed against him for misconduct; only one of those involved an allegation of excessive force. Def.'s Br. in Support of Mot. for S.J., Exh. 56. Defendant Officer McCardle had been the subject of three complaints, none of which involved the use of force. *Id.* at Exh. 57.

**\*2** Plaintiff filed suit in this Court against multiple defendants, stating claims under Section 1983 for the use of excessive force in effecting Brett Katzenmoyer's arrest; in addition, Plaintiff asserted an entitlement to relief under the New Jersey Wrongful Death and Survival statutes. After a prolonged period involving administrative termination of the case for over six months followed by the discovery process, Defendant filed the instant motion for summary judgment (Doc. No. 78). Defendant advances three arguments in support of its motion. First, it claims that Plaintiff has not satisfied the requirements for establishing municipal liability under section 1983. Def.'s Br. in Support of Mot. for S.J. 25–29 (citing *Monell v. Department of Soc. Servs. of City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Second, Defendant asserts that it is entitled to qualified immunity from suit. *Id.* at 29–30.[4] Finally, Defendant maintains that the Court should grant it summary judgment on Plaintiff's state law claims because no dispute of material fact exists showing any wrongful conduct on the part of any defendant named in this case.

[4]     Plaintiff correctly notes that municipalities are not entitled to the defense of qualified immunity. Pl.'s Opp.

Br. 28 (citing *Leatherman v. Tarrant County,* 507 U.S. 163, 166, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993)). Defendant offers no colorable argument to the contrary. Thus, the Court will deny Defendant summary judgment on this basis, and the issue will receive no further consideration in this opinion.

## II. DISCUSSION

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists only if the evidence is such that a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the Court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1080 (3d Cir.1996). The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325.

Once the moving party satisfies this initial burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.' " *Corliss v. Varner,* 247 Fed. Appx. 353, 354 (3d Cir. Sept.17, 2007) (quoting *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.,* 311 F.3d 226, 233 (3d Cir.2002)).

**\*3** In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249. Credibility determinations are the province of the factfinder, not the district court. *BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992).

## III. ANALYSIS

### A. Municipal Liability under Section 1983
Defendant correctly notes that, as a municipal entity, it cannot be held liable to Plaintiff under 42 U.S.C. § 1983 on a theory of respondeat superior. *See Monell v. Department of Soc. Servs. of City of New York,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Rather, to establish a Section 1983 municipal liability claim that will survive a motion for summary judgment, Plaintiff must offer evidence of a particular municipal policy or custom, "whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," that contributed to the injury of which Plaintiff now complains. *See id.* at 694. Having identified that custom, Plaintiff then must establish causation by showing how the municipality's deliberate conduct under that custom was the "moving force" behind the injury alleged. *See Board of County Com'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Where, as here, the custom itself does not facially violate federal law, this burden involves "demonstrating that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Berg v. County of Allegheny,* 219 F.3d 261, 276 (3d Cir.2000) (quoting *Brown,* 520 U.S. at 404).

Accordingly, Plaintiff, in her moving papers opposing summary judgment, argues that Defendant failed to act "in the face of an obvious risk of future Constitutional violations." Pl.'s Opp. Br. 23 (citing *Jones v. City of Philadelphia,* No. 08–3336, 2011 WL 710212 at *4 (E.D.Pa. Feb.25, 2011)). Specifically, Plaintiff relies on evidence suggesting that the alleged failure of Defendant to sustain excessive force complaints filed against the Camden City Police Department created a custom "tolerating the tacit use of excessive force by its police officers," and that this custom was the moving force behind the physical injuries Brett Katzenmoyer suffered when he was arrested by defendant Officers McArdle and Lattanzio. *Id.* at 26 (citing *Beck v. City of Pittsburgh,* 89 F.3d 966, 976 (3d Cir.1996)).

It is well recognized that municipalities may be liable under Section 1983 on this basis. *See, e.g., Hammock v. Borough of Upper Darby,* No. 06–1006, 2007 WL 3232115 at *8 (E.D.Pa. Oct.31, 2007) (describing the inquiry as "whether [the defendant's] internal investigatory and disciplinary procedures constituted a municipal policy of deliberate indifference toward the risks of police misconduct, and whether adherence to that policy proximately caused [the plaintiff's] constitutional injuries."). Whether this custom in fact existed and had such an effect in the present case, Plaintiff maintains, is an issue of disputed fact that precludes the entry of summary judgment at this time. The Court now turns to the merits of this argument.

**\*4** In *Beck v. City of Pittsburgh,* the Third Circuit recognized that a Section 1983 claim for damages against a municipality could survive summary disposition where the plaintiff offered evidence suggesting that the municipality's chief law enforcement policymaker knew about and acquiesced in a custom that tolerated the use of excessive force by city police officers. 89 F.3d 966 (3d Cir.1996). Specifically, the plaintiff offered into evidence a series of detailed excessive force complaints against the defendant police officer who had allegedly injured plaintiff.[5] The Court found the introduction of these records sufficient "for a reasonable jury to infer that the Chief of Police of Pittsburgh ... knew, or should have known, of [the defendant officer's] violent behavior in arresting citizens." *Id.* at 973. That is, because the officer had allegedly used excessive force on numerous occasions in the past before allegedly using such force against the plaintiff in *Beck,* there arose disputed issues of fact whether an informal policy of acquiescence existed and whether it had caused the plaintiff's alleged injuries. Accordingly, the Third Circuit panel reversed the trial court's grant of judgment as a matter of law in favor of the defendant municipality. *Id.* at 976.

[5]     The trial court in that case bifurcated the plaintiff's cases against the police officer and the city, so the police officer was not actually a party to the case that the Third Circuit heard on appeal. *Beck,* 89 F.3d at 967.

While the *Beck* court noted that a number of considerations led it to reverse the trial court's judgment,[6] the court distinguished contrary authority principally on the basis of the admission of numerous written civilian complaints filed against the officer who had allegedly injured the plaintiff. *Id.* at 975 (distinguishing *Bryant v. Whalen,* 759 F.Supp. 410 (N.D.Ill.1991)). That is, the multiplicity of excessive force complaints surrounding a single officer suggested to the court

that those occurrences were not isolated incidents, but rather constituted a pattern of dangerous behavior requiring real intervention on the part of the city. See *id.* at 975.

6    Specifically, the Court found that the city's procedures for investigating complaints of excessive force by officers were "structured to curtail disciplinary action and stifle investigations into the credibility of the City's police officers." *Id.* at 974. This was because police officers' statements appeared to have been given special, favorable consideration. *Id.* In addition, there was no formalized tracking of complaints made against individual officers. Further, there was an internal report acknowledging that the department had a problem with police use of excessive force. *Id.* at 975. Finally, there was statistical evidence offered about the number of excessive force complaints lodged against the city each year and the rate at which they were sustained by the investigating agency. *Id.* at 970.

Since the *Beck* decision, trial courts in this circuit have grappled with the issue of what type of evidence a plaintiff must adduce in support of a *Monell* municipal liability claim under Section 1983 in order to survive summary judgment. For instance, statistical evidence alone, "isolated and without further context," generally "may not justify a finding that a municipal policy or custom authorizes or condones the unconstitutional acts of police officers." *Merman v. City of Camden,* 824 F.Supp.2d 581, 591 (D.N.J.2010) (citing *Strauss v. City of Chicago,* 760 F.2d 765, 768–69 (7th Cir.1985)). Instead, if a plaintiff wishes to rely principally on statistics showing the frequency of excessive force complaints and the rate at which those complaints are sustained, she must show why those prior incidents were wrongly decided and "how the misconduct in those cases is similar to that involved in the present action. See *Franks v. Cape May County,* No. 07–6005, 2010 WL 3614193 at *12 (D.N.J. Sept.8, 2010). One way to do this would be to show, as was done in the *Beck* case, that the officer whom a plaintiff accuses of using excessive force has been the subject of multiple similar complaints in the past. See *Beck,* 89 F.3d at 975; see also *Garcia v. City of Newark,* No. 08–1725, 2011 WL 689616 at ——3–5 (D.N.J. Feb.16, 2011) (denying defendant municipality's motion for summary judgment on plaintiff's Section 1983 claim when plaintiff presented evidence that the six individual defendants together accounted for more than 55 complaints for excessive force and false arrest in the 11 years prior to the incidents at issue in that case).

*5 Alternatively, when such evidence against the particular officer is not available, a trial court in this District has found sufficient a plaintiff's submission of a sample of forty excessive force complaints from the relevant police department bearing similarities to her own case and arguably evincing a tendency on the part of the internal affairs division to insulate officers from liability. *Merman v. City of Camden,* 824 F.Supp.2d 581, 593–94 (D.N.J.2010).

In this case, even viewing the facts alleged in the light most favorable to the non-moving party, the Court must conclude that Plaintiff has not offered the type of evidence necessary to create a genuine issue of material fact regarding her *Monell* claim against Defendant. Plaintiff offered record evidence showing that between 2003 and 2009, out of 641 complaints filed against Camden police officers, the City's Internal Affairs Division sustained only once such grievance. Pl.'s SUMF B. ¶ 1. Standing alone, however, this is the type of statistical evidence that cannot support a finding of municipal liability under Section 1983. See *Merman,* 824 F.Supp.2d at 591. Further, Plaintiff has not offered a sample of these complaints for the Court's consideration; such evidence is necessary to give rise to the inference that the Internal Affairs Division rejected civilian complaints in order to insulate officers from liability (thereby laying the foundation for Plaintiff's deliberate indifference liability theory) as opposed to some other, permissible reason (such as that the claims were without evidentiary foundation). See *id.; see also Beck,* 89 F.3d at 975 (citing *Strauss v. City of Chicago,* 760 F.3d 765, 768–69 (7th Cir.1985)) for the proposition that statistics alone are insufficient to prove municipal liability "because people may file complaints for many reasons, or for no reason at all").[7]

7    Plaintiff notes that she requested a comprehensive history of internal affairs records during the process of discovery but that Defendant refused the request as "burdensome." Pl.'s SUMF B. ¶ 2 n. 3. However, Defendant rightly notes that the mere objection to a discovery request does not permit the inference that the documents, had they been produced, would have supported Plaintiff's claim. Def.'s Reply Br. 8 (citing *Lamb v. Wysocki,* No. 06–2166, 2008 WL 1732973 at *14 (D.N.J. Apr.10, 2008)). Rather, Plaintiff's proper course of action would have been to take steps to compel production of these documents from Defendant, given their importance to establishing her *Monell* claim.

In addition, Plaintiff cannot show that either of the two particular officers in question, defendant Officers McArdle

Katzenmoyer v. Camden Police Dept., Not Reported in F.Supp.2d (2012)

2012 WL 6691746

and Lattanzio, had a history with multiple excessive force complaints, as was the case of the defendant officer in *Beck. See Beck,* 89 F.3d at 975. Specifically, at the time they encountered Brett Katzenmoyer in the parking lot of the Tweeter Center in August 2008, Defendant Lattanzio had been the subject of a single excessive force complaint, while Defendant McArdle had had no such complaints filed against him.[8] Def.'s Br. in Support of Mot. for S.J., Exhs. 56–57. Thus, Plaintiff cannot rely on the particular officers' respective histories of excessive force allegations in support of her municipal liability claim.

[8]    Plaintiff offers documentation that she claims shows that Officer Lattanzio had eight complaints filed against him for misconduct prior to the incident involving Brett Katzenmoyer. Plaintiff's SUMF B. ¶ 5; Exh. R. The Court's review of that exhibit indicates the presence of only four such complaints. However, Defendant's exhibits concerning Officer Lattanzio indicate that he had been the subject of nine complaints. Even crediting the higher number, the Court notes that, given the range of reasons that a police officer might have a complaint filed against him, the proper inquiry for determining whether Defendant should have been on notice about this officer's propensity to use excessive force should be the number of *actual written civilian complaints* alleging the use of excessive force or similarly serious infractions, rather than the number of complaints in total, which might include allegations of unpleasant demeanor, police rule infractions, and similar minor, non-violent offenses. *Accord Beck,* 89 F.3d at 969–970 (reviewing only those complaints for excessive force against the officer in question); *Garcia,* 2011 WL 689616 at *4 (considering only those complaints for excessive force and false arrest). Thus, this Court concludes that Defendant Lattanzio had only one past complaint of relevance to the present case, while Defendant McArdle had none.

For these reasons, the Court finds that Plaintiff has not offered evidence that creates a disputed issue of material fact sufficient to support her municipal liability claim against Defendant under 42 U.S.C. § 1983. Thus, Defendant's motion for summary judgment on this claim will be granted.[9]

[9]    Finally, while Plaintiff does present evidence suggesting that the excessive force investigation involving Brett

Katzenmoyer and defendant Officers Lattanzio and McArdle left something to be desired in terms of its thoroughness and scope, Plaintiff cannot rely on the *Beck* case, as she appears to do, for the proposition that such anecdotal evidence based on one investigation is sufficient to create a triable issue of material fact on her *Monell* deliberate indifference claim. *See* Pl.'s Opp. Br. 25–26; *see also Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (finding that "a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* "). Thus, her claim cannot survive summary judgment on this basis.

**B. Sufficiency of Allegations under New Jersey Statutes**

 **\*6** Defendant argues that "there simply is not a causal connection between any claimed *wrongful* actions of any of the Defendants in this case and the death of the decedent." Def.'s Br. in Support of Mot. for S.J. 33. However, Defendants support this contention with facts that are in dispute with Plaintiff's proffered evidence. *See, e.g.,* Pl.'s Opp. Br. 29–30 (citing deposition of Anthony Robertson, pp. 72–73; Report of Wayne K. Ross, p. 14). Thus, viewing the facts in the light most favorable to the non-moving party, the Court cannot conclude that Defendants are entitled to judgment as a matter of law. Accordingly, it will deny Defendant's motion for summary judgment on Plaintiff's state law claims.

## IV. CONCLUSION

For the reasons stated above, the Court will grant in part and deny in part Defendant's motion for summary judgment. Specifically, the Court finds that Plaintiff has not offered sufficient evidence to support her municipal liability claim under 42 U.S.C. § 1983. Thus, the Court will grant Defendant's motion for summary judgment on that claim. On the other hand, Plaintiff has presented evidence sufficient to create a triable issue of material fact regarding her claims against Defendant brought under the New Jersey Wrongful Death Act, N.J.S.A. § 2A:31–1 *et seq.,* and New Jersey Survival Act, N.J.S.A. § 2A:15–3 *et seq.* Accordingly, the Court will deny summary judgment on these claims. An appropriate order shall issue today.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 6691746

End of Document                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT C

Case 1:14-cv-05519-JRS-AMD   Document 336   Filed 08/23/20   Page 46 of 53 PageID: 14109
Payano v. City of Camden, Not Reported in Fed. Supp. (2016)

2016 WL 386040

2016 WL 386040
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

Henry J. PAYANO, Plaintiff,

v.

CITY OF CAMDEN, et al., Defendants.

Civil No. 13-2528 (NLH)
|
Signed 02/01/2016

**Attorneys and Law Firms**

CONRAD J. BENEDETTO, 1814 East Route 70, Suite 350, Cherry Hill, NJ 08003, Attorney for Plaintiff Henry J. Payano

BRIAN E. TURNER, MEREDITH A. ACCOO, TIMOTHY J. GALANAUGH, CAMDEN CITY ATTORNEY, P.O. Box 95120, Camden, NJ 08101, Attorneys for City of Camden, City of Camden Police Dept., Tya Miles

**OPINION**

**\*1** HILLMAN, District Judge:

In this case, Henry J. Payano claims that the City of Camden, the Camden City Police Department, and Camden Police Officer Tya Miles violated his constitutional rights on August 19, 2012, when Officer Miles seized and used excessive force against Payano.[1] Before the Court is a motion for summary judgment, pursuant to Federal Rules of Civil Procedure 56, filed by the Defendants. For the reasons expressed below, and pursuant to Rule 78, this Court will deny the summary judgment motion of Officer Miles, grant summary judgment in favor of the City, and dismiss the Police Department as defendant.

[1]     The action was initially filed by Alicia Peralta, Payano's mother and guardian, because Payano was a minor at the time the events described in the Complaint occurred and at the time the Complaint was filed. After Payano reached the age of majority, the caption of the Complaint was amended to show that Payano is the sole Plaintiff. (ECF No. 21.)

**I. BACKGROUND**

Plaintiff's Complaint names the City of Camden, the Camden Police Department, Camden Police Officer Tya Miles, John Does 1 through 10, and fictitious corporations 1 through 10. He asserts that on April 19, 2012, between 4:00 p.m. and 5:00 p.m., he was working at B & B Grocery, a store owned and operated by his mother Alicia Peralta and his grandmother. He alleges that while he was sitting on a milk crate in front of the ice machine outside the store and speaking with his next door neighbor, Pete Garcia, who was sitting on his front steps, a police car driven by Defendant Miles stopped in front of the store. Miles allegedly stated to Payano: "I am getting tired of this shit." (ECF No. 1 at 3.) According to the Complaint, when Miles asked Payano to prove that he lived there, Payano entered the store and asked his grandmother, who was working at the cash register, to go upstairs to retrieve his identification. Payano asserts that, although he made no sudden movements, when he turned around he saw Miles pointing her gun at him. She allegedly instructed him to exit the store. He alleges that when he did so, Miles grabbed him by the waistband, threw him onto the ice machine, handcuffed him, and then threw him into the back of her car.

Payano further asserts that when a second male police officer arrived on the scene, Payano was removed from the police car and his handcuffs removed. The second officer then told Payano to hit him. Payano alleges that he "had not physically resisted or assaulted Defendant Miles or the back-up police officer in any way and the force used against him was unnecessary, unreasonable, and excessive." Id. at 4. Payano further asserts that, as a result of the incident, he suffers disc herniation, bulging discs, pain, and other injuries.

Payano claims that Defendants are liable under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act for unlawful seizure and use of excessive force in violation of the Fourth Amendment and violation of the First Amendment (Counts One, Two, Three, Seven, Nine); the City of Camden and the Camden Police Department are liable for Miles' violation of Payano's constitutional rights because Miles acted "pursuant to the customs, policies, usages, practices, procedures, and rules of the City of Camden, and the City of Camden Police Department, all under the supervision of ranking officers of said department" (Count Four)(ECF No. 1 at 8); Defendants are liable for assault and battery under New Jersey law (Counts Five, Six); and Defendants are liable under New

Case 1:14-cv-05519-JRS-AMD Document 336 Filed 08/23/20 Page 47 of 53 PageID: 14110
Payano v. City of Camden, Not Reported in Fed. Supp. (2016)
2016 WL 386040

Jersey law for intentional infliction of emotional distress (Count Eight).

**\*2** Defendants have filed a motion for summary judgment on all claims, arguing that the undisputed facts show that Miles did not use excessive force in violation of Payano's constitutional rights and that she is entitled to qualified immunity; the City of Camden and its police department are not liable under 42 U.S.C. § 1983 for violation of Payano's rights; and the claims arising under New Jersey law lack merit. In response, Payano argues that the Court should deny summary judgment because there are issues of material fact that must be resolved by a jury and that Miles is not protected by qualified immunity.[2]

[2]     Neither Defendants nor Payano discuss the violation of the First Amendment referenced in the Complaint. The Court will presume that Payano has withdrawn the First Amendment claim.

## II. DISCUSSION

A. Summary Judgment Standard

Rule 56(a) provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 184 (3d Cir. 2010). "An issue of material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Zavala v. Wal Mart Stores Inc., 691 F.3d 527, 545 (3d Cir. 2012). The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[I]n ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" Tolan v. Cotton, 134 S.Ct. 1861, 1863 (2014) (quoting Anderson v. Liberty Lobby, 477 U.S. at 255); see also Aman v. Cort Furniture Rental Corp., 85 F. 3d 1074, 1080-81 (3d Cir. 1996).

B. Fourth Amendment

Plaintiff claims that his civil rights under the United States Constitution and New Jersey Constitution were violated. The New Jersey Civil Rights Act ("NJCRA") creates a private cause of action for violations of civil rights secured under the New Jersey Constitution. See Trafton v. City of Woodbury, 799 F. Supp. 2d 417, 443 (D.N.J. 2011). "This district has repeatedly interpreted NJCRA analogously to § 1983." Hottenstein v. City of Sea Isle City, 977 F. Supp. 2d 353, 365 (D.N.J. 2013); see also Rezem Family Associates, LP v. Borough of Millstone, 423 N.J. Super. 103 (App. Div. 2011). The Court will combine consideration of Payano's claims under the New Jersey Constitution with the analysis of his Fourth Amendment claims.

To recover under 42 U.S.C. § 1983 a plaintiff must show: (1) a person deprived him or caused him to be deprived of a right secured by the Constitution or laws of the United States, and (2) the deprivation was done under color of state law. See West v. Atkins, 487 U.S. 42, 48 (1988); Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970).

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons ... against unreasonable ... seizures." U.S. Const. amend. IV. "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Terry v. Ohio, 392 U.S. 1, 16 (1968). An officer without a warrant or probable cause may conduct a "brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). Under the reasonable suspicion standard, "the police officer must be able to point to specific and articulable facts, taken together with rational inferences from those facts, reasonably warrant intrusion." Terry, 392 U.S. at 21.

**\*3** When a plaintiff alleges use of excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures. See Tolan v. Cotton, 134 S.Ct. 1861, 1865 (2014); Graham v. Connor, 490 U.S. 386, 394 (1989). "The use of excessive force is itself an unlawful 'seizure' under the Fourth Amendment." Couden v. Duffy, 446 F.3d 483, 496 (3d Cir. 2006). "Determining whether the force used to effect a particular seizure is 'reasonable' ... requires ... careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. In addition, the Third Circuit instructs a court to consider "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that

Case 1:14-cv-05519-JRS-AMD Document 336 Filed 08/23/20 Page 48 of 53 PageID: 14111
Payano v. City of Camden, Not Reported in Fed. Supp. (2016)

2016 WL 386040

the suspect may be armed, and the number of persons with whom the police officers must contend at one time." Santini v. Fuentes, 795 F.3d 410, 417 (3d Cir. 2015) (quoting Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997)). The inquiry is objective and fact specific. See Graham, 490 U.S. at 397; Santini, 795 F.3d at 417. "Reasonableness is to be evaluated from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Carswell v. Borough of Homestead, 381 F.3d 235, 240 (3d Cir. 2004) (internal quotation marks and citation omitted).

In resolving questions of qualified immunity at summary judgment, a court must first ask "whether the facts '[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a [federal] right." Tolon, 134 S.Ct. at 1865 (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). The second prong of the qualified immunity analysis requires a court to determine "whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged [conduct] was unconstitutional." Tolon, 134 S.Ct. at 1866 (citation and internal quotation marks omitted).

Relying on police reports, Miles argues that there is no genuine issue of material fact regarding the Fourth Amendment and use of excessive force and that she is entitled to summary judgment as a matter of law under 42 U.S.C. § 1983 and New Jersey law. Miles admits that she pointed her gun at Payano but she argues that Miles reasonably believed that Payano was committing a disorderly persons offense by "engag[ing] in fighting or threatening ..." or [that he was] "creat[ing] a hazardous or physically dangerous condition by any act which serves no legitimate purpose of the actor" in violation of N.J. Stat. Ann. § 2C:33-2(a). Miles claims that because Payano "took a fighting stance with closed fists, during a conversation with Officer Miles and one of two males sitting on a step nearby Plaintiff stood up as Officer Miles was interacting with Plaintiff," Miles "reasonably believed she had a duty to arrest Plaintiff and use her training to use the appropriate procedures to ensure her safety." (ECF No. 62 at 32.) Miles maintains that because Payano "verbally and physically resisted Officer Miles during the course of their brief interaction on April 19, 2012[, she] put Plaintiff up against the ice machine outside of B & B Grocery and handcuffed him to subdue him and guide him to submit to arrest and custody." Id. at 32-33.

Defendants' argument ignores the deposition of Payano and the legal requirement that this Court is required to view the facts in the light most favorable to the party opposing

summary judgment. Payano's description of the incident, as set forth in his deposition, conflicts with Miles' version of the incident. In his deposition, Payano testified that the day after Miles had given his mother parking tickets and his mother had complained to Miles' supervisor about her conduct, Payano was sitting on a milk crate in front of his family's grocery store and speaking with his neighbor Pete Garcia, who was sitting on the front stoop. Payano testified that he observed Officer Miles drive around the block four times: "She kept on driving around the block, laughing, ha, ha, ha. Drive back. At one point she said, oh, I'm tired of this asshole. Sorry for saying it like that. She pulled up, and that's when everything happened." (ECF No. 62-6 at 16.) Payano further testified that the fourth time she drove around the block, Miles parked in front of Garcia's property and the ice machine and the following occurred:

**\*4** Payano: And she told me, I'm tired – I'm tired of this shit. She came – she pulled up. She tried to ask me for identification. I told her, I said – I told her I don't have it on me. I have to go inside to get it. I'm going inside.

Q: Yes?

Payano: My identification was upstairs. I told my grandmom, grandmom, could you get my ID upstairs?

Q: Yes?

Payano: By the time I turned around, she had a gun pointed out at me telling me to come outside.

Q: Yes?

Payano: She grabbed me, threw me on the freezer.

Q: Yes?

Payano: Put the cuff on me, put me in the car. And three minutes later, five minutes later, that's when the other officer came. They took me out the car, took the cuff[s] off me.

Q: Yes?

Payano: And the cop, you tough? Swing. That's when they took me off the cuff. They like [told me to] swing. And I ain't do nothing. They put me back in handcuff[s], took me to the station.

(ECF No. 62-6 at 19.)

2016 WL 386040

Payano also testified that he lost consciousness for a period of time when Miles threw him against the ice machine, that his family took him to the emergency room at Virtua West Jersey on the day of the incident after the police released him from custody, and that he received treatment at the emergency room and subsequently from other doctors for injuries to his back, neck, shoulder and mental health. (ECF No. 62-6 at 9.)

By disregarding Payano's deposition and his version of events, Miles argues that the facts respecting the excessive force claim are undisputed and that she is entitled to judgment on the Fourth Amendment claims. However, as explained above, a court may not resolve factual disputes on summary judgment and is required to "view the evidence in the light most favorable to the opposing party." See Tolan, 134 S.Ct. at 1866 (quoting Adickes, 398 U.S. at 157). As the Supreme Court recently emphasized, "[t]he witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system." Tolan, 134 S.Ct. at 1868.

Viewing the evidence in the light most favorable to Payano, this Court finds that Payano's deposition creates disputed issues of material fact with respect to whether Miles unlawfully seized Payano and whether she used excessive force in violation of the Fourth Amendment. The conflicting facts, taken in the light most favorable to Payano, demonstrate that, by pointing her gun at Payano, throwing him on to an ice machine, handcuffing him, and transporting him to the police station, Miles violated Payano's Fourth Amendment rights prohibiting seizure without reasonable articulable suspicion and use of excessive force. Moreover, if Payano's version of events is true Miles is not entitled to qualified immunity because, in 2012 a reasonable police officer would have known that Miles' conduct violated Payano's Fourth Amendment rights.

First, the facts viewed in the light most favorable to Payano demonstrate that Miles seized Payano without reasonable suspicion that criminal activity was afoot. Payano testified that while he was working at the grocery store, he was sitting on a milk crate outside the store near the ice machine and speaking with his next door neighbor, who was sitting on the stoop, for about one-half hour before Miles directed him to provide identification, pointed her gun at him, handcuffed him, and took him to the police station. Under Payano's version of events, nothing he did suggested that he was acting suspiciously or unlawfully. Therefore, under the facts

presented in Payano's deposition, a reasonable police officer would not have suspected that criminal activity was afoot. In other words, it would have been clear to a reasonable police officer that Payano's conduct, viewed in the light most favorable to him, did not provide reasonable suspicion of illicit activity necessary for a Terry stop. See Couden v. Duffy, 446 F.3d 483, 495-96 (3d Cir. 2006) (holding that conduct consisting of "a young man exiting a car parked near a house, walking from the car into the garage of the house while carrying a skateboard and then looking into a window of the house, turning on its brights, and honking" did not provide reasonable suspicion); Johnson v. Campbell, 332 F.3d 199, 209 (3d Cir. 2003) (finding no basis for reasonable suspicion where the person was "drinking coffee, flipping through a newspaper, pacing, and rubbing his head").

**\*5** Second, Payano's version of the incident, if believed by a jury, could demonstrate that Miles used excessive force against Payano when she pointed a gun at his head and threw him on to the ice machine. In 2012, a reasonable officer would have known that pointing a gun at Payano and throwing him on to the ice machine was excessive, given that, under Payano's version of events, he did nothing threatening when he got up from the milk crate and went into the grocery to ask his grandmother to get his identification. See Couden, 446 F.3d at 497 (finding that officers violated Adam Couden's clearly established Fourth Amendment rights when they jumped on him, pointed a gun at his head, handcuffed him and sprayed him with mace); Baker v. Monroe Twp., 50 F.3d 1186, 1193 (3d Cir. 1995) (finding that officers violated the Fourth Amendment by pointing guns at family members, pushing them down to the ground and handcuffing them where there was "simply no evidence of anything that should have caused the officers to use the kind of force they are alleged to have used").[3]

---

3    See also Robinson v. Solano County, 278 F.3d 1007, 1015 (9th Cir. 2002) (en banc) (finding the law clearly established in 2002 recognized the "general principle that pointing a gun to the head of an apparently unarmed suspect during an investigation" can constitute excessive force, "especially where the individual poses no particular danger"); Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1192-93 (10th Cir. 2001)("The display of weapons, and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force. Such a show of force should be predicated on at least a perceived risk of injury

Case 1:14-cv-05519-JRS-AMD   Document 336   Filed 08/23/20   Page 50 of 53 PageID: 14113
Payano v. City of Camden, Not Reported in Fed. Supp. (2016)

2016 WL 386040

or danger to the officers or others, based upon what the officers know at that time.").

Because the facts concerning the incident are disputed and a jury could find that Miles violated Payano's Fourth Amendment rights, the Court will deny summary judgment on Payano's Fourth Amendment seizure and excessive force claims against Officer Miles.

## C. Municipal Liability

The City of Camden argues that there are no genuine issues of material fact and the City is entitled to judgment as a matter of law on Payano's claim that it is liable under § 1983 for causing Miles' violation of Payano's Fourth Amendment rights. Payano argues that because his expert's report establishes that the Camden Police were deliberately indifferent to the need to train and more closely supervise police officers generally and Officer Miles in particular, the Court must deny summary judgment on Payano's § 1983 claim against the City.

The parties agree that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Monell v. Dept. of Social Services of City of New York, 436 U.S. 658, 694 (1978). "[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences." Bd. Of County Com'rs of Bryan County, Okl. V. Brown, 520 U.S. 397, 407 (1997). As the Court explained,

> [i]f a [police training] program does not prevent constitutional violations, municipal decisionmakers may eventually be put on notice that a new program is called for. Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the deliberate indifference – necessary to trigger municipal liability ... In addition, the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved

in a particular incident, is the moving force behind the plaintiff's injury.

**\*6** Bryan County, 520 U.S. at 407-408 (citations and internal quotation marks omitted).

For example, in Connick v. Thompson, 563 U.S. 51, __, 131 S.Ct. 1350, 1358 (2011), a jury found that the Orleans Parish District Attorney's Office had violated Thompson's rights under Brady v. Maryland, 373 U.S. 83 (1963), because Harry Connick, the District Attorney/policymaker, failed to adequately train his attorneys about their duty under Brady to produce exculpatory evidence and this lack of training had caused nondisclosure of an exculpatory lab report identifying the blood type of the perpetrator in a robbery case wherein Thompson was wrongly convicted. The Supreme Court held that the § 1983 case had improperly gone to the jury because, absent a showing of a pattern of Brady violations, Thompson had not shown that Connick "was on actual or constructive notice of, and therefore deliberately indifferent to, a need for more or different Brady training." Connick, 131 S.Ct. at 1358. The Court rejected the notion that a "showing of obviousness can substitute for the pattern of violations ordinarily necessary to establish municipal culpability," Connick, 131 S.Ct. at 1361, and held that the district court "should have granted Connick judgment as a matter of law on the failure-to-train claim because Thompson did not prove a pattern of similar violations that would 'establish that the policy of inaction [was] the functional equivalent of a decision by the city itself to violate the Constitution.'" Id. at 1366 (quoting Canton, 489 U.S. at 395). See also Bielevicz v. Dubinon, 915 F.2d 845, 851 (3d Cir. 1990) ("[T]o sustain a § 1983 action against the City, plaintiffs must [show] that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to their injury.")

A municipal policymaker is a person who is "responsible for establishing final government policy respecting" the activity in question and "whether an official had final policymaking authority is a question of state law." Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986). Under New Jersey law, the Chief of Police is the relevant policymaker for a municipal police department. See Hernandez v. Bor. Of Palisades Park Police Dept., 58 F. App'x 909, 913 (3d Cir. 2003)(citing N.J. Stat. Ann. § 40A:14-118). Unlike Thompson in Connick, in this case, Payano presented an expert report. The report indicates that Payano's expert, Richard Rivera, examined the records maintained by the Camden City Police Department

Payano v. City of Camden, Not Reported in Fed. Supp. (2016)

2016 WL 386040

concerning the incidents involving Miles, Payano and his mother on April 18 and 19, 2012, the Internal Affairs Department's investigation of the incidents concerning Miles on April 18 and 19, 2012, as well as internal affairs annual summary reports, and use of force incident reports. (ECF No. 64-6.)

Rivera noted that, although Payano's grandmother owned the grocery store for 25 years and she and her family parked their vehicles next to the store for many years without incident, on April 18, 2012, Officer Miles issued traffic tickets to three vehicles parked next to the store, two of which were owned by Payano's family members. Miles reported that "at least three persons were yelling, cursing and charging at Officer Miles after she wrote the tickets [and she] requested the individuals produce identification, including from an older woman that called Miles a 'bitch' in Spanish." Id. at 5-6.

*7 Rivera further noted that Miles believed that Alicia Peralta, Payano's mother, had called the Internal Affairs Unit or her supervisor during the incident. According to Rivera's report, the records showed that, once a Sgt. Tunstall arrived, Miles insisted that he obtain the identities of the three persons and she drafted disorderly conduct charges against Alicia Peralta and Rahademes Bernard and mailed the summonses to them. Later that night at about 11:00 p.m. Miles returned to the intersection where the grocery is located and issued additional summonses to Peralta. Peralta then went to the police station to speak with Sgt. Tunstall about Miles but she was told that he was no longer on duty. According to the report, on the morning of April 19, 2012, Peralta went to the police station and filed a formal complaint against Miles.

Mr. Rivera's review of Officer Miles' training records uncovered that her 2010 police academy record contained the following comments from an instructor:

> Miles was a bit too immature for the rigors of the academy ... Her study habits were nonexistent. This was evident in her academic standing average ... Miles was 71st out of 71 recruits academically. Physical training is another area of concern. Miles was lazy and just did enough to get by evidenced by her lack of progress in relation to entryway and exercise totals. Firearms was another difficult area for Miles ... Her problem is a lack of concentration and lazy demeanor. Miles will struggle with her weight if she does not continue on a PT regiment. Additionally, Miles must be assigned a detail oriented, strong, task minded FTO or she will experience problems.

(ECF No. 64-6 at 20.)

Rivera concluded that, if Internal Affairs or the Police Chief had reviewed the training and internal affairs records of Officer Miles, as he did, their review would have indicated a need for greater supervision and training of Miles. Id. at 11 ("The frequency and pattern of complaints against Miles in an agency using an early warning system as described in Camden's Internal Affairs Policy (CAM 0826) would have triggered a response from the IA Commander but did not.")

In addition, Rivera's review of the Internal Affairs records regarding excessive force complaints (which were extremely difficult for Rivera to obtain) showed, for example, that in 2001, only 11 of 128 excessive force allegations were investigated; in 2002 only six out of 117 excessive force allegations were investigated; and the 2009 audit of backlogged internal affairs cases revealed 227 open cases. Rivera concluded that, although the system in place allowed policymakers to identify officers who engaged in patterns of misconduct, "[t]hrough their inaction and custom of nonintervention they tacitly approved officer misconduct." (ECF No. 64-6 at 10.)

In its reply brief, the City argues that "[n]one of the facts presented by Plaintiff in his Opposition Brief demonstrate a policy or custom during the relevant time period that caused Plaintiff's alleged injuries and there is no evidence that the City of Camden or its Police Department or any members thereof were deliberately indifferent to Plaintiff's rights." (ECF No. 66 at 18-19.) We agree with the City.

The Supreme Court has explained that, "when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." Connick, 563 U.S. at 61-62 (citations and internal quotation marks omitted).

Even, as we must, construing the evidence in the light most favorable to Payano, including the Rivera report, this Court finds that there is insufficient evidence for a jury to find the City of Camden liable under § 1983 for causing any violation of Payano's Fourth Amendment rights. First, much of the evidence relied upon by Rivera is very old. It is difficult to discern how an analysis of the volume of investigated

Case 1:14-cv-05519-JRS-AMD   Document 336   Filed 08/23/20   Page 52 of 53 PageID: 14115
Payano v. City of Camden, Not Reported in Fed. Supp. (2016)

2016 WL 386040

excessive force claims from a decade or more before the alleged incident could have any bearing on the City's responsibilities for Miles's conduct in 2012. The same holds true for a backlog of excessive force investigations from the year (2009) before Miles graduated from the police academy (2010) and three years before the event at issue (2012). While the Rivera report relies heavily on Miles's poor performance in the academy when compared to her classmates, nothing in the cited academic record suggests directly or indirectly any propensity of Miles toward excessive force or any other constitutional torts.

**\*8** The remainder of Rivera's report characterizes the City of Camden's internal affair unit as incompetent and in disarray in 2012, the year before the city force was disbanded and a county police force was created to police the city. Rivera's description of the state of affair in 2012 may be true but, at best, his conclusions merely support a claim of vicariously liability for Miles's action based on negligence. That, however, is not the standard.

Plaintiff must proffer sufficient evidence from which a reasonable juror could conclude that the relevant policymakers adopted a policy to not investigate and not punish excessive force used by Camden officers during the relevant time period or were deliberately indifferent to such conduct. Plaintiff, however, did not take the deposition of a single Camden policymaker, analyze Camden's institutional treatment of excessive force complaints (as a opposed to other forms of complaints) to show a pattern of indifference during the relevant time period, or identify any policy, custom, or practice by the City, de facto or otherwise, which condoned, encouraged, and excused claims of excessive force. If anything, the only evidence on the issue suggests the opposite. Sgt. Tunstall cautioned Miles on the day in question that verbal abuse from citizens was to be an expected occurrence in Camden requiring restraint and apparently went out of his way to diffuse the ongoing dispute between Peralta and Miles. Moreover, Peralta's complaints resulted in an investigation of Miles's alleged conduct.

Most importantly, Plaintiff has failed to show how any Camden policy, custom, or practice caused the alleged assault on the Plaintiff. Rivera's report focuses on the after-the-fact internal affairs investigation of Miles's conduct. Rivera's criticism of that process, even if valid, cannot supply the missing causation. Only in the face of some evidence that the City knew that Miles was prone to the use of excessive force and adopted a policy to ignore that fact prior to the incident

with Plaintiff could the element of causation be established. There is simply no evidence in the record to support such a claim.

In sum, absent some evidence that the City of Camden chose to ignore claims of excessive force in 2012, failed to train officers on the proper use of force, or ignored evidence that Miles was prone to such conduct herself there is insufficient records evidence from which a reasonable juror could conclude the City was deliberately indifferent to the need for additional training and supervision of Miles or any other officer for that matter. The Court will, accordingly, grant the City of Camden's motion for summary judgment. Moreover, the Court will dismiss the Camden Police Department as a Defendant because a police department is not a person under § 1983 independent of the municipality itself. See Padilla v. Twp. of Cherry Hill, 110 F. App'x 272, 278 (3d Cir. 2004); Adams v. City of Camden, 461 F. Supp. 2d 263, 266 (D.N.J. 2006).

D. State Claims

Defendants argue that Payano has presented no facts to support his claims for assault and battery and intentional infliction of emotional distress. (ECF No. 62 at 41-42.) Payano argues that the Court should deny summary judgment on these claims because Payano's deposition testimony creates factual disputes regarding these claims.

"A party moving for summary judgment must clear two hurdles to meet its initial burden. It must show that (1) there are no genuine questions of material fact and (2) the party is entitled to judgment as a matter of law." Howard Hess Dental Laboratories Inc. v. Dentsply International, Inc., 602 F.3d 237, 251 (3d Cir. 2010). If the movant "fail[s] to show the absence of any disputed material fact .., the District Court err[s] in granting summary judgment." Adickes v. S.H. Kress & Co., 398 U.S. 144, 148 (1970).

**\*9** For the same reasons we expressed regarding Plaintiff's § 1983 claim, the Court finds that Defendants have failed to carry their burden under Rule 56 of showing that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law on Payano's New Jersey claims for assault, battery, and intentional infliction of emotional distress. The Court will deny summary judgment on these claims.

2016 WL 386040

### III. CONCLUSION

For the reasons set forth above, the Court will grant in part and deny in part Defendants' summary judgment motion and

dismisses the Camden Police Department as defendant. An Order consistent with this Opinion will be entered.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 386040

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---