# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| XAVIER INGRAM,<br><br>       Plaintiff,<br><br>   vs.<br><br>COUNTY OF CAMDEN, *et al.*,<br><br>      Defendants. | Civil Action No. 14-5519-NLH-KMW<br><br><u>Before</u>: Hon. Juan R. Sanchez, U.S.D.J. |

---

### PLAINTIFF'S PRETRIAL MEMORANDUM

---

Beth G. Baldinger, Esq.
Cory Rothbort, Esq.
**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, New Jersey 07068
P: 973-228-9898
F: 973-228-0303
E: bbaldinger@mazieslater.com
   crothbort@mazieslater.com
*Attorneys for Plaintiff Xavier Ingram*

Plaintiff Xavier Ingram submits this pre-trial memorandum pursuant to the Court's pre-trial order, and in furtherance of Fed. R. Civ. P. 16

## SUMMARY OF CLAIMS ASSERTED

In the Second Amended Complaint (D.E. 64), Plaintiff Ingram asserts three counts, pursuant to 42 U.S.C. §1983, against the three Defendant-Officers, Jeremy Merck ("Merck"); Antonio Gennetta ("Gennetta") and Nicholas Marchiafava ("Marchiafava"):

- Excessive Use of Force (Count 1)

- Failure to Provide Medical Care (Count 2)

- Supervisory and Bystander liability by Defendant Merck (Count 3)

With respect to the County Defendants, the County of Camden, Camden County Police Dept. ("CCPD"), and Chief John Scott Thomson ("Chief Thomson"), Plaintiff asserts two counts of *Monell* liability: for inadequate customs and practices (Count 4), as well as for inadequate training and supervision (Count 5).

Plaintiff also asserts state law claims:  Assault and Battery against the Defendant-Officers (Count 6), Negligence against both the Defendant-Officers and the County-Defendants (Counts 7 & 8), and False Arrest and Imprisonment against the Defendant-Officers (Count 9).

## STATEMENT OF FACTS

**A.**   **Initial Police Encounter**

On June 12, 2014 at approximately 9:30 pm, Ingram was standing with a group of friends where he lived in Chestnut Courtyard of Sycamore Court Apartment Complex. *Ingram did **not** have a gun or any drugs*.  (Pl's St. of Disputed & Undisputed Facts ("PF"), ¶ 6-8) (D.E. 165).  As Defendant-Officers approached the group, they dispersed; Ingram walked, through a parking lot towards Eddie's Liquor Store ("Store") to meet a friend. (PF ¶9-11). Defendant-Officers'

appearance at his apartment courtyard made Ingram nervous because he had outstanding warrant for driving violations. (PF ¶15-17). Consequently, when he entered the parking lot, he initially bent down between two parked cars to hide from defendants. But believing that the defendants saw him, Ingram exited from between the cars and slowly walked away towards the store. *Id.*

Defendants Merck and Marchiafava allege that from across the courtyard in the dark, they saw Ingram adjust his pants, which allegedly made them suspicious he had a gun. They also claim despite their distance from Ingram, that they heard a sound--like metal striking the ground--from an area where Ingram passed between two cars when entering the parking lot. However, Defendants did <u>not</u> stop and detain Ingram in the parking lot after allegedly hearing the sound; nor did they check or secure the area. Instead, they followed Ingram as he walked and entered the Store; they did not believe he was armed. (PF. ¶13, 19-22). Defendant-Officers Merck and Marchiafava then returned to the area of the parked cars.

After returning to the parking lot and the area of the parked cars, Merck claims he saw a gun on the ground by the front tire of a car. Merck told Marchiafava that he found a gun and told him to go arrest Ingram. Separately, Merck told Gennetta to "follow" Marchiafava saying nothing about having found a gun, nor of any arrest to be made. Significantly, Merck never showed the alleged gun on the ground to either Marchiafava or Gennetta. Merck then walked away from the parked cars and told unknown persons in the parking lot to leave the area, after which he returned to the parked cars and while alone, allegedly picked the gun up off of the ground. (PF ¶26-31). Although Merck had gloves, he never used them at any time in handling the gun. Merck then heard a "Code 5" over the radio and proceeded to towards the scene of the arrest of Ingram. Notably, no officer ever saw Ingram in physical possession of any gun. Plaintiff Ingram testified

that he never had any gun.  Plaintiff contends that Merck "planted" or "flanked" the gun and lacked probable cause to arrest him. (PF ¶32).

## B.   The Chase & Ingram's Fall

While in the store, Ingram answered his phone, met his friend Anthony Lemming, and paid for a soda. (PF ¶25). As Ingram exited the store, he saw an officer coming towards him; scared, he fled.  That person, Defendant-Officer Marchiafava, did not give Ingram an indication that he was under arrest or command him to stop. (PF ¶33). Marchiafava makes no reference in his report, prepared that night about having given any order of arrest or other lawful order to Ingram to stop. Likewise, Gennetta did not hear Marchiafava give any such order to Ingram.  Marchiafava pursued Ingram, followed by Gennetta, north up South 7th Street into a different parking lot, located behind the Spanish Restaurant. Ingram turned around and headed back out to South  7th Street where his feet slipped, and he fell. (PF ¶34 – 35).  As Ingram slipped, he turned and fell towards his left side, his hands and knees contacted the ground and he landed on his stomach with his hands above his head.  Ingram lay perpendicular across South 7th Street with his head facing the restaurant parking lot and his feet facing the opposing curb. (PF ¶36-37).

## C.   Use of Excessive & Deadly Force during the Arrest

Defendants Gennetta and Marchiafava <u>admit</u> that there was no justification to use any force in arresting Ingram after he fell, because he did not move, did not resist or use any physical force against them, nor did he threaten them. (PF ¶42-43; ¶55-57).  CCPD's Use of Force policy and training provides that once all resistance or physical force by a suspect ceases, an officer must stop the use of force. (PF ¶55)  Gennetta and Marchiafava also <u>admit</u> that the act of kneeing Ingram in his neck or back would constitute excessive force. (PF ¶55-57). Significantly, any use of force on Ingram's neck was a **prohibited use of <u>deadly</u> force**. (PF ¶52).  Chief Thomson admits that use

of force on an arrestee's neck, including chokeholds constitutes deadly force. (Id.) CCPD's Use of Force training prohibited use of neck restraints, including chokeholds, due to the known risk for causing serious injury or death. (PF ¶53). Marchiafava admits that while arresting Ingram he and Gennetta used force  -- leveraging their knees in Ingram's back -- while they handcuffed him. (PF ¶39).  Merck testified that as he arrived at the scene, he observed Marchiafava and Gennetta applying the handcuffs to Ingram. (PF ¶41)  Ingram does not recall being handcuffed. (PF ¶40)

However, the evidence shows the Defendant-Officers used excessive and unjustified deadly force in arresting Ingram. Ingram testified that, as soon as he fell, the officers were on top of him. One officer was forcefully jamming his knee into his neck and the other officer was jamming his knee into his back, both were punching him in his back and ribs. (PF ¶45). Ingram screamed to the officers that he could not breathe and could not feel his legs, they told him to shut up. (PF ¶45, 46). Ingram testified that when the senior officer Merck arrived, the officers were still kneeing and punching him. Ingram pleaded with Merck that he could not feel his legs, and that Merck retorted "shut up" and stepped down on his neck. Ingram heard a *crack*, felt extreme pain and blacked out. (PF ¶47).[1]  Next, Ingram recalls defendants sitting him up and screaming at him to stand up. However, he had no feeling, and fell over and blacked out. (PF ¶48). His next memory is waking up in the hospital on a ventilator, a quadriplegic. (PF ¶49).

Several eyewitnesses corroborate Ingram's account as to Defendant-Officers' use of force. (PF ¶58-61).  For instance, the next morning, June 13, 2014, Darrell Brown, a passerby who witnessed Ingram's arrest, gave a sworn statement to CCPD internal affairs investigator that, after

---

[1]  The "Eye In the Sky" (EIS) video, as testified to by the defendants, shows Marchiafava was the first to get to Ingram and that he was by Ingram's torso above his legs; Gennetta was next to arrive and he was by Ingram's head/neck area. It also shows Merck arriving and bending over to speak to Ingram and then taking a step towards his head/neck area (PF ¶38).

4

Ingram fell, defendant-officers "[s]tomped him in the back" and "jump[ed] on him with his knee." (PF ¶58). Similarly, Mark Marshall – another independent witness – corroborated that while Ingram was lying on the ground, he saw the first officer (Marchiafava) drop down with his knee onto Ingram's neck and the second officer (Gennetta) was by his head struck him and then was on him. In Mr. Marshall's words, it was an "old fashioned butt whooping." (PF ¶60). Two more witnesses provided sworn accounts that defendants used force to arrest Ingram as he was laying still on the ground. (PF ¶59,61).

**D.    Failure to Provide Medical Care**

Because Marchiafava and Gennetta used force in arresting Ingram, CCPD's Use of Force policy required that they immediately evaluate his need for medical attention and provide medical care in accordance with their training.[2] Defendant-Officers all <u>admit</u> that as Ingram was prone on the ground with his hands cuffed behind his back, was yelling out in pain and stating he could not feel his arms, legs or feet. Defendants claim that they took Plaintiff's medical complaints seriously, did not assume he was faking it, and called for an ambulance right away. (See, Pl's St. of Undisputed Facts ("SUMF")(D.E. 146)  ¶19 - 25). Merck's Metro Incident Report states,

> Once in handcuffs…[Ingram] also began to complain of neck and shoulder pain. He stated that he could not feel his legs. At that time I called for Emergency Medical Services to respond to the scene. Emergency medical services responded and transported Ingram to Cooper Hospital with a police escort. (*Id*.)

That night Merck testified to Internal Affairs,

> Well, once he was secured in handcuffs, he actually looked up at me, like I said he knows who I am, he said – he is saying "Sergeant Merck, I can't feel, I can't feel my arms." He might have said "I can't feel my arms. I can't feel my legs. So I said "okay". So I called for an ambulance. " (*Id*.)

---

[2]   Because Marchiafava and Gennetta used force in arresting Ingram, they completed Use of Force reports as required CCPD's Use of Force Policy. This policy also requires that "whenever an officer uses force, he <u>must</u> <u>immediately</u> evaluate the arrestee's need for medical attention or treatment and provide first aid in accordance with their training." (SUMF ¶21).

Defendant-Officers' were trained as First Responders to recognize that Ingram's complaints of pain and loss of feeling in his extremities were consistent with potential paralysis, and critically, not to move such a person due to risk of further serious injury, but to call for medical assistance. (SUMF ¶27-34). However, Defendant-Officers' violated their First Responder training and CCPD's Use of Force policy, despite knowing of Ingram's complaints they made the decision to move Ingram -- get him to stand up and put him in a police care for transport. According to Merck, they used their "usual protocol" -- turning an arrestee over on his side, pulling their hands up and sitting them up -- to get them to stand up. (SUMF ¶33-35).

However, the EIS Video shows Marchiafava lift Ingram's handcuffed arms/hands straight up and releasing them; dropping down as dead weight. Next it shows Marchiafava and Gennetta roll Ingram over; his body rolls over as dead weight. (SUMF ¶36- 37). Next, Gennetta grabbed Ingram's shirt by the shoulders and jerks him up into a seated position – his head and neck unsupported. Gennetta states that as he held Ingram up with his left hand, he used his right hand to pat down Ingram's chest and stomach area all the while Ingram complained he could not feel his legs. (SUMF ¶38). According to CCPD Officer Michael Shirk who had arrived at the scene, when Ingram was sat up by Gennetta, he was screaming in pain, saying his whole body hurt. (SUMF ¶39). Gennetta testified that as he held Ingram up in a seated position -- with his head and neck unsupported -- he ordered Ingram to stand up. Ingram responded that he was unable stand, was in pain and could not feel his arms and legs. Gennetta had to hold Ingram up. (SUMF ¶40). At this point Gennetta let go of Ingram – he did this in order to force him to stand up. But Ingram was unable to stand up, instead he fell forward striking his face on the ground. (SUMF ¶41).[3] Then

---

[3] The EIS Video shows Gennetta moving Ingram forwards, backwards and forward again at which point he released him, causing him to fall over and strike his face on the ground.

Gennetta picked Ingram up a <u>second time</u>, and demanded that he stand up, which according to Gennetta, Ingram responded, "I can't, you broke my legs."  It was at this point that Gennetta, using his training, <u>first</u> assumed Ingram had a spinal injury and directed that an ambulance be called. This was when he first provided any medical aid – holding Ingram up against his leg while holding his head and neck steady until the EMTS arrived.  Gennetta admits that he did not render any medical aid to Ingram prior to this point.  As Gennetta conceded to Internal Affairs:

> "…Then [I] grabbed him by his shoulders and pulled him up onto my leg and started patting him down the front and I said get up and I let him go and [he] fell down onto his face. When I picked him up again, I said get up. He said, I can't, you broke my legs. Automatically with my military training, I assumed that he had some type of back or neck injury and I took it serious, so I put my hands on his head and supported his head and told Officer Marchiafava to call for an ambulance." (SUMF ¶42)

When the EMTs arrived, Gennetta told them Ingram had a neck injury and they took over his care. (SUMF ¶45).  Notably, the police reports make no reference at all to the Defendant-Officers moving, rolling, lifting and dropping an arrestee with a neck injury. Instead the police reports state that as soon as Ingram complained of loss of feeling, Gennetta immediately rendered medical care by holding his head and neck steady.  But this is contradicted by the EIS video and Gennetta's admissions to the contrary.

As stated above, Ingram testified that he had previously blacked out after Merck stepped on his neck, but came to when the officers tried to sit him up. He heard them screaming "get up", "stand up".  Ingram recalls his head dropped back down and he fell forward -- towards his stomach-- he fell over and blacked out again.  He does not recall anything after that point until he woke up post surgery. (SUMF ¶43).

**E.**   **Supervisory Liability**

The evidence is that Merck failed to stop the officers' use of force on Ingram and participated in it by stepping on his neck. Furthermore, as the supervisor on the scene, Merck admits Ingram was under their control and had the right to have his medical conditions respected and attended to.  (SUMF ¶47) Nevertheless, Merck made the decision to move Ingram and failed to stop Marchiafava and Gennetta from moving Ingram while he was present next to Ingram. (SUMF ¶46)

**F.**   **Medical Findings of Paralysis at the Scene**

At approximately 9:53 p.m., the EMTs, Joseph Zuber and James Barber, arrived at the scene. Their assessment of Ingram included noting his motor response was "flaccid" and sensory response was "absent" in all extremities; no response to painful stimuli. After immobilizing him on a long board with a cervical collar, they left the scene at 10:05 p.m. and arrived at Cooper University Hospital at 10:08 p.m. where his care was transferred to the Trauma Unit.

**G.**   **Medical Findings of Massive Cervical Injuries**

Radiology studies at Cooper University Hospital showed that Ingram suffered extensive, traumatic cervical injuries:

- a jumped facet and a perched facet at C4-5;

- fractures at C4-5;

- traumatic tear to a vertebral artery;

- ruptured posterior ligaments at C4-5;

- severe muscle damage from C-2 through C-6;

- severe spinal cord compression; and

- extensive contusion and edema of the cervical muscle tissue (along one side of his neck)

8

Notably, studies of his head, brain and facial bones were all negative. (PF ¶71-73)

Shortly after Defendant-Officers' use of force, Ingram underwent emergent open reduction and posterior stabilization with internal fixation, C4-C5 dislocation with instrumented fusion, anterior cervical discectomy, and C4-5 with allograft fusion and plate. In the course of the emergency surgery, the anterior longitudinal ligament at C4-C5 was found significantly disrupted; also a large disk fragment was dislodged and found behind the bodies of C4-C5 which had to be removed in piecemeal fashion.

## H.    Causation of the Injuries

Ingram's injuries were caused, medically and scientifically, by significant compression forces applied to his neck by the officers' knee and/or foot as he lay prone on the ground; and cannot be attributed to his fall prior to the officers' contact with him. Plaintiff's experts: board-certified, Yale-educated orthopedic spinal trauma surgeon James Yue, M.D.; board-certified radiologist William Matuozzi, M.D.; and, Yale-educated biomechanical expert Paul Ivancic, Ph.D. have opined that Ingram's injuries were caused by Defendant-Officers' uses of force on Ingram's neck while lying prone with his head turned towards the right. (PF ¶74,81,88). Drs. Yue, Matuozzi and Ivancic will explain to the jury that Ingram's catastrophic injuries cannot be caused by a simple slip and fall (as the defense claims). (PF ¶74,82,93). Moreover, Plaintiff's experts opine that Defendants' post-arrest moving of Ingram (sitting him up twice, dropping him, etc.) worsened the extent and severity of his cervical injuries. (PF ¶74,84,95).

Dr. Matuozzi, a board certified radiologist, reviewed the radiology studies and noted extensive traumatic cervical injuries: A traumatic unilateral left sided dislocation ("jumped facet") and a traumatic right sided subluxation ("perched facet") both at C4-5 level; Multiple fractures at C4-C5, particularly on the left side, with an associated traumatic dissection of the left vertebral

artery; ruptures throughout the posterior ligaments at C4-C-5; severe cord contusion and compression; along with muscle hemorrhage and edema from C-2 through C-5. Notably, the injured muscle tissue extends along one side of his neck from C2 through C5-6 and is seen from the top most layer all the way down to the spinal cord. Dr. Matuozzi states the studies show a predominate hyperflexion – severe rightward rotational mechanism of injury. (PF ¶72-73). Dr. Matuozzi opines such injuries were caused by "severe forces applied to the back and side of his neck while he was in a prone position on the ground. This mechanism of injury is consistent with … the officers applying direct force to his neck with their knees/feet." (PF ¶74).

Similarly, Dr. Ivancic, a biomechanics and causation expert, finds that Ingram suffered paralyzing injuries during the 1 minute, 10 second period between the time he was on the ground after the slip and fall and before the EIS video shows his hands lifted and dropped by the Officer. (PF ¶75-79). Dr. Ivancic opines that given the rightward rotation of Mr. Ingram's head (lying prone with the left side of his face against the ground, face turned right), the forced contact to his head and neck, as described by Mr. Ingram, resulted in a forced right axial rotation sufficient to cause the non-symmetric injuries seen on the radiographic studies (dislocated left facet and perched right facet), as well as the vertebral artery dissection, ligament disruptions, and injuries throughout the cervical muscles. (PF ¶78-81). In sum, Dr. Ivancic opines the cumulative evidence "strongly demonstrates that Mr. Ingram's cervical fracture/dislocation was caused by forced flexion, compression, anterior shear and right axial rotation applied to [his] neck by the officers during the arrest as he was prone on the ground." *Id.*

Likewise, Dr. Yue, a board-certified orthopedic surgeon specializing in spinal trauma (PF ¶85-87), opines that the "type of injuries that are evident, based on the CT scans, MRI and x-rays are highly torsional injuries in which Mr. Ingram's head and neck were torqued and twisted to the

right and subjected to significant force and pressure." (PF ¶89). Dr. Yue opines that the first trauma – compression of the neck with an officer's knee – caused the left sided perched C4-5 facet, and the subsequent trauma – compression on the neck with an officer's boot – caused either the completion of the facet dislocation from its perched position, or a worsening of the displacement and translation to the spinal canal leading to spinal cord injury and disc herniation. (PF ¶88-89). In sum, Dr. Yue opines that "the forces applied to Mr. Ingram's neck by these traumatic insults combined to produce the massive injuries to Mr. Ingram's spine." (PF ¶92).

## I.    *Monell* **Liability**

Plaintiff's police services expert, Christopher Chapman, Ph.D. will testify to the practices of CCPD at issue in this case involving violations of governing standards, upon which the jury may find that CCPD's customs and practices, as well as inadequate training on use of force and supervision, under the supervision and direction of Chief Thomson, led to the violation of Ingram's rights. (PF ¶97 - 103)  These include, but are not limited to the following:

- CCPD's Internal Affairs Unit ("IA Unit"), under the supervision of Defendant Chief Thomson, failed to properly track and report the number of citizen complaints and their dispositions, including for excessive force in the Quarterly and Annual Reports as required by the New Jersey Attorney General Internal Affairs Guidelines ("AG IA Guidelines").  (PF ¶104 - 116)

- CCPD's IA Unit under reported its excessive use of force complaints, and other types of citizen complaints in violation of the AG IA Guidelines. (PF ¶129 - 131)

- CCPD's IA Unit failed to properly investigate citizen complaints of police misconduct as their IA investigations failed to comport with mandatory procedures of the AG IA Guidelines.  (PF ¶131 - 137)

- CCPD's IA Unit routinely failed to sustain any complaints for excessive force.  From May 1, 2013 to December 30, 2014 there were 100 (or 107) civilian complaints for excessive force, but none were sustained which was well below the 5–10% sustain rate for comparable police departments. Moreover, out of a total of 297 citizen complaints only 2 were sustained, 1 for demeanor and 1 for improper search.  (PF ¶117 - 120)

- CCPD failed to sustain complaints of excessive use of force, even where there was evidence of excessive use of force on an arrestee's neck and/or a recommendation that the complaint be sustained. Instead, Defendant Chief Thompson downgraded the complaint and treated it as merely a rule violation.  (PF ¶124 - 128)

- CCPD failed to follow its own Use of Force Policy as it routinely ignored its obligation to have supervisors review all Use of Force Reports and prepare and file the Administrative Review Forms. Here, Defendant Merck had 9 Use of Force Reports for which there was only 1 Administrative Review Form filed with the IA Unit as required. (PF ¶138 - 141)

- CCPD failed to properly implement its early warning system, the Guardian Tracking System, to detect patterns and trends of officer conduct and provide appropriate remedial action.  Here, Defendant Merck's record on use of force should have triggered a review, monitoring and remedial training on use of force, but was not.  By contrast, he was preemptively monitored for traffic accidents. (PF ¶142 - 149)

- CCPD failed to provide mandatory bi-annual Use of Force training to all officers as required by the New Jersey Attorney General Use of Force Guidelines. CCPD did not provide Merck with the mandatory training for a period of 15 months, from April 2013 through July 2014.  Marchiafava and Gennetta did not receive this training until July 2014. (PF ¶150 - 158)

- CCPD failed to do any annual performance reviews as required by its policies. (PF ¶159 - 163)

- CCPD failed to properly respond to and investigate Defendant-Officers' arrest of Ingram and their use of force, despite his catastrophic injuries, in violation of its Use of Force Policy and other policies. Instead, before any meaningful IA investigation, CCPD, via Chief Thomson, blamed Ingram for having caused his own injuries due to a slip and fall; and even commended Defendant-Officers for their performance, demonstrating the CCPD's lack of meaningful accountability and controls when its officers use force.  (PF ¶164 - 173)

In sum, Plaintiff will submit to the jury a strong and compelling body of evidence to support the

*Monell* claims against the County-Defendants.

I.    **Damages**

     Plaintiff Ingram has been, and will be for the remainder of his life, paralyzed from the neck down requiring 24/7 care.  In addition to his initial hospitalizations from June 12, 2014 through October 17, 2014, he has been hospitalized on a number of occasions for complications and has undergone numerous surgical procedures including flap surgery for a severe sacral wound. He requires a colostomy bag and suprapubic catheter, however he has suffered with related infections and complications requiring cystoscopies and stent procedures.  Plaintiff's expert, Guy Fried, M.D., is board certified in Physical Medicine and Rehabilitation, with a sub-specialty in Spinal Cord Injury, and serves as the Chief Medical Officer of Magee Rehabilitation Hospital where he previously treated Mr. Ingram. He has since conducted 2 IMEs and reviewed the medical records. While Mr. Ingram is alert and oriented, Dr. Fried finds he suffers with numerous complications from his spinal cord injury and complete quadriplegia including but not limited to the following:

- Significant contractures in his neck, back arms and legs;

- Unable to roll over, transfer or even scratch his head;

- Increased tone in his muscles, all joints are tightly stiff.  Right arm is more contracted then the left. His elbows are contracted in a flexed position; his wrists are contracted in an extended position.

- Some muscles crossing the contractures in his upper extremities have a little strength and he has trace bilateral strength in the legs, although this does not result in any functional motion.

- Increased tone and spasticity in his arms and legs;

- He has scoliosis causing his hips to tilt to the right and his trunk tilts to the left;

- Significantly decreased pain and light touch sensation below C4 dermatone;

- Suffers with dysesthesias in the bottom of both feet;

- Edema in his legs, contractures of his knees.

13

Mr. Ingram is on a host of medications, including muscle relaxers, pain killers and anti-depressants. In all respects he is trapped in a totally dysfunctional body -- "frozen in position" -- completely paralyzed and suffers with pain and spasms daily all related to his permanent spinal cord injury. He had no pre-existing contributory health conditions. Dr. Fried opines that with the proper care, Mr. Ingram has the capacity to live a normal or near normal life expectancy. He was only 20 years old when he was injured on June 12, 2014.

Plaintiff's life care plan expert, Edmond Provder has detailed the 24/7 care and extensive services plaintiff requires -- including those for facility care in a nursing home and those for in-home care. It is Mr. Ingram's goal to live in a private home where he can be properly supported and cared for while surrounded by his family and children. Plaintiff's economist, Kris Kuscma, M.A., of Sobel Tinari Economic Group Economists, has valued the life care plan. The cost for in home care is $17.6 or $21.3 million (based on 2 options). By way of comparison, the cost for facility care is $11.6 or $15.3 million (based on 2 options). There is also a Medicaid Lien for medical care expenses from June 12, 2014 to present in an amount in excess of $1.5 million. (The amount of the lien is to be determined) In addition to seeking damages for the costs of all past and future medical and care expenses, Plaintiff is entitled to compensatory damages for past, present and future pain and suffering, loss of enjoyment of life, and permanent disability. Furthermore, Plaintiff also has a claim for punitive damages against Defendant-Officers. It will be up to the jury to determine whether punitive damages are warranted and how much should be awarded against the respective officers.

## OVERVIEW OF THE LAW

A. **Claims for Excessive Force**

The Fourth Amendment guarantees freedom from the use of excessive force during an arrest. *Graham v. Connor*, 490 U.S. 386, 394 (1989), *Groman v. Twp. of Manalapan,* 47 F.3d 628, 634 (3d Cir. 1995). "To state a claim for excessive force…, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004). Each case must be evaluated under the totality of circumstances. *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997).

This test is whether the actions of Defendants Merck, Gennetta and Marchiafava "are 'objectively reasonable' in light of the facts and circumstances confronting them…." *Graham,* at 388. The reasonableness of a particular use of force must be evaluated from the perspective of a reasonable officer on the scene. *Id*. Under *Graham*, the factors to be considered are: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he <u>actively</u> is resisting arrest or attempting to evade arrest by flight." *Id*. at 396 (emph. added). The Third Circuit holds the nature of injury is also a relevant factor: "the fact that physical force applied was of such an extent as to lead to injury is indeed a relevant factor to be considered as part of the totality." *Sharrar*, 128 F.3d at 822.  Significant here, the use of force against an arrestee <u>who has already been restrained</u> violates the Fourth Amendment. *Noble v. City of Camden,* 112 F. Supp 3d 208, 228 (D.N.J. 2015); *see Weber v. Rodriguez*, 2011 WL 2555358, at *5 (D.N.J. June 27, 2011) (Accepting plaintiff's claim that officer beat him after he was handcuffed and lying on the ground; jury could conclude officer used excessive force in effecting the arrest); *Hurt v. City of Atl. City*, 210 WL 703193, *8 (D.N.J. Feb. 24, 2010) (Jury must decide issue where officers physically assaulted a plaintiff after he was subdued on the ground). Because

the inquiry is fact sensitive, "[r]easonableness under Fourth Amendment should frequently remain a question for the jury." *Abraham v. Raso,* 183, F.3d 279, 290 (3d Cir. 1999).

In denying Defendants' Motion for Summary Judgment on the Excessive Use of Force claim, the late Hon. Jerome B. Simandle, U.S.D.J. ruled,

> In this case, taking the evidence in the light most favorable to Plaintiff Ingram, the Graham factors do not indicate that deadly force would have been reasonable under the circumstances, as Plaintiff Ingram was arrested under false pretenses, he did not have a weapon, was not threatening violence, or otherwise constituting a threat to safety. Plaintiff Ingram was attempting to flee, but in the absence of any other Graham factors, this alone does not support the Officer Defendants' use of deadly force against Plaintiff Ingram's neck as he lay on the ground. Likewise, … none of the Sharrar factors indicate that the degree of force would have been reasonable under the circumstances, as there is no evidence that Plaintiff Ingram was acting violently, there is no evidence that there was insufficient time for Officer Defendants to have refrained from exerting deadly force against Plaintiff Ingram's neck or spine, Plaintiff Ingram was not armed (although there is evidence he discarded a gun [prior] to the foot chase, which Plaintiff disputes), nor is there evidence that the Officer Defendants were outnumbered. Therefore… the Court finds that a reasonable officer would know that it would be excessive to jump on a suspect who had fallen to the ground, punch and kick him, step on or knee his neck, and to lift and drop him in spite of Plaintiff's vocal cries that he lost feeling in his extremities.
>
> ….. A reasonable jury could find that he was pursued by police under false pretenses, that he never threatened an officer, never displayed something like a weapon, never advanced toward an officer, never touched an officer, never assumed a fighting posture, that after his fall he was not resisting whatsoever, that after his fall Officer Defendants beat Plaintiff Ingram while he lay on the ground, that Plaintiff Ingram's neck injury was sustained by force applied by the officer Defendants, that he told Officer Defendants that he could not feel his legs prior to Officer Defendants disregarding Plaintiff Ingram's cries that he was in pain, could not breathe, and could not feel his legs, and picking him up and dropping his limp body causing him to fall onto his face. A reasonable jury could find that Officer Defendants exercised a degree of force that was not only improper but unconstitutionally excessive.  Under this version of the facts, a jury could reasonably find that this force was not for the purpose of arresting Plaintiff Ingram, but rather for the purpose of summarily punishing him…. (Opinion, Pages 13 – 18) (D.E. 232)

B.    **Failure to Render Medical Care**

The U.S. Constitution guarantees an arrestee the right to reasonable medical care.  *Groman*,

47 F.3d at 637 (3d Cir. 1995); *Jennings v. Fetterman*, 197 F. App'x 162, 165 (3d Cir. 2006) ("As

an arrestee in the custody of government officials, [the plaintiff] was required to be given medical

care for his wounds.") (citing *Monmouth Cnty. Corr. Inst'l Inmates v. Lanzaro*, 834 F.2d 326, 346

n.31 (3d Cir. 1987)).  Where a failure to render medical care arises from a state actor's conduct

during an arrest, or post-arrest but prior to being charged with a crime, then such a claim falls

within the parameters of the Fourth Amendment.  For example, in *Currie v. Chhabra*, the Seventh

Circuit applied the Fourth Amendment's objective reasonableness standard to evaluate a deceased-

plaintiff's medical care claim where a diabetic-plaintiff was arrested and denied medical care prior

to being charged:

> The relevant legal standard for arrestees who have been seized but
> who have not yet had their probable cause hearing, we conclude,
> comes from the Fourth Amendment, not the Fourteenth, and
> certainly not the Eighth. The issue is whether the state actor's
> "response to [the arrestee]'s medical needs was objectively
> unreasonable" and "caused the harm of which [the arrestee]
> complains."

728 F.3d 626, 627, 629-31 (7th Cir. 2013) (quoting *Ortiz v. City of Chicago*, 656 F.3d 523, 530

(7th Cir. 2011) (setting forth factors for Fourth Amendment analysis)).

Consistent with the Seventh Circuit's analysis in *Currie*, the Third Circuit in *James* has

recognized that whether a § 1983 medical claim is governed by the Fourth, Fourteenth and Eighth

Amendments turns on whether the constitutional violation occurred during arrest and prior to being

charged, during pretrial detention after being charged, or during post-trial detention, respectively.

*James v. York Cnty. Police Dept.*, 160 F. App'x 126, 131 (3d Cir. 2005) (holding "James alleged

the use of excessive force during the course of his arrest, before he was charged with, or convicted

17

of, a crime. Therefore, the Eighth and Fourteenth Amendment protections against the use of excessive force were inapplicable."). *Accord Lanzaro*, 834 F.2d at 346 n.31 (3d Cir. 1987) (holding that "constitutional standard" for "pretrial detainees" is set by 14th Amendment, and for "sentenced inmates" by the 8th Amendment; "due process rights of [a detainee]...are[, therefore,] at least as great as the 8th Amendment protections available to a convicted prisoner").

Like *Currie*, courts in the District of New Jersey have applied the Fourth Amendment where a lack of medical care occurs during an arrest but prior to charges. For instance, in *Pierce v. Cherry Hill Township*, the Hon. Joseph H. Rodriguez, U.S.D.J. applied the Fourth Amendment's reasonableness standard in evaluating claims arising from the defendant-officers' failure to render "immediate" medical care subsequent to the arrest of a plaintiff whom the officers knew had suffered a serious head injury, and where the failure to act was inconsistent with the officers' first responder training and this contributed to the arrestee passing away from the untreated head injury. 2013 WL 3283952, at *3-4, 9-10 (D.N.J. June 26, 2013).  In applying the 4th Amendment "reasonableness" standard (rather than the 8th Amendment "deliberate indifference" standard), the *Pierce* court relied on published decisional law from this District, which indicated that, under circumstances analogous to this case, the Fourth Amendment controls.  *Id*. at *7-8 (citing *Hill v. Algor*, 85 F. Supp. 2d 391 (D.N.J. 2000) (Brotman, J. holding Third Circuit in *Groman* "did not define 'custody' nor otherwise indicate where along the custodial continuum the deliberate indifference standard applies"); *Davis v. Twp. of Paulsboro*, 421 F. Supp. 2d 835, 854 (D.N.J. 2006) (Irenas, J. applying 4th Amendment's reasonableness inquiry to medical care claims arising during course of arrest)).

An inquiry under the Fourth Amendment focuses on whether a defendant's actions were "objectively reasonable" in light of the circumstances confronting them "without regard to their

underlying intent or motivation." *Pierce*, 2013 WL 3283952, at *7 n.7.  In this District, and in the State of New Jersey, an arrestee's right to prompt emergency medical care from a police officer has been clearly established since the 1980s and 1990s.  *E.g.*, *Pierce*, 2013 WL 3283952, at *10–11 (collecting cases).  Fourth Amendment jurisprudence instructs that the "reasonableness" inquiry must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Graham*, 490 U.S. at 396–97 (1989).

Here, the undisputed facts judged from the perspective of the reasonable officer establish that Defendants Gennetta, Marchiafava and Merck acted in an unreasonable manner.  Applying the *Ortiz* factors, 656 F.3d at 530–31 (7th Cir. 2011), the facts establish that defendants were on notice of Ingram's medical needs, they knew the seriousness of spinal injuries and paralysis, the treatment required (stabilization and awaiting EMT) was within their power and training, and there was no countervailing police interest that would justify denying Ingram essential care to avoid aggravating or further damaging his spinal trauma.  *See Pierce*, 2013 WL 3283952, at *12 (D.N.J. June 26, 2013) (applying *Ortiz* factors).

At trial, Defendants will likely rely on cases involving pretrial detainee or sentenced inmates to argue the Court should apply the Fourteenth Amendment's "deliberate indifference" standard.  However, the Third Circuit has made clear that a claim arising between arrest and prior to being charged falls within the parameters of the Fourth Amendment.  *James*, 160 F. App'x at 131. "The relevant legal standard for arrestees who have been seized but who have not yet had their probable cause hearing…comes from the Fourth Amendment, not the Fourteenth, and certainly not the Eighth." *Currie*, 728 F.3d at 630-31 (7th Cir. 2013) (rejecting defendant's argument for "deliberate indifference" standard, and holding that "different constitutional provisions, and thus different standards, govern depending on the relationship between the state

and the person in the state's custody"). *See also City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 243–45 (1983) (holding the Fourteenth Amendment, not Eighth, controls medical care claims arising from confined pre-trial detainee).[4]

However, even if *arguendo* the Fourteenth Amendment applied Defendants' conduct here is sufficient to satisfy even the "deliberate indifference" standard.  To establish a "claim for a violation of [the] right to adequate medical care, an inmate must [establish]: (1) a serious medical need; and (2) behavior on the part of prison officials that constitutes deliberate indifference to that need.'" *Andrews*, 95 F. Supp. 2d at 227 (quoting *Estelle*, 429 U.S. at 106).[5]  In this case, the undisputed facts also satisfy the two-prong test for medical care claims under the Fourteenth Amendment.

### (1)  Prong One -- Plaintiff's Medical Needs were Objectively Serious

Plaintiff Ingram's traumatic injuries were "objectively serious."

> "To satisfy the first prong of the *Estelle* inquiry, the inmate must demonstrate that his medical needs are serious. '[B]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to [a constitutional] violation only if those needs are serious.' Serious medical needs include those that have been diagnosed by a physician as requiring treatment or **so obvious that a lay person would recognize the necessity for a doctor's attention**; and those

---

[4]     Our research indicates the Third Circuit has not squarely decided in a precedential decision whether the reasonableness or deliberate indifference standards governs under the facts presented here.  The "Supreme Court has provided relatively little guidance regarding the constitutional rights of arrestees and pretrial detainees" *Currie*, 728 F.3d at 629–30. *Cf. Bocchino v. City of Atl. City*, 179 F. Supp. 3d 387, 404-05 (D.N.J. 2016) (where "parties' submissions do not reconcile the standard to apply to…medical care claim," and plaintiff argued "deliberate indifference," court applied Fourteenth Amendment, while acknowledging that "[a]t least two courts in this district have held that the Fourth Amendment applies to denial of medical care claims asserted by an arrestee and thus have applied an objective reasonableness standard") (in footnote 10, collecting cases re circuit split).

[5]     In the Third Circuit, the same "deliberate indifference" standard is applied to Fourteenth and Eighth Amendment claims.

> **conditions which, if untreated, would result in lifelong handicap or permanent loss**.

*Andrews*, 95 F. Supp. 2d at 227 (emph. added) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992), and *Lanzaro*, 834 F.2d at 347). "Persistent severe pain qualifies as a serious medical need." *Hoffenberg v. Grondolsky*, 09-4784, 2011 WL 124632, at *15 (D.N.J. Jan. 14, 2011).

Here, it is undisputed that Mr. Ingram notified the arresting officers at or around the time that he was handcuffed that (1) he could not feel his extremities (legs and arms), and (2) he had severe neck and back pain. Courts have held complaints of symptoms of paralysis are an "objectively serious" medical condition. *E.g.*, *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 599-600, 603 (6th Cir. 2005) ("We have little difficulty finding a substantial risk of serious harm to [the plaintiff's] health and safety" where after plaintiff fled from defendant-officers, he was tackled, placed in restrain moves, handcuffed, and then moved and not provided medical care while unconscious); *Small v. Owens*, 2006 WL 2355512, at *8 (D.N.J. Aug. 10, 2006) (recognizing that "paralysis likely constitutes a serious medical need"). Accordingly, the first prong of the deliberate indifference test is satisfied.

### (2)  Prong Two -- Defendants Disregarded a Known Risk of Harm

Defendants Gennetta, Marchiafava and Merck's response to Mr. Ingram's medical needs constitutes "deliberate indifference."

> [T]he second prong of the *Estelle* test:  whether any or all defendants were deliberately indifferent to plaintiff's serious medical needs. The second element of the *Estelle* test requires an inmate to show that [defendant] officials acted with deliberate indifference to his serious medical need. "Deliberate indifference" is…a state of mind equivalent to reckless disregard of a known risk of harm…. **The hallmark of [a constitutional] violation arises when such medical treatment, or the withholding of medical treatment, is accompanied by knowing indifference to the pain or risk of serious injury this will cause**….

*Andrews*, 95 F. Supp. 2d at 228 (emph. added) (citing *Farmer v. Brennan*, 511 U.S. 825, 837–38 (1994), and *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990)).  In *Lanzaro*, the Third Circuit explained as follows:

> Where [defendants] deny reasonable requests for medical treatment, however, and such denial exposes the [detainee] "to undue suffering or the threat of tangible residual injury," deliberate indifference is manifest. Similarly, where "knowledge of the need for medical care [is accompanied by the]...intentional refusal to provide that care," the deliberate indifference standard has been met....  Finally, deliberate indifference is demonstrated "[w]hen... [defendants] prevent [a detainee] from receiving recommended treatment for serious medical needs….

*Lanzaro*, 834 F.2d at 346 (3d Cir. 1987) (citations omitted).  *See also Visintine v. Zickefoose*, 2014 WL 4388609, at *11–12 (D.N.J. Sept. 5, 2014) (holding "an intentional delay in…treatment might violate an inmate's constitutional rights…, the inquiry turns on the relation between the seriousness of injury at issue and the promptness of medical care").

Here, Gennetta, Marchiafava, and Merck's course of conduct after handcuffing Mr. Ingram – as **admitted** in depositions and reports and captured on video – establishes that defendants withheld medical treatment accompanied by knowing indifference to the pain or risk of serious injury.  *Andrews*, 95 F. Supp. 2d at 228.  Additionally, the record on this motion shows palpable indifference to whether Mr. Ingram would suffer a permanent, catastrophic injury after defendants were on notice of his condition and then failed to provide first responder medical care, and instead directly violated their training by moving, lifting, shaking and dropping a handcuffed arrestee who had complained of symptoms of paralysis.

As trained first-responders, defendants **admit** that they know how to recognize a spinal injury.  Supervising officer Merck acknowledged that an arrestee is entitled to medical care.  At their depositions, Gennetta, Marchiafava, and Merck did not dispute that their training required

them to immobilize a person who has suffered a spinal injury.  Thus, it is undisputed that at the time of handcuffing, defendant-officers were trained to recognize the signs of a spinal injury and to render first responder care – immobilize and stabilize the injured person until medical professional arrive.

Also important, defendants **conceded** in their reports and depositions that at or around the time that Mr. Ingram was handcuffed and lying prone on the ground, he notified Gennetta, Marchiafava, and Merck that he had symptoms consistent with a serious spinal injury – namely, no feeling in his legs and arms and severe neck pain.  What is more, Gennetta and Merck indicated that there was no sign or belief that Mr. Ingram was feigning injury.  Any lay person knows that a loss of sensation or control of an extremity mandates that the injured person be immobilized and not moved until a collar and backboard are available to safely transport a person for emergency medical care.  This, unfortunately, is a fact commonly observed at the side of the road after car accidents and on sport's fields after a neck injury.  In short, whenever a spinal or neck injury occurs, the public is well aware of the methodical care taken not to move or disturb a person who is in such a fragile state.  *A fortiori*, here, defendants are trained first responders knowledgeable of best practices that Mr. Ingram needed to be immobilized and moved with utmost care to avoid permanent handicap.

Despite all this, defendants' undisputed conduct was, literally, the most harmful course of conduct in responding to a person who has just suffered a catastrophic neck injury.  Defendants intentionally disregarded Ingram's pleas for medical care, instead repeatedly <u>ordering him to stand</u>.  Disregarding their training, defendants repeatedly moved Ingram: rolling him, lifting him twice, and even dropping him to the ground.  The arrest video is disturbing, as it shows Ingram's limp head swinging around loosely.

23

In sum, an arresting-officer yanking a prone, handcuffed arrestee to a sitting position and then dropping him is the "hallmark" of deliberate indifference:  reckless disregard for the known risk of harm.  *Andrews*, 95 F. Supp. 2d at 228; *Lanzaro*, 834 F.2d 326, 346.  The other officers on the scene, including defendant Merck, failed to intervene or provide Mr. Ingram with the required medical care consistent with defendants' first-responder training and knowledge.  *Lambert v. Blackwell*, 2008 WL 2478380, at *4 (D.N.J. June 17, 2008) ("'[S]upervisory liability may attach if the supervisor implemented deficient policies and was deliberately indifferent to the resulting risk or if the supervisor's actions and inactions were 'the moving force' behind the harm suffered by the plaintiff.'") (citation omitted); *see Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) ("Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence"). The Third Circuit has made clear that denial of medical care, which "exposes the [detainee] 'to undue suffering or the threat of tangible residual injury,' deliberate indifference is manifest." *Lanzaro*, 834 F.2d at 346.

In addressing the parties' respective motions for summary judgment on the failure to render medical care claim, Judge Simandle ruled, that,

> In the present case, the moment of seizure is in dispute and therefore the Court cannot simply choose the appropriate test to apply with regard to Plaintiff's Ingram's claim for failure to render medical aid. "It is a question of fact, precisely when, in each case the arrest took place." Sibron v. New York, 392 U.S. 40, 67 (1968) (citation omitted). Therefore, as this issue is currently in dispute, the question  of when Plaintiff Ingram was actually seized cannot be decided in the context of the present motions, but rather must wait for the jury to determine. If "seizure" pursuant to the arrest was completed by subduing and handcuffing Plaintiff on the ground, then this second phase of constitutional violation may be said to have occurred post-seizure, that is while in custody, and rights of a pretrial detainee apply. See Natale, 318 F.3d at 581. On the other hand, if he was not yet a "detainee" because seizure was not yet complete, then this second phase of injurious conduct occurred pursuant to the arrest and would be analyzed as part of the "excessive force" claim.

In the version of events most favorable to Plaintiff Ingram... his need for medical attention stemming from a spinal injury became apparent to the Officer Defendants prior to or during the course of arrest, as a result of Plaintiff Ingram having loudly stated that he could not feel his legs, and rather than rendering immediate medical aid, the Officer Defendants, all of whom are trained first responders, proceeded to pick up Plaintiff Ingram, drop him on his face, pick him up again, and then finally call for an ambulance. In this version of events, Officers Defendants knew or should have known that a persons suffering from a spinal injury should not be moved whatsoever, and rather should be stabilized in place prior to arrival of paramedics. A reasonable jury could find these facts, and, were they do to so, they could also reasonably find in favor of Plaintiff with respect to this claim.

Likewise, in the version of events most favorable to Defendants, the Officer Defendants did not become aware of Plaintiff Ingram's medical need until after he was seized. Officer Defendants, still unaware of Plaintiff Ingram's neck injury, attempted to get Plaintiff Ingram to stand in order to escort him to a patrol car. Once aware that Plaintiff Ingram's reason for not standing was an injury to his neck, Officer Defendants immediately stabilized Plaintiff Ingram in place and requested an ambulance. A reasonable jury could find these facts, and, were they do to so, they could also reasonably find in favor of Defendants with respect to this claim. (See, Opinion, Page18 - 21, D.E. 232)

Accordingly, unless this Court makes a determination at trial as to when the seizure took place and which standard, the 4th or 14th Amendment, applies, this Court will be requested to charge the jury to make this determination and to apply the applicable standard to address this claim.

**C.    Supervisory Liability**

In the Third Circuit, "a supervisor may be personally liable under Section 1983 if he … participated in violating the plaintiff's rights, directed others to violate them, or as the person in charge, had knowledge of and acquiesced in his subordinates violations." *AmM. V. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004); *accord Santiago v. Warminster Twp*., 629 F.3d 121, 130 (3d Cir. 2010).

Here, the jury may find that Defendant Merck, as the supervising Sergeant, has supervisory liability relating to the excessive use of force claim. Plaintiff Ingram testified that when Merck arrived, Marchiafava and Gennetta were still kneeing him in the neck and back, and striking him.

25

Then, even though Ingram had just been handcuffed and was not resisting, Merck stepped down on his neck. This supports the jury finding that Merck participated in the officers' use of excessive force for imposition of supervisor liability. The jury may also find Merck bears such liability for the failure to provide medical care. Particularly as Merck knew of Ingram's complaints of pain and loss of feeling in his extremities, recognized as consistent with potential paralysis and that he should not be moved, but nevertheless made the decision and directed Marchiafava and Gennetta to move him -- get him up for transport in a police car.

**D.     False Arrest**

Merck is the prime defendant of Plaintiff's false arrest claim, as he ordered codefendants to arrest Ingram, but did not have probable cause. *O'Connor v. City of Phila*, 233 F. App'x 161, 164 (3d Cir. 2007) (Arrest without probable cause constitutes false arrest). Mr. Ingram did not have a gun. There is **no direct or forensic evidence** linking Ingram to the gun which Merck claims he found under a car in the parking lot. No officer ever saw Ingram in possession of a gun. It is conspicuous that despite a discovery hold notice – evidence preservation letter from Plaintiff's counsel, and Ingram's catastrophic injuries, Merck and Chief Thomson failed to order testing for fingerprint and DNA evidence from the gun, magazine and bullets, as well as the drug packaging. (*See* Pl's Spoliation Mot., D.E. 289). Ingram asserts that Merck lacked probable cause because he "planted" or "flanked" this gun and then proceeded to file false charges for weapon possession. At trial, if the jury finds that Merck planted the gun, then, as a matter of law, there was no probable cause for Defendants to arrest Ingram. What is more, Plaintiff has sought a spoliation charge with respect to the gun that Merck produced, and then destroyed fingerprint evidence to make it impossible for Plaintiff to prove his prints were not on the gun. *Ergo*, all the damages suffered by Ingram flow from the false arrest.

As to the drugs allegedly found on Mr. Ingram (albeit by different officers at inconsistent times and a broken chain of custody), the drugs allegedly found post-arrest cannot be used to justify the initial arrest. *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 436 (D.N.J. 2011) ("Although probable cause need only exist for any offense that could have been charged under the circumstances, the probable cause for offenses that occurred either during or after the arrest cannot provide the requisite probable cause as to justify the initial arrest").   As to any contention by defendants that the grand jury indictment establishes probable cause as a matter of law, this is not so, particularly where here, plaintiff claims that the charges -- including the grand jury indictment -- all flow from Defendant Officers having planted the gun and falsifying the charges and evidence as considered by the grand jury.

### E.     *Monell* Liability

The County of Camden is directly liable for the violations of Ingram's constitutional rights when those violations were caused by its policy, custom or practice. *Beck vs. City of Pittsburg*, 89 F.3d 966, 971 (3d Cir. 1996) (citing *Monell v. NYC Dept. of Social Servs.*, 436 U.S. 658 (1978)). To prevail under *Monell*, plaintiff must show that defendant had a policy or custom, official or unofficial, that deprived Ingram of his Constitutional rights, *i.e.*, not to be subjected to excessive force, to be provided adequate medical care, and not to be falsely arrested. *Beck*, 89 F.3d at 971. As the District of New Jersey noted, "custom may be established by showing that a given course of conduct 'although not specifically endorsed or authorized by law, is so well-settled and permanent as to virtually to constitute law." *Adams v. City of Atl. City*, 294 F. Supp. 3d 283, 301 (D.N.J. 2018) (citing *Bielevicz v Dubinon*, 915 F.3d 845, 850 (3d Cir. 1990)).   Liability based on a custom proceeds on the theory that the practice is so widespread as to have the force of law. *Constantino v. City of Atlantic Cit*y, 152 F. Supp. 3d 311, 320 (D.N.J. April 10, 2015) citing *Board*

*of County Com'rs of Bryan County, Okl. V. Brown,* 520 U.S. 397, 404 (1997) Custom may also be established by proof of knowledge and acquiescence. Id., citing *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009) The Supreme Court has recognized that where a violation of federal rights is a "highly predictable consequence" of an inadequate custom in a situation likely to recur, municipal liability may attached based upon a single application of the custom. Id. citing *Monaco v. City of Camden*, 2008 WL 8738213 at *7 (D. N.J.  April 14, 2008) (citing *Board of County Com'rs,* 520 U.S. at 409-410.

Once a policy or custom is identified, a plaintiff must "demonstrate that through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Nobel*, 112 F. Supp. 3d at 221. Causation can be established by "demonstrat[ing] that the action was taken with 'deliberate indifference' as to its known or obvious consequences" *Id*.  There must be a direct causal link between the municipal action and the deprivation of rights. *Constantino*, 152 F.Supp.3d at 321.  "A pattern or continued adherence to an approach that a municipality knows or should know has failed to prevent tortious conduct of police officers may establish "the conscious disregard for the consequences of [its] action – the 'deliberate indifferences' – necessary to trigger municipal liability." Id. (citation omitted)

Here, Plaintiff asserts that the County, acting through CCPD and Chief Thomson, tolerated or adopted an unofficial custom and practice that resulted in the unlawful deprivation of constitutional rights. *Ewing v. Cumberland Cnty.*, 152 F. Supp. 3d 269, 302 (D.N.J. 2015). Specifically, plaintiff claims CCPD failed to monitor, train, supervise and discipline its officers so as to prevent them from unlawfully depriving citizens of their constitutional rights. *Id.* at 304. For instance, the claims arise, in part, from CCPD's improper Internal Affairs practices.

> "The Third Circuit has noted: 'The [IA] investigative process must
> be real. It must have some teeth. It must answer to the citizen by

28

> providing at least a rudimentary chance of redress when injustice is done.'"

*Groark v. Timek*, 989 F. Supp. 2d 378, 394 (D.N.J. 2013) (quoting *Beck*, 89 F.3d at 974). "Three things must be done with regard to the internal affairs function. One, police departments 'must implement an internal affairs policy that provides for a meaningful and objective investigation of citizen complaints of police misconduct.' Two, the behavior of police officers for misconduct must be monitored and tracked. Three, officer misconduct must be corrected." *Id.* at 384. Here, through the testimony regarding CCPD's Internal Affairs Unit practices, as well as its internal affairs records, plaintiff's expert, Dr. Chapman will show why prior and other incidents deserved discipline and how the misconduct in those situations is similar to the plaintiff's case as required. *Merman v. City of Camden*, 824 F. Supp.2d 581, 591 (D.N.J. 2010)(citations omitted) In accord, *Katzenmoyer v. Camden Police Dept.*, 2012 WL 66691747 at *12 (D.N.J. Dec. 21, 2012)  Here, Plaintiff will demonstrate that under Defendant Chief Thomson's watch, CCPD's Internal Affairs Unit and process was a sham, it had a custom of not properly investigating citizen complaints, including for excessive force, and it failed to adequately monitor and track the conduct of its officers, including Defendant Merck which gives rise to a custom of tolerating and acquiescing its officers unconstitutional conduct which violated plaintiff's rights.

Plaintiff also bases <u>Monell</u> liability of CCPD's failure to train its officers on use of force. To sustain a claim against CCPD for failure to train, plaintiff must (1) identify the deficiency in training; (2) prove that the deficiency caused the Constitutional violation; and (3) prove that the failure to remedy the deficiency constituted deliberate indifference. *Lapella v. City of Atl. City,* 2012 WL 2952411, *6 (D.N.J. Jul. 18, 2012). Here, CCPD failed to provide the <u>mandatory</u> bi-annual Use of Force training, as required by the New Jersey Attorney General Use of Force Guidelines; CCPD failed to provide the Fall 2013 Use of Force training; and consequently, CCPD

failed to provide Merck with the required bi-annual training for 15-month period (from 4/18/13 through 7/23/14). CCPD did not provide Gennetta and Marchiafava the Spring 2014 Use of Force Training until after their June 2014 arrest of Ingram. Critically, the Spring 2014 Use of Force Training covered the prohibition against the use of neck restraints, because of the high risk of unintended serious injury or death. At the time of Ingram's arrest, Marchiafava admitted he did not know that it would be improper to apply force to Ingram's neck.  The need for use of force training is apparent given the escalating number of complaints of excessive use of force.

As for the "deliberate indifference" element, here Chief Thomson and CCPD IA department knew of prior complaints of officers, including Merck, using force on arrestees' necks, yet did nothing to correct this unjustified use of deadly force.  This pattern of deadly force against arrestees' necks required corrective training. *Wright v. City of Phila*., 685 F. App'x 142, 145 (3d Cir. 2017) (pattern of similar constitutional violations by untrained employees may be sufficient to show deliberate indifference for failure to train claim). Additionally, there are certain situations where a need for training is "so obvious" that failure to train is amounts to deliberate indifference even without a pattern of constitutional violations. *Ewing,* 152 F. Supp. 3d at 303; see *Connick v. Thompson*, 563 U.S. 51 (2011) (holding single incident may trigger municipal liability where unconstitutional consequences for failure to train are "patently obvious"); e.g., *Monaco v. City of Camden*, 2008 WL 8738213, at *7 (D.N.J. Apr. 14, 2008) (holding Camden's history of excessive force may support Monell liability for single incident without a pattern); *Merman*, 824 F. Supp. 2d at 595-96 (holding Camden's history of false arrest may support Monell liability for single incident without a pattern). Whether analyzed individually (Merck's use of force on an arrestee's neck), or collectively (other Camden officers' use of force on arrestees' necks), there is certainly sufficient evidence for the jury to determine that CCPD's failure to provide Use of Force training

30

on prohibited, high-risk deadly contact between police and arrestees is sufficient to support a finding of deliberate indifference to the rights of Camden citizens, who are expected to come into contact with officers during arrests.

## F.     State Law Claims

As a general proposition, public entities are not liable for injuries caused by their direct tortious conduct unless there is a specific exception in the TCA which permits such liability. Fielder v. Stonack, 141 N.J. 101, 117 (1995).  By contrast, public employees have no such blanket immunity.  Id.  N.J.S.A. 59:3-1(a) provides, "[e]xcept as otherwise provided by this Act, a public employee is liable for injury caused by his act or omission to the same extent as a private person.

Thus, the liability of a public employee is found both in the TCA and at common law.  Tice v. Cramer, 133 N.J. 347, 356 (1993).  Moreover, even if a public entity is not directly liable under the TCA, it is liable under the doctrine of respondeat superior for injuries "proximately caused by an act or omission of a public employee within the scope of his employment in the manner and to the same extent as a private individual under like circumstances."  N.J.S.A. 59:2-2(a).  Thus, even if the TCA precludes direct claims against a public entity, the TCA will still permit claims brought against the public entity under the doctrine of respondeat superior.  In short, the same evidence and proofs for the Section 1983 claims will be used to support the state law claims. As for the False Arrest Claim, that claim is asserted under both Federal and State law as it incorporates by reference all preceding allegations. Nevertheless, the proofs and standards are the same.

Defendants argue that several provisions of the TCA immunize them from plaintiffs' state law claims.  However, they alone have the burden of proving that they are entitled to any such immunity. Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 582 (2009) (citing Kolitch v. Lindedahl, 100 N.J. 485, 497 (1985)).  Here, the Officer Defendants are not immune for false

31

arrest. <u>N.J.S.A</u>. 59:3-3.  Nor are Defendants entitled to "pursuit immunity" under New Jersey Tort Claims Act, N.J.S.A. 59:5-2 and *Tice v. Cramer*, 133 N.J. 347 (1993). In *Tice* the Supreme Court held that such immunity does <u>not</u> apply where, like here, the injuries were caused by the pursuing police alone. *Id*. at 371. Unlike *Tice*, here plaintiff's injuries were caused **<u>solely</u>** by the officers' use of force **<u>after</u>** he fell and was handcuffed. (PF ¶79). Additionally, defendants fail to address <u>N.J.S.A</u>. 59:3-14, which precludes immunity where a use of force arises to the level of "willful misconduct." *Compare, Alston v. City of Camden,* 168 N.J. 170, 181 (2001).

## <u>CONCLUSION</u>

Plaintiff respectfully submits this pre-trial memorandum summarizing the major factual and legal issues in the forthcoming trial of this action.

Respectfully submitted,

*/s/Beth G. Baldinger*

BETH G. BALDINGER

BGB:cjr
CC:  All Counsel of Record