**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **XAVIER INGRAM,** | CIVIL ACTION NO. 1:14-CV-05519 |
| **Plaintiff,** | |
| **vs.** | |
| **COUNTY OF CAMDEN, CAMDEN COUNTY POLICE DEPARTMENT, JEREMY MERCK, ANTONIO GENNETTA, NICHOLAS MARCHIAFAVA, JOHN SCOTT THOMSON, ORLANDO CUEVAS, JOHN DOE(S) 1-50, and ABC ENTITIES 1-10.** | |
| **Defendants.** | |

---

**BRIEF ON BEHALF OF DEFENDANTS CAMDEN COUNTY, CAMDEN COUNTY POLICE DEPARTMENT, JOHN SCOTT THOMSON, AND NICHOLAS MARCHIAFAVA IN SUPPORT OF MOTION TO DISMISS ALL CLAIMS RELATING TO POST-HANDCUFFING MOVEMENTS OF INGRAM BY DEFENDANT MARCHIAFAVA PURSUANT TO FED. R. CIV. P. 50**

---

BROWN & CONNERY, LLP
William M. Tambussi, Esq.
William F. Cook, Esq.
360 Haddon Avenue
Westmont, New Jersey 08108
(856) 854-8900
*Attorneys for the County of Camden, Camden County Police Department, John Scott Thomson, and Nicholas Marchiafava*

## INTRODUCTION

In this action, Plaintiff alleges that Defendant Officers acted unlawfully by moving Plaintiff after he was handcuffed.  Plaintiff further alleges that this constituted a failure to provide medical aid and/or negligence.[1]

Due to critical developments in this trial, and specifically the testimony of Plaintiff's medical causation expert, Dr. James Yue, Defendants respectfully seek dismissal of these claims at this time.  Dr. Yue admitted at trial that he ***cannot*** say, within a reasonable degree of medical probability, that any such action of these actions caused injury.  Based on this testimony, Plaintiff cannot meet his burden on these claims as a matter of law, and further, qualified immunity is warranted.  Therefore, any claims relating to alleged failures or misconduct in: (1) lifting Ingram's arms during a search incident to arrest; (2) rolling Ingram over to sit him up; (3) sitting Ingram up; and (4) any subsequent movements of Ingram by the officers should be dismissed with prejudice.

## ARGUMENT

**I.    THE LAW GOVERNING MOTIONS PURSUANT TO RULE 50 OF THE FEDERAL RULES OF CIVIL PROCEDURE**

Under Rule 50 of the Federal Rules of Civil Procedure, a "motion for judgment as a matter of law may be made at any time before the case is submitted to the jury."  Fed. R. Civ. P. 50(a)(2).  The motion is proper if "a party has been fully heard on an issue during a jury trial and

---

[1] Plaintiff alleges the following counts: (1) excessive force in the course of Ingram's arrest in violation of 42 U.S.C. § 1983 ("Section 1983") (Count I); failure to provide adequate medical care (Count II); supervisory and bystander liability as to Merck (Count III); that the County of Camden is liable under a Monell theory for inadequate policies, procedures, and customs (Count IV); that the County of Camden is liable under a Monell theory for inadequate training and supervision (Count V); that Defendant Officers are liable for common law assault and battery (Count VI); that Defendant Officers are liable for common law negligence (Count VII); that the County of Camden, Chief Thomson, and Assistant Chief Cuevas are liable on a common law theory of negligent training and supervision (Count VIII); and that Defendant Officers are liable for false arrest and imprisonment (Count IX).

the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue[.]" Fed. R. Civ. P. 50(a)(1). The court may resolve the issue against the party and "grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue[.]" Fed. R. Civ. P. 50(a)(1)(B).

## II.     THE LAW OF CAUSATION IN SECTION 1983 CASES ALLEGING FAILURE TO PROVIDE MEDICAL AID

Failure to provide medical care to an arrestee or a post-arrest detainee can rise to the level of a constitutional violation under Section 1983 and subject the officer to direct liability "only if that failure rises to the level of deliberate indifference to that person's serious medical needs."[2] Mantz v. Chain, 239 F. Supp. 2d 486, 504 (D.N.J. 2002); Hill v. Algor, 85 F. Supp. 2d 391, 409 (D.N.J. 2000); Groman v. Twp. of Manalapan, 47 F.3d 628, 637 (3d Cir. 1995). The deliberate indifference standard governs claims "arising out of one's arrest and post-arrest detention." Mantz, 239 F. Supp. 2d at 504; Hill, 85 F. Supp. 2d at 409. To demonstrate deliberate indifference to serious medical needs, a plaintiff must show (i) a serious medical need, (ii) acts or omissions by law enforcement officers that indicate deliberate indifference to that need, and (iii) a causal connection between the indifference and the plaintiff's injury. Smith v. Gransden, 553 F. App'x 173, 177 (3d Cir. 2014).

As per the first prong, a medical need is serious if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily

---

[2] The "deliberate indifference" standard in "failure to provide medical care" claims for arrestees and post-arrest detainees under the Fourteenth Amendment is the same standard the Third Circuit, including this Court, has used in assessing "failure to provide medical care" claims for post-conviction inmates under the Eighth Amendment. See Reynolds v. Wagner, 128 F.3d 166, 174 (3d Cir. 1997); Snyder v. Baumecker, 708 F. Supp. 1451, 1460 (D.N.J. 1989); see also Taylor v. Plousis, 101 F. Supp. 2d 255, 261 (D.N.J. 2000) ("[C]ourts have applied the same standard to claims of 'deliberate indifference' asserted under the Due Process Clause as those under the Eighth Amendment.").

recognize the necessity for a doctor's attention." Monmouth Co. Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir. 1987); see also Hill, 85 F. Supp. 2d at 409–10 (recognizing that a gash to plaintiff's head along with blood on his head, hands, and clothing "is the type of injury that a lay person easily would recognize as requiring medical treatment.").

Moreover, deliberate indifference is a "subjective standard of liability consistent with recklessness as that term is defined in criminal law." Gransden, 553 F. App'x at 177; Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003); see also Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999) ("It is well-settled that claims of negligence [], without some more culpable state of mind, do not constitute 'deliberate indifference.'"). Accordingly, holding a police officer liable for failure to provide medical care requires proof that the officer knows of and disregards an excessive risk to health or safety. Davis v. Twp. of Paulsboro, 421 F. Supp. 2d 835, 856-57 (D.N.J. 2006); Mantz, 239 F. Supp. 2d at 504; Gransden, 553 F. App'x at 177. The officer must be both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and... draw the inference." Natale, 318 F.3d at 582 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

If an officer offers to provide the person in custody with medical care and that person refuses, the officer is not deliberately indifferent to the person's medical needs. See Groman, 47 F.3d at 637; Mantz, 239 F. Supp. 2d at 504. Similarly, if an officer lacked the requisite knowledge or training to provide effective aid to the person in custody, a prompt call for an ambulance and efforts to clear a path for its arrival have been shown to demonstrate a timely response to the person's medical need. Gransden, 553 F. App'x at 177–78. Also, if the person in custody did not show clear signs of requiring serious medical attention, the officer is not deliberately indifferent to the person's medical needs. See Walmsley v. City of Philadelphia,

872 F.2d 546, 552 (3d Cir. 1989); <u>Miller v. City of Philadelphia</u>, 174 F.3d 368, 375 (3d Cir. 1999) (recognizing that "a much higher fault standard is proper when [an officer] [] is acting instantaneously and making pressured decisions without the ability to fully consider their risks. In such circumstances, liability will only be applied when a 'purpose to cause harm' is demonstrated."); <u>Giles v. Kearney</u>, 571 F.3d 318, 330 (3d Cir. 2009) (noting that the key inquiry is whether the officer "responded reasonably to the risk.").

The final prong requires that there be a causal connection between officer's deliberate indifference and the plaintiff's injury. <u>Gransden</u>, 553 F. App'x at 177; <u>Natale</u>, 318 F.3d at 582. Thus, where a plaintiff presents no evidence that any injury he suffered was the result of the alleged delay or denial of medical care, as opposed to the alleged excessive force, his claim for failure to provide medical care will fail. <u>See</u> <u>Mantz</u>, 239 F. Supp. 2d at 504 (granting defendant's motion for summary judgment where plaintiff failed to provide any medical evidence that the officer's "alleged delay in responding to his demands for an ambulance caused him to suffer harm which he would not have suffered had an ambulance been immediately called to the scene.").

**III.    THE COURT SHOULD DISMISS ANY CLAIMS ALLEGING A FAILURE TO RECOGNIZE SIGNS OF PARALYSIS OR RELATING TO THE ACTIONS OF THE OFFICERS IN PLACING INGRAM IN A SEATED POSITION**

On March 2, 2022, Plaintiff presented Dr. James Yue, M.D. to testify to his opinions and conclusions as to medical causation. During cross-examination, Dr. Yue admitted that he could ***not*** opine, to a reasonable degree of medical probability, that any manipulations after the alleged knee and alleged boot to Ingram's neck caused any additional injury. Specifically, Dr. Yue testified as follows:

Q. Now, you have come to an opinion in this case that a knee in the neck and a boot in the neck caused this injury, correct?

A. Correct.

Q. All right. Would you agree with me that you -- as you sit here today, you can't state with reasonable medical certainty that the manipulations afterwards caused any additional injury?

A. I can't say a hundred percent, but I can say that when you do move an unstable spine, it does cause damage, further damage.

Q. I understand that it can. Can you sit here and say that within reasonable medical probability or certainty in this case that it did?

A. No. He was already completely quadriplegic, so it's hard to make someone more quadriplegic, but --

Q. Well, can you answer my question? Can you testify in this particular case within reasonable medical certainty that the manipulation caused any additional injury?

MS. BALDINGER: Objection, Your Honor. Certainty versus probability.

MR. BLUMBERG: I'll change it.

MS. BALDINGER: Use the appropriate standard.

THE COURT: Sustained. He's changing it. Go ahead.

BY MR. BLUMBERG:

Q. Would you agree with me that you can't state within reasonable medical probability in this case that the manipulations afterwards caused additional injury, correct?

**A. *I can't say yes or no.***

Trial Transcript, at 451-25 to 453-1 (emphasis added).

Later, on re-direct examination, Dr. Yue was asked follow-up questions by Plaintiff's counsel as to why he could not say, "yes or no", whether the manipulations after the alleged knee and alleged boot in the neck caused additional injury. Dr. Yue stated:

Q. You were asked on cross-examination a question that stated -- and I believe I have it right -- could you tell whether the movement back and forth, after Mr. Ingram was set up, made his injuries worse?

Do you remember that question?

A. Yes.

MR. BLUMBERG: Objection, Judge. That was not the question.
THE COURT: Sustained.

Rephrase your question.

BY MS. BALDINGER:

Q. Do you remember being asked questions by Mr. Blumberg regarding Mr. Ingram's being moved back and forth?

A. Yes.

Q. And remember you said you couldn't answer that question "Yes" or "No"?

A. Correct.

Q. Could you tell us why you couldn't answer the question "Yes" or "No."

A. *Because that would have needed a live MRI during the motion to see if there was actual, you know, tissue damage within the spinal cord itself. And obviously, we're not -- there's no live MRI that's on this North 7th Street that the patient -- that the plaintiff is in. And so you, sort of, need that information, because he's asking me about damage to the tissue.*

Q. Do you have an opinion, within a reasonable degree of medical probability, as to what impact the moving him back and forth and having him fall on his face had on his injuries?

MR. BLUMBERG: Objection.

THE COURT: You don't have to answer. There's an objection.

State your grounds.

MR. BLUMBERG: It's been asked, and it's – during cross-examination. There was no answer to that question, and I don't think he can change his answer.

THE COURT: Well --

6

MS. BALDINGER: It's not --

THE COURT: Excuse me.

Your response?

MS. BALDINGER: It's not. It's a clarification because it was misleading the way the question was asked.

MR. BLUMBERG: Objection, Judge.

THE COURT: Very well. But you know that on redirect, the witness can explain and clarify what was raised on cross.

So overruled. I'll permit it.

BY MS. BALDINGER:

Q. Can you answer the question, Dr. Yue.

What is your opinion as to the impact -- the motion of sitting Mr. Ingram up, having him move back and forth, fall on his face, and pick him back up -- have on his neck injury as sustained originally on the ground?

A. Correct. So any movement of an unstable spine will create further alteration in the physiology of the spinal cord and all the surrounding tissues. It will decrease the likelihood of recovery. The more you contuse the spinal cord, the more you stretch it, the more you rotate it, the less likely that you're going to get a recovery. So that's an additional traumatic event, and that can take -- could I see it acutely? Yes. But I may not see it acutely. I may see it a day or so later or a week later. The effects take time. And so -- but it's the motion, the additional motion, the additional contusion, bruising of the tissue that leads to the decrease in possible, potential recovery and gainful use of his extremities.

Trial Transcript, at 487:7 to 489:20 (emphasis added).

Given that Dr. Yue is Plaintiff's medical expert in this case, and since Dr. Yue candidly admitted that he cannot say "yes or no" as whether any manipulations of Ingram after the alleged knee and alleged boot in the neck caused injury, Plaintiff's claims relating to these movements by the officers should be dismissed.  Plaintiff fails to establish even a *prima facie* case as to any

causal connection between any alleged deliberate indifference to a medical need and actual injury.  Dismissal is warranted as to this allegation, and any related claims, as a matter of law.

Dismissal of such claims is further warranted based on Dr. Yue's statement that, in order for him – an orthopedic surgeon who has treated hundreds of patients and teaches medical students - to determine whether any manipulations caused injury, he "*would have needed a live MRI during the motion to see if there was actual, you know, tissue damage within the spinal cord itself*".  As Yue further states, *obviously, we're not -- there's no live MRI that's on this North 7th Street that the patient -- that the plaintiff is in. And so you, sort of, need that information, because he's asking me about damage to the tissue*".  Yue then follows that "any movement of an unstable spine will create further alteration in the physiology of the spinal cord and all the surrounding tissues".  This is too generalized and unspecific to the actions of the individual officers, especially given his earlier admissions.  The statement is wholly without foundation given his admission that he would need an MRI in the street to determine whether those actions caused damage.

Dismissal is also warranted because, where a plaintiff presents no evidence that any injury he suffered was the result of the alleged delay or denial of medical care, as opposed to the alleged excessive force, his claim for failure to provide medical care will fail.  See Mantz, 239 F. Supp. 2d at 504 (granting defendant's motion for summary judgment where plaintiff failed to provide any medical evidence that the officer's "alleged delay in responding to his demands for an ambulance caused him to suffer harm which he would not have suffered had an ambulance been immediately called to the scene.").

Dismissal is warranted because Dr. Yue is unable to tie any specific post-handcuffing movements of Officer Marchiafava to any specific damages of Plaintiff.  It is clear that "officers

must be personally involved in a constitutional rights violation to be held liable for it." Lozano v. New Jersey, 9 F.4th 239, 242 (3d Cir. 2021) (citing Jutrowski v. Township of Riverdale, 904 F.3d 280, 284–85 (3d Cir. 2018)). In Jutrowski, plaintiff alleged excessive force as to multiple officers, claiming that one of the officers kicked him. However, plaintiff stated that he was unable to identify the specific officer who kicked him because plaintiff was face was pinned to the pavement when the alleged excessive force occurred. Jutrowski, 904 F.3d at 284. The Third Circuit concluded that summary judgment was warranted on the excessive force claim because, while Plaintiff was able to identify the universe of officers at the scene, he could not identify which officer kicked him.

> The authorities on which we rely—tort law principles informing § 1983 liability, our own precedent, and the wisdom of our Sister Circuits—are thus unanimous that, in the face of motion for summary judgment, a § 1983 plaintiff must produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial. But Jutrowski has not done so: As he concedes, after significant discovery, he has narrowed the potential universe of actors to those that were in his immediate vicinity, but he filed suit against only four of the five of them and still cannot "identify the actor that kicked him." Appellant's Br. 12. Put another way, he admittedly seeks to proceed to trial against at least three defendants who are "free of liability," [Howell v. Cataldi, 464 F.2d 272, 283 (3d Cir. 1972)], without any "ascertainment of [which] individual charged was the perpetrator of the constitutional deprivation," id. at 282. As the foregoing discussion teaches, that is not a sufficient basis to survive summary judgment.

> Jutrowski, 904 F.3d at 291–92.

Here, Plaintiff fails to tie any specific post-handcuffing actions of Marchiafava to any actual damages sustained by Plaintiff as a matter of law. Dr. Yue did not identify any actions of Marchiafava which caused any movement of Ingram's unstable spine. Yue admitted that he could not testify to a reasonable degree of medical probability that *any* post-handcuffing movements caused injury. Even his specious attempt on re-direct to change his testimony does not save Plaintiff, as Dr. Yue does not identify any actions of Marchiafava which caused injury.

At best, the most Plaintiff has been able to show is that is that in some hypothetical situation that there might be a decrease in the ultimate recovery.  However, when asked specifically about this case, Dr. Yue could **not** opine within reasonable medical probability that it caused further damage.  He further did not render any opinion in this case to a reasonable medical probability that it actually had any effect on the "recovery."  Possibility is not enough.

For all of these reasons, Plaintiff fails to meet his burden that any post-handcuffing movements of Ingram led to injury.  As such, any claims relating to these post-handcuffing movements should be dismissed with prejudice.

IV.    **QUALIFIED IMMUNITY SHOULD BE GRANTED AS A MATTER OF LAW AS TO CLAIMS RELATING TO MOVEMENTS OF INGRAM AFTER THE ALLEGED KNEE AND ALLEGED BOOT IN THE NECK**

Dr. Yue's testimony compels dismissal on the basis of qualified immunity.  In assessing qualified immunity, the issue is whether 'it would [have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  Lamont v. New Jersey, 637 F.3d 177, 182 (3d Cir. 2011) (quoting Saucier v. Katz, 533 U.S. 194, 201–02 (2001); citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)). "The qualified immunity standard 'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'" Gilles v. Davis, 427 F.3d 197, 203 (3d Cir.2005) (quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991)); Kelly v. Borough of Carlisle, 622 F.3d 248, 254 (3d Cir. 2010).

Here, if Plaintiff's medical expert would need an MRI on North 7th Street to determine if movements of Mr. Ingram are causing damage to the spinal cord, it cannot be said that the officers were objectively unreasonable in moving Ingram, as they did not know that these movements might cause damage.  None of their actions can be considered as so plainly incompetent that no reasonable police officer would have done the same.  See, e.g. Rodriguez v.

Panarello, 119 F. Supp. 3d 331, 339 (E.D. Pa. 2015) (no excessive force where plaintiff was paralyzed after falling off of the roof of a car from officer's use of a Taser; officers' actions were appropriate based on information known at the time); Pena v. Bexar Cty., Texas, 726 F. Supp. 2d 675, 692 (W.D. Tex. 2010) (no excessive force where officers moved suspect without knowledge that suspect was paralyzed).

## CONCLUSION

For these reasons, any claims relating to alleged failures or misconduct in: (1) lifting Ingram's arms during a search incident to arrest; (2) rolling Ingram over to sit him up; (3) sitting Ingram up; and (4) any subsequent movements of Ingram by the officers should be dismissed with prejudice.

Respectfully submitted,

**BROWN & CONNERY LLP**

By:  */s/ William F. Cook*
William F. Cook

DATED:       March 3, 2022

11

# EXHIBIT D-1

1

2                    **UNITED STATES DISTRICT COURT**
                 **FOR THE DISTRICT OF NEW JERSEY**
3

4    _____

     **XAVIER INGRAM,**                    **CIVIL ACTION NUMBER:**
5
            **Plaintiff,**                 **14-CV-5519-JRS**
6
      **v.**                               **TRIAL VOLUME 3**
7                                          **PAGES 331-559**

8    **COUNTY OF CAMDEN, CAMDEN**
     **COUNTY POLICE DEPARTMENT,**
     **ET AL,**
9
            **Defendants.**
10   _____

11        Mitchell H. Cohen Building & U.S. Courthouse
          4th & Cooper Streets
12        Camden, New Jersey  08101
          Wednesday, March 2, 2022
13        Commencing at 9:00 a.m.

14

15   **B E F O R E:**              **THE HONORABLE CHIEF JUAN R. SÁNCHEZ,**
                                   **CHIEF UNITED STATES DISTRICT JUDGE**
16

17   **A P P E A R A N C E S:**

18        MAZIE SLATER KATZ & FREEMAN LLC
          BY:  BETH G. BALDINGER, ESQUIRE
19             CORY ROTHBORT, ESQUIRE
          103 Eisenhower Parkway
20        Roseland, NJ 07054
          For the Plaintiff
21

22
               Sharon Ricci, Official Court Reporter
23              sharon.ricci.usdcnj@gmail.com
                       267-249-8780
24

25    Proceedings recorded by mechanical stenography; transcript
            produced by computer-aided transcription.

1   in the neck and a boot in the neck caused this injury, correct?

2   A.   Correct.

3   Q.   All right.  Would you agree with me that you -- as you sit

4   here today, you can't state with reasonable medical certainty

5   that the manipulations afterwards caused any additional injury?

6   A.   I can't say a hundred percent, but I can say that when you

7   do move an unstable spine, it does cause damage, further

8   damage.

9   Q.   I understand that it can.  Can you sit here and say that

10  within reasonable medical probability or certainty in this case

11  that it did?

12  A.   No.  He was already completely quadriplegic, so it's hard

13  to make someone more quadriplegic, but --

14  Q.   Well, can you answer my question?  Can you testify in this

15  particular case within reasonable medical certainty that the

16  manipulation caused any additional injury?

17          MS. BALDINGER:  Objection, Your Honor.  Certainty

18  versus probability.

19          MR. BLUMBERG:  I'll change it.

20          MS. BALDINGER:  Use the appropriate standard.

21          THE COURT:  Sustained.  He's changing it.  Go ahead.

22  BY MR. BLUMBERG:

23  Q.   Would you agree with me that you can't state within

24  reasonable medical probability in this case that the

25  manipulations afterwards caused additional injury, correct?

1    A.   I can't say yes or no.

2    Q.   Okay.  Now, in coming to the opinion that the fall did not

3    cause the injury, you had to have an understanding of the fall,

4    correct?

5    A.   Correct.

6    Q.   All right.  And in your opinion, based on everything

7    you've reviewed, including the Eye in the Sky video, it is your

8    opinion that Mr. Ingram fell to his hands and knees, correct?

9    A.   My opinion is that as he ran from behind the parking lot

10   with the sandy shoes, he loses traction, officers catch up with

11   him, he tries to stop.  And basically --

12   Q.   I didn't ask you to demonstrate.  I just asked you to

13   answer my question.

14   A.   I'm trying to, if you --

15   Q.   Can you answer my question --

16   A.   I can't answer without telling you what I think.

17   Q.   Well, did you think -- I took your --

18   A.   I'm trying to tell you what I think, but you're not

19   allowing me to.

20        MS. BALDINGER:  Your Honor --

21        THE COURT:  Excuse me.  Just ask questions.  Listen to

22   the question and try to answer the question as best as you can.

23   There will be redirect, and then you could show the jury again.

24        THE WITNESS:  So, again, he's running --

25        THE COURT:  Wait a minute.  There's no question.

```
 1              THE WITNESS:  Oh, I am sorry.  I thought he asked me a
 2    question.
 3              THE COURT:  Repeat your question.
 4              MR. BLUMBERG:  Right.
 5    BY MR. BLUMBERG:
 6    Q.   Is it your opinion based on everything you've reviewed
 7    that Mr. Ingram fell to his hands, his hands and knees hit the
 8    ground first, and the fall ended with him on his stomach?
 9    A.   Yes.
10    Q.   Okay.
11              MR. BLUMBERG:  Can we play -- do you have the video of
12    the fall available?
13    BY MR. BLUMBERG:
14    Q.   Now, you reviewed the Eye in the Sky video as part of your
15    review in this case?
16    A.   Multiple times.
17              (Video playing.)
18    BY MR. BLUMBERG:
19    Q.   You see him running?
20    A.   Absolutely.
21    Q.   And it's your opinion, after reviewing that video -- well,
22    let me ask you this.  This video shows him running from the
23    left side of the screen to the right side of the screen,
24    correct?
25    A.   Absolutely.
```

YUE - CROSS - BLUMBERG

 1  Q.   Okay.  And this video also shows that when after he falls,

 2  that his feet are on the right side of the screen and his head

 3  is on the left side of the screen.

 4  A.   Correct.

 5  Q.   Okay.  And is it your testimony that this video shows him

 6  on his stomach?

 7  A.   It shows him, yes -- it shows him with his feet to the

 8  right lying down on his stomach.

 9  Q.   Okay.  Feet to the right, head to the left, and he's lying

10  on his stomach.

11  A.   Correct.

12  Q.   You could tell all that from that video?

13  A.   Yes.

14  Q.   Okay.  Now, you reviewed testimony in this case as well of

15  Officers Gennetta and Marchiafava?

16  A.   Yes.

17  Q.   And you would agree with me that they have both testified

18  under oath that, in fact, Mr. Ingram landed with his feet to

19  the right, his head to the left on his back?  Are you familiar

20  with that testimony?

21  A.   Yes.

22  Q.   Okay.  Your belief is after his hands and his knees hit

23  the ground, the rest of his body hit the ground at the same

24  time, correct?

25  A.   Correct, kind of like a Tom Brady slide fall.

YUE - CROSS - BLUMBERG

1  Q.  I want to make sure I have the language correct.  His

2  knees or hands or some other part where he's going to be trying

3  to stop his fall.  Correct?  That's what hit the ground next?

4  A.  Yes, after his feet slide forward, he's rolling to the

5  left.  He lands on his left side of his body.

6  Q.  So he was twisting?

7  A.  He was turning as he fell.  He wasn't twisting himself.

8  Q.  You wouldn't agree with a twist?

9  A.  Well, you said he was twisted.  He wasn't --

10  Q.  No, I said twisting.

11  A.  Turning, yes.  Twisting, yes.

12  Q.  He was twisting his body?

13  A.  Correct.

14  Q.  Twisting his neck?

15  A.  Potentially.

16  Q.  You would agree that this type of injury is a flexion

17  injury?

18  A.  There's a component of flexion, but it's more rotational.

19  Q.  Okay.  But it does include flexion, correct?

20  A.  Yes.

21  Q.  And would you agree that a boot on the back of a neck

22  would cause extension?

23  A.  Depends on the position of the head.  If his face is down,

24  yes.  If his face is turned, no.

25  Q.  That gets us a little bit -- you said that in your opinion

1  the head was turned to the right, based on the deposition of

2  the plaintiff?

3  A.   And attorney -- I am sorry, Officer Merck.  Sorry.

4  Q.   Well, let's start with the deposition of the plaintiff.

5  Is it your testimony that somewhere in that deposition or

6  depositions he testified that his head was turned to the right?

7  A.   That's my belief, yes.

8  Q.   Okay.  You also indicated that Sergeant Merck testified

9  that his head was turned to the right, correct?

10  A.   Yes.

11  Q.   Is there any other evidence other than the testimony of

12  the plaintiff, you say, and the testimony of Sergeant Merck

13  that says his head was turned to the right?  Anything else that

14  leads you to conclude that his head was turned to the right?

15  A.   No.

16  Q.   So if I represent to you that neither one of them

17  testified that his head was turned to the right, would that

18  change your opinion?

19  A.   It could.

20  Q.   Now, you talked about the fact that there was a full

21  thickness muscle injury, correct?

22  A.   Yes.

23  Q.   And that you'd agree that with a -- either an

24  unilateral -- I think you've said this -- or a bilateral

25  facet -- maybe you haven't.  Let me back up.  With a unilateral

 1   or bilateral facet dislocation, do you see muscle injury?

 2   A.   Normally, no.

 3   Q.   Okay.  When you said normally don't, would you agree with

 4   me that it's not unheard of?

 5   A.   To this degree, I've never seen it in 30 years of

 6   practice.

 7   Q.   Fair enough.  But would you agree that it's

 8   not -- forgetting the degree, that there can be muscle injury

 9   as a result of a facet dislocation?

10   A.   There can be some.

11   Q.   So that your opinion in this case is that the extent of

12   the muscle injury is unusual?

13   A.   Exactly.

14   Q.   Okay.  Now, you reviewed the MRIs in this case, right?  I

15   think you took us through the MRIs and showed us the muscle

16   injury, right?

17   A.   Correct.

18   Q.   And you said white is bad, black is good.

19   A.   Dark.

20   Q.   Dark is good.

21   A.   Yeah.

22   Q.   And would you agree with me that based on the MRI, that

23   the subcutaneous tissue between the muscle and the skin on the

24   back of the neck was dark?

25   A.   There is no -- under the skin there's no edema.  In the

1    superficial layers, there's nothing.

2    Q.    Okay.  So would you agree with me that the MRI did not

3    demonstrate any type of injury to the subcutaneous tissue

4    between the muscle and the skin?

5    A.    There is some superficial muscle edema but -- between the

6    skin and the fat, I don't see anything.

7    Q.    So someone -- if someone were to testify that there was no

8    injury to the subcutaneous tissue above the muscle, that would

9    be accurate, correct?

10   A.    Yes.

11   Q.    Okay.  Would you agree -- well, let me strike that.  Now,

12   you reviewed the EMS records, the ambulance report?

13   A.    Yes.

14   Q.    All right.  And the ambulance report, the people, the

15   paramedics write reports as to what their observations are with

16   respect to the individuals who they're getting?

17   A.    Correct.

18   Q.    All right.  And would you agree with me that, in that

19   ambulance run record, there is nowhere in that record, any

20   documentation of a contusion or an abrasion or a bruising of

21   the neck?

22   A.    Agree.

23   Q.    All right.  You also reviewed the records of Cooper

24   Hospital.  After the EMS dropped him off at Cooper Hospital, he

25   goes to the emergency room, and then he gets treated in the

 1   trauma unit or wherever he gets treated at Cooper, correct?

 2   A.   Yes.

 3   Q.   All right.  And would you agree with me that nowhere in

 4   those Cooper records is there any documentation of a contusion,

 5   abrasion, or bruising to the neck?

 6   A.   A hundred percent agree.

 7   Q.   And would you agree with me that there is no mention in

 8   the Cooper records of any type of contusion, abrasion, or

 9   bruising to the back?

10   A.   Agree.

11   Q.   All right.  Would you agree that you have never treated a

12   patient who was laying down where human pressure caused a facet

13   dislocation, either unilateral or bilateral?

14   A.   Correct.

15   Q.   All right.  And would you agree with me that the video,

16   the Eye in the Sky video, does not allow one to conclude that a

17   boot or a knee was placed on the back of plaintiff's neck?

18   A.   Agree.

19   Q.   Now, you had talked to this jury and you put together some

20   type of presentation talking about the absence of a teardrop

21   fracture.

22        Do you recall that?

23   A.   Correct, yes.

24   Q.   I've reviewed your report.  Do you have your report?

25   A.   Yes.

YUE - CROSS - BLUMBERG                    *461*

 1   Q.   Do you mention anywhere in your report anything about a
 2   teardrop or the absence of a teardrop fracture?
 3   A.   I talk about fractures in general that occur with flexion
 4   distraction injuries.  I don't specifically use the term
 5   "teardrop," but I mention fractures.
 6   Q.   Okay.  And you -- and with respect to fractures, did you
 7   indicate that -- in this report, that the absence of a
 8   particular fracture supported your opinions?
 9   A.   No.
10   Q.   Okay.  You talked about the fractures that did occur,
11   correct?
12   A.   Correct.
13   Q.   So I go back to did you ever mention anything about the
14   teardrop fracture or the absence of it in your initial report?
15   A.   No.
16   Q.   And then in the second report that you generated, after
17   the reports of the defense were sent to you, did you mention
18   anything about the absence of a teardrop fracture in this
19   second report?
20   A.   Not specifically.
21   Q.   Well, did you do it even generally?
22   A.   Yes.
23   Q.   Okay.  And how did you do that?
24   A.   In where I state there's usual patterns of fracture that
25   are seen in flexion distraction injuries.  I don't go into

YUE - CROSS - BLUMBERG

*462*

1   specifics, but there are certain elements of a flexion

2   distraction injury that are evident.

3   Q.   Do you have your report in front of you?

4   A.   Yeah.

5   Q.   This is the January -- I'm looking at the January 17

6   report.  And what I'm going to ask you to do is tell me where

7   in that report you generally refer to the absence of the

8   teardrop fracture.

9   A.   I think I'm missing my second report.

10       Oh, wait, I got it.  I found it.  I found it.

11       So the predominant mechanism of injury --

12   Q.   You don't -- don't -- anything you read, she has to take

13   down.  So unless you're answering my question --

14   A.   Yeah, I am.

15   Q.   Okay.

16   A.   Well, you told me to read what I --

17   Q.   No.  I just didn't want you to start reading your whole

18   report because --

19   A.   No, I'm not.  I'm on the third paragraph.

20   Q.   Okay.

21   A.   So I talk about predominant mechanism of injury of

22   unilateral facet dislocation --

23   Q.   Wait.  You have to slow way down for the court reporter.

24   A.   Okay.  So I say, "Assuming the plaintiff sustained a

25   post" --

YUE - CROSS - BLUMBERG                    *463*

1   Q.   Tell me where you are.  I am sorry.

2   A.   Oh, yeah.  Last page, last paragraph.

3   Q.   Okay.

4   A.   "Assuming the plaintiff sustained a post fall fracture

5   dislocation."  And so within that fracture dislocation are many

6   things.  There is ligament injuries, disc injuries, a

7   whole -- I didn't list every single thing because it's

8   impossible, but I mention the fracture dislocation injury as a

9   potential possibility, and within that falls teardrop

10  fractures, disc herniations, disc locations, spinal cord

11  injuries.  I mean, the list goes on and on so...

12  Q.   In fairness, Doctor, isn't that third paragraph talking

13  about your opinions as it relates to further injury from moving

14  him?

15  A.   Anything.  It could be --

16  Q.   No.  Isn't -- answer my question.

17       Isn't that third paragraph about your opinions about the

18  movement of Mr. Ingram?

19  A.   Yes, assuming there's a fracture dislocation, which there

20  were.  There was.

21  Q.   Now, you showed us an article about a study with respect

22  to falls and -- those studies and the effect of those falls on

23  the cervical spine.

24       Do you remember that?

25  A.   Correct.

YUE - CROSS - BLUMBERG

*464*

1   Q.   All right.  And I think you indicated that that -- was

2   that article supplied by the defense or by you?

3   A.   Which exhibit?

4   Q.   It's 1089.

5   A.   That's -- you supplied that.

6   Q.   Okay.  Would you agree with me that that article does not

7   indicate that a fall from a standing height is impossible to

8   have a facet dislocation?

9          MS. BALDINGER:  Objection, Your Honor.  "Impossible."

10         THE COURT:  Rephrase.  Rephrase.

11         Objection sustained.  Rephrase.

12  BY MR. BLUMBERG:

13  Q.   Well, would you agree with me that that article does not

14  stand for the proposition that a fall from a standing height

15  cannot cause an injury?

16  A.   There was no injuries on there that was from a standing

17  falling height, so I would assume that there was none that were

18  there.

19  Q.   Well, did they study any from a standing --

20  A.   They studied all quadriplegic fracture dislocations that

21  came into that facility over a period of 15 years.

22  Q.   Okay.

23  A.   And none of them were from a standing height.

24  Q.   Okay.  So my question goes back to, did they ever indicate

25  that a fall -- does that article indicate that a fall from a

1  standing height cannot cause an injury?

2  A.   I don't think they say it cannot, but it just wasn't ever

3  seen.

4  Q.   Okay.  Now, you have indicated that it is unlikely that

5  the injury in this case was caused by a flexion distraction

6  type of movement, correct?

7  A.   Right.

8  Q.   Would you agree with me it's possible?

9  A.   No.

10 Q.   So it's your testimony that it's impossible.

11       MS. BALDINGER:  Objection, Your Honor, "possible" and

12 "impossible."  It's "probable" or "improbable."

13       THE COURT:  The objection is sustained.

14       He answered your question.  You may move on.

15 BY MR. BLUMBERG:

16 Q.   Now, in terms of the animations we saw, you had a part in

17 putting together those animations?

18 A.   Correct.

19 Q.   And you indicated that you gave that information to

20 the -- I think you said the plaintiff's team?

21 A.   Correct.

22 Q.   Are you a member of the plaintiff's team?

23 A.   I guess I am.  I don't know if that's an official

24 category, but...

25 Q.   You then indicated that the injury to C4-5, you talked

YUE - CROSS - BLUMBERG                          *466*

1   about the C4-5 keeps you alive?

2   A.   Keeps the diaphragm alive.

3   Q.   Keeps the diaphragm alive.

4        Would you agree with me that no one was breathing for

5   Mr. Ingram?

6   A.   Correct, until he got to the -- Cooper, where they had to

7   put him in a tube because he stopped breathing.

8   Q.   I'm talking about the scene.

9   A.   Correct.

10  Q.   At the scene, no one was breathing for him, correct?

11  A.   Correct.

12  Q.   All right.  Now, you talk about the amount of force needed

13  to dislocate a facet.  I think you said, what is it, 6 -- did

14  you say 6?  I don't remember.

15  A.   10 newton meters.

16  Q.   10 newton meters?

17       And can you tell the jury, what is 1 newton meter?  Give

18  us an example of 1 newton meter.

19  A.   Yeah.  So 1 newton meter would be equivalent to -- so I

20  have -- if you're going do 1 newton meter, you have one -- you

21  know, the force would be approximately equal to a door, a heavy

22  door, opening a heavy door.

23  Q.   Okay.  Would you agree with me that a facet dislocation

24  can occur from someone twisting their neck without pressure?

25  A.   I need more specifics.

1  Q.  Okay.  Now, if Mr. Ingram did, in fact, have his head to

2  the right, as you've opined, would you agree with me that the

3  maximum torque would be 90 degrees?

4  A.  Less than -- no, less than that.

5  Q.  Less than that?

6  A.  You mean -- physiologic movement, you mean, or like how

7  far I could -- that someone else could turn his neck?

8  Q.  Well, I mean, if his head is on the ground -- let's assume

9  his head is on the ground and his shoulders --

10  A.  Uh-huh.

11  Q.  -- and he's laying prone on the ground.

12  A.  Yep.

13  Q.  Is your neck in 90 degrees?

14  A.  Not quite.

15  Q.  Okay.

16  A.  It's not -- you're not at -- actually, it's about

17  50 degrees.  The normal range of motion is 50 to 60 degrees in

18  rotation.  Beyond that, it's beyond physiologic.

19  Q.  Okay.  So 50 to 60 degrees is when you're basically laying

20  on the ground with your head turned to one side.

21  A.  That's right.

22  Q.  Okay.

23      MR. BLUMBERG:  Your Honor, I'd like an opportunity to

24  look at my notes.  I'm just about done but --

25      THE COURT:  You may.  You may.

```
 1              (Brief pause.)
 2   BY MR. BLUMBERG:
 3   Q.   Last two questions, Doctor.
 4        Would you agree with me that there is no documentation in
 5   any of the records that you reviewed of a boot mark on
 6   Mr. Ingram's neck?
 7   A.   Correct.
 8   Q.   And finally, Mr. Ingram says that he complained of a crack
 9   at the time that a boot was placed on the back of his neck.
10        Do you recall that testimony?
11   A.   Yes.
12   Q.   Would you agree with me that you've never heard a patient
13   complain of a crack during a facet dislocation?
14   A.   I hear patients complain of cracks in their neck all the
15   time.  I can turn my neck.  I can crack my neck.  It's very
16   easy to crack your neck.  But, yes.  I mean, if I have a
17   recording of someone during a quadriplegic event?  I've never
18   had a recording of someone undergoing a quadriplegic event, no.
19   Q.   When you've treated patients for facet dislocations, have
20   any patients complained of hearing a crack?
21        And your answer at the time of the deposition under oath
22   was, no.  Correct?
23   A.   Correct.
24              MR. BLUMBERG:  All right.  That's all I have.
25              MS. BALDINGER:  Dr. Yue --
```

1          THE COURT:  Hold on.  Any questions?

2          MR. TAMBUSSI:  No, Your Honor.

3          THE COURT:  Mr. Wittman?

4          MR. WITTMAN:  No, Your Honor.

5          THE COURT:  Okay.  It's 12:30.  We're going to take a

6   break.  15 -- I'm sorry.  This is lunch break.  It's 12:30.

7          Members of the Jury, we're going to take a lunch break

8   for one hour.  We'll resume at 1:30 and continue with the

9   redirect examination of this witness, and then we'll see where

10  we are at the conclusion of the examination.

11         Do I need to repeat my instructions?

12         THE JURY:  No, Your Honor.

13         THE COURT:  Okay.  Thank you very much.  Have a good

14  lunch.

15         MS. BALDINGER:  Just wait, Dr. Yue.

16         THE COURT:  Just stay there.

17         (Jury exits the courtroom at 12:29 p.m.)

18         THE COURT:  So out of curiosity, how long do you have

19  on redirect?

20         MS. BALDINGER:  Probably 30 minutes.

21         THE COURT:  And how long -- you have another witness

22  in the afternoon?

23         MR. ROTHBORT:  Your Honor, our intention in the

24  afternoon was to play in some read-ins that would probably

25  go -- Mr. Cortopassi, he was trying to find out the exact time

YUE - CROSS - BLUMBERG                         *470*

1    for me, but I think at least an hour worth of read-ins.

2            However, the problem is the that defendants have

3    objected to some of the read-ins.  And despite some meet and

4    confers, we haven't been able to resolve all the issues.  We do

5    have -- if need be, we do have a couple of fact witnesses that

6    have been present, but they would only take up, like, an hour

7    at most.

8            THE COURT:  All right.  On the -- on the issues that

9    you have with these depositions, do I have designations and

10   counterdesignations, and did you outline the -- the objections

11   for me ahead of time?

12           MR. ROTHBORT:  Your Honor, we do have a list, and I

13   can absolutely outline what --

14           THE COURT:  When did you generate this list?  When was

15   the list generated?

16           MR. ROTHBORT:  I provided it to the defendants

17   yesterday.

18           THE COURT:  Okay.  Yesterday it's provided?

19           MS. BALDINGER:  Your Honor --

20           MR. ROTHBORT:  Your Honor, we do have all the

21   defendants' counterdesignation and their objections.  We've

22   been trying to have -- there's a lot of deposition testimony,

23   and we've been trying to have meet and confers and resolve

24   them.  And we did resolve many of the issues.  There's just

25   some outstanding ones that we haven't been able to resolve.

1    Some of them concern Defendant Marchiafava, who we just haven't

2    had a chance to fully go through his deposition testimony.

3                THE COURT:  So give me a sense of the universe of

4    these objections.

5                MR. ROTHBORT:  Your Honor, there's -- I think there's

6    about -- I mean, Mr. Cook might be able to say as well because

7    I don't know if he's agreeing to waive any of the objections

8    that I gave him to the proposed read-ins, but I think a number

9    of them -- just so Your Honor understands, the read-ins that we

10   intend on offering all speak to the "failure to render medical

11   care" claim.  And I do believe that many of the objections are

12   relevancy-based objections as to Officer Marchiafava's

13   testimony about what occurred and how the officers responded to

14   Mr. Ingram.

15               THE COURT:  Okay.  Very well.

16               MR. COOK:  Your Honor, respectfully, I don't know who

17   they're playing.  I mean, I can take a look at it at lunch.

18               THE COURT:  Well, take a look at it.  If it's

19   relevance, you know, I could resolve -- I could resolve that

20   very easily.  But work through lunch and do the best you can.

21   I'm not going to delay this trial.  I warned you already about

22   this.  Once we get into trial, we're going to move.  So try to

23   resolve them, or I'm going to resolve them for you.  And I --

24               MR. WITTMAN:  Your Honor, just on some of the

25   objections on Officer Gennetta, they're, for the most part,

 1   compound questions and very misleading and confusing.

 2          THE COURT:  Okay.

 3          MR. BLUMBERG:  What is the Court's position whether

 4   counsel is allowed to speak to her witness on cross --

 5          MS. BALDINGER:  I'm not speaking to my witness during

 6   lunch, Your Honor.

 7          THE COURT:  Once the witness is on the stand and has

 8   testified, no communication --

 9          MS. BALDINGER:  I understand.

10          THE COURT:  -- with regards to the case.

11          MR. BLUMBERG:  No, I get it.  I get it.

12          THE COURT:  With regards to the testimony of the case.

13          MR. BLUMBERG:  Understood.

14          MS. BALDINGER:  I wasn't planning on it.

15          MR. BLUMBERG:  I wasn't -- I didn't say you were.  I

16   was just asking him --

17          THE COURT:  All right.  Anything else?  I'll see you

18   in an hour.

19            (Lunch recess taken at 12:33 p.m.)

20            (Jury enters the courtroom at 1:36 p.m.)

21          THE COURT:  You may be seated.

22          MS. BALDINGER:  May I proceed, Your Honor?

23          THE COURT:  You may.

24          MS. BALDINGER:  Thank you.

25   (REDIRECT EXAMINATION OF DR. JAMES JOSEPH YUE BY MS.

1    BALDINGER:)

2    Q.   Doctor, just a quick minute of housekeeping here.  You

3    were asked some questions on cross-examination by Mr. Blumberg

4    regarding what was and was not in your report.  Do you have a

5    copy of your second report of January 7th, 2018?

6    A.   Yes, I do.  Yes, I do.

7    Q.   Okay.  And you were asked about whether, in that report,

8    you discussed flexion dislocation or flexion injury and

9    symptoms associated with it or characteristics of it?

10   A.   Correct.

11         MR. BLUMBERG:  Objection.  That's not what the

12   question -- mischaracterizes it.  That was not the question

13   that I asked.

14         THE COURT:  Very well.  It doesn't have to be the

15   specific question.  It could be the same area.  Overruled.

16   I'll permit it.

17         MS. BALDINGER:  Thank you.

18   BY MS. BALDINGER:

19   Q.   Doctor, if you could please read for yourself for a minute

20   the fourth paragraph that starts with "The premise of the

21   plaintiff's fall"?

22   A.   "The premise of the plaintiff's fall resulted in a flexion

23   injury resulting in the fracture dislocation of the C4-5 facet

24   is highly implausible."

25   Q.   Did you then go on to note in your report various

1  characteristics or factors as to why that would be implausible?

2  A.  Yes.

3  Q.  Okay.  Is that the premise upon which today you expanded

4  with that particular demonstrative exhibit, the chart?

5          MR. BLUMBERG:  Objection, leading.

6          THE WITNESS:  Correct.

7          MS. BALDINGER:  Thank you.

8          THE COURT:  Sustained.  Rephrase the question.  It's

9  still direct examination.

10         MS. BALDINGER:  Thank you, Your Honor.

11  BY MS. BALDINGER:

12  Q.  Can you tell us whether the area of whether or not this is

13  a flexion distraction or injury was covered in that paragraph

14  of the report?

15  A.  Yes.

16  Q.  Okay.  And the demonstrative that we showed the Court

17  today, was that an expansion or further elicitation of that

18  premise of that opinion?

19         MR. BLUMBERG:  Objection.

20         THE COURT:  State your ground.

21         MR. BLUMBERG:  Leading.

22         THE COURT:  Attorney Baldinger, it's still direct

23  examination.

24         MS. BALDINGER:  Fine.

25  BY MS. BALDINGER:

YUE - REDIRECT - BALDINGER                    *475*

 1   Q.   Can you tell us what the point of that demonstrative was

 2   in connection with your report?

 3   A.   Yes.  I wanted to differentiate between what the defense

 4   theory was and what my under -- my interpretation of what

 5   occurred.

 6   Q.   Very good.  Thank you.  And was that -- okay.  Let me go

 7   back.  On cross-examination, you were asked a question about

 8   whether a bilateral facet dislocation could spontaneously

 9   convert into a one-sided unilateral dislocation.  Do you recall

10   that?

11   A.   Yes.

12   Q.   Okay.  Could you tell us, Dr. Yue, how often that actually

13   happens in real life, that a bilateral facet dislocation

14   spontaneously converts back into proper position and you only

15   have a unilateral dislocation?

16   A.   It's very infrequent.

17   Q.   Okay.  And do you have an opinion within a reasonable

18   degree of medical probability with regard to whether this very

19   infrequent situation occurred with Mr. Ingram?

20   A.   I do not think it occurred.

21   Q.   Okay.  And what is the basis for that?

22   A.   The constellation of radiographic findings that are

23   evident on the CT and MRI scan.

24          MS. BALDINGER:  Can we take a look at Exhibit 403-3,

25   please.

1  BY MS. BALDINGER:

2  Q.   What does this diagram, this medical illustration, show

3  us?

4  A.   So this shows the left-sided C4-5 jump facet, dislocated

5  facet at the C4-5 with the fractures of the facet and the

6  pedicle.

7  Q.   Can we go to 409-4, please.

8       What does this show us?

9  A.   This shows a perched facet on the right-hand side.

10 Q.   So if I understand, he had a perched facet on one side, on

11 the right, and a dislocated facet on the left, correct?

12 A.   Correct.

13 Q.   Can you tell this jury what the degree was of that perched

14 facet and whether or not the degree of that perching influences

15 your opinion that it could not have converted from a

16 bilateral -- true bilateral dislocation into a unilateral

17 dislocation?

18 A.   Sure.  You have the left-side facet was obviously a

19 hundred percent dislocated.  The right-sided facet was perched

20 probably with about 50 percent -- 30 to 50 percent continuity.

21 Q.   Okay.  And how does that factor into whether or not it can

22 spontaneously convert into a unilateral?

23 A.   It's unlikely given the fact that this facet is more

24 located than not.

25           MS. BALDINGER:  Thank you.  You can take that down.

 1  BY MS. BALDINGER:

 2  Q.   You were asked on cross-examination by Mr. Blumberg about

 3  unilateral and bilateral dislocations both resulting in

 4  ligament damage, correct?

 5  A.   Correct.

 6  Q.   And then you said, "But you know what's interesting is

 7  there was a pattern to ligament damage with regard to a

 8  torsional injury as compared to a flexion distraction,"

 9  correct?

10  A.   Yes.

11  Q.   And Mr. Blumberg didn't ask you what that pattern was and

12  whether you saw it in the case, did he?

13  A.   No.

14  Q.   Can we please bring up Exhibit 409-5.

15       Do you see this diagram, sir?

16  A.   Yes.

17  Q.   Okay.  And what does this diagram show us?

18  A.   Well, it shows us the ligamentous injury in the facet

19  joint, in the -- between the vertebral bodies and between the

20  spinous process of C4 and C5.

21  Q.   And these are the actual ligament damages that Mr. Ingram

22  sustained, correct?

23  A.   Correct.

24  Q.   And can you tell us whether the actual ligament injuries

25  Mr. Ingram sustained as shown on this illustration are

1    consistent with a torsional injury as compared to a flexion

2    distraction injury?

3    A.   These would be consistent with a torsional injury.  I

4    would have to see the opposite side as well to assess those

5    ligaments to determine if it was flexion distraction or not.

6    Q.   Okay.  This is -- but on this side, would it be

7    consistent?

8    A.   Yes.

9    Q.   Okay.  With regard to --

10       You can take that down.

11       With regard to questions by Mr. Blumberg about

12   Mr. Ingram's fall -- I want to bring your attention there --

13   you were shown the video, and you were asked questions.  You

14   said the video shows Mr. Ingram lying on his stomach, and then

15   you said he fell like a Tom Brady slide.  Did I quote you

16   correctly?

17   A.   Correct.

18   Q.   And you weren't given an opportunity to fully explain your

19   answer.  Could you explain the basis of those statements?

20       MR. BLUMBERG:  I just would object, Judge, to the

21   characterization that he wasn't given an opportunity.

22       THE COURT:  Fine, Your Honor.  I'll withdraw that

23   portion of my question.

24   BY MS. BALDINGER:

25   Q.   You were asked about Mr. Ingram's fall.  You were asked

1   about your opinion that you could see that he fell on his

2   stomach and that he fell like a Tom Brady slide?

3   A.   Yes.

4   Q.   Could you please explain the basis for those statements

5   for the jury?

6   A.   Sure.  If you look at the video that was shown.

7            MS. BALDINGER:  If you could tee it up, please, the

8   Eye in the Sky.

9            THE WITNESS:  So in the video, he has dark shoes on,

10  light pants, and his head is dark.  And you can see that the

11  shoes, they extend away from his head, not under his head.  You

12  have to look at the black shoes very carefully.  You'll see

13  them the entire video.

14            (Video playing.)

15            THE WITNESS:  Stop it right there.  Keep going.  Frame

16  by frame.  There.

17            So you can see that the shoes are to the far right,

18  and his head, which is the other dark object, is to the left.

19  Okay?  And so that's how I know his feet did not fall

20  underneath him.

21            So in order to get the flexion distraction type of

22  injury, his feet would have had to somehow, like a bunny

23  rabbit, he would have to be jumping across the street like a

24  bunny rabbit and then land on his buttocks, and his head would

25  fall forward.  That's what Dr. Batterman says, and -- yeah,

YUE - REDIRECT - BALDINGER                          *480*

1  Dr. Batterman says that.

2          So I don't see him running across the street like a

3  bunny rabbit.  He's sprinting, taking strides.  And then when

4  he tries to stop, his feet go forward, which is like a Tom

5  Brady slide.  Like so if Tom Brady is going for a third down,

6  fourth down, and he runs, he gets the down, and he slides down

7  so he's down, his feet go first.

8          And in this case, my assumption is he has a bad left

9  ankle, it's been fractured before, he has screws in his ankle.

10  He's going to protect that left ankle.  He's going to stop with

11  his right foot.  He's going to fall towards his left-hand side.

12  That's my --

13          MR. BLUMBERG:  Objection.

14          THE WITNESS:  -- interpretation.

15          THE COURT:  State your objection.

16          MR. BLUMBERG:  I've never heard this before.

17          THE COURT:  Your response?

18          MS. BALDINGER:  Your Honor, he opened the door.  I

19  just asked him to follow up on the question, and this came.

20          THE COURT:  Very well.  Overruled.  I'll permit it.

21  Please move on.

22          MS. BALDINGER:  Thank you, Your Honor.

23          Can you please do me a favor and bring up the article

24  that we just had?  What was it, 1036 at page 9.  We'll start

25  with the first page.

YUE - REDIRECT - BALDINGER          *481*

```
 1   BY MS. BALDINGER:

 2   Q.   Okay.  This is an article.  Do you recognize -- did you

 3   see this article?

 4   A.   I don't -- I just see a disclaimer.

 5   Q.   Go to the next page where it has a title.

 6   A.   Yes, I've seen this before, yes.

 7   Q.   And the title is, "Common protective movements govern

 8   unexpected falls from a standing height"?

 9           MR. BLUMBERG:  Objection, Judge.  Beyond the scope.

10           THE COURT:  Your response?

11           MS. BALDINGER:  It goes directly to what was elicited

12   on cross-examination and right to page 9.

13           THE COURT:  Let me see you at sidebar, Attorney

14   Baldinger.

15           (Sidebar as follows:)

16           THE COURT:  So, Attorney Baldinger, if you believe

17   that they opened the door for something, you have to ask them

18   information to go through that door.  I don't want you to be

19   assuming that I'm going to agree that you are permitted.  He

20   already answered the question, so I don't know what damage has

21   been done.  But if this was not, as he said, discussed before

22   with him, I don't think that's right.  So I'm going to caution

23   you.  If you think he opened the door for something, let me

24   know before --

25           MS. BALDINGER:  Okay.  That's fine.
```

 1              THE COURT:  -- you go through that door.  And this is

 2    a warning for everyone.

 3              And what is your objection to --

 4              MR. BLUMBERG:  I didn't discuss this article at all.

 5    This article never came up in my cross-examination with this

 6    witness.

 7              MS. BALDINGER:  He questioned him about whether he

 8    fell -- actually, that he hit his hands and knees and that he

 9    fell on his stomach.  I wanted to show him this article from

10    the defendants that showed this is exactly a common accepted

11    way of falling that's consistent with what he testified to.

12              THE COURT:  Okay.  Shouldn't you be asking that --

13    that of their expert, not him of, because it's outside the

14    scope of direct.

15              MS. BALDINGER:  I'll move on.  That's no problem.

16              THE COURT:  Okay.  The objection is sustained.

17              MS. BALDINGER:  Thank you, Your Honor.

18              (Sidebar concluded.)

19              THE COURT:  Take it down.

20              MS. BALDINGER:  Thank you.

21    BY MS. BALDINGER:

22    Q.  You were asked to confirm -- or you were asked on

23    cross-examination about the full thickness muscle injury?

24    A.  Yes.

25    Q.  And you indicated that it was unusual, correct?

 1  A.   Yes.

 2  Q.   You also were asked about whether there was any sign of

 3  injury under the subcutaneous tissue in Mr. Ingram's neck,

 4  correct?

 5  A.   Correct.

 6  Q.   What is subcutaneous tissue?

 7  A.   Subcutaneous tissue is mainly a fatty layer under the

 8  skin.

 9  Q.   And what significance, if any, is there, Doctor, you -- to

10  the fact that you did not see any injury in the subcutaneous

11  layer of Mr. Ingram's neck?

12  A.   The subcutaneous injury would be dependent upon the

13  thickness of the fat.  A thinner person would have much less

14  fat.  Therefore, you would see very little potential trauma

15  because there's nothing to traumatize.

16       Secondly, the -- you can press on muscle, the different

17  layers, but the only layer that's going to be really, harshly

18  affected is going to be the muscle that's up against something

19  very hard, a bone.  Okay?

20       And so in this case, the skin, the fat, and the very

21  superficial muscle are not up against a bone.  They're up

22  against more muscle.  Okay?  So it's not until the deeper

23  layers, which are against the bone, right, are pressed on, and

24  those are the layers that will be injured.  Okay?  They have

25  to -- muscles -- like I said, the Slinky, it's very

1   stretchable, pliable.  But it has its limitations, especially

2   up against something very hard.

3   Q.  And did you see that in Mr. -- in your review of

4   Mr. Ingram's studies?

5   A.  Yes.  There -- yes, we did.

6   Q.  Can you tell the jury where and how.

7   A.  On the MRI scan, axial view, I think we had one that has a

8   picture of it with the red around it that's pretty

9   depictive(Sic) of it.

10  Q.  If we could take a look at 402-2, is that what you're

11  asking for, or 406-4?  Is that what you're looking for?

12  A.  That one and the other one that has the other cut, the --

13          MS. BALDINGER:  402-2, please.  Or just maybe 406-2.

14  I am sorry.

15  BY MS. BALDINGER:

16  Q.  Is that what you were looking for?

17  A.  Yes.

18  Q.  Okay.  Can you explain, please.

19  A.  So you can see that the muscle that's red --

20          MS. BALDINGER:  Your Honor, may he approach?

21          THE COURT:  He may.

22          MS. BALDINGER:  Thank you.

23          Here you go.  Just stand over here so you're not

24  blocking the jurors.

25          THE WITNESS:  Yeah.  This red muscle, which was -- you

1    saw white on the PowerPoint that I showed this morning -- is

2    the same muscle.  It's just highlighted to show the damage.

3    And so this is red.  That's the sub- -- that's the muscle

4    that's up against this bone.  This other muscle is not against

5    anything hard.  It's up against more soft muscle.  And this

6    very thin layer is the fat.

7            So Mr. Ingram is in exceptional shape.  He doesn't

8    have a subcutaneous layer to really speak of because it's a

9    very thin layer.  Okay?  And the rest of the muscle is smaller,

10   and it's up against the soft, but this muscle is up against the

11   bone.

12           See this bone right there?  And anything -- any time

13   muscle is pressed against something hard, it's going to have a

14   limitation.  And that's why that muscle is damaged and that's

15   why the tissue above it is not.

16   BY MS. BALDINGER:

17   Q.   And what was the cause of that muscle injury, as you see

18   it?

19   A.   Pressure downwards with a knee.  And, again, I measured

20   this to be about 6 centimeters in length, which is about the

21   same size of a knee.  Patella in a human being is about 4 to

22   6 centimeters.  It measures exactly the same size.

23           MS. BALDINGER:  Can we take a look at 406-4, please.

24   BY MS. BALDINGER:

25   Q.   Can you show us that in this drawing.

1    A.   Yes.  So this distance -- if you measure this distance,

2    the width of the axial view, especially.  This is a

3    longitudinal view.  The axial view is better.

4    Q.   Up and down?

5    A.   If you have the other view that has the measurement is

6    better.

7         MS. BALDINGER:  Okay.  The other view, if you could go

8    back, please.

9         THE WITNESS:  This distance -- so the kneecap --

10   imagine a knee right there is the same width as a kneecap,

11   okay, so that's why you're seeing that size.  It's a very,

12   very -- common sense.

13        MS. BALDINGER:  Thank you, Doctor.

14   BY MS. BALDINGER:

15   Q.   You were asked about the lack of abrasions, bruising, or

16   contusions; in other words, the absence of external marks as

17   being noted.  There were no such indications of those being

18   present in the EMS report and in the emergency room, correct?

19   A.   Correct.

20   Q.   Okay.  Can you tell us, does the lack of bruising or an

21   abrasion or a contusion to the right side or the back of

22   Mr. Ingram's neck have any significance to your opinions?

23   A.   It doesn't change them because, again, that tissue is not

24   going to be affected.  It's not up against anything hard.  And

25   so unless someone took a knife or something sharp, you know, a

 1  studded-something, you're not going to see anything back there

 2  because the knee is soft.  I mean, it's got a padding to it.

 3  There's pants.  It's not a sharp point.  It's more of a broader

 4  surface.  And so that broader surface won't leave significant

 5  marks of bruising because he's -- it's not going to -- it's not

 6  up against anything hard.

 7  Q.  You were asked on cross-examination a question that

 8  stated -- and I believe I have it right -- could you tell

 9  whether the movement back and forth, after Mr. Ingram was set

10  up, made his injuries worse?

11      Do you remember that question?

12  A.  Yes.

13          MR. BLUMBERG:  Objection, Judge.  That was not the

14  question.

15          THE COURT:  Sustained.

16          Rephrase your question.

17  BY MS. BALDINGER:

18  Q.  Do you remember being asked questions by Mr. Blumberg

19  regarding Mr. Ingram's being moved back and forth?

20  A.  Yes.

21  Q.  And remember you said you couldn't answer that question

22  "Yes" or "No"?

23  A.  Correct.

24  Q.  Could you tell us why you couldn't answer the question

25  "Yes" or "No."

 1   A.   Because that would have needed a live MRI during the

 2   motion to see if there was actual, you know, tissue damage

 3   within the spinal cord itself.  And obviously, we're

 4   not -- there's no live MRI that's on this North 7th Street that

 5   the patient -- that the plaintiff is in.  And so you, sort of,

 6   need that information, because he's asking me about damage to

 7   the tissue.

 8   Q.   Do you have an opinion, within a reasonable degree of

 9   medical probability, as to what impact the moving him back and

10   forth and having him fall on his face had on his injuries?

11           MR. BLUMBERG:  Objection.

12           THE COURT:  You don't have to answer.  There's an

13   objection.

14           State your grounds.

15           MR. BLUMBERG:  It's been asked, and it's -- during

16   cross-examination.  There was no answer to that question, and I

17   don't think he can change his answer.

18           THE COURT:  Well --

19           MS. BALDINGER:  It's not --

20           THE COURT:  Excuse me.

21           Your response?

22           MS. BALDINGER:  It's not.  It's a clarification

23   because it was misleading the way the question was asked.

24           MR. BLUMBERG:  Objection, Judge.

25           THE COURT:  Very well.  But you know that on redirect,

1  the witness can explain and clarify what was raised on cross.

2          So overruled.  I'll permit it.

3  BY MS. BALDINGER:

4  Q.  Can you answer the question, Dr. Yue.

5          What is your opinion as to the impact -- the motion of

6  sitting Mr. Ingram up, having him move back and forth, fall on

7  his face, and pick him back up -- have on his neck injury as

8  sustained originally on the ground?

9  A.  Correct.  So any movement of an unstable spine will create

10  further alteration in the physiology of the spinal cord and all

11  the surrounding tissues.  It will decrease the likelihood of

12  recovery.  The more you contuse the spinal cord, the more you

13  stretch it, the more you rotate it, the less likely that you're

14  going to get a recovery.  So that's an additional traumatic

15  event, and that can take -- could I see it acutely?  Yes.  But

16  I may not see it acutely.  I may see it a day or so later or a

17  week later.  The effects take time.  And so -- but it's the

18  motion, the additional motion, the additional contusion,

19  bruising of the tissue that leads to the decrease in possible,

20  potential recovery and gainful use of his extremities.

21          MS. BALDINGER:  Thank you, Dr. Yue.

22          Nothing further.

23          THE COURT:  May I see you at sidebar?

24          (Sidebar as follows:)

25          THE COURT:  Mr. Blumberg, you didn't have an

1   opportunity to cross-examine on -- I think it was Exhibit

2   404-3, the testimony about the infrequency -- when he was

3   testifying about his opinion regarding the infrequency

4   situation with Mr. Ingram.  And I think there was a discussion

5   about Exhibits 404.

6           And I -- also, I don't think the issue of -- I think

7   you objected, and I overruled the objection, but I wanted to

8   offer you an opportunity to cross or recross on the issue of

9   the fact that you said you never heard him before say that

10  the -- explain how he fell and the fact that I think he had an

11  injury to the left side.

12          MR. BLUMBERG:  Okay.

13          THE COURT:  Do you wish to cross-examine on those two

14  things?

15          MR. BLUMBERG:  Yes, Your Honor.

16          THE COURT:  I want to give him an opportunity.  It's

17  only fair.

18          MS. BALDINGER:  No problem.

19          THE COURT:  You may.

20          MS. BALDINGER:  Thank you.

21          (Sidebar concluded.)

22          THE COURT:  Mr. Blumberg.

23          MR. BLUMBERG:  Thank you.

24  (RECROSS EXAMINATION OF DR. JAMES JOSEPH YUE BY MR. BLUMBERG:)

25  Q.  Dr. Yue, you mentioned on the redirect examination about

1  the fact that he was running and that he had a prior fracture

2  of his -- was it his ankle or --

3  A.   Left ankle.

4  Q.   Left ankle, with respect to protecting that left ankle,

5  et cetera.  Do you remember all that testimony?

6  A.   Yes, I do.

7  Q.   Is it your testimony that you could tell that that's what

8  he was doing in that video that you observed?

9  A.   I could tell that his --

10 Q.   Can you answer that "yes" or "no," first.

11 A.   Can I tell the difference between the right foot and the

12 left foot, no.

13 Q.   Okay.  So is it a fair statement that you can't support

14 the fact that he was favoring one versus the other, as you

15 testified on redirect examination, based on that video

16 evidence, correct?

17 A.   Correct.

18 Q.   And that's all the evidence you have at this point to

19 indicate how he was running across the street, fair?

20 A.   Yes.

21         MR. BLUMBERG:  I have nothing further.

22         THE COURT:  Okay.  Thank you for your testimony.

23 Nobody else has any -- you don't have?

24         MR. TAMBUSSI:  No, Your Honor.

25         MR. WITTMAN:  No, Your Honor.

YUE - RECROSS - BLUMBERG

*492*

 1          THE COURT:  You're excused.

 2          (Witness excused.)

 3          THE COURT:  Okay.  Call your next witness.

 4          MR. ROTHBORT:  Your Honor, at this point the plaintiff

 5  would like to play a number of deposition read-ins.  We have

 6  agreed upon what's going to be played with the defendants.

 7  There will be both video clips, and there's also a supplemental

 8  addition that I guess I will be reading to the jury in a

 9  question and answer session.

10          THE COURT:  Okay.  So these are depositions, audio and

11  visual?

12          MR. ROTHBORT:  Yes.

13          THE COURT:  The jury is going to be able to see them?

14          MR. ROTHBORT:  Yes, they're going to be on the videos.

15  If Your Honor would permit us a brief minute or two,

16  Mr. Cortopassi just needs to do a sound check, just to make

17  sure that all the jurors can hear it, because some of the audio

18  clips are varying degrees of decibel.

19          THE COURT:  Do you want me to discuss how to consider

20  the video deposition testimony with the jury?

21          MR. ROTHBORT:  Yes, I think that would be a fair

22  instruction, as long as the defendants don't have any

23  objection.

24          THE COURT:  Well, I could briefly give them an

25  instruction on how to consider video and deposition testimony.

                      YUE - RECROSS - BLUMBERG

1             So, Members of the Jury, you're going to be listening

2    to the deposition testimony -- it's also on video -- that will

3    be presented to you.  And if you remember in my preliminary

4    instructions, I gave you specific instructions on how to

5    determine and the factors to consider the credibility of the

6    witnesses.  And you are to apply the same standards in

7    assessing credibility to this type of testimony.

8             Just because it's submitted to you by way of a

9    deposition or a video deposition is not entitled to more weight

10   or less weight.  You apply the same legal standards in

11   determining the extent to which you accept the testimony of the

12   witnesses.

13            With that, we will proceed to listen to the deposition

14   testimony of various witnesses, and the lawyers will identify

15   who they are.

16            MR. ROTHBORT:  Sure.  Thank you, Your Honor.  I'll

17   just ask for a moment of the Court's indulgence.  We just have

18   to do a brief sound test.

19            (Pause.)

20            THE COURT:  Could you give me a sense of how long this

21   deposition testimony is going to be?

22            MR. ROTHBORT:  I expect it to be about an hour or so.

23            THE COURT:  Okay.

24            MR. ROTHBORT:  Your Honor, we're going play the first

25   clip, which is going to be from Defendant Merck's deposition

 1   testimony, lines 37, 11, through 38, 5.  And just since this is

 2   the first clip, if any of the jurors are having trouble

 3   hearing, just please let me know, so I can raise the volume.

 4           THE COURT:  You may proceed.

 5           (Video playing.)

 6           MR. ROTHBORT:  Thank you.  Can you please read in from

 7   Defendant Merck's deposition page 38, line 16 through page 39,

 8   line 5.

 9           (Video playing.)

10           MR. ROTHBORT:  Your Honor, is there audio coming from

11   your monitor?

12           THE COURT:  I'm not sure.

13           MR. ROTHBORT:  Sorry.  We heard an echo back here, and

14   that's why I was asking.

15           THE COURT:  You believe it's me?

16           THE TECHNICIAN:  I believe it might be a monitor, Your

17   Honor.  The computer screen it might be playing audio or the

18   microphones are picking up.

19           THE COURT:  Maybe it's picking up.

20           MR. ROTHBORT:  Thank you.

21           THE COURT:  Try now.

22           MR. ROTHBORT:  We'll try the next one.  From Defendant

23   Marchiafava's deposition, page 60, line 16 through 22.

24           (Video playing.)

25           MR. ROTHBORT:  And the next clip is from Defendant

1  Gennetta's, page 196, line 19 through page 197, line 25.

2          (Video playing.)

3          MR. ROTHBORT:  Next we're going to play from Defendant

4  Gennetta's deposition page 198, line 5 through page 199,

5  line 10.

6          (Video playing.)

7          MR. ROTHBORT:  And next from Defendant Gennetta's

8  deposition page 284, lines 9 through 13.

9          (Video playing.)

10          MR. ROTHBORT:  And Defendant Gennetta page 284,

11  lines 21 through page 286, line 1.

12          (Video playing.)

13          MR. ROTHBORT:  Thank you.  Now please play from

14  Defendant Gennetta, page 286, line 15 through 287, line 20.

15          (Video playing.)

16          MR. ROTHBORT:  Defendant Gennetta, page 288, lines 12

17  through 22.

18          (Video playing.)

19          MR. ROTHBORT:  Next I'd like to play from Defendant

20  Merck's deposition page 40, line 7 through page 43, line 8.

21          (Video playing.)

22          THE COURT:  We have a problem here.  We think it's the

23  monitor.

24           (A discussion held off the record.)

25          THE COURT:  Thank you.

YUE – RECROSS – BLUMBERG                    *496*

1          MR. ROTHBORT:  Next please play from Defendant Merck,

2    page 42, line 22, to page 43, line 8.

3          (Video playing.)

4          THE COURT:  We have an echo here.

5          MR. ROTHBORT:  Your Honor, what we're going to do is

6    mute the TVs, and Mr. Cortopassi has speakers, he's going to

7    just play it from those.

8          THE COURT:  Okay.  I appreciate that.

9          MR. ROTHBORT:  All right.  We'll try and see if this

10   works.

11         James, could you please play from Defendant Merck's

12   deposition page 43, line 11 through page 44, line 25.

13         (Video playing.)

14         MR. ROTHBORT:  Let's move on to Defendant Marchiafava.

15   I'm going to ask that we play three separate clips, they're all

16   in sequential order:  Page 60, line 23 through page 61, line 9;

17   and then page 61, line 10 through 16; and page 61, line 17

18   through 25.  So please play those three clips in a row.

19         (Video playing.)

20         MR. ROTHBORT:  Please play from Defendant

21   Marchiafava's deposition page 62, line 19 through page 63,

22   line 14.

23         (Video playing. )

24         MR. ROTHBORT:  Next I'm going to ask to play a series

25   of clips from Defendant Marchiafava's deposition beginning at

1   page 66, line 1 through 13; page 66, line 14 through 21;

2   page 66, lines 22 through 67(Sic); page 67, line 4; page 67,

3   line 5 through 8.

4            (A discussion held off the record.)

5            MR. ROTHBORT:  Through 19.

6            (Video playing.)

7            MR. ROTHBORT:  Please also play page 67, line 20

8   through page 68, line 3 of Defendant Marchiafava's deposition.

9            (Video playing.)

10           MR. TAMBUSSI:  Judge, excuse me.  It's just a small

11  clarification.  I'm sure that Officer Marchiafava would

12  appreciate the promotion, but he's not a lieutenant, he's an

13  officer.

14           THE COURT:  Very well.

15           MR. ROTHBORT:  Next we're going to play two clips

16  sequentially from Defendant Marchiafava:  Page 68, line 17

17  through page 69, line 2; and page 69, line 3 through page

18  68 -- excuse me -- page 69, line 3 through 8; and then page 69,

19  line 9 through 19.

20           (Video playing.)

21           MR. ROTHBORT:  Your Honor, if I could just have a

22  moment of the Court's indulgence, I have to go confer with

23  Mr. Cook.

24            (A discussion held off the record.)

25           MR. ROTHBORT:  Your Honor, do you mind if I just pull

1   this down for a second?

2            Next we're going to be reading deposition testimony

3   from Chief Nelson Weist.  We have some video clips, but there's

4   also some portions just from the deposition that I'm going the

5   read to the jury since those clips aren't currently available.

6            THE COURT:  Okay.  Go ahead.

7            MR. ROTHBORT:  So:

8            Question:  So Chief Weist, where are you

9   currently -- sorry, let me read the lines.  Page 61, line 10

10  through page 13, line 20.

11           Question:  So Chief Weist, where are you currently

12  employed?

13           Answer:  My primary employment is with the South

14  Jersey Transportation Authority.  I am the fire chief.  My

15  primary discipline is the Atlantic City International Airport,

16  which encompasses the tech center, 177th Fighter Wing and the

17  campus.  It's a 5,500 acre campus.

18           Question:  Specifically what is your position, your

19  title?

20           Answer:  I am the fire chief.

21           Question:  And how long have you been the fire chief

22  for South Jersey Transportation Authority located at the

23  Atlantic City International Airport?

24           Answer:  Since June of 2016.

25           Question:  What are some of your -- generally, you can

1  give me an overview of your roles and responsibilities in that

2  primary position.

3        Answer:  I am responsible for the day-to-day

4  operations of a career department managing all of the

5  personnel, managing the budgets and responsible for the

6  different disciplines that we are responsible to, aircraft

7  rescue and fire fighting, structural fire fighting, basic life

8  support, and everything else that falls under our umbrella.

9        Question:  Okay.  And prior to assuming this position

10  as fire chief for South Jersey Transportation at the Atlantic

11  City Airport in June of 2016, what was your previous primary

12  employment?

13        Answer:  I was a shift commander for the airport fire

14  department, the South Jersey Transportation Authority fire

15  department.  I was one of the assistant chiefs.

16        Question:  And how long did you hold that position?

17        Answer:  Roughly four years.

18        Question:  So that would have been 2012 to 2016,

19  approximately?

20        Answer:  It's pretty close.

21        Question:  And what were some of your

22  responsibilities -- what were some of your roles and

23  responsibilities, generally, as assistant chief and shift

24  commander for the South Jersey transportation association?

25        Answer:  I was responsible for managing the shifts,

1   both of my shifts.  I was responsible for the personnel,

2   oversight with regards to any responses, obviously the incident

3   commander on any responses and ensuring that -- I was the

4   planning and preparedness chief for the campus, and I was also

5   responsible for the BLS training for the department personnel.

6           Question:  BLS training means basic life support,

7   correct?

8           Answer:  Yes, ma'am.

9           Question:  And prior to holding the position from 2012

10  to 2016, what was your previous primary employment?

11          Answer:  I was a fire captain for the South Jersey

12  Transportation Authority at the Atlantic City International

13  Airport, I believe 2009, somewhere in 2009 until my promotion

14  to assistant chief.

15          I'll now read from page 15, line 24 through page 16,

16  line 5.

17          Question:  Now, can you tell me what certifications or

18  licenses that you hold pertinent to emergency medical services?

19          Answer:  Sure.  I am an emergency medical technician

20  with the state of New Jersey.  I'm also a certified emergency

21  medical technician instructor with the state of New Jersey.

22          Next, page 23, line 6, through page 24, line 23.

23          Question:  And are you aware of Camden County College

24  also having a police academy?

25          Answer:  Yes, ma'am.

1          Question:  When did you start to provide any type of
2    educational training services through Camden County Police
3    Academy?
4          Answer:  My best recollection would be somewhere
5    around 2012, 2013.
6          Question:  And what process did you go through to
7    become qualified or hired by Camden County Police Academy to
8    provide instructional services?
9          Answer:  We had to provide our professional
10   certifications to become certified as PTC instructors -- police
11   training commission instructors -- strictly in our discipline,
12   emergency medical field.
13         Question:  What training or instruction did you go
14   through to become a police training commission instructor?
15         Answer:  Our professional certifications afforded us
16   the opportunity, we went through the paperwork process, and
17   then we received some training from the academy staff on how
18   the police academy worked.
19         Question:  Do you hold a certificate of any kind or a
20   license of any kind recognizing you as a police training
21   commission instructor?
22         Answer:  Yes, ma'am.
23         Question:  What is it called?  Does it have a title?
24         Answer:  Off the top of my head, I don't remember.
25         Question:  What would you refer to it as?

YUE - RECROSS - BLUMBERG                    *502*

1           Answer:  My PTC instructor.

2           Question:  Do you maintain copies of your certificates

3    and licenses, sir?

4           Answer:  Yes, ma'am.

5           Question:  So if I made a request of you to please

6    produce a copy of your PTC instructor's certificate, you would

7    be able to do that?

8           Answer:  Yes, ma'am.

9           Question:  When did you obtain your PTC instructor's

10   certificate?

11          Answer:  I don't remember.

12          And now I would ask, James, if you would please play

13   Chief Nelson Weist, page 24, line 24, through page 25, line 12.

14          (Video playing.)

15          MR. ROTHBORT:  Please play page 52, line 16, through

16   page 53, line 3.

17          (Video playing.)

18          MR. ROTHBORT:  Please play page 58, line 5, through

19   page 58, line 18.

20          (Video playing.)

21          MR. ROTHBORT:  Please play page 60, line 14

22   through 25.

23          (Video playing.)

24          MR. ROTHBORT:  I'll now read from page 61, line 1

25   through 11, from Chief Weist's deposition.

1      Question:  If an officer is acting as a first

2   responder in assessing an individual, if they are not sure

3   whether the individual's presenting with a medical condition or

4   a trauma-related condition, the advisable and recommended

5   course of action to take, pursuant to their first responder

6   training, is to treat it as a trauma, correct?

7      Answer:  It's based on the circumstances.  It's based

8   on the general impressions.  I can't give a clear answer on

9   that because each patient presents with a deferent set of

10  implications.

11      Please play page 61, lines 12 through 17, and then

12  page 61, lines 20, through page 62, 7.

13       (A discussion held off the record.)

14      MR. ROTHBORT:  Sorry.  Those are of Chief Weist.

15      (Video playing.)

16      MR. ROTHBORT:  And now I will read from page 62,

17  lines 18 through 24, from Mr. Weist's deposition.

18      Question:  If the patient is reporting a loss of

19  feeling in their arms and their legs and their feet, are your

20  officers trained that those are potential symptoms associated

21  with paralysis?

22      Answer:  Again, it depends on the circumstances of

23  the -- of how the patient got to where they're at.

24      Please play from Chief Weist's deposition page 62,

25  lines 25, through page 66, line 19.

 1              (Video playing.)

 2              MR. ROTHBORT:  Please play Chief Weist's deposition

 3    page 69, line 19, through page 71, line 1.

 4              (Video playing.)

 5              MR. ROTHBORT:  Please play from Chief Weist's

 6    deposition page 80, lines 12 through 24.

 7              (Video playing.)

 8              MR. ROTHBORT:  Please play from Defendant Merck's

 9    deposition page 216, line 2, through page -- through line 25.

10              (Video playing.)

11              MR. ROTHBORT:  Please play from Defendant Merck's

12    deposition page 246, line 14, through page 250, line 15.

13              (Video playing.)

14              MR. ROTHBORT:  Please play from Defendant

15    Marchiafava's deposition page 282, line 4 through 11, followed

16    by lines 12 through 16 of page 282.

17              (Video playing.)

18              MR. ROTHBORT:  Please play from Defendant Marchiafava

19    page 282, line 17, through page 283, line 5.

20              (Video playing.)

21              MR. ROTHBORT:  Please play from Defendant

22    Marchiafava's deposition page 283, line 20, through page 284,

23    line 3.

24              THE COURT:  And then we'll recess.  Play this, and

25    then we'll recess.

 1          MR. ROTHBORT:  Your Honor, there's just another set of

 2    clips in the same series, if -- I want to make sure for

 3    continuity purposes.

 4          THE COURT:  Okay.  So this is a good time to break for

 5    a 15-minute break?

 6          MR. ROTHBORT:  That's fine.

 7          THE COURT:  Members of the Jury, this will be our

 8    afternoon break.  15 minutes.  I don't need to repeat the

 9    instructions, right?

10          THE JURY:  No, Your Honor.

11          THE COURT:  All right.  Have a good break.

12          THE COURTROOM DEPUTY:  All rise.

13

14          (Jury exits the courtroom at 2:59 p.m.)

15          THE COURT:  See you in 15 minutes.

16          How much more do we have?

17          MR. ROTHBORT:  Your Honor, I think with some of the

18    delays that I may have underestimated about, I think maybe

19    about a half an hour.

20          THE COURT:  All right.

21          MS. BALDINGER:  Then I have -- that takes us to about

22    quarter to 4:00.

23          THE COURT:  Okay.  And then what do we have?

24          MS. BALDINGER:  I have another witness or two, and

25    then we'll be done for the day.

1          THE COURT:  We're going to be taking testimony until

2    5:00, right?

3          MS. BALDINGER:  That's what I said, another witness or

4    two.  I'm hoping to stay as close to 5:00, Your Honor.  We're

5    going as fast as we can.

6          THE COURT:  Okay.

7          MS. BALDINGER:  Can I just address what we're going to

8    do for tomorrow afternoon with the bed coming and the delivery

9    so that I can plan appropriately?

10          THE COURT:  Yes.

11          MS. BALDINGER:  So the bed is coming I'm -- at 2:30,

12    the delivery people.

13          THE COURT:  Where is the bed going to be coming at

14    2:30?

15          MS. BALDINGER:  Yeah, I know that they'll be here at

16    3:00, but I've asked them to come at 2:30 to make sure we don't

17    run into a time deadline.  So with the jury, I'm thinking maybe

18    we'd finish around 2:30, quarter after 2:00.  I have -- I need

19    the time to move the courtroom.  We need to move the equipment.

20    We need to set it up.

21          THE COURT:  Any reason why that can't be done after we

22    take --

23          MS. BALDINGER:  Yes, because of office -- because of

24    security, they only work certain hours we can get into the

25    building, and the bed delivery people don't work late

1  at -- they don't work after 5:00.  Your Honor, we've been down

2  this road.  I mean -- and I apologize.  I recognize this is an

3  inconvenience to the Court.  It's interrupting the Court's

4  schedule.  But I also know that when other people here in the

5  courtroom, they need time, we've allotted it.  Okay.  I know

6  Mr. Tambussi needed a day for oral argument, no problem.

7          I need two hours, Your Honor, or a couple of hours to

8  get this bed set up and give Mr. Ingram his day in court.

9  We're doing our best to keep things moving.  We have a full day

10 next week.  My hands are tied.  We've been making these

11 arrangements for weeks.  We've made sure everybody is

12 vaccinated, everything is ready to go, downstairs is ready,

13 security knows they have to be out of the building at a certain

14 time.

15          THE COURT:  All right.  We'll meet in 15 minutes.

16 I'll talk to you later about this.

17          MS. BALDINGER:  Thank you, Your Honor.

18           (Brief recess at 3:01 p.m.)

19          THE COURT:  Any reason we cannot take testimony until

20 3:00 tomorrow and then you have the balance of the day?

21          MS. BALDINGER:  Your Honor, I really prefer to end at

22 2:30, and I'm asking for your indulgence.  I have everything

23 set up.  We have witnesses to cover us to 2:30.  I'm not trying

24 to shortcircuit this trial by any means.  We have been filling

25 every minute.  We appreciate the court's time, Your Honor's

 1   time, everyone that's here.

 2          I'm not trying to cut it short.  I have just made all

 3   of these arrangements because I understand security has to

 4   close the courthouse and our men have to be out by 5:00.  I

 5   don't want any problem.  I'm asking for a 30-minute indulgence,

 6   Your Honor.

 7          THE COURT:  Very well.

 8          THE COURTROOM DEPUTY:  Are you ready?

 9          THE COURT:  Yeah, bring the jury in.

10          MS. BALDINGER:  If it was --

11          THE COURT:  I'll talk to you -- I'll talk to you

12   later.

13          THE COURTROOM DEPUTY:  All rise.

14           (Jury enters at 3:17 p.m.)

15          THE COURT:  You may be seated.

16          MR. ROTHBORT:  All right.  We'll continue with the

17   deposition read-ins.  Continue with Defendant Marchiafava,

18   page 283, line 20, through page 284, line 3.  And then actually

19   there will be additional clips continuing through page 284,

20   line 14.

21          (Video playing.)

22          MR. ROTHBORT:  Please play Defendant Gennetta,

23   page 200, lines 9 through 18.

24          (Video playing.)

25          MR. ROTHBORT:  Please play Defendant Gennetta,