THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| XAVIER INGRAM, <br><br>          Plaintiff, <br> vs. <br><br> COUNTY OF CAMDEN, *et al.*, <br><br>        Defendants. | Civil Action No. 14-5519 <br><br><br> <u>Argument Date</u>:  March 14, 2022 <br><br><br> <u>Before</u>:  Hon. Juan R. Sanchez, U.S.D.J. <br><br>        **Oral Argument Requested** |

---

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION, UNDER RULE
50, FOR PARTIAL JUDGMENT ON ALL CLAIMS**

---

Beth G. Baldinger, Esq.
Cory J. Rothbort, Esq.
Trevor D. Dickson, Esq.
**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, New Jersey 07068
P: 973-228-9898
F: 973-228-0303
E: bbaldinger@mazieslater.com
*Attorneys for Plaintiff Xavier Ingram*

## STANDARD

Defendants' recitation of the standard for JMOL is incomplete, and concomitantly, its motion is flawed in that it fails to view all evidence, inferences and credibility in the light most favorable to Plaintiff Xavier Ingram.  The standard for Rule 50(a) is,

> whether viewing the evidence in the light most favorable to the nonmovant [Ingram] and giving [him] the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability . . . .  The question is not whether there is literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly have found its verdict.  Furthermore, [i]n performing this narrow inquiry, we must refrain from weighing the evidence, determining the credibility of witnesses, or substituting our own version of the facts for that of the jury.

*Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 433 (3d Cir. 2009) (citations and internal quotation marks omitted).  What is more, on this motion the trial court,

> **must** disregard all evidence favorable to [**Defendants**] that the jury is not required to believe….  [W]e cannot help but conclude that [the court's] decision to grant [defendant's] motion for [JMOL] was irretrievably flawed.  [Plaintiff] provided ample proof of conduct that could support its…claims, much of which was uncontroverted and came directly from the testimony of [defendants] themselves….  [T]his case is a **reminder that [JMOL] should be granted <u>sparingly</u>**.

*Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 373 (3d Cir. 2016) (citations and internal question marks omitted) (emphasis added).

When the correct standard is applied to the facts and evidence adduced in plaintiff's case-in-chief, Defendants' motion for JMOL falls far short of the standard.  *E.g.*, *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (holding trial court erred by granting judgment in a §1983 *Monell* case).

1

**ARGUMENT**

**POINT I**

**DEFENDANTS' ARGUMENT THAT PLAINTIFF HAS FAILED TO ESTABLISH A PRIMA FACIE CASE OF EXCESSIVE FORCE IS FACTUALLY AND LEGALLY UNSUPPORTED**

Defendants argument that Plaintiff's excessive force claim should be dismissed because Plaintiff could not identify the specific Defendant-Officers who used force against him is wholly without merit as it finds no support in the record.

At the outset, "the issue of whether excessive force was employed must be left to the trier of fact." *Kopec v. Tate*, 361 F.3d 772, 778 n.7 (3d Cir. 2004). Nonetheless, Defendants baselessly argue that Plaintiff's excessive force claim should be dismissed as a matter of law. But, Defendants' reliance on *Jutrowski* is misplaced. There, the plaintiff was kicked in the face by one officer during an arrest involving multiple officers. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 286 (3d Cir. 2018). The Third Circuit, in granting the defendants' motion for summary judgment, noted that the plaintiff did "not contend that all [the officers] kicked him, only that one did." *Id.* at 293.

Here, Plaintiff has submitted competent evidence to allow a reasonable juror to conclude that Defendant Marchiafava and Defendant Gennetta – acting in concert – used excessive force against him ultimately resulting in the constellation of his cervical injuries resulting in quadriplegia. Plaintiff testified that Defendants Gennetta and Marchiafava had their knees in his neck and back and were punching him. Plaintiff further testified that Defendant Merck stepped down on his neck. *See, e.g.*, Trial Transcript, dated March 4, 2022, at T.805:20-24, T.807:6-11, T.811:13-22. The eyewitness testimony of Mark Marshall and Darryl Brown (a/k/a "Brownie") also supports Plaintiff's description of events. *See, e.g.*, Trial Transcript, dated March 2, 2022, at

2

T.354:8-22, T.358:13—360:19; Trial Transcript, dated March 7, 2022, at T.881:12—882:9. This is not a situation where only one of many officers used force. Rather, Plaintiff's excessive force claim is that all three officers involved in his arrest used force.[1] *See D'Arrigo v. Gloucester City*, Civ. A. No. 04-5967, 2007 WL 1755970, 2007 U.S. Dist. LEXIS 44316, at *43 (D.N.J. June 19, 2007) (declining to grant summary judgment for the defendants on the plaintiff's Fourth Amendment claim for excessive force against two police officers). Simply put, *Jutrowski* is inapposite, and Plaintiff's excessive force claim should be submitted for the jury to decide.[2]

## POINT II

### PLAINTIFF HAS PRESENTED SUFFICIENT EVIDENCE TO WARRANT SUBMITTING HIS *MONELL* CLAIMS TO THE JURY

It is well-settled that a plaintiff can proceed under *Monell* in two separate and distinct avenues. As the Court explained in *White v. City of Vineland*,

> A plaintiff that pursues a claim of municipal liability under Section 1983 may proceed in two ways. He may "put forth that an unconstitutional policy or custom of the municipality led to his . . . injuries, or that they were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (cleaned up). The two avenues "remain distinct: a plaintiff alleging that a policy or custom led to his or her injuries must be referring to an unconstitutional policy or custom, and a plaintiff alleging failure-to-supervise, train, or discipline must show that said failure amounts to deliberate indifference to the constitutional rights of those affected." *Id.* at 106.

---

[1] Defendants' acknowledge that Plaintiff specifically identifies Defendant Merck as the officer who stepped on his neck. Defs.' Br. at 14, ECF No. 422-1. In doing so, Defendants are forced to argue that Plaintiff's version of events is "inconsistent." However, credibility is the sole province for the jury. *United States v. Jannotti*, 673 F.2d 578, 598 (3d Cir. 1982) (holding that "[c]redibility determinations are for the jury").

[2] Plaintiff incorporates by reference his arguments in his opposition to Defendants' motion for judgment as a matter of law, *see* ECF No. 423, with respect to Defendants' Points V and VI. Defs.' Br. at 15-20, ECF No. 422-1.

500 F. Supp. 3d 295, 306 (D.N.J. 2020).  Plaintiff's Second Amended Complaint, Counts Four and

Five, asserts claims for liability under *Monell* and its progeny, pursuant to 42 U.S.C. § 1983, based

on the conduct of Defendants County of Camden and Chief John Scott Thomson, the policy-maker

for Camden County Police Department.  Plaintiff has adduced competent evidence to allow both

of its *Monell* claims to be submitted to the jury and, therefore, Defendants' motion for judgment

as a matter of law should be denied.

### A.  Plaintiff has Submitted Sufficient and Competent Evidence that the CCPD has a Custom of Failing to Supervise and Discipline its Officers.

As to a *Monell* claim proceeding under a "custom," Plaintiff must adduce evidence creating

establishing that the County (1) had a custom (2) that proximately caused the violation of Plaintiff's

constitutional rights.  *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 694-95 (1978); *see also Beck*

*v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) ("the plaintiff must 'simply establish a

municipal custom coupled with causation--*i.e.*, that policymakers were aware of similar unlawful

conduct in the past, but failed to take precautions against future violations, and that this failure, at

least in part, led to their injury.'" (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990)));

*Merman v. City of Camden*, 824 F. Supp. 2d 581, 589 (D.N.J. 2010).

A custom is "a given course of conduct, although not specifically endorsed or authorized

by law, is so well-settled and permanent as virtually to constitute law."  *White*, 500 F. Supp. 3d at

306 (quoting *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019)).[3]  "A plaintiff

must also show that the custom was the proximate cause of his injuries."  *Id.*; *see also Gottlieb ex*

*rel. Calabria v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 176 (3d Cir. 2001) (Plaintiff may show

---

[3]  "[A] plaintiff must show that an official who has the power to make policy is responsible for
either the affirmative proclamation of policy or [an] acquiescence in a well-settled custom."
*Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).

causation by establishing that "policymakers were aware of similar conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to [Plaintiff's] injury." (quoting *Losch v. Borough of Parkesburg, Pa.*, 736 F.2d 903, 910 (3d Cir. 1984))). CCPD's "custom regarding its investigation of all serious citizen complaints, not just excessive force complaints, is relevant to whether . . . whether it tolerated its police officers' misconduct." *Groark v. Timek*, No. 12-1984 (RBK/JS), 2014 U.S. Dist. LEXIS 97551, 2014 WL 3556367, at *8 (D.N.J. July 18, 2014) (Exh. A).

In *White*, the Court refused to grant summary judgment to the defendants where the defendant-municipality did not sustain any excessive force complaints, and the plaintiff had evidence that the investigations were "incomplete, at best." *Id.* at 306-07. In denying the defendant-municipality's motion for summary judgment, the Court noted:

> The Third Circuit has explained that having an investigative process in place does not protect against municipal liability unless the investigative process is real. . . . A reasonable juror could conclude that the City's process was not real.
>
> Defendants ask the Court to disregard these incidents because they are not sufficiently factually similar to the case at hand. Defendants' argument, for purposes of a summary judgment motion, are too granular. Often, Defendants rely on the fact that other incidents did not involve the use of a police dog, but that is not the only basis on which Plaintiffs assert the excessive use of force. The Court rejects Defendants' invitation to weigh the evidence. A reasonable juror could conclude from the history of complaints about Officer Platania specifically and **other officers more generally that the City had a custom of permitting officers to use excessive force**. Contrary to Defendants' argument, the Third Circuit's decision in *Forrest* [*v. Parry*, 930 F.3d 93 (3d Cir. 2019)] does require the Court to parse the complaints. **It stands only for the unremarkable proposition that the incidents to which a plaintiff points must be of a "similar nature" to the incident at issue and close enough in time.**

*Id.* at 307 (citations omitted and emphasis added).

5

Preliminarily, Plaintiff notes that this matter is unique insofar as the CCPD was only in existence for a mere approximate 13 (thirteen) months (May 1, 2013 to June 12, 2014) prior to the incident at issue. In contrast, many of the cases concerning *Monell* liability, involve police forces in existence for significantly-longer periods of time. Nonetheless, Plaintiff has produced significant evidence evincing an alarming custom of failing to investigate and supervise its officers use of force. In part through the testimony of Dr. Chapman, Plaintiff presented sufficient evidence to warrant presenting his *Monell* claim to the jury that the CCPD had a custom of failing to investigate and supervise its officers use of force.

At the outset,[4] Dr. Chapman identified 22 (twenty-two) Internal Affairs complaints, each of which had multiple flaws in the investigation. *See* Trial Exhibit 447(A). There were also a number of specific complaints of excessive force – involving use of force on a complainants neck, including chokeholds and restraints – which were improperly investigated and, most importantly, either not sustained or downgraded by Chief Thomson to a simple rule violation. These cases include IA File No. 13-055, where medical personnel from Lady of Lourdes reported that Officer Naughton choked an individual and then kneed him in the groin. This complaint was initially marked "sustained" but later reduced to a simply rule violation, which is no more serious than not wearing one's hat. IA File No. 13-105 was another instance where the Internal Affairs investigator, although determining that the force used on a complainant was "not commensurate with the force being inflicted upon him at the time of the incident," only sustained the officer's conduct as a rule violation despite video – which was shown to the jury – revealing that the officer used force against

---

[4] Due to time constraints, i.e. Plaintiff having to respond to this brief mere hours after it was filed by Defendants, Plaintiff cannot cite to specific testimony from the trial transcript. Plaintiff is willing, at this Court's request, to supplement this filing with specific references to the trial transcript.

the complainant while the complainant was sitting inside of a holding cell and not posing a threat to any officer or citizen nor resisting arrest. Dr. Chapman also cited the incident involving Officer Shockley at the scene of Plaintiff's arrest. As depicted on the Eye in the Sky Video, while Plaintiff laid on the ground and moments after the Defendant-Officers rolled Plaintiff, sat him up and dropped him to the ground, there was an interaction between Officer Shockley and another citizen in which Officer Shockley brought this citizen to the ground utilizing what he referred to as a "leg sweep." The IA Investigation into this matter concurred and based upon the video found that Officer Shockley utilized a "leg sweep" and concluded that the allegations of excessive force were not sustained. See Trial Exhibits 67 and 68. The jury was shown the video and a reasonable jury consistent with Dr. Chapman's opinion could conclude that the force used by Officer Shockley was not a "leg sweep" but rather something akin to a "body slam" and constituted excessive force. This is true even if the force used was a leg sweep because as Dr. Chapman opined, the citizen was not using any force against the officers or anyone else and thus any force (even if only a leg sweep) would be excessive.

Furthermore, Dr. Chapman cited IA File No. 13-327, which involved Defendant Merck. Therein, the complainant, along with an eye-witness, alleged that he was choked by CCPD officers. The findings within the IA Investigation Memorandum omit the complainant's allegation of being choked, a form of neck restrain and deadly force. Moreover, Defendant Merck signed his Use of Force Report as his own supervisor, contrary to accepted police practices, Attorney General Use of Force Guidelines and CCPD's own policies. This collateral issue was not identified by the IA Investigator nor addressed with Defendant Merck. Also, Defendant Merck failed to complete a separate Use of Force report for his interaction with the complainant at the hospital contrary to accepted police practices, and CCPD's own policies.

Dr. Chapman also discussed the flaws within IA File No. 14-091 wherein CCPD Officers, including Defendant Gennetta, failed to document drawing their guns against an individual who was pulled over for a motor vehicle stop, in violation of CCPD policies. The IA Investigative Memorandum asserted "[t]he video footage is not clear enough to see whether or not the officers have their weapons drawn." *See* Trial Exhibit 181(B), at Page 3. To the contrary, the video footage clearly shows the Officers with their guns drawn:



*See* Trial Exhibit 181(P). No action was taken against the Officers for this collateral, but critical issue. Dr. Chapman commented that the failure by CCPD IA to address this collateral issue, including as to Defendant Gennetta is:

> … contrary to accepted police practices and procedures, and it's recognized that when a police department's Internal Affairs division does not appropriately or properly investigate allegations of police use of force or police officers not following policies, that it has a negative effect on the supervision of the police officer.

See Trial Transcript, dated March 9, 2022, T.1469:2-13.

More generally, the Internal Investigations were flawed because investigators did not utilize an Internal Affairs Manual, which is "an investigative manual detailing the process and procedures for conducting an internal affairs investigation, and the forms required in accordance with this directive." *See* Trial Exhibit 117, at 3.  It also requires the use of an Investigation Plan which is developed and approved by the Internal Affairs Commander or Police Chief within five (5) days of the case being assigned and used in the investigation, including interviews. *Id.* at 3, 6. There was testimony from Chief Thomson, Captain Alexandro Ibarrando, and Saul Cintron that these important provisions of the CCPD's Internal Affairs policy were not being followed.  In fact, no Internal Affairs Investigation Manual, nor any Investigation Plans, were developed for investigations.  Indeed, Captain Ibarrando utilized a manual from the Rogers Group while Saul Cintron was told not to follow CCPD's Internal Affairs policy at all and use only the Attorney General Internal Affairs Guidelines.  Dr. Chapman testified that this was in direct contravention of CCPD's own internal policy, the Attorney General Internal Affairs Guidelines, and accepted police practices.  In sum, without an Internal Affairs Investigation Manual, there was no standardized method or system for investigating all complaints. Likewise, without use of Investigation Plan, there was no structure or focused goals for each investigation of each individual complaint.  *See Forrest*, 930 F.3d at 108-09 ("evidence regarding Internal Affairs' complaint backlog and other deficiencies" was relevant a showing of a municipality's failure to supervise). According to Dr. Chapman, these breaches led to flawed and substandard internal affairs investigations.  This in turn undermined the ability of CCPD to properly supervise, monitor and discipline officers.

Moreover, the Attorney General Internal Affairs Guidelines required that every "agency must submit to the county prosecutor a report summarizing its internal affairs activity on a form

established by the County Prosecutor for that purpose."   It goes on to state, "[e]very law enforcement agency will report internal affairs activity to the county prosecutor on an internal affairs summary report form. The form simply summarizes the number of cases by type of case, which were received and disposed of during the reporting period."  *See* Trial Exhibit 118(A), at 48.  Likewise, CCPD's Internal Affairs Policy, requires that such Quarterly and Annual Reports ("Reports") be prepared and submitted to the Prosecutor's Office. As introduced at trial, these Reports detail all complaints received each quarter, the number and types of dispositions, to the year-end totals.  Testimony was introduced that Chief Thomson relied on these Reports to track and monitor internal affairs complaints and the conduct of the officers.

However, Dr. Chapman demonstrated that CCPD's Quarterly Reports contained multiple errors – including in the number of excessive force cases – which were confirmed by the testimony of Captain Ibarrando that was played before the jury.  Chief Thomson was unaware of these errors. Dr. Chapman opined that this flawed and inaccurate data could not be relied upon by the Chief, as they were, to accurately track and monitor internal affairs complaints and the conduct of the officers, particularly regarding excessive force cases.  Moreover, Dr. Chapman explained and opined that CCPD's use of the IA Pro System and the Guardian Tracking System did not replace these Reports.  In short, the Chief cannot fix a problem unless he knows a problem exists.

Defendants also had a zero percent sustain rate of its excessive force complaints.  Dr. Chapman testified that, pursuant to the Internal Affairs Annual and Quarterly Reports, from May 1, 2013 to December 31, 2014, CCPD received 107 Excessive Force complaints, of which eighty-six (86) had been investigated to final disposition without a single complaint of Excessive Force having been sustained.  Also, of the seventy-three excessive force complaint Internal Affairs cases produced in discovery, there was also a zero percent sustain rate. Case 13-055, which presumably

10

Defendants will rely on to rebut the zero-percent sustain rate, was not sustained as an excessive force violation but rather a rule violation.   A zero percent sustain rate was far below national averages and was not in accordance with national police practices. Based upon the foregoing evidence, including but not limited to IA File Nos. 13-055 and 13-105, a reasonable juror could conclude that excessive force complaints were not properly or thoroughly investigated and/or not sustained and/or downgraded to Rule Violations in an effort to maintain a otherwise deflated zero sustain rate, which as demonstrated, was not accurate.

Separately, the Attorney General IA Guidelines require that Internal Affairs have an early warning system in place to monitor and track officer conduct.  CCPD utilized a computer program, the Guardian Tracking System, and had in place a Guardian Tracking Policy.  *See* Trial Exhibit 116(A).  Dr. Chapman opined that CCPD failed to follow the Guardian Tracking Policy as exemplified by its failure to monitor Defendant Merck for his multiple instances of use of force. As shown at trial, Merck had multiple Use of Force incidents, but not all of them had been entered into the Guardian Tracking System as required.  However, it was also shown that as between August of 2013 and November of 2013, Defendant Merck's four (4) use of force reports within six (6) months, which were entered into Guardian Tracking, should have triggered the mandatory requirement that he be monitored for use of force for a period of six (6) months.  However, this was not done in violation of CCPD's own internal policy and contrary to accepted police practices. Even afterwards, with additional use of force reports, he was still never monitored for use of force, further violation of the policy and standards.  Oddly, Defendant Merck was monitored for car accidents.  This evidence is sufficient to allow a reasonable juror to conclude that the CCPD had a custom of failing to monitor, supervise and investigate its Officers' (including Merck's) Use of Force.

The failure to monitor Defendant Merck's use of force was not isolated.  As Dr. Chapman testified, it was part of an overall and **systemic failure to monitor all officers' use of force**. The Attorney General Guidelines on use of force require that "in all instances when physical, mechanical or deadly force is used, each officer who has employed such force shall complete any reports made necessary by the nature of the underlying incident and a Use of Force Report."  *See* Trial Exhibit 112, at 7.  CCPD's Use of Force Policy mirrors this requirement and further requires that each Use of Force Report be reviewed by the officer's supervisor for accuracy and completeness, and that the Supervisor document this review by completing an Administrative Review Form.  *See* Trial Exhibit 111(A), at 10-11; *see also* Trial Exhibit 130(A), at 81.  At trial, Chief Thomson's testimony was played wherein he states that every use of force report must be accompanied by a supervisor's Administrative Review Form, and that failure to have an Administrative Review Form was a serious violation of CCPD's Use of Force Policy.

Dr. Chapman testified that, in his review of the seventy-three (73) Internal Affairs investigations which were classified by the CCPD as Excessive Force cases,[5] he found only 3 (three) cases where the investigation found officers failed to submit use of force reports and addressed these errors by way of Performance Notices.  *See* Trial Exhibit 2467.  These limited cases demonstrate that the Internal Affairs Unit knew how to identify problems with use of force reports and how to address them properly as required.  However, there was no indication that Internal Affairs followed up with any of the supervisors of the offending officers to find out why the supervisors had not detected or corrected these problems, which was also a breach of the standards of care.  Dr. Chapman further testified that in fifteen (15) Internal Affairs investigations,

---

[5] Of the seventy-three (73) excessive force cases reviewed, in which there were approximately 100 use of force reports, there was only one (1) Administrative Review Form. In other words, there were approximately ninety-nine (99) missing Administrative Review Forms.

he found twenty-four (24) instances in which there were errors in the use of force reports which were not identified or corrected by Internal Affairs.  *See* Trial Exhibit 2464.  These errors were a breach of the standard of care and deviated from accepted police practices because CCPD officers signed their own use of force reports as their own supervisor and there were no Administrative Review Forms.  *Id.*  Introduced at trial was Chief Thomson's testimony that every use of force Report must be signed by a supervisor.  Dr. Chapman testified that the failure to identify and correct these problems with the use of force reports was a deviation from the standards of care, breach of policy, and demonstrated a disconnect in the supervision of officers' use of force.

Dr. Chapman also analyzed and testified relating to 1,297 use of force reports from May 1, 2013 through December 31, 2014 produced by CCPD in response to an OPRA request.  *See* Trial Exhibit 567(A).  Dr. Chapman found that almost one-third of the use of force reports contained errors in violation CCPD's policy and industry standards.  The errors included officers signing their own Use of Force Reports as supervisors, no signatures at all, or Use of Force descriptions were blank.  *See* Trial Exhibits 567(E), 567(F), and 567(H).  Moreover, CCPD's Use of Force Policy requires that every use of force report be "forwarded through the appropriate chain of command to Internal Affairs."  *See* Trial Exhibit 111(A), at 10.  It also requires that "[a]ll Use of Force incidents will be reviewed by Internal Affairs" to determine whether:

1. Departmental rules, policy or procedures were adhered to;

2. The relevant directive was clearly understandable and effective to cover the situation;

3. Department equipment is adequate;

4. Department training is currently adequate.

*Id.* at 10.  Moreover, this policy provides that "[a]ll findings of violations of directives or training inadequacies shall be reported through the chain of command for resolution and/or discipline.  An

annual summary report of use of force incidents will be published and made available to the public upon request." *Id.* at 11.

Finally, Plaintiff has presented evidence of his own case and the manner in which it was handled by the CCPD. This includes gross deficiencies in the Internal Affairs investigation into Plaintiff's claims of excessive force against the Defendant-Officers including through the testimony of Detective Cintron, the IA Investigator assigned to Plaintiff's case. Amongst the evidence elicited is the following: (1) Detective Cintron was not a neutral and objective Investigator; (2) failure to identify collateral issues including inconsistent statements by the Defendant-Officers as to the alleged drugs they found in Plaintiff's possession and failing to render medical care to Plaintiff; (3) failing to review medical records of Plaintiff or obtaining additional information as to the nature of Plaintiff's injuries; (4) failing to identify Defendant Merck as a target of the investigation; and (5) omitting critical information from the Internal Affairs file including that the Defendant-Officers rolled Plaintiff over, sat him up and he then fell to the ground prior to the Officers rendering medical aid to Plaintiff.  The evidence also adduces that the CCPD, specifically Lieutenant Frampton and Captain Ibarrondo (head of Internal Affairs) issued Exceptional Performance Notices to all 3 Defendant-Officers mere days after the incident occurred and before any meaningful investigation had been completed or even undertaken.  Dr. Chapman opined that doing so under these circumstances was a deviation from accepted police practices. Deposition testimony from Lt. Frampton played to the jury confirmed that Lt. Frampton finds that the statements of Officers, including Defendant Merck, are "inherently reliable" and that he takes their word "like gospel." Dr. Chapman further opined that accepting an officers' version prior to completing a meaningful investigation was inappropriate and contrary to accepted police practices as well as the Attorney General's Internal Affairs guidelines.

14

The sum total of the foregoing evidence demonstrates that there was a systemic oversight as to the supervision, monitoring, and investigation of the CCPD officers' use of force and serious citizens' complaints.  This evidence, coupled with the testimony of Dr. Chapman, is sufficient for purposes of establishing a prima facie case of a custom under *Monell*.  *See, e.g.*, *D'Arrigo*, 2007 WL 1755970, at *13 (holding a reasonable jury could conclude that the defendant-city had a policy or custom of ignoring unconstitutional excessive force and was deliberately indifferent to excessive force in violation of the Fourth Amendment where the plaintiff offered evidence of twenty-five years' worth of excessive force complaints without a single officer being disciplined) (Exh. B); *Day v. Jackson Twp.*, No. 10-4011, 2013 U.S. Dist. LEXIS 12211, 2013 WL 394151, at *11 (D.N.J. Jan. 30, 2013) (denying the defendant municipality's motion for summary judgment because the plaintiff alleged that, in a five year period, the police department investigated fifteen excessive force complaints, none of which resulted in disciplinary action, and three of the four defendant officers had previously been investigated for excessive use of force but exonerated) (Exh. C); *Noble v. City of Camden*, 112 F. Supp. 3d 208, 224 (D.N.J. 2015) (denying summary judgment on *Monell* claim against the city for failure to properly investigate and/or discipline officers accused of using excessive force where the plaintiff's expert presented evidence that the defendant officers and police department as a whole had a history of a large number of excessive force claims without any disciplinary measures being taken); *Malik v. Hannah*, 799 F. Supp. 2d 355, 363 (D.N.J. 2011) (entering judgment for plaintiff, as a matter of law, on *Monell* claim against City of Camden for having a custom of tolerating excessive force where, among other things, evidence showed that there were a large number of citizen complaints – more than 300 – for excessive force against police officers in the years prior to plaintiff's injury and the city had a custom of ignoring such violations); *Adams v. City of Atl. City*, 294 F. Supp. 3d 283, 301-03 (D.N.J.

2018) (denying a motion for summary judgment on a *Monell* claim for failure to investigate and supervise where, among other things, the defendant officers, in a fourteen year period, accumulated sixty-three complaints that involved assault or excessive force and none were sustained).[6]

In sum, Plaintiff's Monell claim for a "custom" of failing to investigate and supervise its officers should be presented to the jury and, thus, Defendants' motion for judgment as a matter of law should be denied.

### B. Plaintiff Has Also Submitted Sufficient and Competent Evidence that, Because the CCPD did not Adequately Supervise its Officers, it did not Consider Training When Necessary.

Defendants argue that the fact that the Defendant-Officers received training on use of force ipso facto defeats a failure to train under *Monell*.  However, as discussed above, because there was custom of failing to supervise, monitor, and investigate claims of excessive and instances of use of force, CCPD failed to consider training when it was required. Defendants' motion for judgment as a matter of law must be denied.

"When deciding if a city should be liable for failure to train or supervise its officers, 'the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform.'"  *Adams*, 294 F. Supp. 3d at 304 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).  It must be shown that this failure "reflects a deliberate or conscious choice." *Estate of Roman*, 914 F.3d at 798, 800 (quoting *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 215 (3d Cir. 2001)).  Deliberate indifference must be shown by demonstrating:  "(1) municipal policy makers know that employees will confront a particular situation, (2) the situation involves a difficult

---

6 The Court in *Adams* also cited factors like "the likelihood that an external complainant will not be interviewed, the lack of responsiveness to individuals attempting to follow up on their complaint, and the complete lack of discipline or supervision when an officer triggers ACPD's Early Warning System."  294 F. Supp. 3d at 302.

choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id.* (quoting *Doe v. Luzerne Cnty.*, 660 F.3d 169, 180 (3d Cir. 2011) (internal brackets omitted)); *see also Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989) (deliberate indifference may be established where harm occurred on numerous previous occasions and officials failed to respond appropriately, or where risk of harm is great and obvious). The plaintiff must establish causation – *i.e.* "a causal nexus" between the failure to train and the specific constitutional injury at issue. *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 226 (3d Cir. 2014) (quoting *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1030 (3d Cir. 1991)).

Plaintiff reiterates the various deficiencies in CCPD's monitoring, supervising, and investigating instances of excessive force and, generally, use of force. *See supra,* Point II.A. Aside from these fundamental deficiencies, there were other serious flaws in the training of CCPD officers, including the Defendant-Officers. *See Lapella v. City of Atlantic City*, No. 10-2454, 2012 U.S. Dist. LEXIS 100327, 2012 WL 2952411, at *6 (D.N.J. July 18, 2012) (to sustain an inadequate training theory, plaintiff must identify the precise deficiency in training) (Exh. D). For example, the Attorney General Use of Force Guidelines requires every police department to provide and document semi-annual use-of-force training. *See* Trial Exhibit 112, at 7. CCPD's Use of Force Policy provides that "Use of Force training shall be conducted biannually concurrent with or in close proximity to weapons requalification" and "all Use of Force training shall be documented each time it is conducted listing all personnel being trained. This training may be accomplished electronically." *See* Trial Exhibit 111(A), at 11. Dr. Chapman explained that the bi-annual Use of Force training is to be given six (6) months apart.

Dr. Chapman opined that CCPD violated the Attorney General's Use of Force Guidelines and CCPD's Use of Force Policy during the time period of May 1, 2013 through May 1, 2014 in

17

that it only provided Use of Force Training in the Spring of 2013.  The CCPD failed to provide

any Use of Force training in the Fall of 2013 as required.  Consequently, Defendant Merck did not

receive the required bi-annual Use of Force training.  Specifically, Defendant Merck completed

the 2013 Spring Use of Force training in April of 2013; and then the 2014 Spring Use of Force

training in July 2014, after the incident.  *Cf. Adams*, 294 F. Supp. 3d at 305 (granting summary

judgment on a failure to train theory because the municipality produced records that its officers

regularly underwent yearly in-service training specifically in the area of use-of-force).  Also

admitted at trial was Chief Thomson's testimony that he is responsible for all training, but was

unaware that there was no Fall 2013 Use of Force training – even though he was required to

complete it on the DMS system the same as all other officers.

There was also evidence adduced at trial that none of the Defendant-Officers ever received

a performance evaluation while with the CCPD in violation of CCPD's own internal policy.

Without conducting the required annual performance evaluation, the CCPD could not possibly

have known if, and what, to train Defendants Merck, Marchiafava and Merck on.  In fact,

testimony from Chief Thomson was played to the jury that if no performance evaluations were

done, that would be a violation of CCPD policy. Moreover, as demonstrated, *supra*, Point II.A,

CCPD was not properly tracking Defendant Merck's use of force in violation of their own

Guardian Tracking policies.  The CCPD did not monitor Defendant Merck and, thus, could not

recommend or institute training in light of his extensive use of force history.  Dr. Chapman opined

that the import of this failure to implement performance evaluations would have negative impacts

on not only CCPD Officers but supervisors as well:

> Q:    Do you have an opinion with regard to what the import or impact is
> by the failure to have produced and performed performance
> evaluations on Sergeant Merck, Officer Gennetta, and Officer
> Marchiafava?

18

A:      Yes.

Q:      What is that opinion?

A:      That there is no mechanism in place, as per the policy, to advise the officers of their deficiencies and to give them a mechanism for improving the deficiencies to effectively notify them of their shortcomings, whatever they may be.

A:      That there is no mechanism in place, as per the policy, to advise the officers of their deficiencies and to give them a mechanism for improving the deficiencies to effectively notify them of their shortcomings, whatever they may be.

Q:      And what about from a supervisory perspective or organizational perspective? Do you have an opinion as to what the lack of performance evaluations mean?

A:      Yes.
Q:      Can you please tell us what that opinion is.

A:       From a supervisor's position and from an organizational position, it does not afford the supervisor or any level of the chain of command to know the limitations of the police officer and the areas in which the officer may need additional assistance.

See Trial Transcript, dated March 8, 2022, at T.1336:24—1337:18.

For the reasons set forth above and in subsection (A), *see supra*, Plaintiff respectfully submits that Defendants' judgment as a matter of law on the failure to train under *Monell* must be denied.

19

## POINT III

**PLAINTIFF HAS PRESENTED SUFFICIENT EVIDENCE TO WARRANT
SUBMITTING HIS CIVIL CONSPIRACY CLAIM TO THE JURY**

Defendants, in passing, argue that Plaintiff's civil conspiracy claim must be dismissed as a matter of law because Plaintiff failed "to identify any pre-arrest conduct regarding any alleged 'conspiracy.'"  Defs.' Br. at 21, ECF No. 422-1.  This argument overlooks *Jutrowski*, a case that Defendants' heavily relied on yet suspiciously omit.

To show a claim of civil conspiracy under § 1983, Plaintiff must allege and ultimately prove that (1) two or more persons conspired to deprive an individual of a constitutional right; (2) that one or more of the conspirators performed an overt act in furtherance of the conspiracy; (3) the overt act injured the individual by depriving him or her of a constitutional right; and (4) the conspirators were acting under color of state law.  *Barnes Found v. Twp. of Lower Merion*, 242 F.3d 151, 162 (3d Cir. 2001) (quoting 42 U.S.C. § 1983); *see also Stolinski v. Pennypacker*, 772 F. Supp. 2d 626, 646 (D.N.J. 2011) (To prove a civil conspiracy under Section 1983, a plaintiff must show "that two or more co-conspirators reached an agreement for the purpose of depriving constitutional rights under color of state law.").

Although deprivations of these rights typically involve direct access to the courts, state actors may also deny these rights when they "conspire to cover up constitutional violations." *Jutrowski*, 904 F.3d at 294.  In such instances, a "conspiracy of silence" is actionable because the coordinated conduct impedes a person's access to the courts and "renders 'hollow' a victim's right to redress in a court of law." *Id.* (quoting *Vasquez v. Hernandez*, 60 F.3d 325, 328-29 (7th Cir. 1995)).   In *Jutrowski*, the Third Circuit reversed summary judgment on the after-the-fact conspiracy claim, finding that significant the material omissions in contemporaneous police reports, the conversations between officers before filing the reports, as well as the officers'

20

distorted and conflicting accounts of the events, all supported the plaintiff's civil conspiracy claim. *Id.* at 295-98.

This case, akin to *Jutrowski*, presents an after-the-fact conspiracy to cover up misconduct. For example, after the incident, Defendant Scott Thomson, the then-Chief of Police, released an official public statement, without any investigation by Internal Affairs or the Camden County Prosecutor's Office,[7] indicating that "Ingram's tragic injury appears to be an accident of his own accord. The arresting officers displayed composure throughout the incident and had the presence of mind to immediately render aid and summon medical assistance."  *See* Trial Exhibit 28(A). The evidence presented to the jury showed that Chief Thomson collaborated with then-Camden County Prosecutor Warren Faulk on this official public statement, which clearly blamed Plaintiff for his tragic injuries and, at the same time, exonerated the Defendant-Officers, which was in direct contravention of their legal obligation to conduct a thorough and impartial investigation.  This, standing alone, is evidence of a post-incident cover-up that would constitute a civil conspiracy under § 1983.   Then-Sergeant William Frampton also, in furtherance of the after-the-fact conspiracy to cover-up the excessive force and failure to provide medical care, issued three exceptional performance notices to Defendants Marchiafava, Gennetta, and Merck, notwithstanding the fact that there was an ongoing Internal Affairs investigation.  *See* Trial Exhibits 55(A), 55(B), and 55(C).  These exceptional performance notices, as will be shown at trial, make no mention of the fact that Defendants Marchiafava and Gennetta – after hearing Plaintiff's complaints of pain in his extremities and the inability to move – decided to rock Plaintiff back-and-forth, pick him up, and then drop him, causing Plaintiff to strike his face on the ground.

---

[7] As presented to the jury, Chief Thomson's statement was made without any medical evidence supporting the conclusion that Plaintiff's injuries were caused by a fall, and based solely on his review of the Eye-in-the-Sky footage.

Like the facts presented in *Jutrowski*, the Defendant-Officers irreconcilably inconsistent accounts of the discovery of narcotics also underscores the viability of Plaintiff's civil conspiracy claim.  For example, compare Defendant Merck's report, which states that the drugs were found by Defendant Marchiafava search incident to arrest, to Defendant Marchiafava's statement to Internal Affairs indicating that he found the drugs in the ambulance.  Defendant Gennetta testified, both to Internal Affairs and during his deposition, that he found the drugs at the hospital in Plaintiff's pants.  These conflicting stories and blatant disparities also support Plaintiff's civil conspiracy claim.  *See Jutrowski*, 904 F.3d at 295 ("[I]n the context of an alleged conspiracy among police officers, [agreement and concerted action or a meeting of the minds] may manifest as conversations between officers about the incident, allegedly distorted stories that emerged, an awareness of conflicting stories and irregularities in the series of official investigations into the incident."  (internal quotation marks omitted) (quoting *Hampton v. Hanrahan*, 600 F.2d 600, 627-28 (7th Cir. 1979))).

Accordingly, Defendants' motion for judgment as a matter of law on Plaintiff's civil conspiracy claim, *see* ECF No. 64, at ¶ 65, should be denied and left for the jury to decide.

**POINT IV**

**DEFENDANTS' ARGUMENT THAT PLAINTIFF'S CLAIM FOR SUPERVISORY LIABILITY IS MERITLESS AND PLAINTIFF'S CLAIM SHOULD BE LEFT TO THE JURY'S ULTIMATE DETERMINATION**

Defendants erroneously argue that Plaintiff's claim for supervisory liability should be dismissed "because there is no evidence that [Defendant] Merck was present at the time of the application of the alleged knee in the neck."  Defs.' Br. at 20, ECF No. 422-1.  Defendants' argument misses the mark because Defendant Merck is implicated for (1) ordering Defendants Marchiafava and Gennetta to falsely arrest Plaintiff; (2) stepping on Plaintiff's neck; and (3) failing

22

to prevent his subordinates, Defendants Gennetta and Marchiafava, from moving Plaintiff even after he made complaints that should have been recognized as consistent with paralysis as well as participating in the decision to move Plaintiff.

A supervisor may be held liable when "he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 n.5 (3d Cir. 2010)) (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004)).  As Defendants correctly noted, Defendant Merck can be liable for "not to tak[ing] any particular action."  *Reedy v. Evanson*, 615 F.3d 197, 231 (3d Cir. 2010).

Here, Plaintiff's police practices expert, Dr. Christopher Chapman, testified that Defendant Merck was Defendant Marchiafava and Gennetta's supervisor at the time, that as the supervisor on scene he had the obligation to ensure the officers were following appropriate police practices and that Merck's decision to sit up Plaintiff was a violation of accepted police practices and contrary to his first responder training.  *See* Trial Transcript, dated March 8, 2022, at T.1178:19—1179:14.

Because Plaintiff has shown the deprivation of a constitutional right by both Defendants Marchiafava and Gennetta in needlessly moving Plaintiff after his explicit complaints that were consistent with paralysis, *see Allen v. Eckard*, 804 F. App'x 123, 127 (3d Cir. 2020) (supervisory liability under 42 U.S.C. § 1983 requires "a showing that there was an actual constitutional violation at the hands of subordinates." (quoting *Santiago*, 629 F.3d at 130)), and Defendant Merck did nothing to prevent his subordinates from engaging in such conduct, Plaintiff's claim for supervisory liability should be decided by the jury.  Therefore, Defendants' motion for judgment as a matter of law on Plaintiff's claim for supervisory liability should be denied.

POINT V

**PLAINTIFF'S STATE LAW CLAIMS SHOULD BE SUBMITTED TO THE JURY**

Defendants cite numerous immunities under New Jersey's Tort Claims Act (TCA) to dismiss Plaintiff's state law claims. Defendants have the burden to prove these immunities and have not done so. Therefore, this Court should deny Defendants' motion for judgment as a matter of law.

As a backdrop, the TCA has limits. Our Legislature has recognized the risk of "inherently unfair and inequitable results which occur in the strict application of the traditional doctrine of sovereign immunity." N.J.S.A. 59:1-2. The Tort Claims Act instructs that a trial court should presume from the outset that there is no immunity for public employees. The touchstone for analyzing public employee immunity is that: "a public employee is liable for injury caused by his act or omission to the same extent as a private person." N.J.S.A. 59:3-1(a). Thus, the "immunity of a public employee under the TCA is the exception [not the rule] . . . [and] any immunity provided a public employee must be independent of a public entity's immunity under the TCA." *Fluerhr v. City of Cape May*, 159 N.J. 532, 539-40 (1999). "[T]he public employee has the burden to plead and prove his immunity under the TCA." *Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 582 (2009). Thus, there is no immunity unless defendants are able to meet their burden to prove that an immunity applies. *Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 582 (2009).[8]

Because Plaintiff's state law negligence claims are predicated on a public employee functioning in a ministerial capacity – that pursuant to CCPD's Use of Force policy they were required to immediately assess Ingram for medical needs and provide medical care in accordance

---

[8] Defendants have previously argued that the pursuit immunity, N.J.S.A. 59:5-2, applies under the circumstances. However, the Honorable Jerome Simandle previously rejected this argument, *see* ECF. No. 232, and this Court should do the same.

with their first responder training – no immunities apply to the Defendant-Officers, nor Camden County as the employer entity.  *See* N.J.S.A. 59:3-2 ("Nothing in this section [59:3-2] shall exonerate a public employee for negligence arising out of his acts or omissions in carrying out his ministerial functions"); *see also* N.J.S.A. 59:2-3 ("Nothing in this section [59:2-3] shall exonerate a public entity for negligence arising out of his acts or omissions of its employees in carrying out their ministerial functions.").

Because plaintiff's claims arise from defendants' ministerial functions, defendants are only entitled to immunity if they can persuade the factfinder at trial that Gennetta, Marchiafava and Merck "act[ed] in good faith in the execution or enforcement of any law." N.J.S.A. 59:3–3.  *See Toto v. Ensuar*, 196 N.J. 134, 146 (2008) (public employee bears the burden of proving good faith immunity).  To obtain good faith immunity for ministerial conduct, a public employee must "establish that [his or her] acts were objectively reasonable or that [he or she] performed them with subjective good faith."  *Leang*, 198 N.J. at 582 (2009).  This is the only basis that the Defendants can use to avoid liability for their gross negligence.

Because Defendants have not presented any evidence whatsoever, they cannot meet the burden of proving that any TCA immunities apply under the circumstances.

## **CONCLUSION**

Because Plaintiff has put forth adequate and competent evidence with to the excessive force, *Monell*, supervisory liability, and civil conspiracy claims, Defendants' motion for a judgment as a matter of law should be denied in its entirety.

Respectfully Submitted,

BY: ___/s/ Beth G. Baldinger___
        BETH G. BALDINGER

Dated:  March 14, 2022

25

# EXHIBIT

# A

KeyCite Yellow Flag - Negative Treatment

Disagreement Recognized by   Nothstein v. USA Cycling,   E.D.Pa.,
October 19, 2020

989 F.Supp.2d 378
United States District Court, D. New Jersey.

Matthew GROARK, Plaintiff,

v.

Police Officer Frank TIMEK, et al., Defendants.

Civil No. 12–1984 (RBK/JS).

|

Nov. 27, 2013.

**Synopsis**

**Background:** Arrestee brought § 1983 action against police
officers and city, alleging false arrest, excessive force, and
malicious prosecution in violation of Fourth Amendment.
Arrestee moved to compel production of documents.

**Holdings:** The District Court, Joel Schneider, United States
Magistrate Judge, held that:

[1] law enforcement privilege was inapplicable and did not
prevent disclosure of police internal affairs (IA) records
regarding prior complaints against police officers;

[2] IA records regarding prior complaints were directly
relevant to and discoverable in arrestee's § 1983 action; and

[3] city was not entitled to in camera review of IA records.

Motion granted.

West Headnotes (29)

[1] **Municipal Corporations**   Capacity to sue
or be sued in general

In New Jersey a municipal police department is
not a separate legal entity from the governing
municipality.

1 Cases that cite this headnote

[2] **Civil Rights**   Acts of officers and
employees in general;  vicarious liability and
respondeat superior in general

Although a municipality may be liable under §
1983, it cannot be held liable on a theory of
respondeat superior.   42 U.S.C.A. § 1983.

[3] **Civil Rights**   Governmental Ordinance,
Policy, Practice, or Custom

As to policy, municipalities are liable under   §
1983 where the action that is alleged to be
unconstitutional implements or executes a policy
statement, ordinance, regulation, or decision
officially adopted and promulgated by the body's
officers.   42 U.S.C.A. § 1983.

[4] **Civil Rights**   Governmental Ordinance,
Policy, Practice, or Custom

As to custom, municipalities may be sued under
§ 1983 for constitutional deprivations visited
pursuant to governmental custom even though
such a custom has not received formal approval
through the body's official decision making
channels.   42 U.S.C.A. § 1983.

[5] **Civil Rights**   Governmental Ordinance,
Policy, Practice, or Custom

**Civil Rights**   Lack of Control, Training, or
Supervision;  Knowledge and Inaction

Under   § 1983, liability based on a custom
rather than a formal adopted policy proceeds
on the theory that the relevant practice is so
widespread as to have the force of law; custom
may also be established by proof of knowledge
and acquiescence.   42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[6]    Civil Rights**  🔑  **Governmental Ordinance, Policy, Practice, or Custom**

In order to impose 🚩 § 1983 liability pursuant to a custom, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and a direct causal link between the municipal action and the deprivation of federal rights. 🚩 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[7]    Civil Rights**  🔑  **Lack of Control, Training, or Supervision;  Knowledge and Inaction**

In a 🚩 § 1983 action, simply showing that a plaintiff has suffered a deprivation of constitutional rights will not alone permit an inference of municipal culpability and causation; instead, the plaintiff must demonstrate that the municipal action was taken with deliberate indifference to its known or obvious consequences, and a showing of simple or even heightened negligence will not suffice. 🚩 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[8]    Civil Rights**  🔑  **Lack of Control, Training, or Supervision;  Knowledge and Inaction**

A pattern or continued adherence to an approach that a municipality knows or should know has failed to prevent tortious conduct of police officers may establish the conscious disregard for the consequences of its action necessary to trigger municipal liability under 🚩 § 1983; deliberate indifference may also be shown if it is obvious that a policy or custom would lead to constitutional violations. 🚩 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[9]    Civil Rights**  🔑  **Criminal law enforcement; prisons**

In an action for municipal liability under 🚩 § 1983 based on excessive force by a police officer, rather than simply reciting a number of prior complaints against the officer or offenses by the officer, a plaintiff must show why those prior incidents deserved discipline and how the misconduct in those cases is similar to that involved in the present action; this can be done by showing that the officer whom a plaintiff accuses of using excessive force has been the subject of multiple similar complaints. U.S.C.A. Const.Amend. 4; 🚩 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**[10]    Civil Rights**  🔑  **Criminal law enforcement; prisons**

A plaintiff bringing a municipal liability claim under 🚩 § 1983 based on excessive force by a police officer can submit a sample of excessive force complaints from the relevant police department bearing similarities to her own case and arguably evincing a tendency on the part of the internal affairs division to insulate officers from liability. U.S.C.A. Const.Amend. 4; 🚩 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**[11]    Privileged Communications and Confidentiality**  🔑  **Investigatory or law enforcement records**

Under New York law, a court can order the production of internal affairs (IA) reports in a 🚩 § 1983 lawsuit. 🚩 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**[12]    Federal Civil Procedure**  🔑  **Scope**

Arrestee was entitled to relevant non-privileged discovery regarding his 🚩 § 1983 claim against city under theory of municipal liability, where arrestee's complaint pleaded that city's deliberate indifference to its inadequate customs, policies, and practices caused violation of his constitutional rights. 🚩 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[13]** **Federal Courts**  Privilege and confidentiality

Where a complaint alleges a federal question claim and supplemental state law claims, the federal common law of privilege applies to all claims. Fed.Rules Evid.Rule 501, 28 U.S.C.A.

**[14]** **Privileged Communications and Confidentiality**  Investigatory or law enforcement records

The law enforcement privilege is designed to protect documents and information whose disclosure would seriously harm the operation of government.

1 Cases that cite this headnote

**[15]** **Privileged Communications and Confidentiality**  Investigatory or law enforcement records

The application of the law enforcement privilege requires a court to weigh the government's interest in ensuring the secrecy of the documents in question against the need of the adverse party to obtain the discovery.

**[16]** **Privileged Communications and Confidentiality**  Investigatory or law enforcement records

The application of the law enforcement privilege is a fact intensive analysis that is dependent on the particular facts of each case, taking into consideration the nature of the claim, the possible defenses, the significance of the requested information, and other relevant factors; ultimately the decision boils down to the question of fundamental fairness, and if the requested documents are essential to a fair determination of a cause, the privilege must give way.

**[17]** **Privileged Communications and Confidentiality**  Investigatory or law enforcement records

A claim asserting the law enforcement privilege must be made by the head of the agency making the privilege after that person has personally reviewed the material and served precise and certain reasons for preserving the confidentiality of the communications; usually such claims are made by affidavit.

5 Cases that cite this headnote

**[18]** **Privileged Communications and Confidentiality**  Investigatory or law enforcement records

The party asserting the law enforcement privilege must demonstrate to the court that the relevancy of the allegedly privileged documents is outweighed by the specific harm that would ensue from their disclosure.

5 Cases that cite this headnote

**[19]** **Privileged Communications and Confidentiality**  Investigatory or law enforcement records

Law enforcement privilege was inapplicable and did not prevent disclosure of police internal affairs (IA) records regarding prior complaints against police officers in arrestee's § 1983 action against city and police officers based on alleged use of excessive force, where Chief of Police did not submit proof that they personally reviewed requested records, city did not offer precise and certain reasons for preserving confidentiality of its IA records, city merely made broad allegations of potential harm from releasing IA records, and law enforcement privilege was outweighed by public interest in disclosure of requested IA files. 42 U.S.C.A. § 1983.

6 Cases that cite this headnote

**[20]**  **Privileged Communications and Confidentiality** 🔑 Investigatory or law enforcement records

Law enforcement privilege was inapplicable and did not prevent disclosure of police internal affairs (IA) records regarding prior complaints against police officers in arrestee's

§ 1983 action against city and police officers based on alleged use of excessive force; disclosure would not have discouraged citizen complaints or had detrimental impact on them, government self-evaluation and program improvement would not have been chilled by disclosure, as public recognized robust IA process was necessary to rein in "bad apples," arrestee was not criminal defendant, requested investigations were complete, there had not been any intradepartmental disciplinary proceedings from complaints, arrestee's case was not frivolous, arrestee had no other available source to obtain information contained in records, and documents were vital to arrestee's claim. 42 U.S.C.A. § 1983.

**[21]**  **Federal Civil Procedure** 🔑 Government records, papers and property

Internal affairs (IA) files regarding prior citizen complaints against police officers were directly relevant to and discoverable in arrestee's

§ 1983 action alleging that city followed unconstitutional customs and that it failed to properly train its officers as to proper use of force; arrestee knew that at least 78 similar citizen complaints were made against officers and that city's IA unit did not sustain any of complaints, and arrestee intended to argue that city had been "deliberately indifferent" to officers' violent propensities, and that city's IA unit was a sham. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 26(b)(1), 28 U.S.C.A.

3 Cases that cite this headnote

**[22]**  **Federal Civil Procedure** 🔑 Scope

While otherwise relevant evidence may be barred from discovery on grounds of privilege or burden, relevance remains a major factor in delineating proper discovery.

**[23]**  **Federal Civil Procedure** 🔑 Scope

Because discovery is not limited to evidence that is ultimately admissible, the relevance inquiry is significantly broader at the discovery stage than at the trial stage.

**[24]**  **Federal Civil Procedure** 🔑 Scope

Parties seeking information during discovery must demonstrate that the information sought is reasonably calculated to lead to the discovery of admissible evidence.

3 Cases that cite this headnote

**[25]**  **Civil Rights** 🔑 Lack of Control, Training, or Supervision;  Knowledge and Inaction

A plaintiff who alleges municipal liability in a § 1983 action based on acquiescence by a policymaker to a custom must prove the existence of a custom that resulted in a constitutional violation, and that said custom is so permanently and well-settled as to virtually constitute law. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[26]**  **Federal Civil Procedure** 🔑 Government records, papers and property

Evidence in internal affairs (IA) files regarding police officers' conduct after incident with arrestee was relevant to and discoverable in arrestee's § 1983 action alleging that city had custom of condoning excessive force by its officers and had longstanding custom of conducting sham IA investigations. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 26(b)(1), 28 U.S.C.A.

1 Cases that cite this headnote

**[27]    Civil Rights** 🔑 Vicarious liability and respondeat superior in general;  supervisory liability in general

Supervisory liability may be established in a 📄 § 1983 action by showing that supervisor tolerated past or ongoing behavior or failed to train, supervise, and discipline subordinates. 📄 42 U.S.C.A. § 1983.

**[28]    Federal Civil Procedure** 🔑 Government records, papers and property

Evidence in internal affairs (IA) files regarding police officers' conduct prior to incident with arrestee was relevant to and discoverable in arrestee's 📄 § 1983 action alleging that city had custom of condoning excessive force by its officers and had longstanding custom of conducting sham IA investigations; arrestee was entitled to know if his encounter with officers was isolated instance or if it was consistent with longstanding and continuing practice. U.S.C.A. Const.Amend. 4; 📄 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[29]    Privileged Communications and Confidentiality** 🔑 In camera review

City did not provide sufficient evidence to support reasonable belief that materials requested by arrestee were not discoverable, as required to support city's request for in camera review of materials in 📄 § 1983 action. 📄 42 U.S.C.A. § 1983.

**Attorneys and Law Firms**

**\*381** Carolyn A. Castagna, Gabriel Zalman Levin, Levin & Zeiger, LLP, Philadelphia, PA, for Plaintiff.

Tracy Riley, Law Offices of Riley & Riley, Mt. Holly, NJ, Scott M. Russ, Christopher J. Hoare, Capehart & Scatchard PA, Mt. Laurel, NJ, for Defendants.

**\*382** *OPINION*

JOEL SCHNEIDER, United States Magistrate Judge.

**[1]**   Plaintiff Matthew Groark alleges Atlantic City Police Officers Frank Timek ("Timek") and Sterling Wheaten ("Wheaten") beat him up without provocation and then filed false criminal charges. Plaintiff learned in discovery that from May 2001 to the present, Timek and Wheaten have collectively been the subject of approximately 78 complaints similar to those asserted here—excessive force, assault, threats, improper search and arrest, and malicious prosecution.[1] Atlantic City's Police Department ("Atlantic City") did not sustain any of the complaints and Timek and Wheaten were never disciplined. Plaintiff's Motion to Compel Discovery asks the Court to Order Atlantic City to produce Timek and Wheaten's complete Internal Affairs ("IA") files so plaintiff can determine if Atlantic City's IA unit and investigations are a sham. Plaintiff argues that Atlantic City is deliberately indifferent to its police officers' misconduct and it condones the obvious consequences of its failure to properly train, supervise and discipline its officers. Plaintiff also argues he wants to get to the bottom of why it appears Timek and Wheaten repeatedly use excessive force with impunity. Plaintiff's motion has been fully briefed and argued. Plaintiff's motion is GRANTED.[2]

*Background*

On August 7, 2010, plaintiff was a customer at the Dusk Nightclub in Caesar's Casino, Atlantic City, New Jersey, where defendant police officers Frank Timek and Sterling Wheaten were working security. Plaintiff alleges that "[w]ithout provocation" Timek and Wheaten threw him down the stairs and punched and "kneed" him repeatedly. Complaint ¶¶ 26, 27. The officers then arrested plaintiff and charged him with obstructing the administration of law or other governmental function, resisting arrest, and aggravated assault. The aggravated assault charge was later reduced to simple assault. *Id.* ¶¶ 37, 38. All charges were subsequently dismissed. *Id.* ¶ 39.

Plaintiff sued Timek, Wheaton and Atlantic City. Plaintiff alleges there was no probable cause to arrest him and that

he was assaulted without cause or justification. *Id.* ¶¶ 42, 43. As to Atlantic City, plaintiff alleges it did not properly train its police officers and that its "customs, policies, practices, ordinances, regulations, and directives ... caused [his] false arrest...." *Id.* ¶¶ 49, 52. Plaintiff also alleges that Atlantic City "has been deliberately indifferent to the violent propensities of its police officers, the individually named Defendant police officers in particular." *Id.* ¶ 53. Plaintiff's complaint includes Fourth Amendment claims for excessive force, false arrest and malicious prosecution. Counts IV and V of the complaint assert claims against Atlantic City for constitutional deprivations caused by "inadequate policies, procedures, and customs," **\*383** and "inadequate training and supervision." *See* 📑 *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). [3]

During discovery plaintiff requested all IA files regarding Timek and Wheaten and the August 7, 2010 incident. Plaintiff believes these records may include witness statements, officer statements, investigation documents, and "written depositions." Although Atlantic City objected to plaintiff's request it produced the "Internal Affairs Index Cards" (hereinafter "Index Cards") for Timek and Wheaten. As to Timek, the Index Card lists 52 complaints from May 30, 2001 to March 20, 2012. [4] The complaints include, *inter alia,* allegations of "simple assault," "excessive force," "racial profiling," "racial slurs," "demeanor," "improper search," "false arrest," "threats and demeanor," and "improper arrest." As to the "disposition" of these charges, 49 of the 53 listed incidents are marked "exonerated," "unfounded," or "not sustained." [5] The Index Card for Wheaten lists 26 complaints from September 19, 2008 to April 26, 2012. [6] The complaints include allegations of "excessive force," "harassment," "improper search and demeanor," "simple assault and standard of conduct," "assault and neglect of duty," and "improper arrest." All 26 complaints, except for one marked "Administratively Closed," are marked "exonerated" or "not sustained."

Complaints made against Timek and Wheaten by senior police department personnel fared no better than citizen complaints. The charges made by Chief Snellbaker on October 5, 2004, Captain Wm. Burke on March 20, 2005, Captain Dooley on March 7, 2006, and Acting Chief Jubilee on October 11, 2006, were also not "sustained." The same is true for Chief Mooney's July 16, 2009 complaint against Wheaten of "simple assault and standard of conduct."

Plaintiff filed the instant motion after Atlantic City refused to produce the complete IA files for Timek and Wheaten rather than just their Index Cards. Plaintiff argues the requested IA files are relevant to Atlantic City's *Monell* liability and whether "there was a clear pattern of misconduct and constitutional violations by the Defendant Officers in the months and years leading up to physical assault of the Plaintiff." Motion at ¶ 16. Plaintiff also **\*384** argues, "[s]uch a pattern would demonstrate that Atlantic City had a policy and custom of deliberate indifference to the persistent problem of police brutality and false arrests." *Id.* at ¶ 17.

Atlantic City makes several arguments in response to plaintiff's motion. First, it argues "[p]laintiff should not be entitled to confidential files involving completely separate and irrelevant incidents and individuals when he failed to make a complaint himself." May 16, 2013 Letter Brief ("LB") at 2. Second, plaintiff argues the requested documents should not be compelled because plaintiff "failed to satisfy the pleading requirement for his 📑 § 1983 claim." *Id.* Third, Atlantic City argues the requested documents are privileged and irrelevant.

*Discussion*

The Court will first discuss two important topics to put the subject discovery issue in context. The first topic is the internal affairs process that all New Jersey municipalities must follow. The second topic is a general summary of Atlantic City's potential *Monell* liability.

### 1. *The Internal Affairs Process*

Pursuant to 📑 N.J.S.A. 40A:14–181, municipalities such as Atlantic City are required to adopt and implement internal affairs guidelines that must be consistent with the guidelines governing the "Internal Affairs Policy and Procedures" (hereinafter "IAPP") of the Police Management Manual promulgated by the Police Bureau of the Division of Criminal Justice of the Department of Law and Safety. [7] The purpose of the IAPP is to "assist the State's law enforcement agencies with the investigation and resolution of complaints of police misconduct that originate with private citizens or are generated by the supervisors, officers or employees of a law enforcement agency." IAPP at 3. The goal of Internal Affairs "is to insure that the integrity of the [police] department is maintained through a system of internal discipline where fairness and justice are assured by objective,

impartial investigation and review." *See* November 1992 Internal Affairs Memorandum of Robert J. Del Tufo, Attorney General ("Del Tufo AG Memo.") at 9, available at http:// www.state.nj. us/lps/dcj/agguide/internal.htm. Three things must be done with regard to the internal affairs function. One, police departments "must implement an internal affairs policy that provides for a meaningful and objective investigation of citizen complaints of police misconduct." *Id.* Two, the behavior of police officers for misconduct must be monitored and tracked. Three, officer misconduct must be corrected. *Id.*

The purpose of the internal affairs unit is "to establish a mechanism for the receipt, investigation and resolution of complaints of officer misconduct." *Id.* at 13. Mandated internal affairs requirements include the following:

• Each agency must thoroughly and objectively investigate all allegations against its officers.

...

• Each agency must establish and maintain an internal affairs records system which, at a minimum, will consist of an internal affairs index system and a filing system for all documents and records. In addition, each agency shall establish a protocol for monitoring and tracking the conduct of all officers.

• Each agency must submit periodic reports to the county prosecutor summarizing the allegations received and the investigations concluded for that period. Each county prosecutor shall establish a schedule for the submission of the reports **\*385** and specify the content of the reports.

• Each agency must periodically release reports to the public summarizing the allegations received and the investigations concluded for that period. These reports shall not contain the identities of officers or complainants. In addition, each agency shall periodically release a brief synopsis of all complaints where a fine or suspension of ten days or more was assessed to a member of the agency. The synopsis shall not contain the identities of the officers or complainants.

*Id.* at 4–5. These are "critical performance standards that must be implemented." *Id.* at 5.

The IAPP describes the records Atlantic City must keep and the protocols it must follow. Atlantic City must:

[M]aintain a comprehensive central file on all complaints received, whether investigated by internal affairs or assigned to the officer's supervisors for investigation and disposition. In addition, internal affairs should establish protocol for tracking all complaints received by the agency and the conduct of all officers. The protocol must include criteria for evaluating the number of complaints received by the agency and the number of complaints filed against individual officers.

*Id.* at 14. All citizen complaints must "be uniformly documented for future reference and tracking." *Id.* at 18. According to the IAPP a "thorough and impartial" investigation must be done for a proper disposition of a complaint. *Id.* at 27. The complainant and witnesses should be personally interviewed if circumstances permit and formal statements taken. *Id.* at 28. All relevant records should be obtained, reviewed and preserved. *Id.* At the conclusion of the IA investigation the investigator must prepare a written report that consists of an "objective investigation report which recounts all of the facts of the case and a summary of the case along with conclusions for each allegation and recommendations for further action." *Id.* at 45. The report must also "contain a complete account of the investigation." *Id.* In addition, "a detailed chronology [must] be maintained of each investigation so that critical actions and decisions are documented." *Id.* at 20.

For each allegation in an IA investigation the conclusion must be recorded as "exonerated" (the alleged incident did occur, but the actions of the officer were justified, legal and proper), "sustained" (the investigation disclosed sufficient evidence to prove the allegation and the actions of the officer violated a provision of the agency's rules and regulations or procedures), or "not sustained" (the investigation failed to disclose sufficient evidence to clearly prove or disprove the allegation). *Id.* at 21, 45. An IA investigation file is required for all IA reports and all IA complaints must be recorded in an index file. The file must include "the entire work product of the internal affairs investigation." *Id.* at 46. These record requirements give Atlantic City "the ability to track

the complaint records of individual officers and identify those officers with a disportionate number of complaints against them." *Id.* at 51. Procedures must be established "for dealing with problem employees." *Id.* at 51.

Atlantic City is required to prepare periodic reports, at least quarterly, for "the law enforcement executive that summarize[s] the nature and disposition of all misconduct complaints...." *Id.* at 48. Internal Affairs activity must also be reported to the county prosecutor. *Id.* An annual report that summarizes the types of complaints received and the dispositions of **\*386** the complaints must be made available to the public. *Id.* at 50.

"The most critical aspect of the disciplinary process is the investigation of an allegation of police misconduct. Only after a complete, diligent and impartial investigation can a good faith decision be made as to the proper disposition of the complaint." Del Tufo AG Memo. Perfunctory investigations are prohibited. The process must be "real" and the investigation "meaningful and objective." IAPP at 51. The IA process:

> Must provide the citizen with "at least a rudimentary chance of redress when an injustice is done." It is not enough for police executives to adopt a policy governing the receipt, investigation and resolution of complaints of officer misconduct. The policy must be implemented and executed with a commitment to the integrity of the agency and the constitutional rights of the citizenry. Agencies with an objective and fair internal affairs process will limit their risk of civil liability. Agencies with a superficial or shallow internal affairs process run the risk of significant civil liability.

*Id.* The "linchpin" of the process to monitor and track the behavior and performance of individual police officers is "quality supervision and an objective and impartial internal affairs process." *Id.*

### 2. *Monell Liability*

**[2]** **[3]** **[4]** **[5]** Although a municipality may be liable under 42 U.S.C. § 1983, it cannot be held liable on a theory of *respondeat superior*. *Monell,* 436 U.S. at 691, 98 S.Ct. 2018. Under § 1983 Atlantic City is only responsible for its own illegal acts. *Id.* at 692, 98 S.Ct. 2018. This has resulted in a "two-path track to municipal

liability," depending on whether the allegation is based on an alleged unconstitutional municipal policy or custom. *Beck v. City of Pittsburgh,* 89 F.3d 966, 971 (3d Cir.1996). As to policy, municipalities like Atlantic City are liable where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated" by the body's officers. *Id.* at 690, 98 S.Ct. 2018. As to custom, municipalities may be sued for "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." *Id.* at 690–91, 98 S.Ct. 2018. Liability based on a custom rather than a formal adopted policy proceeds on the theory that the relevant practice is so widespread as to have the force of law. *Board of County Com'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Custom may also be established by proof of knowledge and acquiescence. *Fletcher v. O'Donnell,* 867 F.2d 791, 793 (3d Cir.1989). The Supreme Court has recognized that where a violation of federal rights is a "highly predictable consequence" of an inadequate training in a situation likely to recur, municipal liability may attach based upon a single application of the custom. *Monaco v. City of Camden,* C.A. No. 04–2406(JBS), 2008 WL 8738213, at \*7 (D.N.J. April 14, 2008) (citing *Board of County Com'rs,* 520 U.S. at 409–410, 117 S.Ct. 1382 (1997)).

**[6]** **[7]** **[8]** In order to impose § 1983 liability pursuant to a custom, "plaintiff must show that the municipal action was taken with the requisite degree of culpability and [there must be] ... a direct causal link between the municipal action and the deprivation of federal rights." *Board of County Com'rs,* 520 U.S. at 404, 117 S.Ct. 1382. Simply showing that plaintiff has suffered a deprivation of constitutional rights "will not alone permit an inference of municipal culpability and causation." **\*387** *Id.* at 406, 117 S.Ct. 1382. "Instead, plaintiff must demonstrate "that the municipal action was taken with 'deliberate indifference' to its known or obvious consequences...." A showing of simple or even heightened negligence will not suffice." *Id.* at 407, 117 S.Ct. 1382. A pattern or continued adherence to an approach that a municipality knows or should know has failed to prevent tortious conduct of police officers may establish "the conscious disregard for the consequences

of [its] action necessary to trigger municipal liability." *Id.* Deliberate indifference may also be shown if it is obvious that a policy or custom would lead to constitutional violations.

*Berg v. County of Allegheny,* 219 F.3d 261, 277 (3d Cir.2000).

**[9]** **[10]** The decision in *Katzenmoyer v. Camden Police Department,* C.A. No. 08–1995 (RBK/JS), 2012 WL 6691746, at *4 (D.N.J. Dec. 21, 2012), discussed the fact that courts in this Circuit have grappled with the issue of what evidence a plaintiff must submit to support a *Monell* municipal liability claim under § 1983. The case noted that statistical evidence standing alone, "isolated and without further context," is generally not enough to "justify a finding that a municipal policy or custom authorizes or condones the unconstitutional acts of police officer." *Id.* at *4 (citing *Merman v. City of Camden,* 824 F.Supp.2d 581, 591 (D.N.J.2010)). If a plaintiff relies mainly on statistics showing the frequency of excessive force complaints and how frequently they are sustained, the plaintiff must show why the prior incidents were wrongly decided and how the misconduct in the case is similar to that involved in the present action. *Id.* (citing *Franks v. Cape May County,* C.A. No. 07–6005 (JHR/JS), 2010 WL 3614193, at *12 (D.N.J. Sept. 8, 2010)). As the Court noted in *Franks* at *12 (citation and quotation omitted), "[r]ather than simply reciting a number of complaints or offenses, a plaintiff must show why those prior incidents deserved discipline and how the misconduct in those cases is similar to that involved in the present action." This can be done by showing "that the officer whom a plaintiff accuses of using excessive force has been the subject of multiple similar complaints." *Katzenmoyer,* 2012 WL 6691746, at *4. A plaintiff can also submit a sample of excessive force complaints from the relevant police department "bearing similarities to her own case and arguably evincing a tendency on the part of the internal affairs division to insulate officers from liability." *Id.* at *5.

So, for example, even though the plaintiff in *Katzenmoyer* presented evidence that between 2003 and 2009, only one grievance out of 641 complaints filed against Camden police officers was sustained, the Court granted summary judgment to Camden on the plaintiff's *Monell* claim. The Court noted that the plaintiff did not offer a sample of the complaints for its evaluation, and that "standing alone" the statistical evidence it submitted did not support a finding of municipal

liability under Section 1983. *Id.*[8] But *see Worrall v. City of Atlantic City,* C.A. No. 11–3750 (RBK/JS), 2013 WL 4500583 (D.N.J. Aug. 20, 2013). In *Worrall* the Court denied Atlantic City's motion for summary judgment based on the number of complaints against Wheaten, the related subject matter of the complaints, and the relatively short time within which the complaints were filed. Even though the complaints against Wheaten were either "not sustained" or he was "exonerated," the Court **\*388** held that the jury could have inferred Atlantic City's acquiescence to Wheaten's alleged unlawful conduct, and could have inferred knowledge and deliberate indifference. *Id.* at *5. In the same vein, in *Merman, supra,* the Court denied Camden's motion for summary judgment in an excessive force case asserting a *Monell* claim. The Court noted:

> Given the sheer number of civilian complaints in relation to the number of officer, and the pattern of escalation over the years, the significance of plaintiff's quantitative evidence is, unquestionably, substantial and greatly informs this Court's decision.

824 F.Supp.2d at 591.[9]

### 3. Atlantic City's Arguments

**[11]** Several of Atlantic City's arguments merit only a short mention. The argument that plaintiff cannot compel the production of IA records because he did not file an IA complaint is meritless.[10] *See* LB at 2. ("Defendants maintain the position that plaintiff should not be entitled to confidential files involving completely separate and irrelevant incidents and individuals when he failed to make a complaint himself."). There is no support for the proposition that a party may not discover relevant IA files unless he/she files an IA complaint. Not surprisingly Atlantic City cites no credible support for its position. Atlantic City relies on its guidelines which provide that it may release the IA investigation to the attorney for an officer named in a lawsuit. LB at 9. However, Atlantic City ignores the portion of the IAPP which provides that an IA investigation may be released "[u]pon Court Order." IAPP at 47. Further, Atlantic City disregards the substantial unassailable body of New Jersey case law which evidences that a court can Order the production of IA reports in a § 1983 lawsuit. *See, e.g., Torres v. Kuzniasz,* 936 F.Supp. 1201 (D.N.J.1996); *Jones v. DeRosa,* 238 F.R.D. 157 (D.N.J.2006); *Scouler v. Craig,* 116 F.R.D. 494

(D.N.J.1987); *Preston v. Malcolm,* C.A. No. 09–3714(JAP), 2009 WL 4796797 (D.N.J. Dec. 8, 2009).

**[12]** Atlantic City's argument that plaintiff's discovery motion should be denied because plaintiff did not plead a proper *Monell* claim is also meritless. *See* LB at 2. ("[T]he production of the internal affairs files should not be compelled because Plaintiff failed to satisfy the pleading requirement for his § 1983 claim.") Citing to *McTernan v. City of York, PA,* 564 F.3d 636 (3d Cir.2009), Atlantic City argues that plaintiff's complaint is deficient and, therefore, its motion should be denied. However, now is not the time or context to address the adequacy of plaintiff's pleading. Atlantic City had the opportunity to challenge the sufficiency of plaintiff's pleading when it answered plaintiff's complaint on May 30, 2012 [Doc. No. 4] and amended **\*389** complaint on March 4, 2013 [Doc. No. 17]. Instead of filing a responsive Rule 12(b) motion, Atlantic City answered the complaint. To date Atlantic City also has not filed a Rule 12(c) motion. Atlantic City cannot use its failure to file a dispositive motion as an excuse to avoid producing relevant discovery. Pursuant to Fed.R.Civ.P. 26(b)(1), plaintiff may obtain discovery relevant to his claims.[11] Since plaintiff pleaded a *Monell* claim, and the claim is presently viable, Atlantic City must produce relevant non-privileged discovery regarding the claim. The Court agrees with plaintiff that in order "to determine exactly what information is relevant and 'essential' to plaintiff's claim, a review of the Amended Complaint and the Counts contained therein is crucial." LB at 2–3. This is exactly what the Court is doing. Plaintiff pleaded that Atlantic City's deliberate indifference to its inadequate customs, policies, and practices caused the violation of his constitutional rights. Therefore, *Monell* discovery is not off limits.

4. *Privilege and Relevancy*

Pursuant to Fed.R.Civ.P. 26(b)(1), parties may obtain discovery of non-privileged matter that is relevant to a party's claim or defense. The Court will separately address Atlantic City's objection that the requested discovery is privileged and irrelevant.

a. *Law Enforcement Privilege*

**[13]** Although not discussed in detail, Atlantic City argues the requested IA records are privileged. The Court disagrees. Since this matter is pending in federal court the privilege issues in the case depend upon the application of Fed.R.Evid.

501. This Rule provides that in federal question cases the federal common law of privilege applies rather than state law. *Torres,* 936 F.Supp. at 1207–08. Where, as in this case, the complaint alleges a federal question claim and supplemental state law claims, the federal common law of privilege applies to all claims. *Wm. T. Thompson Co. v. General Nutrition Corp., Inc.,* 671 F.2d 100, 104 (3d Cir.1982). The justification for this rule is sound:

> [T]he rule providing for the application of the federal law of privilege, rather than state law, in civil rights actions is designed to ensure that state and county officials may not exempt themselves from the very laws which guard against their unconstitutional conduct by claiming that state law requires all evidence of their alleged wrongdoing to remain confidential.

*Torres,* 936 F.Supp. at 1213.

**[14]** **[15]** In a § 1983 case a claim of governmental privilege "[m]ust be so meritorious as to overcome the fundamental importance of a law meant to insure each citizen from unconstitutional state action." *Scouler,* 116 F.R.D. at 496 (citation and quotation omitted). Without specifying its name, Atlantic City presumably relies on the qualified "law enforcement privilege." The privilege is "designed to protect documents and information whose disclosure would seriously harm the operation of government." *Preston,* 2009 WL 4796797, at \*6; *see also* *Torres,* 936 F.Supp. at 1209. As noted in *Torres,* the application of the privilege "requires a court to weigh the government's interest in ensuring the secrecy of the documents in question against the need of the adverse party to obtain the discovery." *Id.; see also* *United States v.* **\*390** *O'Neill ("O'Neill"),* 619 F.2d 222, 227 (3d Cir.1980).

**[16]** There is no fixed rule for determining when the law enforcement privilege applies. The decision in *Frankenhauser v. Rizzo,* 59 F.R.D. 339 (E.D.Pa.1973),

is the seminal case identifying the factors to evaluate and balance when deciding whether the law enforcement privilege applies. The *Frankenhauser* factors are:

> (1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information; (2) the impact upon persons who have given information of having their identities disclosed; (3) the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure; (4) whether the information sought is factual data or evaluative summary; (5) whether the party seeking the discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question; (6) whether the police investigation has been completed; (7) whether an intradepartmental disciplinary proceeding have arisen or may arise from the investigation; (8) whether the plaintiff's suit is non-frivolous and brought in good faith; (9) whether the information sought is available through other discovery or from other sources; and (10) the importance of the information sought to the plaintiff's case.

*Id.* at 344. The application of the law enforcement privilege is a fact intensive analysis that is dependent on the particular facts of each case, taking into consideration the nature of the claim, the possible defenses, the significance of the requested information, and other relevant factors. *See D'Orazio v. Washington Tp.,* C.A. No. 07–5097(RMB), 2008 WL 4307446, at *3 (D.N.J. Sept. 16, 2008) (citing *Roviaro v. United States,* 353 U.S. 53, 62–63, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957)). [12] Ultimately the decision boils down to the question of fundamental fairness. If the requested documents are "essential to a fair determination of a cause, the privilege

must give way." *Id.* (citing *Roviaro,* 353 U.S. at 61, 77 S.Ct. 623).

**[17]** **[18]** A claim asserting the law enforcement privilege must be made by the head of the agency making the privilege after that person has personally reviewed the material and served "precise and certain reasons for preserving" the confidentiality of the communications. *O'Neill,* 619 F.2d at 226 (citation omitted). Usually such claims are made by affidavit. *Id.* Broad invocations of a privilege are unacceptable. *Id.* at 225. In addition, the party asserting the privilege "must demonstrate to the court that [the] relevancy [of the allegedly privileged IA documents] is outweighed by the specific harm that would ensue from their disclosure." *Torres,* 936 F.Supp. at 1212.

**[19]** Atlantic City's privilege argument is summarily denied since it did not properly support its assertion. No proof was submitted by the Chief of Police (or his/her designee) that they personally reviewed the requested records. Atlantic City's privilege argument is also summarily denied because Atlantic City did not offer "precise and certain reasons for preserving" the confidentiality of its IA records. *See O'Neill, supra.* Atlantic City merely makes broad allegations of harm such as the release of the IA files "will be **\*391** harmful to the interests of law enforcement, not to mention the public interest." LB at 10. It also argues "[u]nlimited disclosure will interfere with future internal affairs investigations" and "[t]o release this information would certainly jeopardize the functions and procedures of the IA unit which would ultimately harm the public." *Id.* at 10, 13. These "broadside invocation[s]" and "wholesale claims" of privilege are unsatisfactory. *O'Neill,* 619 F.2d at 225–227; *Torres,* 936 F.Supp. at 1208–09. Surely Atlantic City cannot deny that its IA files contain some non-privileged discoverable facts. Atlantic City's indiscriminate claim of privilege is a sufficient ground in and of itself to reject its privilege claim. When faced with such a claim the Court cannot make a just or reasonable determination of its validity. *O'Neill,* 619 F.2d at 228. Nevertheless, even if the required affidavit was served, and even if Atlantic City served specific privilege objections, the Court would still hold that the requested records are not privileged.

Based on the facts and circumstances present herein, the Court has no hesitation ruling that the law enforcement privilege is outweighed by the public interest in disclosure of the

requested IA files. The factors the Court has to weigh are presented in the context of a case where Timek and Wheaten have a long history of similar complaints against them. On top of this, Timek and Wheaten are no strangers to § 1983 litigation, having been named as party defendants in other cases filed in this court, several of which are presently pending. [13] Further, Timek and Wheaten's IA records have been produced in other cases. [14]

**[20]** As to the *Frankenhauser* analysis, the first and second factors to examine are whether disclosure will discourage citizen complaints and have a detrimental impact on them. The answer is no. As to the complainants, there is nothing embarrassing about the complaints and they are not likely to lead to undue publicity or retaliation. In fact, the complainants may very well want their identities revealed. This might give them comfort that there are other similarly situated individuals who are pursuing relief for alleged constitutional violations. In any event, Atlantic City's IA files will be designated as "Confidential" pursuant to the terms of the parties' Discovery Confidentiality Order [Doc. No. 11] and will not be widely distributed or published during the discovery phase of the case. [15] The records will be reviewed by approved individuals and only for the purpose of prosecuting or defending this lawsuit.

**\*392** The third *Frankenhauser* factor examines whether government self-evaluation and program improvement will be chilled by the disclosure. The answer is no. Atlantic City argues, "Unlimited disclosure will interfere with future internal affairs investigations." LB at 10. Atlantic City also argues that if its IA files are released parties will not be "open, honest and fully forth-coming." *Id.* To the extent Atlantic City is referring to the citizen population, it underestimates their motivation, will and intelligence. The Court believes the public recognizes that a robust IA process and investigation is necessary to rein in "bad apples." If the release of their names and complaints is necessary to prevent this from occurring, the complaining public should view this as a small price to pay for helping to root out excessive force constitutional violations. Faced with a choice of keeping their identities secret and the possibility that their complaints could be "swept under the rug," or disclosure of their complaints that could motivate a police force to protect rather than violate citizens' rights, it is likely complainants would favor disclosure. The Court also believes that most citizens agree with the Court that "[s]unlight is said to be the best of

disinfectants; electric light the most efficient policeman." L. Brandeis, *Other People's Money* 62 (1933).

To the extent Atlantic City posits that its police officers and IA investigations will be "chilled" by the disclosure of its IA files, the Court completely discounts the argument. Atlantic City must recognize that it is statutorily bound to follow the dictates of the IAPP and that it would be violating the law if it does not comply with the required mandates. Shame on any municipality if it "chills" its investigation of potential police misconduct because it is concerned about what a thorough, unbiased and objective investigation would reveal. The Court's analysis is consistent with the case law favoring disclosure. "The balancing test for determining whether the law enforcement privilege applies must be conducted with an eye toward disclosure." *O'Neill,* 619 F.2d at 228; *Torres,* 936 F.Supp. at 1210; *Dawson v. Ocean Tp.,* C.A. No. 09–6274(JAP), 2011 WL 890692, at \*19 (D.N.J. March 14, 2011); *see also U.S. v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) ("Whatever their origins, thee exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth.").

As to the fourth factor, the Court has not seen the requested records and does not know if they contain evaluative data. However, the records undoubtedly contain discoverable relevant facts surrounding the citizens' complaints. Further, even if the records contain "evaluative" materials they are not shielded and may be discovered. *Scouler,* 116 F.R.D. at 497. As to the fifth factor to examine, the plaintiff is not a criminal defendant and thus this factor weighs in favor of disclosure. As to the sixth factor, since it appears that the requested investigations are complete this weighs in favor of disclosure. [16] The seventh factor also weighs in favor of disclosure since there is no indication that there have been any intradepartmental disciplinary proceedings from the complaints. The eighth factor weighs in favor of disclosure since this case is not frivolous. The ninth factor also weighs in favor of disclosure because plaintiff has no other available **\*393** source to obtain the information contained in the requested records. The tenth and final *Frankenhauser* factor is perhaps most important. That is, the importance of the information to the plaintiff's case. As will be discussed, this factor overwhelmingly favors disclosure. The requested documents are vital to plaintiff's *Monell* claim; fundamental fairness demands that they be produced. Thus,

for the foregoing reasons, the Court finds that the requested records are not protected by the law enforcement privilege.


#### b. *Relevance*

Simply because the requested records are not privileged does not necessarily require they be produced. The records must also be relevant to plaintiff's claims or Atlantic City's defense. The answer to whether the requested documents are relevant is a resounding yes.

 **[21]**   Given the discussion *infra* regarding plaintiff's burden of proof regarding his *Monell* claim, the Court is at a loss to find a credible basis to argue that Timek and Wheaten's IA files are irrelevant. *Accord* 📄 *Scouler,* 116 F.R.D. at 496 ("[T]here can be no question of the relevancy of [the IA files] to the allegations of the complaint, particularly where" the complaint alleges inadequate supervision and training under 📄 § 1983.). The Court has no doubt that the requested IA files are clearly relevant to plaintiff's claim that Atlantic City follows unconstitutional customs and that it failed to properly train its officers as to the proper use of force. At the moment plaintiff knows that at least 78 similar citizen complaints were made against Timek and Wheaten. Plaintiff also knows that Atlantic City's IA unit did not sustain any of the complaints. Plaintiff has made no secret of the fact that he intends to argue that Atlantic City has been "deliberately indifferent" to Timek and Wheaten's violent propensities, and that Atlantic City's IA unit is a sham. The information in the IA files is vital to these allegations. For example, the files are relevant to determine if Atlantic City complied with its statutory duty to thoroughly, impartially and objectively investigate all allegations against Timek and Wheaten. *See* IAPP at 4–5, 18. The files are also relevant to determining whether the defendant officers' complainants were personally interviewed and if all relevant records were examined. *Id.* at 28. In addition, the files will reveal if Atlantic City's IA unit prepared an "objective investigation report" recounting "all of the facts of the case" and a "summary of the case" with "conclusions for each allegation and recommendation for further action." *Id.* at 45. These are "critical performance standards that must be implemented by every county and municipal law enforcement agency." *Id.* at 5.

Atlantic City will undoubtedly argue at trial that its IA investigations were adequate. For example, Atlantic City argues, "it is imperative to note that Officer Timek has only

one internal affairs complaint that was sustained in March of 2006. Every other complaint against Officer Timek and Officer Wheaten was either "exonerated" or "not sustained." LB at 6. Plaintiff is entitled to test the defense. It is disingenuous for Atlantic City to argue that its officers' statistics show no misconduct but yet deny plaintiff the opportunity to test whether the evaluations of the complaints against them were "real." The best way for plaintiff to test Atlantic City's defense is for plaintiff to review Timek and Wheaten's IA files. The fact that Timek and Wheaten were not disciplined for any of the complaints against them gives plaintiff good cause to believe that Atlantic City's IA investigations were not "real," "meaningful," and "objective." Plaintiff is not on a "fishing expedition." Plaintiff has a justifiable  **\*394**  basis to believe that Atlantic City's IA investigations were bogus. Plaintiff may, therefore, focus discovery in this direction. Just as in *Merman, supra,* the trier of fact should have an opportunity to review the evidence to decide if the subject IA investigations were "valid and just, or instead, they may fortify the façade of a superficial investigatory process that, either by design or application, shields officer misconduct." 📄 824 F.Supp.2d at 593.

The Third Circuit has noted:

> The ["IA"] investigative process must be real. It must have some teeth. It must answer to the citizen by providing at least a rudimentary chance of redress when injustice is done. The mere fact of investigation for the sake of investigation does not fulfill a city's obligation to its citizens.

📄 *Beck,* 89 F.3d at 974. The requested IA files are directly relevant to whether Atlantic City's IA process is "real." The mere fact that Atlantic City had an IA unit does not insulate it from liability. *Beck* further noted:

> Formalism is often the last refuge of scoundrels; history teaches us that the most tyrannical regimes, from Pinochet's Chile to Stalin's Soviet Union, are theoretically those with the most developed legal procedures.

The point is obviously not to tar the Police Department's good name with disreputable associations, but only to illustrate that we cannot look to the mere existence of superficial grievance procedures as a guarantee that citizens' constitutional liberties are secure. Protection of citizens' rights and liberties depends upon the substance of the [IA] investigatory procedures. Whether those procedures [have] substance [is] for the jury's consideration.

*Id.* Under the facts presented here, the requested IA files are fair game for discovery because they are directly relevant to plaintiff's claim that Atlantic City's IA process is a sham and that Atlantic City failed to properly train its officers. The requested files are also directly relevant to Atlantic City's defense that its IA procedures are adequate.

The Third Circuit's *Beck, supra,* decision is instructive. In *Beck,* like this case, the plaintiff alleged he was beat up by the police (City of Pittsburgh), and he attempted to prove at trial that the governing municipality was liable under *Monell.* At the conclusion of plaintiff's case the trial court granted Pittsburgh judgment as a matter of law. The Third Circuit reversed and held there was sufficient evidence for a jury to decide that the IA process was "structured to curtail disciplinary action and stifle investigations into the credibility of the City's police officers." 89 F.3d at 974. The Court noted the jury could find that the police officer's statements were "given special, favorable consideration." *Id.* In addition, that Pittsburgh's IA investigations were "a façade to cover the violent behavioral patterns of police officers under investigation, to protect them from disciplinary action, and thereby perpetuate the City's custom of acquiescence in the excessive use of force by its police officers." *Id.* Discovery of the requested IA files is relevant to whether plaintiff can support the same arguments against Atlantic City in this case. It is noteworthy that the decision in *Beck* relied on "actual written civilian complaints." *Id.* at 975. This is the same information that should be in Timek and Wheaten's IA files.

In its *Beck* decision the Third Circuit also criticized Pittsburgh's process for investigating citizens' complaints of police misconduct because the testimony of witnesses "was rendered weightless" if they accompanied the complainant at the time of the incident, even if the IA investigator **\*395** found the witness believable. *Id.* at 973. The Court also criticized Pittsburgh's investigations because the result of the investigations was based on the testimony of the complainant and accused officer "thereby disposing of them unfavorably for the complaining citizen." *Id.* at 973. In addition, defendant was criticized because the IA process did not consider "prior citizen complaints of an officer's excessive use of force as relevant in assessing a pending complaint, and manifested no interest in probing the credibility of the officer under investigation." *Id.* Atlantic City's IA files are relevant to whether plaintiff can support the same assertions in this case. As noted in *Monaco,* 2008 WL 8738213, at *7 (citation and quotation omitted), "police officers' inclination to employ excessive force may be found to be a highly predicable consequence of a municipality's failure to investigate excessive force complaints."

The recent decision in another Atlantic City excessive force case, *Troso v. City of Atlantic City,* C.A. No. 10–1566 (RMB/JS), 2013 WL 6070028, 2013 U.S. Dist. LEXIS 163420 (D.N.J. Nov. 15, 2013), is a perfect illustration of why plaintiff needs the requested IA files. [17] In that § 1983 case the plaintiff sued Wheaten, other Atlantic City police officers, and Atlantic City, alleging he was subject to excessive force. Atlantic City filed a motion *in limine* to exclude its Internal Affairs Summary Repots and Use of Force Report Summaries. *See* C.A. No. 10–1566, Doc. No. 79. It argued that the documents are "wholly irrelevant to the issue of the alleged failure of Atlantic City to train its officers." *Id.* at 8. Atlantic City also argued that the reports were irrelevant because they only contained statistics with "no supporting facts or data," and "no details about each complaint." *Id.* The plaintiff opposed the motion and argued, like here, that Atlantic City condoned the use of excessive use of force by its officers, and Atlantic City had "a policy of granting police officers virtual impunity." Brief in Opposition at 8, Doc. No. 80. The plaintiff also submitted Atlantic City's May 25, 2011 Certification attesting to the fact that since 2003 no Atlantic City police officer has been disciplined for the excessive use of force. *See* Certification of Stacey Falcone, Doc. No. 80–2, Exhibit G. This remarkable representation was made even though Troso's brief summarized Atlantic City's IA statistics which revealed that for the calendar years 2004 to 2008 a

total of approximately 350 Internal Affairs complaints for excessive force were made. *See* Brief in Opposition at 4–6.

Nevertheless, despite plaintiff's facially compelling statistics, the Court granted Atlantic City's motion *in limine.* The Court noted that "it is clear" that when a party seeks to submit statistical evidence showing the frequency of excessive force complaints and the rate at which the complaints are sustained to support a *Monell* claim under § 1983, he "must show why those prior incidents were wrongly decided and how the misconduct in those cases is similar to that involved in the present action." *Id.* at *1, 2013 U.S. Dist. LEXIS 163420 at *1 (quoting *Katzenmoyer,* 2012 WL 6691746, at *1). The *Troso* decision could not make it clearer why plaintiff is justifiably not satisfied with just the IA statistical information that Atlantic City produced. Plaintiff must know the details regarding the IA complaints and the follow-up investigations to support his *Monell* claim.

*Troso* is not the only decision that supports plaintiff's insistence that he should not have to rely solely on Atlantic City's statistics to prove his *Monell* claim. In **\*396** *Franks, supra,* the Court granted defendant Cape May County's motion for summary judgment in a § 1983 excessive force case. The Court explained:

> Nor does Franks's citation to statistics showing the number of unsubstantiated complaints support her allegations. Plaintiff provides no evidence that those complaints that were dismissed were improperly investigated and should have been sustained. Rather than simply reciting a number of complaints or offenses, a plaintiff must show why those prior incidents deserved discipline and how the misconduct in those cases is similar to that involved in the present action.

2010 WL 3614193, at *12 (citation and quotation omitted); *see also Katzenmoyer,* 2012 WL 6691746, at *5 (granting summary judgment to the City of Camden even though plaintiff offered evidence that between 2003 and 2009 only one of 641 complaints against Camden police

officers was sustained). Based on these decisions plaintiff can reasonably anticipate that if he just relies on IA statistics Atlantic City will seek dismissal of his *Monell* clam via summary judgment. The requested discovery is relevant to prove plaintiff's *Monell* claim and to rebut Atlantic City's anticipated defense.

The decision in *Worrall, supra,* is not sufficiently compelling to deny plaintiff's request for Timek and Wheaten's IA files. In *Worrall,* an excessive force case remarkably similar to the instant matter, the plaintiff alleged that Wheaten beat him up at the Dusk Nightclub in Atlantic City on September 5, 2010. The Court noted that between September 19, 2008 and June 8, 2011, Wheaten was the subject of 21 complaints. Of the 21 complaints, 15 involved either excessive force or some type of assault, standard of conduct, and improper search. 2013 WL 4500583, at *3. It is true that Atlantic City's motion for summary judgment was denied. ("Plaintiff has provided a series of complaints against Officer Wheaten that is sufficient to infer a pattern of violent behavior and unlawful conduct." *Id.* at *4.). However, the Court noted that plaintiff's evidence "teeters on the border of insufficiency." *Id.* This holding hardly gives plaintiff the comfort he needs to forego requesting otherwise relevant discovery. Another relevant decision is *Garcia v. City of Newark,* C.A. No. 08–1725(SRC), 2011 WL 689616 (D.N.J. Feb. 16, 2011). In that case the Court denied Newark's summary judgment motion where one defendant officer was the subject of 35 excessive force and false arrest complaints before the incident in question, and six other defendants accounted for 55 complaints of similar misconduct. However, in addition to these statistics the plaintiff submitted an expert report attesting to Newark's practice of paying little or no attention to citizen complaints. Also, the IA investigator in the case testified he never sustained an excessive force allegation unless the Prosecutor found sufficient evidence to bring a criminal charge. *Id.* at *4.

One take away from *Worrall* and *Garcia* on the one hand, and *Katzenmoyer* and *Troso* on the other, is that the case law is far from clear that plaintiff can merely rely on statistical information to prove his *Monell* claim. Not surprisingly, Atlantic City intends to rely on the *Katzenmoyer* and *Troso* line of cases. *See* October 4, 2013 LB at 2, Doc. No. 44. ("The temporal proximity of the complaints coupled with the quantity of complaints pertaining to [Timek and Wheaten] are inadequate evidence that the City had notice of any offending policy, procedure or custom.") Atlantic City cannot use its

statistics as a sword and a shield. On the one hand Atlantic City argues it satisfied its discovery obligations by producing the statistics **\*397** regarding the complaints made against Timek and Wheaten. On the other hand, Atlantic City argues the statistics do not prove plaintiff's *Monell* claim. Plaintiff is entitled to relevant discovery regarding the details of similar citizen complaints against Timek and Wheaten since this information is in Atlantic City IA files, and the Court has ruled that the files are not privileged, the files must be produced. Since the IAPP requires that Timek and Wheaten's IA files should be available, the Court expects that all of the requested files will be produced. IAPP at 47 (police departments should maintain internal affairs investigative records as they relate to a particular officer for the career of the officer plus five years). Plaintiff must be allowed to examine all relevant evidence so that he will have a fair opportunity to present an effective case at trial. *Caver v. City of Trenton,* 192 F.R.D. 154, 159 (D.N.J.2000).

### 5. *Scope of the IA Files to be Produced*

As an alternative, Atlantic City argues the scope of its production should be limited. It argues that all post-incident (August 7, 2010) IA files are irrelevant and that not all pre-incident files are relevant. These arguments are rejected.

#### a. *Post–Incident Discovery*

**[22]  [23]  [24]**  "It is well recognized that the federal rules allow broad and liberal discovery." *Pacitti v. Macy's,* 193 F.3d 766, 777 (3d Cir.1999). The general scope of discovery is defined by Fed.R.Civ.P. 26(b)(1):

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense.... Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to the discovery of admissible evidence.

Rule 26 does not limit discovery to evidence which tends to prove plaintiff's claim; nor does it require that the discovered evidence be inherently probative to any matter at issue.

Rather, Rule 26(b)(1) provides that evidence relevant to any party's claim or defense is discoverable if it "bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Caver,* 192 F.R.D. at 159 (citing *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978)). While otherwise relevant evidence may be barred from discovery on grounds of privilege or burden, relevance remains a major factor in delineating proper discovery. *See NL Indus., Inc. v. Commercial Union Ins. Co.,* 144 F.R.D. 225, 234 (D.N.J.1992) (citing *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.,* 135 F.R.D. 101, 104 (D.N.J.1990)). Because discovery is not limited to evidence that is ultimately admissible, "[t]he relevance inquiry is significantly broader at the discovery stage than at the trial stage." *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.,* 135 F.R.D. 101, 104 (D.N.J.1990); *Unicasa Marketing Group, LLC v. Spinelli,* C.A. 04–4173(PGS), 2007 WL 2363158, at \*2 (D.N.J. Aug. 15, 2007) (citing *Nestle Foods Corp., supra* ). Nevertheless, the Court recognizes that discovery is not unlimited. Parties seeking information must still demonstrate that the information sought is reasonably calculated to lead to the discovery of admissible evidence. *Caver,* 192 F.R.D. at 159.

**[25]  [26]**  As noted, a plaintiff who alleges municipal liability based on acquiescence by a policymaker to a custom must prove the existence of a custom that resulted in a constitutional violation, and that said custom is so "permanently and well-settled as to virtually constitute law." *McTernan,* 564 F.3d at 658 (citation and quotation omitted). Atlantic City is correct that evidence of subsequent constitutional **\*398** violations cannot be used to show its knowledge of an unconstitutional custom or policy at the time of plaintiff's August 7, 2010 incident. *See Barrett v. City of New York,* 237 F.R.D. 39, 41 (E.D.N.Y.2006). Subsequent incidents, however, may be relevant to show a continuous pattern that supports a finding of an accepted custom or policy. *See Beck,* 89 F.3d at 972 (finding that post-incident events "may have evidentiary value for a jury's consideration whether [policymakers] had a pattern of tacitly approving the use of excessive force"). They are also relevant to issues of "pattern, intent, and absence of mistake." *Barrett,* 237 F.R.D. at 41.

In *Monaco, supra,* the Court agreed that post-incident evidence is relevant to proving a pre-incident custom. 2008 WL 8738213, at *8 (collecting cases). In fact, the Court stated that the evidence could be "highly probative." *Id.* (citation omitted). There are good grounds to permit plaintiff's request for discovery of post-incident events because otherwise "plaintiff may encounter difficulties ..., because of the lack of available credible witnesses and the avenues for dispute and distraction over the actual facts of each specific incident." *Id.* (citation and quotation omitted). Thus, where alleged police abuse is particularly conspicuous, "the disposition of the policymaker may be inferred from his conduct after the events that are the subject of the lawsuit." *Id.* (citation and quotation omitted). Here, a substantial number of excessive force complaints were made against Timek and Wheaten with no recorded discipline. If these allegations of serious misconduct received little attention and action from Atlantic City, the jury could conclude "that it was accepted as the way things are done and have been done in the City." *Id.* (quoting 🔖 *Grandstaff v. City of Borger, Tex.,* 767 F.2d 161, 171 (5th Cir.1985)). [18]

Jurisdictions outside New Jersey and the Third Circuit also support the view that post-incident events may be relevant to a *Monell* claim. *See* 🔖 *Henry v. County of Shasta,* 132 F.3d 512, 519 (9th Cir.1997) ("Post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry.") 🔖 *Foley v. City of Lowell, Mass.,* 948 F.2d 10, 14 (1st Cir.1991) ( "[A]ctions taken subsequent to an event are admissible if, and to the extent that, they provide reliable insight into the policy in force at the time of the incident."); 🔖 *Bordanaro v. McLeod,* 871 F.2d 1151, 1167 (1st Cir.1989) ( "Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right."). Like its pre-incident conduct, Atlantic City's post-incident conduct is relevant to whether it has a custom of condoning excessive force by its officers and whether it has a longstanding custom of conducting sham IA investigations designed to insulate police officers from discipline or criticism. "Events after a disputed incident often shed light both on the intent of participants, and on institutional or individual patterns of behavior." *Montalvo v. Hutchinson,* 837 F.Supp. 576, 581 (S.D.N.Y.1993) (declining to find files concerning subsequent occurrences of alleged police misconduct inherently irrelevant).

### b. *Pre–Incident Discovery*

**[27]** **[28]** Atlantic City argues it should not have to produce all of Timek and Wheaton's pre-incident IA files. The Court disagrees. The files are relevant to determining how entrenched and longstanding **\*399** Atlantic City's alleged unconstitutional custom existed. Supervisory liability may be established "by showing a supervisor tolerated past or ongoing behavior or failed to train, supervise, and discipline subordinates." 🔖 *Grande v. Keansburg Borough,* C.A. No. 12–1968(JAP), 2013 WL 2933794, at *10 (D.N.J. June 13, 2013) (citing 🔖 *Argueta v. U.S. Immigration & Customs Enforcement,* 643 F.3d 60, 72 (3d Cir.2011)). In this vein the requested pre-incident files are relevant to plaintiff's punitive damage claims against Timek and Wheaten. Plaintiff is entitled to know if his encounter with Timek and Wheaten was an isolated instance or if it was consistent with a longstanding and continuing practice. In addition, the requested IA files are relevant to finding out when and if Atlantic City was on notice of its police officers' alleged excessive force problems.

*Accord* 🔖 *Foley v. Boag,* C.A. No. 05–3727(SRC), 2006 WL 6830911 (D.N.J. May 31, 2006) (ordering the production of records dating back ten years because, *inter alia,* that is the time the defendant officer was with the police department); 🔖 *Barrett,* 237 F.R.D. at 40–41 (investigations older than ten years may be relevant to establish a pattern or knowledge, and should not be barred from discovery based solely on their age).

The decision in 🔖 *Johnson v. City of Philadelphia,* No. CIV. A. 94–1429, 1994 WL 612785 (E.D.Pa. Nov. 7, 1994), does not compel a different result. In *Johnson* the court limited discovery to the five years immediately preceding the alleged constitutional violations. 🔖 *Id.* at *11. In that case, however, the defendants argued that the plaintiffs' request for documents was "overly broad" and "unduly burdensome." 🔖 *Id.* In addition, the disputed material was objectively "voluminous," involving personnel files and performance evaluations covering a period of up to twenty years. 🔖 *Id.* Although the court in *Johnson* limited discovery to materials preceding the subject incident, the court affirmed the relevancy of all disputed documents 🔖 (*id.* at *12),

and gave plaintiffs the opportunity to discover the restricted material for good cause shown. 🔖 *Id.* at *11.

To be sure, the Court's Opinion should not be read as a free pass to request all pre- and post-incident IA files in every case alleging police misconduct. Every case is different and a party's discovery requests must be evaluated pursuant to the standards set forth in Rules 26(b) and 26(b)(2)(C). *See Jones v. DeRosa,* 238 F.R.D. 157, 164 (D.N.J.2006) ("The executive or law enforcement privilege doctrine in federal courts is left to the courts to develop on a case-by-case basis."); 🔖 *Forrest v. Corzine,* 757 F.Supp.2d 473, 477 (D.N.J.2010) (Magistrate Judges have wide discretion to manage discovery.). However, even though the Court is not weighing in on the merits of the case, plaintiff's claims are not frivolous. The defendant officers have a long history of complaints without any discipline, which raises a legitimate question about the efficacy of Atlantic City's IA process. Given Atlantic City's expected vigorous defense, fairness compels the Court to conclude that plaintiff is entitled to all the discovery he seeks. Atlantic City has not argued that it is burdensome to collect and produce the requested records. Even if it did, however, the weighing process lands in plaintiff's favor. *See* 🔖 *Torres,* 936 F.Supp. at 1213 (rejecting defendant's arguments that it should not have to review 1200 IA files).

### 6. *Protective Order*

The Court agrees with Atlantic City that precautions should be taken to protect the confidentiality of Atlantic City's IA files. The files should be designated as "Confidential" pursuant to the Discovery Confidentiality Order entered in the case. Although **\*400** the files are discoverable, at this stage of the case their distribution should be limited to authorized individuals. Also, the files should only be used for the purpose of prosecution or defense of this action and not for any business, commercial, competitive, personal or other purpose. The Court also agrees that the personal information of Timek and Wheaten is irrelevant and may be redacted. This includes social security numbers, addresses, telephone numbers, driver's license numbers, financial information, and information pertaining to their family members and friends (unless they are relevant witnesses). If Atlantic City or Timek request to seal the IA files or otherwise restrict public access, they shall follow the requirements in L. Civ. R. 5.3(c).

### 7. *In–Camera Review*

**[29]**   Last, the Court declines Atlantic City's invitation to review its IA files *in camera*. In 🔖 *United States v. Zolin,* 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989), the Supreme Court held that a district court may, in some circumstances also require an *in camera* review of documents. However, it held that the court should not conduct such a review solely because a party begs it to do so. 🔖 *Id.* at 571, 109 S.Ct. 2619. There must first be a sufficient evidentiary showing which creates a legitimate issue as to the application of the privilege asserted. 🔖 *Id.* at 571–72, 109 S.Ct. 2619. If a party requesting *in camera* review has not provided sufficient evidence to support a reasonable belief that the requested materials are not discoverable, the request should be denied. *Id.* Atlantic City has not made this showing so its request for an *in camera* review is denied.

### *Conclusion*

Thus far the record has demonstrated that not one of the hundreds of excessive force complaints lodged against Atlantic City's police officers has been "sustained." In particular, the two officer defendants, Timek and Wheaten, have had scores of complaints lodged against them, none of which resulted in any discipline. This is true even though the officers regularly appear in this court as defendants in 🔖 § 1983 excessive force cases, several of which are remarkably similar to the instant matter.

Atlantic City has taken a disingenuous discovery position. It argues that plaintiff is only entitled to review Internal Affairs statistics and then it argues the statistics in and of themselves cannot establish *Monell* liability. Atlantic City's discovery argument is soundly rejected by this Court and the applicable case law.

The Court, of course, is not ruling on the merits of plaintiff's claims. The Court is also not ruling that Atlantic City's Internal Affairs documents are admissible at trial. The Court is instead ruling that since the requested documents are not privileged, and they are relevant for discovery purposes, they must be produced. The documents are directly relevant to plaintiff's *Monell* claim and they will reveal whether plaintiff can support his argument that Atlantic City's Internal Affairs process and investigations are a sham. In addition, plaintiff expects the documents will reveal if, how, and why Atlantic City's police officers, and Timek and Wheaten in particular, repeatedly use excessive force with impunity.

Accordingly, for all the foregoing reasons, plaintiff's Motion to Compel Defendant Officers' Internal Affairs Files is GRANTED. An appropriate form of Order consistent with this Opinion will be entered.

**All Citations**

989 F.Supp.2d 378

## Footnotes

1    The statistics for Timek and Wheaten cited in this Opinion are derived from Atlantic City's Internal Affairs Index Cards attached as Exhibit C to plaintiff's motion. Doc. No. 32. (Atlantic City has not argued the Index Cards are Confidential.) In the face of the messy compilation, the Court did its best to summarize the relevant numbers. Even if the Court's analysis is not 100% accurate, the essence of the numbers speak for themselves.

2    In New Jersey a municipal police department is not a separate legal entity from the governing municipality. *Franks v. Cape May County,* C.A. No. 07–6005(JHR), 2010 WL 3614193, at *7 (D.N.J. Sept. 8, 2010). Accordingly, the Court will refer to Atlantic City and not the Atlantic City Police Department.

3    The complaint also includes common law claims for assault and battery, false imprisonment, false arrest and malicious prosecution.

4    Atlantic City argues an excessive number complaints were made because "any incident of a criminal apprehension with the use of a K–9 triggers an Internal Affairs investigation." May 16, 2013 Letter Brief at 7, citing to Exhibit B, Doc. No. 34. Although not clear, it appears that Atlantic City may be misreading its referenced K–9 Policy and Procedure. The policy only requires that a "Use of Force Report" be prepared when a K–9 is involved in an incident, not an IA complaint. Also, the policy provides that if a K–9 bites someone the K–9 Unit Supervisor and Internal Affairs must review the circumstances to determine if there are policy, training and discipline issues to address. The policy does not explicitly require that an IA complaint be recorded.

5    No disposition is listed for excessive force charges on March 20, 2012 and April 12, 2012. Timek's charge of "missing property" on July 12, 2005, is marked "administratively closed," and a charge of "unsworn falsification to authorities" on March 20, 2006, was "sustained."

6    The Court is not certain that a complete list of Wheaten's IA history has been produced. Olin Jardue Caldwell, Jr., (C.A. No. 94–5049(JHR)) filed a § 1983 lawsuit against Wheaten on November 14, 1994. If Wheaten worked as an Atlantic City police officer at least as early as 1994, the Court cannot easily explain why September 19, 2008, is the first listed IA complaint on his Index Card.

7    The IAPP is available at http://www.state.nj. us/lps/dcj/agguide/internalaffairs2000vi.2.pdf.

8    The Court also noted that the officer defendants did not have a history of multiple excessive force complaints. *Id.*

9    It is noteworthy that in *Merman* Camden's motion was denied after the Court reviewed "extensive Internal Affairs' records," comprised of at least forty reports. *Id.* at 591–92. These are the same types of records plaintiff is requesting here.

10    It is apparent that not all citizens who complain about excessive force file IA complaints. For example, on September 16, 2011, Huschel B. Story filed a *pro se* § 1983 complaint against Atlantic City and Officer Frank Timex (sic) (C.A. No. 11–5340 (RBK/JS)). Timek's Index Card does not list Story as making a complaint. The same situation exists for Seth Rouzier (C.A. No. 07–5218 (RBK/AMD) (date of incident ("DOI") November 5, 2005)). As to Wheaton, the same situation exists for Michael Troso (C.A. No. 10–1566 (RMB/JS)) (DOI August 19, 2008), David Castellani (C.A. No. 13–5848 (RMB/JS)) (DOI June 15, 2013), Mohamed Ellaisy (C.A. No. 13–5401 (JBS/AMD)), and Janie Costantino (C.A. No. 13–6667 (RBK/AMD)) (DOI July 20, 2012).

*Groark v. Timek,* 989 F.Supp.2d 378 (2013)

11    The Court is not ruling that Atlantic City waived its right to assert a Rule 12(b) or (c) defense. The Court is instead ruling that defendant cannot rely upon an alleged deficient complaint that it answered as an excuse to bar otherwise relevant discovery.

12    Although *D'Orazio* discussed the application of the "informer's privilege," its discussion is relevant because the informer's privilege and law enforcement privileges are analogous. *Id.* at *4; *see also O'Neill,* 619 F.2d at 229.

13    *See Rivera v. Garry,* C.A. No. 12–4379 (NLH/AMD); *Rovzier v. Timek,* C.A. No. 07–5218 (RBK/AMD); *Williams v. Atlantic City,* C.A. No. 02–4501 (JHR/JBR); *Simmons v. Timek,* C.A. No. 04–572 (NLH/AMD); *Brooks v. City of Atlantic City,* C.A. No. 09–3110 (NLH/AMD); *Troso v. City of Atlantic City,* C.A. No. 10–1566 (RMB/JS); *Castellani v. City of Atlantic City,* C.A. No. 13–5848 (RMB/AMD); *Ellaisy v. City of Atlantic City,* C.A. No. 13–5401 (JBS/AMD); *Costantino v. City of Atlantic City,* C.A. No. 13–6667 (RBK/AMD); *Caldwell v. Whitman,* C.A. No. 94–5049(JHR); *Worrall v. City of Atlantic City,* C.A. No. 11–3750 (RBK/JS); *Kelly v. City of Atlantic City,* C.A. No. 11–5976 (JBS/JS). The Court does not have access to the docket entries for cases filed against Timek and Wheaten in state court.

14    *See Lapella v. City of Atlantic City,* C.A. No. 10–2454 (JBS/JS), Order dated January 18, 2012 [Doc No. 64]; *Worrall v. City of Atlantic City,* C.A. No. 11–3750 (RBK/JS), Order dated April 5, 2012 [Doc. No. 29]; *Jeffers v. City of Atlantic City,* C.A. No. 11–5975, Order dated September 18, 2012 [Doc. No. 23].

15    The Court is not weighing in on whether the IA records will remain confidential at trial.

16    The latest two complaints involving Timek, dated March 20, 2012 and April 12, 2012, do not list a disposition. The fact that the investigations may be continuing does not bar their production. *O'Neill,* 619 F.2d at 229 ("We know of no Supreme Court case which provides support for such a broad amorphous Government privilege.").

17    Trial is scheduled to start in two weeks.

18    *Monaco* noted that the Fifth Circuit held that *Grandstaff* only applies to instances of "extreme" police misconduct. 2008 WL 8738213, at *8 n. 6 (citing *Snyder v. Trepagnier,* 142 F.3d 791, 797 (5th Cir.1998)).

---

**End of Document**    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT

# B

D'Arrigo v. Gloucester City, Not Reported in F.Supp.2d (2007)

2007 WL 1755970

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by   Castro v. Delaware River Port Authority,   D.N.J.,
June 26, 2014

KeyCite Overruling Risk - Negative Treatment

Overruling Risk   Pearson v. Callahan,   U.S.,   January 21, 2009

2007 WL 1755970
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Arthur G. D'ARRIGO, Jr., Plaintiff,

v.

GLOUCESTER CITY, et al., Defendants.

Civil Action No. 04–5967 (JBS).
|
June 19, 2007.

**Attorneys and Law Firms**

Cris D'Arrigo, Esq., D'Arrigo & D'arrigo, Bridgeton, NJ, for
Plaintiff.

Michael O. Kassak, Esq., White & Williams, Esqs., Cherry
Hill, NJ, for Defendants Gloucester City, Gloucester City
Police Department, Kenneth Iepson, Brian Morrell, and R.
Kraft.

Susan M. Leming, Esq., Diane S. Kane, Esq., William M.
Tambussi, Esq., Brown & Connery, LLP, Westmont, NJ,
for Defendants Delaware River Port Authority and Larry
Goodwin.

**OPINION**

SIMANDLE, District Judge.

**I. INTRODUCTION**

 **\*1** In this suit, Plaintiff Arthur G. D'Arrigo, Jr., claims
he was arrested without probable cause by an officer of
the Delaware River Port Authority, who took him to the
Gloucester City, N.J. Police Department for a breathalyzer
test, where he was allegedly beaten by two officers of the
Gloucester City Police Department on January 6, 2004, which
caused permanent injuries including a fractured shoulder.
This matter comes before the Court on two motions for
summary judgment, pursuant to Fed.R.Civ.P. 56—one by
Defendants Delaware River Port Authority ("DRPA") and

Patrolman Larry Goodwin [Docket Item 23] and one by
Defendants Gloucester City, Gloucester City Municipal
Police Department, Officer Iepson, Officer Morrell and
Officer Kraft (collectively "the Gloucester City Defendants")
[Docket Item 28]. The principal issues to be determined
include the availability of qualified immunity as a defense
by the officers, and liability of the officers, the DRPA and
Gloucester City for the alleged excessive force, arrest without
probable cause, filing of false police reports, intimidation and
humiliation, and bystander liability of an officer who fails to
prevent use of excessive force by fellow officers, pursuant to
the United States Constitution and New Jersey law. For the
reasons explained below, the Court shall grant the motions in
part and deny them in part.

**II. BACKGROUND**

This case arises out of a dispute over a traffic stop, sobriety
testing, and the alleged harassment and assault of Plaintiff
Arthur D'Arrigo ("Plaintiff") by law enforcement officers.
On January 5, 2004, between approximately 9:30 P.M.
and midnight, Plaintiff ate dinner with some friends in
Philadelphia, shot pool, and consumed approximately three
beers. (Def. DRPA and Goodwin's St. of Undisp. Material
Facts (hereinafter "1DUMF") at ¶ 1–5.) [1]

At approximately 1 A.M. Plaintiff began driving himself
back to Bridgeton, New Jersey. (*Id.* at ¶ 6.) He was
driving approximately 85–90 miles per hour on Route 42
in Gloucester City, well over the speed limit, when he
passed Defendant Patrolman Goodwin of the DRPA Police
Department. (*Id.* at ¶¶ 6–7.) Patrolman Goodwin activated his
lights and pulled Plaintiff over. (*Id.* at ¶ 8.) When Goodwin
approached the car, Plaintiff admitted that he was going "very
fast." (*Id.* at ¶ 9.) Goodwin asked Plaintiff whether he had
been drinking and Plaintiff admitted that he had consumed
three drinks that evening. (*Id.* at ¶ 10.) Goodwin asked
Plaintiff to exit his vehicle to perform field sobriety testing.
(*Id.* at ¶ 12.) The parties dispute whether Plaintiff passed
the tests. Goodwin then instructed Plaintiff to return to his
vehicle. (*Id.*)

DRPA Officer Smith then arrived at the scene, asked Plaintiff
to get out of his car again, and performed additional sobriety
tests. (*Id.* at ¶ 13.) The parties also dispute whether Plaintiff
passed those tests. Goodwin then asked Plaintiff if he could
call someone to drive him home. (*Id.* at ¶ 17.) Plaintiff said
"no" and insisted that he was not drunk. (*Id.*) Plaintiff claims
that he did not want anyone else driving his car and that it was

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.                1

*D'Arrigo v. Gloucester City, Not Reported in F.Supp.2d (2007)*

2007 WL 1755970

not he had made that known to the officers that they decided to issue him a breathalyzer test. (Pl. Alt. St. of Facts in opp. to DRPA and Goodwin's Mot. (hereinafter "1PASF") at ¶ 7.) Plaintiff was arrested, handcuffed, and placed in the back of the DRPA police cruiser. (1DUMF at ¶ 18.) When asked at his deposition why he didn't call someone to drive him home, Plaintiff said that he believed that if he took the breathalyzer test and proved his sobriety, then he would be set free (*id.* at ¶ 19).

**\*2** Goodwin then drove Plaintiff to the Gloucester City police station. (1PASF at ¶ 11.) Upon arrival, Plaintiff was placed in a holding cell while Gloucester City Police Officer Kraft prepared the breathalyzer. (*Id.* at ¶ 12.) Goodwin was not a certified breathalyzer operator. (1DUMF at ¶ 21.) Plaintiff claims that Defendants Iepson and Morrell, Gloucester City police officers, were teasing and taunting him. (1PASF at ¶ 13.) Goodwin did not do anything to stop this teasing. (*Id.* at ¶ 14.) Officer Kraft then administered the breathalyzer test. (DUMF at ¶ 23.) Plaintiff claims he blew full force into the machine and that a green light came on when he did. (1PASF at ¶ 16.) Officer Kraft told Plaintiff he was not blowing hard enough and Plaintiff gave another breath sample. (*Id.* at ¶ 17.) Plaintiff had never been arrested for DUI previously and had never taken a breathalyzer test. (*Id.* at ¶ 15.) Plaintiff again blew full force into the machine, according to him. (*Id.* at ¶ 17.) But Officer Kraft looked at Goodwin and said, "refusal?". (*Id.*) Goodwin nodded affirmatively, according to Plaintiff. (*Id.*) Because Officer Goodwin was not trained to operate a breathalyzer machine, however, he relied on Officer Kraft's assessment of the test and whether Plaintiff had refused to provide a proper breath sample. (*Id.* at ¶ 20.)

The Gloucester City officers continued to tease and taunt Plaintiff. (*Id.* at ¶ 24.) In response, Goodwin claims, Plaintiff, who was handcuffed [2], "stepped ... towards the officers who were taunting him." (*Id.*) Officers Iepson and Morrell then tackled Plaintiff and "drove [him] through the door of the holding cell and rammed the Plaintiff into the rear wall of that cell." (*Id.* at ¶ 22.) An officer laid on top of Plaintiff and punched him in the chest approximately five times. (*Id.* at ¶ 23.) Officers Iepson and Morrell are each over six feet tall (*Id.* at ¶ 26) and Plaintiff is approximately five feet tall and weighs about 130 pounds (*Id.* at ¶ 29.)

Plaintiff claims that while he was in the holding cell, several Gloucester City officers came to the window of the cell and taunted him by saying, "How do you feel now, little man?"

and "You're a loser." (1DUMF at ¶ 31.) Plaintiff also claims his shoulder was injured in the encounter with the officers and that he sat in pain in the cell for twenty minutes until Goodwin transported him to DRPA headquarters. (*Id.* at ¶¶ 32–33; 1PASF at ¶ 28.) On the way, he complained of significant pain in his arm and shoulder. (1PASF at ¶ 28.) DRPA Officer Smith heard Plaintiff complain about his shoulder and offered medical assistance, which Plaintiff refused. (1DUMF at ¶ 34.) Plaintiff was charged with driving under the influence and refusing to provide a breath sample, but not with resisting arrest. (1PASF at ¶ 32.)

Plaintiff called his brother, an attorney, from DRPA headquarters. (1DUMF at ¶ 35.) Plaintiff's brother picked him up and drove him to Elmer Hospital, where tests revealed that Plaintiff's shoulder was broken. (*Id.* at ¶¶ 36–37.) Within a day or two, Plaintiff returned to his full-time job as a mortgage banker and missed work thereafter occasionally to attend physical therapy sessions for his shoulder. (*Id.* at ¶ 38.) Plaintiff claims he continues to suffer pain in his shoulder and can no longer play basketball. (*Id.* at ¶¶ 41–42.)

**\*3** Plaintiff admits that he never directly complained to any officer that he was suffering shoulder pain and that when he made comments to himself about the pain at the Gloucester City police station, he does not know whether Goodwin was near enough to hear him. (*Id.* at ¶ 45.) Plaintiff admits that after leaving the Gloucester City Police Department, he did not directly tell Goodwin that his shoulder hurt. (*Id.*) Further, Plaintiff testified at his deposition that Goodwin never ridiculed him or teased him (*id.* at ¶ 46); rather Plaintiff blames Goodwin for failing to intervene to prevent the other officers from teasing and assaulting Plaintiff. (Pl. Resp. to 1DUMF at ¶¶ 44, 46.) Plaintiff also testified that he has no facts to support his argument that DRPA failed to properly train or supervise Patrolman Goodwin or any other officer. (1DUMF at ¶ 48.)

An expert physician retained by Defendants Gloucester City, Gloucester City Police Department, Officer Iepson, Officer Morrell and Officer Kraft examined Plaintiff and concluded that he has no physical functional limitations or impairments and can participate in physical activities without restriction. (Gloucester City Def. St. Undisp. Mat. Facts at ¶ 35.) Plaintiff claims that his medical records contradict that finding.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material

D'Arrigo v. Gloucester City, Not Reported in F.Supp.2d (2007)

2007 WL 1755970

fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. *Id.* Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Id.*

In deciding whether there is a disputed issue of material fact, a court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.' " *Hunt v. Cromartie,* 526 U.S. 541, 552 (1999) (*quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby,* 477 U.S. at 250; *Brewer v. Quaker State Oil Ref. Corp.,* 72 F.3d 326, 329–30 (3d Cir.1995) (citation omitted). The moving party always bears the initial burden of showing that no genuine issue of material fact exists, regardless of which party would have the burden of persuasion at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Country Floors v. P'ship of Gepner and Ford,* 930 F.2d 1056, 1061–63 (3d Cir.1991). "The burden on the moving party may be discharged by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

**\*4** "[T]he nonmoving party may not, in the face of a showing of a lack of a genuine issue, withstand summary judgment by resting on mere allegations or denials in the pleadings; rather, that party must set forth 'specific facts showing that there is a genuine issue for trial,' else summary judgment, 'if appropriate,' will be entered ." *U.S. v. Premises Known as 717 S. Woodward Street, Allentown, Pa.,* 2 F.3d 529, 533 (3d Cir.1993) (quoting Fed.R.Civ.P. 56(e)) (citations omitted).

Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex,* 477 U.S. at 323.

## IV. DISCUSSION

### A. Motion for Summary Judgment by Defendants DRPA and Patrolman Larry Goodwin

Defendants DRPA and Goodwin move for summary judgment on all counts of Plaintiff's Complaint that are asserted against them. Because not all claims are asserted against both parties, the Court shall treat these Defendants separately.

#### 1. *Claims Against Defendant Goodwin via 42 U.S.C. § 1983*

Defendant Goodwin moves for summary judgment on Counts Two, Three, Five and Seven of the Complaint, which assert claims against him via 42 U.S.C. § 1983. [3] Count Two alleges unconstitutional [4] excessive force; Count Three alleges that Goodwin and the other officers violated Plaintiff's due process rights by filing a false police report [5]; Count Five complains of intimidation and humiliation, but alleges no federally-protected right; and Count Seven alleges that the officers violated Plaintiff's due process rights by holding him against his will without probable cause. Defendant Goodwin argues that because all evidence indicates that he acted objectively reasonably, he enjoys immunity from liability as to all of these § 1983 claims.

Plaintiff opposes, claiming that the question whether Goodwin's actions were reasonable should be left to the jury. (Pl. Br. Opp. Goodman/DRPA Mot. at 25, 32–33.) Plaintiff cites a New Jersey Supreme Court opinion, *Schneider v. Simonini,* 163 N.J. 336 (2000), to support his argument that a jury must determine the underlying facts before a judge can determine whether the defendant invoking qualified immunity behaved reasonably (Pl. Br. Opp. Goodman/DRPA Mot. at 33.) [6]

In determining the issue of a defendant's qualified immunity for unconstitutional conduct, the Third Circuit, following *Saucier v. Katz,* 533 U.S. 194 (2001), has described the two-step inquiry:

> In considering whether qualified immunity applies, a court must first decide whether the facts, taken in the light most favorable to the plaintiff, demonstrate a constitutional violation. *Curley v. Klem,* 298 F.3d 271, 277 (3d Cir.2002)

D'Arrigo v. Gloucester City, Not Reported in F.Supp.2d (2007)

2007 WL 1755970

(citing *Saucier [v. Katz* ], 533 U.S. [194,] 201 [ ( 2001) ] ). If so, the court next determines whether the constitutional right in question was clearly established. *Id.* at 277 (citing *Saucier,* 533 U.S. at 201). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted ." *Saucier,* 533 U.S. at 202. "If the officer's mistake as to what the law requires is reasonable," the officer is entitled to qualified immunity. *Id.* at 205.

 **\*5**  *Couden v. Duffy,* 446 F.3d 483, 492 (3d Cir.2006).

On this issue of federal immunity, this Court looks to the Third Circuit, which in *Curley v. Klem,* 298 F.3d 271 (3d Cir.2002), made a similar point as the New Jersey Supreme Court in *Simonini.* In *Curley* the Third Circuit reviewed a District Court's grant of summary judgment to the defendant and explained that "at this stage of the qualified immunity analysis, where we discern simply whether [the plaintiff] alleges conduct in violation of a constitutional right, we must consider only the facts alleged by [the plaintiff], taken in the light most favorable to him." *Id.* at 279–80.

"[T]he standard for granting or denying a motion for summary judgment does not change in the qualified immunity context." *See Karnes [v. Skrutski],* 62 F.3d [485,] 494 [ (3d Cir.1995]. Viewing the facts in the light most favorable to the plaintiff, a court must determine whether the defendant should prevail as a matter of law. *See id.; see also Gruenke [v. Seipe,* 225 F.3d [290,] 299–300 [ (3d Cir.2000) ] (observing that "this admittedly fact-intensive analysis must be conducted by viewing the facts alleged in the light most favorable to the plaintiff").

*Curley,* 298 F.3d at 282–83.

Plaintiff does not identify any disputed fact that is relevant to the Court's determination of qualified immunity for Defendant Goodwin and that might call for special interrogatories to a jury. As to the excessive force claim and intimidation claims, Counts Two and Five, Defendant Goodwin and Plaintiff essentially agree for purposes of this motion that Goodwin stood by as other officers assaulted and harassed Plaintiff. They only dispute whether that inaction makes Goodwin liable. Although the Court must determine at this stage whether Goodwin had an opportunity to intervene to prevent the harassment and assault by other officers, the parties do not dispute that "from the time of contact with Officers Iepson and Morrell to the time that the Plaintiff was

punched in the holding cell was very rapid." (Pl. Resp. to 1DUMF at ¶ 28.) There is no additional fact a jury needs to find for the Court to decide whether Defendant Goodwin's failure to intervene entitles him to immunity on a summary judgment motion. Indeed, Plaintiff's theory is that because Goodwin had an opportunity to intervene to prevent the harassment, and because the harassment caused Plaintiff to lunge at the police officers, which caused the officers to assault him, Goodwin should be held liable for excessive force based on his failure to intervene to stop the harassment. (Pl. Br. Opp. Goodwin/DRPA Mot. for Summ. J. at 23.)

As to Plaintiff's claim in Count Seven, lack of probable cause, the Court needs no jury to aid the qualified immunity decision because the Court will simply view the facts supported by the record that favor Plaintiff. Taking these as true, the Court can then determine whether Goodwin's conduct was such that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted, obviating any need for the jury to resolve the facts at this stage. The Court will consider only the facts in the light most favorable to Plaintiff to determine whether Goodwin is entitled to qualified immunity. Plaintiff argues that viewing the facts in the light most favorable to him, including statements Goodwin made at his deposition, Goodwin lacked probable cause to arrest him and should be held liable. Goodwin's summary judgment motion argues to the contrary. This is the standard posture in which a court decides motions pursuant to Fed.R.Civ.P. 56. To determine qualified immunity on these claims also requires no aid from a jury.

 **\*6**  Therefore, the Court will proceed to determine, for each claim alleged against Goodwin, whether he is entitled to qualified immunity. Goodwin will not be entitled to such immunity if (1) the facts, taken in the light most favorable to Plaintiff, demonstrate a constitutional violation and (2) the right was clearly established such that Goodwin's violation of it was not reasonable.

*a. Excessive Force*

Plaintiff alleges that Goodwin is liable for other officers' use of excessive force because Plaintiff was in Goodwin's custody and stood by while the Gloucester City officers taunted him to the point that a physical confrontation occurred. " 'To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable.' " *Kopec v. Tate,* 361 F.3d 772, 776 (3d Cir.2004) (quoting *Estate of Smith*

D'Arrigo v. Gloucester City, Not Reported in F.Supp.2d (2007)

2007 WL 1755970

*v. Marasco,* 318 F.3d 497, 515 (3d Cir.2003)). [7] A plaintiff can sustain an excessive force claim against an officer who did not participate directly in the use of force if the defendant officer failed to intervene to prevent the use of excessive force when there was a reasonable opportunity to do so. *See Smith v. Mensinger,* 293 F.3d 641, 650 (3d Cir.2002). " 'If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983.' " *Id.* (quoting *Byrd v. Clark,* 783 F.2d 1002, 1007 (11th Cir.1986)). "However, an officer is only liable if there is a realistic and reasonable opportunity to intervene." *Id.* at 651.

At his deposition, Plaintiff described the assault as occurring very quickly:

> I was handcuffed by Officer Goodwin and being led towards the holding cell. As I said, these guys came in on a run, and it happened very, very quickly. [Officer Goodwin] was behind me. He had cuffed me and was behind me and this guy was coming—I was walking toward the holding cell and I could see them come into the room at a rush, basically [the Gloucester City officers] grabbed me and just rammed me back into the holding cell, grabbed me, turned me so that I was completely off my feet at least at one point and just—again, just rammed me into the back of the room.... After I hit the wall the officer who was lying on top of me then punched me four or five times in the rib cage.

It is disputed whether Plaintiff was already handcuffed or whether Goodwin was in the process of handcuffing him, as Goodwin contends. Also, it is unclear to the Court whether Plaintiff disputes that he lunged at the Gloucester City Officers prior to the assault, as Goodwin contends. However, viewing the facts in the light most favorable to Plaintiff, Goodwin had a reasonable opportunity to intervene to prevent the punching. Plaintiff's account indicates that Officer Goodwin was standing directly behind him when the assault occurred and did not say or do anything to discourage it. While it may or may not have been possible for Goodwin to prevent the very fast rush of the Gloucester City officers onto Plaintiff, there certainly appears to have been a reasonable opportunity for Goodwin to intervene once the officers crashed on top of Plaintiff in the holding cell. A reasonable jury could find that Goodwin had an opportunity to prevent the assault from the officer who repeatedly punched Plaintiff. Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude from Plaintiff's admissible evidence that Defendant Goodwin could have intervened to stop the assault. [8]

*7 Although not necessary to the Court's consideration of the immunity issue, the Court rejects Plaintiff's argument that the state-created danger theory should apply to impose liability on Goodwin. Liability under the state-created danger theory requires that the governmental actor defendants "create[d] plaintiffs' peril, increase[d] their risks of harm, or act[ed] to render them more vulnerable to the [private] ... defendants' assaults." *D.R. by L.R. v. Middle Bucks Area Voc. Tech. Sch.,* 972 F.2d 1364, 1374 (3d Cir.1992). The issue is "whether the [defendant] state actors involved affirmatively acted to *create* plaintiff's danger, or to render him or her more *vulnerable* to it," *id.* at 1373, because "the Due Process Clause does not impose an affirmative duty upon the state to protect its citizens," *id.* at 1369.

Fundamentally, the state-created danger theory does not apply in cases like this one. "State-created danger" refers to a state actor's culpability for harms ultimately inflicted by a private party. There are four essential elements of a state-created danger claim:

(1) the harm ultimately caused was foreseeable and fairly direct;

(2) a state actor acted with a degree of culpability that shocks the conscience;

(3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

(4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*D'Arrigo v. Gloucester City, Not Reported in F.Supp.2d (2007)*

2007 WL 1755970

*Bright v. Westmoreland County,* 443 F.3d 276, 281 (3d Cir.2006). On the other hand, where the harm is the direct result of conduct by another state actor and there is no evidence showing an opportunity to intervene, additional recourse to the state-created danger theory seems an improper attempt to duplicate recovery by imposing one officer's liability on another. Even if the doctrine applied, Plaintiff's facts do not satisfy it. [9]

Nevertheless, the Court shall deny summary judgment on Count Two. First, the facts taken in the light most favorable to Plaintiff would permit a reasonable jury to find that Goodwin, who was standing directly behind Plaintiff when Gloucester City Officers attacked him, was liable for violation of Plaintiff's Fourth Amendment rights because he failed to intervene to prevent a Gloucester City officer from repeatedly punching Plaintiff in the chest. Second, the right to be free from such an unreasonable seizure (i.e., the assault by police officers), and Goodwin's obligation to intervene, are clearly established such that Goodwin's conduct was not reasonable. Defendant Goodwin is not entitled to qualified immunity on the excessive force claim and the Court will therefore deny his motion for summary judgment on Count Two.

#### b. Intimidation and Humiliation

**\*8** In Count Five of the Complaint, Plaintiff alleges that the defendants' "actions in subjecting Plaintiff to intimidating, humiliating and degrading treatment constituted violations of the United States Code 42 U.S.C.A. § 1983 et seq." The Court shall grant Defendant Goodwin's motion for summary judgment on this Count because (1) 42 U.S.C. § 1983 does not provide Plaintiff any substantive rights, but rather only provides a vehicle for protecting established federal rights, *see* n. 2, *supra,* and (2) Plaintiff identifies no federally-protected right, nor is the Court aware of any, that could have been injured by the name-calling and taunting at issue in this case. [10]

#### c. Holding Plaintiff Without Probable Cause

In Count Seven of his Complaint, Plaintiff alleges that the "Defendants' actions in hol[d]ing plaintiff against his will without probable cause constitute a violation of the Plaintiff's Substantive and Procedural rights to due process guaranteed by" the New Jersey and federal Constitutions, which he alleges "constitute violations of the United States Code 42 U.S.C.A. § 1983...." Liberally construed, this is a constitutional claim for arrest without probable cause, in

violation of the Fourth Amendment, brought via 42 U.S.C. § 1983. Indeed, that is how the parties to this motion construe it in their briefs.

An arrest without a warrant is permissible under the Fourth Amendment so long as the arresting officers had probable cause to believe a crime had occurred or was occurring. Probable cause exists where "facts and circumstances [are] sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense." *Sharrar v. Felsing,* 128 F.3d 810, 818 (3d. Cir.1997).

The parties do not agree whether Plaintiff passed his sobriety testing prior to his arrest. However, there is no material dispute that Goodwin saw Plaintiff speeding and pulled him over. [11] Further, the parties agree that Plaintiff had been drinking that evening and that when he was pulled over by Officer Goodwin, he told Goodwin that he had been drinking and admitted he was driving "very fast." On this undisputed evidence, Goodwin had probable cause to arrest Plaintiff for driving while intoxicated, N.J. Stat. Ann. § 39:4–50, and speeding, so the Court will grant summary judgment to him on Count Seven. Plaintiff may not proceed with claims of arrest without probable cause against Defendant Goodwin.

Further, it is undisputed that after Officer Kraft informed Goodwin that Plaintiff refused the breathalyzer, Goodwin had probable cause to continue to hold Plaintiff and charge him with that refusal, thus insulating Goodwin from any constitutional claim for Goodwin's decision to hold Plaintiff after that alleged refusal. Goodwin had probable cause to believe, based on Kraft's reading of the breathalyzer, that Plaintiff refused a breathalyzer in violation of New Jersey law, N.J. Stat. Ann. § 39:4–50.40a. *See Groman v. Twp. of Manalapan,* 47 F.3d 628, 635 n. 10 (3d Cir.1995) (probable cause existed when one officer told another officer crime occurred, precluding Fourth Amendment false arrest and imprisonment claims as to the second officer). Thus, the claims in Count Seven cannot proceed against Defendant Goodwin and he is entitled to summary judgment. [12]

#### 3. Claims against DRPA via 42 U.S.C. § 1983

**\*9** DRPA claims that the federal claims against it that Plaintiff levies via 42 U.S.C. § 1983 fail as a matter of law because 42 U.S.C. § 1983 does not permit vicarious liability claims. Plaintiff does not oppose this aspect of the Goodwin/DRPA motion for summary judgment. For the reasons explained below, the Court shall grant DRPA

2007 WL 1755970

summary judgment on all vicarious liability claims brought against it via 42 U.S.C. § 1983—Counts Two, Three, Five and Seven.

It is well-settled that local governmental units cannot be held civilly liable for violations of one's federal rights, pursuant to 42 U.S.C. § 1983, solely on the basis of a *respondeat superior* theory of liability, *Monell v. Dep't of Soc. Svcs.,* 436 U.S. 658 (1978); rather, a local government unit may be liable only if its policy or custom is the "moving force" behind a constitutional violation, *Sanford v. Stiles,* 456 F.3d 298, 314 (3d Cir.2006).

Thus,

a plaintiff seeking to impose liability on a municipality [ [13] ] under § 1983 [must] identify a municipal "policy" or "custom" that caused the plaintiff's injury. Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.

[*Bd. of County Comm'rs. v.] Brown,* 520 U.S. [397,]403–04 [ (1997) ] (citations omitted). In other words, "[a] plaintiff must identify the challenged policy, attribute it to the city itself, and show a causal link between execution of the policy and the injury suffered." *Losch v. Parkesburg,* 736 F.2d 903, 910 (3d Cir.1984).

*Adams v. City of Camden,* 461 F.Supp.2d 263, 267 (D.N.J.2006).

Plaintiff has not identified any DRPA policy or custom-either in the Complaint or in evidence presented in opposition to this summary judgment motion-that would support any finding of § 1983 liability on the part of the DRPA. For those reasons, the Court shall grant DRPA summary judgment on all § 1983 claims against it.

4. *State Law Claims Against Goodwin* [14]

Plaintiff asserts several tort claims against Defendant Goodwin pursuant to New Jersey law: excessive force (Count One), intentional infliction of emotional distress (Count Four) and false arrest/imprisonment (Count Six). The Court has already determined that Goodwin is entitled to summary

judgment on Count Six because he had probable cause to arrest and hold Plaintiff. Defendant Goodwin also asserts that he is entitled to summary judgment on Plaintiff's tort claims in Counts One and Four. Plaintiff's brief does not address Count Four, intentional infliction of emotional distress, therefore, the Court shall deem that aspect of Goodwin's motion to be unopposed and shall grant it. As explained below, however, the Court shall deny Officer Goodwin's motion for summary judgment on the remaining state law claim for excessive force, because he has not established good faith immunity under the New Jersey Tort Claims Act, N.J. Stat. Ann. § 53:3–3.

**\*10** Defendant Goodwin argues that he is entitled to immunity under the New Jersey Tort Claims Act, N.J. Stat. Ann. § 59:3–3, for all state tort claims asserted against him because he acted in good faith and was not reckless. *See* N.J. Stat. Ann. § 32:4–6 (DRPA police officers have same immunities under New Jersey law as state and municipal police officers). Plaintiff opposes, arguing that the Tort Claims Act does not apply to DRPA. In his reply brief, Goodwin acknowledges that the DRPA itself is not covered by the Tort Claims Act but argues that N.J. Stat. Ann. § 32:4–6 applies the immunities in the Tort Claims Act to DRPA *officers.*

The New Jersey Tort Claims Act ("the Tort Claims Act" or "the Act") is a comprehensive statute regulating the immunities and liabilities of New Jersey's public entities. One provision of the Act exempts public employees acting in good faith from civil liability for the harms they cause:"A public employee is not liable if he acts in good faith in the execution or enforcement of any law." N.J. Stat. Ann. § 59:3–3. However, the New Jersey Supreme Court has determined that the DRPA is not a "public entity" within the meaning of the Act and that, therefore, the Act does not apply to DRPA. *Bell v. Bell,* 83 N.J. 417 (1980).

Yet, the officers may have immunity that the entity itself does not possess. By its plain language, New Jersey's DRPA statute provides DRPA police officers, such as Defendant Goodwin, with the same immunity provided to other law enforcement officers under New Jersey law:

[W]hile acting within any other areas of the port district, police officers appointed by the Delaware River Port Authority shall have all of the

powers, including the right to carry firearms while on duty, and all of the immunities conferred by law on police officers or municipal police officers in the enforcement of the laws of the State of New Jersey and the Commonwealth of Pennsylvania....

N.J. Stat. Ann. § 32:4–6. This immunity was not a part of the original Act, but rather, became part of the statute when DRPA police powers were expanded in 1987. *See* Act of Jan. 8, 1987, ch. 209, 1986 N.J. Sess. Law Serv. 206 (West); S. Ind. Auth. Comm. St. on S. 2287 (N.J.1986)("The bill also confers on DRPA police officers acting within the port district all of the powers and immunities enjoyed by other police officers in New Jersey and Pennsylvania.")

Pennsylvania's DRPA statute contains an identical provision, 36 P .S. § 3504.1, but Pennsylvania tort law does not include good faith immunity from tort claims. Because DRPA is a bi-state agency, generally a law must be in force in both Pennsylvania and New Jersey before that law can apply to the agency. *See Bell,* 83 N.J. at 424 and *Del. Riv. & Bay Auth. v. N.J. Pub. Emp. Rel. Com.,* 112 N .J.Super. 160 (App.Div.1970), *aff'd o. b.* 58 N.J. 388, 277 (1971) ("Bi-state agencies exist by virtue of compacts between the states involved, entered into by their respective legislatures with the approval of Congress. When formed, they become a single agency of government of both states.... We fail to see how either state could enact laws involving and regulating the bi-state agency unless both states agree thereto. To sanction such practice would lead to discord and a destruction of the purposes for which such bi-state agencies are formed."). However, there is a strong argument that good faith immunity would be available to DRPA officers because (1) they are not the agency itself, to which the Tort Claims Act does not apply and (2) both states agreed, through enactment of N.J. Stat. Ann. § 32:4–6 and 36 P.S. § 3504.1, that any DRPA officer's conduct would be governed by the tort immunity available to that officer under the substantive tort law being applied to that officer's conduct. Thus, it follows, according to the law of both New Jersey and Pennsylvania, when a DRPA's officer's conduct occurs wholly within New Jersey, New Jersey tort law and its attendant immunities apply and when an officer's conduct occurs in Pennsylvania, Pennsylvania tort law, including its absence of good faith immunity, applies. This Court need not decide this issue, however, because even if one assumes that the defense of good faith immunity from

state tort claims is available to a DRPA officer acting in New Jersey, Officer Goodwin's conduct, as alleged in the evidence presented by Plaintiff, does not qualify for good faith immunity.

**\*11**  Good faith immunity is not available to Goodwin under the Tort Claims Act in this case because there is a material question of fact whether his failure to intervene to stop the use of excessive force was in good faith.

> The same "objective reasonableness" standard that is used to determine whether a defendant enjoys qualified immunity from actions brought pursuant to 42 U.S.C. § 1983 is used to determine questions of good faith arising under N.J.S.A. § 59:3–3. *See Lear v. Twp. of Piscataway,* 236 N.J.Super. 550, 553, 566 A.2d 557 (App.Div.1989). Therefore, the same uncertainty that prevents the Court from determining as a matter of law whether [the defendant police officer] enjoys qualified immunity with regard to [the plaintiff's] § 1983 claim also prevents the Court from determining as a matter of law whether the TCA [ (Tort Claims Act) ] shields him from liability for allegedly assaulting [plaintiff].

*Mantz v. Chain,* 239 F.Supp.2d 486, 508 (D.N.J.2002). Accordingly, the Court will deny summary judgment on Goodwin's claims of good faith immunity and will permit Plaintiff's state law claim for excessive force, Count One, to proceed.

### B. Motion for Summary Judgment by Defendants Gloucester City, Gloucester City Police Department, and Officers Iepson, Morrell, and Kraft

The Gloucester City Defendants also moved for summary judgment. For the reasons explained below [15], the Court shall deny summary judgment on Plaintiff's claim of unconstitutional excessive force against Officers Iepson and Morrell and shall grant summary judgment on that claim as to Officer Kraft; shall grant the motion for summary judgment

2007 WL 1755970

of the Gloucester City Police Department; shall grant the motion for summary judgment by these defendants as to any claim for intentional infliction of emotional distress, which aspect of the motion Plaintiff does not address; and shall deny the motion for summary judgment on Plaintiff's claims for damages related to his pain and suffering. [16]

### 1. *Excessive Force Claim Against Officers Iepson and Morrell* [17]

The facts viewed in the light most favorable to Plaintiff show that Gloucester City Officers Iepson and Morrell participated in an assault on Plaintiff in violation of his Fourth Amendment rights. To state a claim for excessive force under the Fourth Amendment, a plaintiff must show that defendants seized him with an unreasonable degree of force. *Kopec v. Tate,* 361 F.3d 772, 776 (3d Cir.2004).

The test of reasonableness under the Fourth Amendment is whether under the totality of the circumstances, "the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). Thus, if a use of force is objectively reasonable, an officer's good faith is irrelevant and any bad faith motivation on his part is immaterial. *See Estate of Smith,* 318 F.3d at 515; *Abraham [v. Raso],* 183 F.3d [279,] 289 [ (3d Cir.1999) ]. Factors to consider in making a determination of reasonableness include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he actively is resisting arrest or attempting to evade arrest by flight. *See Graham,* 490 U.S. at 396, 109 S.Ct. at 1872. A court in making a reasonableness assessment also may consider the possibility that the persons subject to the police action are violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time. *See Sharrar v. Felsing,* 128 F.3d 810, 822 (3d Cir.1997).

**\*12** *Kopec,* 361 F.3d at 776–77.

Defendants do not claim that the use of force in this incident was reasonable. [18] Rather, they argue that because Plaintiff is unable to identify which officers punched and tackled him, a reasonable jury could not find by the preponderance of the

evidence that either of them used excessive force. Plaintiff opposes, noting that although he might not have personal recollection of the names of the officers who assaulted him, other evidence in the case, including a police report filed by Officer Kraft indicating that Morrell and Iepson were involved in the incident (Ex. A to Pl.'s Opp. to Gloucester City Mot. for Summ. J), would permit a reasonable jury to find that these officers used excessive force. Further, Officer Goodwin testified that he witnessed the incident and that he would be able to identify the two officers who entered the cell with Plaintiff if he saw them.

In light of this evidence, the Court finds there is a genuine issue of material fact that precludes summary judgment on Plaintiff's excessive force claim against Defendants Morrell and Iepson. [19] Furthermore, even if Plaintiff is ultimately able to show that both officers were present but only one used excessive force, liability could attach to both because clearly, on Plaintiff's version of facts, each officer had a reasonable opportunity to intervene to prevent the other from using force against Plaintiff. Plaintiff may proceed with his excessive force claims against Officers Morrell and Iepson and their motion for summary judgment on that claim is denied.

### 2. *Section 1983 Liability of Municipal Defendants*

Defendants Gloucester City and the Gloucester City Police Department argue that all claims against them brought via 42 U.S.C. § 1983 (Counts Two, Three, Five and Seven) are barred because those claims impermissibly rely on a theory of *vicarious* liability. Plaintiff opposes and claims that the Gloucester City Police Department can be held liable for the actions of its officers because the Department's supervisors tolerated similar misconduct and maintained an inadequate internal investigation system. The Court has already determined that there is no legal basis for the underlying claims in Counts Three, Five and Seven; accordingly, the municipal defendants cannot be derivatively liable on those counts. The Court shall discuss Gloucester City's liability for Count Two (excessive force) below.

However, the Court will grant the motion for summary judgment as to all claims against the Gloucester City Police Department. In New Jersey a municipal police department is not an entity separate from the municipality, N.J. Stat. Ann. § 40A:14–118 (municipal police department is "an executive and enforcement function of municipal government"); therefore, the Gloucester City Police Department is not a proper defendant in this action for any of the claims, and is

entitled to judgment as a matter of law on all counts of the Complaint, *see Adams v. City of Camden,* 461 F.Supp.2d 263, 266 (D.N.J.2006).

**\*13** As to Gloucester City, although it is well-settled that a city cannot be liable for the acts of its employees under § 1983 solely because of that employment relationship, when the employee's act is the result of a municipal policy or custom, the municipality can be held liable for the resulting constitutional violations:

> There are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983. The first is where "the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy." *Bryan County,* 520 U.S. at 417 (Souter, J., dissenting). The second occurs where "no rule has been announced as policy but federal law has been violated by an act of the policymaker itself." *Id.* Finally, a policy or custom may also exist where "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.' " *Id.* at 417–18 (quoting *City of Canton, Ohio v. Harris,* 489 U.S. 378, 390, 103 L.Ed.2d 412, 109 S.Ct. 1197 (1989); *see also Berg [v. Cty. of Allegheny],* 219 F.3d [261,] 276 [ (3d Cir.2000) ](holding that plaintiff must "demonstrat[e] that the municipal action was taken with 'deliberate indifference' to its known or obvious consequences").

*Natale v. Camden County Corr. Facility,* 318 F.3d 575, 584 (3d Cir.2003). That third situation, deliberate indifference, is the basis for Plaintiff's excessive force claim against Gloucester City.

Plaintiff has alleged that Gloucester City fails to properly investigate and/or discipline officers accused of using excessive force. Plaintiff comes forward with evidence showing that in twenty five years, no officer has been fired for a disciplinary reason. The leadership of the Gloucester City police department testified that they have no knowledge or recollection of an internal investigation of a complaint of excessive force that resulted in a finding of excessive force.[20]

In the face of this evidence, and viewing it in the light most favorable to Plaintiff, a reasonable jury could find that the City has a policy or custom of ignoring unconstitutional excessive force in the police department such that it is deliberately indifferent to excessive force in violation of the Fourth Amendment. *See Bd. of County Comm'rs v. Brown,* 520 U .S. 397, 407–08 (1997). Therefore, the Court shall deny the motion for summary judgment on Count Two; Plaintiff may proceed with his § 1983 claim against the City for excessive force. [21]

### 2. *Pain and Suffering*

**\*14** Plaintiff's excessive force claims also can be construed as tort claims. Therefore, the Court must determine whether Officers Iepson and Morrell are exposed to claims for pain and suffering under New Jersey law.

The Tort Claims Act, which clearly applies to Officers Iepson and Morrell, limits the availability of damages related to a plaintiff's pain and suffering:

> No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00. For purposes of this section medical treatment expenses are defined as the reasonable value of services rendered for necessary surgical, medical and dental treatment of the claimant for such injury, sickness or disease, including prosthetic devices and ambulance, hospital or professional nursing service.

N.J. Stat. Ann. § 59:9–2(d).

Defendants argue that because their medical expert found that Plaintiff's injuries were not permanent, the Court should

grant summary judgment. This argument is inadequate on a motion for summary judgment. The Court must view the facts in the light most favorable to Plaintiff and he has presented evidence, substantiated by medical evaluation and testing, that he suffered a shoulder fracture and that he has permanent shoulder pain and impaired functionality in his range of motion from his injured shoulder. (Ex. G to Pl.'s Opp. to Gloucester Defs.' Mot. for Summ. J.) (Dr. Gleimer's Rpt.). The Court cannot determine at this stage, therefore, that Plaintiff's injuries fall outside the requirements of this statute. As such, the Court will deny summary judgment on Plaintiff's pain and suffering claims.

**V. CONCLUSION**

For the foregoing reasons, the Court shall grant the motions for summary judgment in part and deny them in part, consistent with this Opinion. The only claims remaining for trial, therefore, are the claims of excessive force arising under New Jersey law and the Fourth Amendment of the Constitution as against Defendants Patrolman Larry Goodwin, Officers Iepson and Morrell, and deliberate indifference thereto by the City of Gloucester, which shall be scheduled for trial shortly. The accompanying Order shall be entered.

**ORDER**

This matter comes before the Court on motions for summary judgment, pursuant to Fed.R.Civ.P. 56 by Defendants Delaware River Port Authority and Patrolman Larry Goodwin [Docket Item 23] and by Defendants Gloucester City, Gloucester City Municipal Police Department, Officer Iepson, Officer Morrell and Officer Kraft [Docket Item 28]. The Court has considered the submissions of the parties; for the reasons stated in the Opinion of today's date; and for good cause shown;

IT IS this **19th** day of **June, 2007** hereby

**\*15** ORDERED that the motions for summary judgment shall be granted in part and denied in part as follows:

The Court shall **DENY** summary judgment on Plaintiff's claims against:

1. Defendant Goodwin under Counts One and Two for failure to intervene to prevent the use of excessive force, under New Jersey tort and federal constitutional law;

2. Gloucester City for deliberate indifference to excessive force;

3. Defendants Iepson and Morrell for New Jersey tort and federal constitutional claims of excessive force;

4. All Defendants except DRPA for Plaintiff's claims of pain and suffering.

The Court shall **GRANT** summary judgment in favor of:

5. Defendant Goodwin for all other claims against him;

6. Defendant DRPA for all claims against it;

7. All Defendants for claims of false arrest, false imprisonment, and filing false police reports;

8. Defendant Kraft for excessive force;

9. Defendant Gloucester City for punitive damages;

10. Defendant Gloucester City Police Department for all claims against it; and

11. All Defendants for claims of intentional infliction of emotional distress.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 1755970

**Footnotes**

1    The facts set forth here are those facts in Defendants' statements of undisputed fact that are actually not in dispute and those facts set forth by Plaintiff in opposition.

2    Plaintiff claims he was handcuffed. Goodwin claims he was in the process of handcuffing Plaintiff and only got one cuff on him by the time Plaintiff lunged at the officers and swung one arm free from Goodwin's hold.

D'Arrigo v. Gloucester City, Not Reported in F.Supp.2d (2007)

2007 WL 1755970

In Plaintiff's alternative statement of facts, he refers to Goodwin's testimony about this lunge, but does not indicate whether Goodwin's account is correct. However, as the Court must view the facts in the light most favorable to Plaintiff at the summary judgment stage, the Court will assume that Plaintiff's account of events is the true one and that he was handcuffed. In other words, Defendants Goodwin and DRPA have failed to meet their burden of showing that this material fact is undisputed.

3   Of course 42 U.S.C. § 1983 does not create substantive rights; rather it provides a vehicle for vindicating rights protected by the Constitution or laws of the United States. *Baker v. McCollan,* 443 U.S. 137, 144, n. 3 (1979). "A prima facie case under § 1983 requires a plaintiff to demonstrate: (1) a person deprived him of a federal right; and (2) the person who deprived him of that right acted under color of state or territorial law." *Groman v. Twp. of Manalapan,* 47 F.3d 628, 633 (3d Cir.1995) (citing *Gomez v. Toledo,* 446 U.S. 635, 640 (1980)).

4   In the Complaint, Plaintiff's constitutional claims are always alleged to be violations of both the federal and New Jersey Constitutions, although Plaintiff makes no reference to which provisions of New Jersey's Constitution were allegedly violated. Of course, violation of Plaintiff's state constitutional rights would not entitle him to bring an action via 42 U.S.C. § 1983 and therefore the Court considers no state constitutional claim.

5   Plaintiff's opposition to Goodwin and DRPA's motion for summary judgment does not address Goodwin's argument that he is entitled to summary judgment on Count Three because even on Plaintiff's version of facts, no harm resulted to Plaintiff from the police report. Because 42 U.S.C. § 1983 claims are cognizable only when there has been a harm to a federally-protected right, *see, e.g., Paul v. Davis,* 424 U.S. 693 (1976) (defamation is not cognizable deprivation of liberty or property) and *Landrigan v. City of Warwick,* 628 F.2d 736, 745 (1st Cir.1980) ("the mere filing of the false police reports, by themselves and without more, did not create a right of action in damages under 42 U.S.C. § 1983"), and because this aspect of the motion is unopposed, the Court shall grant Goodwin's motion for summary judgment as to Count Three. Indeed, Plaintiff has not explained how his right to due process was affected by this allegedly false report, which Plaintiff does not claim caused him any deprivation of liberty or property.

Similarly, the Court must grant the motion for summary judgment by the Gloucester City Defendants on Plaintiff's identical claim against them for filing a false police report.

Plaintiff's only argument is that filing a police report constitutes a crime under New Jersey law and that DRPA and Gloucester City reports differ so substantially that one must be false. Those facts, however, are irrelevant to Plaintiff's § 1983 claim unless he suffered some cognizable harm, as explained above. Plaintiff has not alleged that a false police report has deprived him of liberty or property that would entitle him to pursue a § 1983 action against these Defendants for filing such a false police report, also in Count Three.

6   In *Simonini,* the New Jersey Supreme Court explained that where a disputed fact would be material to a judge's determination whether a government official's conduct was reasonable, the court should allow the jury to determine that disputed fact:

That means the judge must decide whether probable cause existed, and if not, whether the executive official could reasonably have believed in its existence. Where historical or foundational facts that are critical to those determinations are disputed, the jury should decide those disputed facts on special interrogatories. The jury's role "should be restricted to the who-what-when-where-why type of historical fact issues." *Cottrell [v. Caldwell ],* 85 F.3d [1480,] 1488 [ ( 11th Cir.1996]. Based on the jury's factual findings, the trial judge must then make the legal determination of whether qualified immunity exists.

163 N.J. at 359.

7   As neither Goodwin nor Plaintiff disputes that the assault constituted a seizure, the Court will assume that is so for purposes of the DRPA/Goodwin motion.

8   Plaintiff's argument that Goodwin should have intervened to stop the verbal taunts is beside the point; failure to intervene only amounts to a constitutional violation if the act in which the plaintiff had an opportunity to intervene was itself unconstitutional. *Smith v. Mensinger,* 293 F.3d 641, 650 (3d Cir .2002). As explained

below, the Court finds that viewing the facts in the light most favorable to Plaintiff, a reasonable jury could find that the physical altercation amounted to excessive force in violation of Plaintiff's constitutional rights.

9   In this case, the affirmative acts that Defendant Goodwin took were arresting Plaintiff and transporting him to the Gloucester City police department so Plaintiff could provide a breath sample. First, the harm those officers allegedly caused Plaintiff was neither foreseeable nor a direct result of Goodwin's taking Plaintiff to the Gloucester City police station. Importantly, Plaintiff has provided no evidence that incidents like these occurred in the past at that police station. There is no evidence that any action by Goodwin could be linked "fairly direct[ly]" to the assault—the assault was not the foreseeable result of the arrest or the transport to the police headquarters. Second, Plaintiff points to no evidence indicating Goodwin took him to the police department in willful disregard for his safety. Nor does Goodwin's decision to test the breath of a suspected driver under the influence of alcohol "shock the conscience," even assuming that Plaintiff passed some of the road-side sobriety tests, as he claims. *See Schieber v. City of Philadelphia,* 320 F.3d, 409 417 (3d Cir.2003)(explaining that liability will not attach unless conduct "shocks the conscience"). It is undisputed Plaintiff drank at least three beers and was observed driving at an excessive speed, so it was not unreasonable to take him in for a breathalyzer test. Even assuming the third and fourth elements of the state-created danger theory are met on Plaintiff's version of events, it cannot fairly be said that Goodwin affirmatively acted to cause the danger of the assault. *See Kneipp,* 95 F.3d at 1374. Thus, Goodwin cannot be liable under the state-created danger theory.

10  For the same reasons, the Court shall grant summary judgment to the Gloucester City defendants on this claim.

11  This alone created probable cause for an arrest and entitles Goodwin to summary judgment on Count Seven. [T]he standard of probable cause "applies to all arrests, without the need to 'balance' the interests and circumstances involved in particular situations." *Dunaway v. New York,* 442 U .S. 200, 208[ ](1979). If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.

*Atwater v. City of Lago Vista,* 532 U.S. 318, 354 (2001).

12  Because Goodwin also had probable cause under New Jersey law and because probable cause is an absolute defense to Plaintiff's New Jersey tort claims of false arrest and false imprisonment in Count Six, *see Wildoner v. Bor. of Ramsey,* 162 N.J. 375 (2000), the Court shall grant Goodwin summary judgment on the claims asserted in Count Six. Because DRPA's liability under Count Six is premised on a theory of vicarious liability, DRPA is also entitled to summary judgment on those claims.

13  DRPA concedes that it should be treated like a municipality, and not like an arm of the state, for purposes of 42 U.S.C. § 1983.

14  Goodwin argues that if the Court dismisses all § 1983 claims against him, then it should also decline to exercise supplemental jurisdiction over the state law claims against him. *See* 28 U.S.C. § 1367(c). Because the Court has permitted Plaintiff's claim of unconstitutional excessive force to proceed against Goodwin based on his failure to intervene, the Court need not address that jurisdiction argument.

15  The Court has already granted this motion insofar as it seeks to preclude Plaintiff's federal claims against the Gloucester City defendants for allegedly filing a false police report. *See* n. 4, *supra*. In addition, the Court has granted Defendant Goodwin summary judgment on Plaintiff's claims of false arrest and imprisonment because there was probable cause to arrest Plaintiff. Insofar as Plaintiff asserts the identical claims against the Gloucester City Defendants for false arrest and imprisonment based on their complicity in Goodwin's alleged misconduct, the Gloucester City defendants are also entitled to summary judgment.

16  Gloucester City also argues that claims against it for punitive damages must be dismissed. Plaintiff does not oppose that aspect of the motion and New Jersey law does not appear to permit such damages against a public entity. N.J. Stat. Ann. § 59:9–2(c). Therefore, the Court shall grant that aspect of the motion for summary judgment.

17  Plaintiff concedes that Officer Kraft did not use excessive force against him. In addition, Plaintiff has come forward with no evidence indicating that Kraft had any opportunity to intervene in the assault by the other

D'Arrigo v. Gloucester City, Not Reported in F.Supp.2d (2007)

2007 WL 1755970

officers. Therefore, the Court shall grant summary judgment for Officer Kraft on Plaintiff's claims against him for unconstitutional excessive force and for tortious assault.

18     However, the Court notes that on Plaintiff's version of facts there is no reasonable justification for the punches to Plaintiff's chest that these officers allegedly inflicted.

19     Indeed, the Gloucester City Defendants highlight this as a disputed fact. (Gloucester Br. at 8.) That dispute is material and precludes summary judgment on Plaintiff's excessive force claim.

       In addition, in the face of the police report, the absence of evidence from Officers Morrell and Iepson might persuade a reasonable jury that these defendants are culpable; the officers have not provided any evidence indicating that they were not involved in the incident, such as sworn affidavits. Of course, even if they had denied involvement, summary judgment would be inappropriate because there is a genuine issue of material fact.

20     By way of example, there were investigations into two incidents of excessive force in 2005. (Crothers Dep. at 44). There is no evidence on how many excessive force complaints were received. There were investigations into fifteen new complaints against police officers in 2001, seven in 2002, nine in 2003, and sixteen in 2004, with no indication whether they all related to excessive force or how many complaints were received. (*Id.* at 48–50.) Three of those investigations involved prior excessive force complaints against Officer Iepson, one against Officer Kraft, and at least two against Officer Morrell. (*Id.* at 53.) At trial, Plaintiff will have the burden of proving that there was, prior to January 6, 2004, (1) a pattern of actual instances of excessive force by members of the Gloucester City Police Department, (2) which were reported to, or otherwise known by, the Department's leadership, (3) for which no disciplinary measures were taken, thus exhibiting deliberate indifference to the rights of persons to be free from the use of excessive police force.

21     In Count Nine, Plaintiff explicitly asserts claims against the City for failure to train and supervise the defendant Gloucester City police officers. This seems to be his method for articulating the basis of the City's liability for the officers' excessive force, which the Court recognizes here as viable under the deliberate indifference theory.

---

**End of Document**                           © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT

# C

📙 KeyCite Yellow Flag - Negative Treatment

Distinguished by Benhaim v. Borough of Highland Park, D.N.J., January 6, 2015

2013 WL 394151
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
D. New Jersey.

Salvatore DAY, et al., Plaintiffs,
v.
JACKSON TOWNSHIP, et al., Defendants.

Civil Action No. 10–4011 (MAS)(TJB).
|
Jan. 30, 2013.

**Attorneys and Law Firms**

Thomas J. Mallon, Mallon & Tranger, Freehold, NJ, for Plaintiffs.

Jared James Monaco, Thomas E. Monahan, Gilmore & Monahan PA, Peter J. Van Dyke, Kelaher, Van Dyke & Moriarty, Toms River, NJ, for Defendants.

**MEMORANDUM OPINION**

SHIPP, District Judge.

*1 On May 25, 2012 Jackson Township ("Jackson" or the "Township"), Chief of Police Matthew Kunz ("Chief Kunz") and Sergeant John Decker ("Sgt.Decker") (collectively, the "Supervisor Defendants"), jointly filed a Motion for Summary Judgment. (Supervisor Defs.' Br., ECF No. 26–1.) On the same day, individual police officers Joseph Candido ("Candido"), Michael Cavallo ("Cavallo"), James Reynolds ("Reynolds"), Gregory Vidalis ("Vidalis"), and Detective Scott Conover ("Det.Conover") (collectively, the "Officer Defendants"), also filed a Motion for Summary Judgment. (Officer Defs.' Br., ECF No. 25–1.) Plaintiffs filed opposition on July 2, 2012, (Pls.' Opp'n, ECF No. 32), and July 6, 2012, [1] (Pls.' Sealed Opp'n, ECF No. 34). The Supervisor Defendants filed a Reply Brief on July 16, 2012. (Supervisor Defs.' Reply, ECF No. 36.) Oral argument on the matter was held on January 25, 2013.

## I. *Background*

### A. Factual Background

On December 20, 2009, Officers Vidalis, Candido, Reynolds, and Cavallo responded to 20 Hemlock Hill Road, Jackson, New Jersey, the home of Plaintiffs' neighbor, Gary Jeter, on a report of a dispute. (Officer Defs.' Br. 6 ¶ 16.) As a result of this dispute, the officers proceeded to 77 Hemlock Hill Road, the home of the Plaintiffs Salvatore and Joanne Day. (*Id.* ¶ 17.) As Officer Candido exited his truck, the Plaintiffs began yelling at the officers from the front door of Plaintiffs' residence. (*Id.* ¶ 18.) Plaintiffs deny that they were yelling at the Officer Defendants, rather, Plaintiffs contend that Salvatore Day opened the door and advised the officers that "if this has to do with my neighbor, go and get my neighbor and bring him here and we all can discuss this." (Pls.' Opp'n 6 ¶ 6.) Officer Candido advised Salvatore Day that he needed to calm down and that the officers needed to speak with him. (Officer Defs.' Br. 7 ¶ 19.) Plaintiffs responded that only one officer would be allowed into his residence. (*Id.* ¶ 20.) Officer Candido advised Plaintiffs that they could not limit the number of officers, and in response, Salvatore Day began to verbally assault the Officer Defendants. (*Id.* ¶ 21.) Plaintiffs deny that the Officer Defendants told Salvatore Day to calm down and that Salvatore Day told the officers that only one officer could enter his home. (Pls.' Opp'n 3 ¶¶ 20–21.)

Plaintiffs' two dogs came to the door and Officer Candido instructed Salvatore Day to place the dogs in a secure location so that he could speak with him. (Officer Defs.' Br. 7 ¶¶ 24–25.) Plaintiffs contend that once the dogs came to the front door, Candido ordered Salvatore Day to "get the goddamn dogs away from the doorway." (Pls.' Opp'n 6 ¶ 7.) Both sides agree that the front door then closed, although they disagree whether the door was slammed, (Officer Defs.' Br. 7 f 26), or if it was simply shut, (Pls .' Opp'n 6 ¶ 8.)

The Officer Defendants then allege the following set of events: 1) Salvatore Day allegedly continued to yell and be irate toward Officer Candido after the door was subsequently opened and hit Candido in the chest. (Officer Defs.' Br. 7–8 ¶ 27.) 2) Candido then attempted to arrest Salvatore Day and when Candido took control of Salvatore Day's arm Officer Candido was pulled into the home. (*Id.* at 8 ¶¶ 28–29.) 3) Officers Cavallo and Reynolds followed Officer Candido into the home and attempted to gain control of Salvatore Day's other arm. (*Id.* ¶ 31.) 4) The officers eventually were able to restrain and gain control of Salvatore Day and were able to handcuff him. (*Id.* ¶¶ 32–34.) Plaintiffs' son, Salvatore Day,

Case 1:14-cv-05519-JRS-PAC   Document 426   Filed 03/14/22   Page 65 of 82 PageID: 16119
Day v. Jackson Tp., Not Reported in F.Supp.2d (2013)
2013 WL 394151

Jr., was also arrested after advancing "aggressively toward the officers" and shouting expletives. (*Id* . ¶¶ 35–40.)

**\*2** Plaintiffs contend a different set of events transpired: Once Joanne Day removed the dogs, the Officer Defendants forcefully opened the door, entered the home, and "attacked" Salvatore Day. (Pls.' Opp'n 7 ¶¶ 9–14.) The "attack" included various applications of physical force to Salvatore Day's face, back and neck. (*Id.* ¶¶ 10–14.)

Both Parties agree that Salvatore Day was eventually restrained by the Officer Defendants and placed into a police car and transported to the Jackson Township Police Station. (Officer Defs.' Br. 10 ¶ 50.) Plaintiffs, however, allege that Salvatore Day was "dragged down his snow covered driveway wearing only wet socks and thrown in the police car." (Pls.' Opp'n 7 ¶ 18.)

Neighbors of Plaintiffs, including Suzy Johnson and her husband Bruce Johnson, witnessed portions of the incident. (Officer Defs.' Br. 9–10 ¶¶ 44–52.) When deposed, the Johnsons testified that the incident happened very quickly. (*Id.* 10 ¶¶ 48, 51.) Neither of the Johnsons saw any of the Officer Defendants "punch or kick" Salvatore Day. (*Id.* 10 ¶¶ 49, 52.)

Plaintiffs agree that Salvatore Days' "claims of excessive force are limited to the incident with the [Officer Defendants] at [their] home." (Supervisor Defs.' Br. 1 ¶ 7; Pls.' Opp'n to Supervisors 2 ¶¶ 1–9.)

Salvatore Day was charged with burglary, terroristic threats, and aggravated assault on a police officer with no weapon and resisting arrest. (Officer Defs.' Br. 10 ¶ 57.) He was admitted into New Jersey's Pretrial Intervention Program ("PTI") in order to avoid prosecution for the charges. (*Id.* 11 ¶ 58.)

While at the Jackson Township Police Station, Salvatore Day was treated by EMS for a cut that, according to Plaintiffs, was sustained from being slammed into the wall. (Pls.' Opp'n 8 ¶ 21.) Plaintiffs state that Salvatore Day was diagnosed with the following injuries: cervical, thoracic and lumbosacral sprains; disc herniation at C3–4; disc bulges at C4–5, C5–6, and C6–7; cervical radiculopathy, and status post C4 transforaminal epidural injections. (*Id.* 123.)

Plaintiffs' Opposition to the Supervisor Defendants' Motion also contains information regarding the internal affairs policies of the Jackson Police Department. (Pls.' Opp'n

to Supervisors 3–5 ¶¶ 7–15.) Fifteen (15) excessive force internal affairs investigations took place between 2005 and 2010, none of which resulted in a finding that an officer used excessive force. (*Id.* 3 ¶¶ 7–8 .) There is also additional information regarding the use of force and excessive force complaints lodged against Officers Reynolds, Conover and Candido. (*Id.* 4–7 ¶¶ 10–29.) Reynolds, Candido and Vidalis filed a total of thirty-five (35) use of force reports between 2007 through 2010.[2] (*Id.* 4–5 ¶¶ 10–13.) Conover and Reynolds were the subject of an internal affairs investigation regarding alleged use of excessive force stemming from a common incident. (*Id.* 5 ¶¶ 16–26.) Both officers were exonerated as to the excessive force complaint; charges against Conover for use of expletives and lack of demeanor were sustained. (*Id.* 6 ¶ 23.) Candido was also the subject of an internal affairs investigation regarding alleged use of excessive force. (*Id.* 7 ¶¶ 27–29.) The complaint was deemed "unfounded." (ECF No. 34–10.)

**\*3** Plaintiffs' filed an internal affair complaint regarding the use of force at their home. (Pls.' Opp'n to Supervisors 7–11 ¶¶ 30–62.) It was investigated by Captain Newman. (*Id.* 7 ¶ 32.) Plaintiffs allege the investigation was lacking because Plaintiffs and the accused officers were never interviewed by Captain Newman, as required by Jackson Police Guidelines and the Attorney General Guidelines. (*Id.* 10–11 ¶¶ 52–59.) Captain Newman exonerated the Officer Defendants. (*Id.* 11 ¶ 60.) The investigation was reopened after Plaintiffs filed the present lawsuit. (*Id.* ¶¶ 61–62.)

Plaintiffs' opposition to the Supervisor's Motion also includes various information about allegedly lax training policies regarding use of force on the part of the Jackson Police Department. (*Id.* 12–19 ¶¶ 63–97.) Plaintiffs also refer to three additional lawsuits filed against the Township or its officers related to excessive force, all of which were filed by Plaintiffs' Counsel. (*Id.* 18–19 ¶¶ 90–97.)

## B. Plaintiffs' Amended Complaint

Plaintiffs' first count is a 42 U.S.C. § 1983 claim alleging Use of Excessive Force (hereinafter "Excessive Force"). It names Defendants Candido, Cavallo, Reynolds, Vidalis and/ or Fictitious Defendants John Does 1–5 and alleges that Salvatore Day sustained bodily harm and was deprived of his right to be secure in his person against unreasonable seizures as a result of the unlawful physical abuse by the aforementioned Defendants. (Am. Compl. 4–5 ¶¶ 2–3, ECF No. 15.)

The second count names Defendants Candido, Cavallo, Reynolds, Vidalis and/or Fictitious Defendants John Does 1–10 and alleges Failure to Intervene in the assault and arrest of Salvatore Day, which allegedly infringed on his Fourth and Fourteenth Amendment rights. Plaintiffs claim that Salvatore Day suffered physical injury, medical expenses, lost wages and mental anguish in connection with said deprivation of constitutional rights. (Am. Compl. 5–6 ¶¶ 3–6.)

Count three names Defendants Sergeant Decker, Conover, Candido, Cavallo, Reynolds, Vidalis and/or Fictitious Defendants John Does 1–10 and is a 42 U.S.C. § 1983 Abuse of Process claim. It alleges that the aforementioned Defendants "arrested [Salvatore Day]; caused bail to be posted; denied Plaintiff[s] the opportunity to obtain the bail amount from his brother and pressured [Joanne Day] to use a bail bonds company of Defendant's choosing." Plaintiffs also allege that Defendants made false statements of fact, or otherwise misrepresented the facts of their encounter with the Salvatore Day, which lead to the initiation of the criminal prosecution against Salvatore Day. (Am. Compl. 6–7 ¶¶ 2–5.)

Count four names Sgt. Decker, Det. Conover, and Fictitious Defendants John Doe 2 and John Does 6–10. Plaintiffs claim Supervisory Liability for the actions of the subordinate officers, which allegedly infringed upon Plaintiffs' Fourth and Fourteenth Amendment rights. (Am. Compl. 8 ¶¶ 2–5.)

 **\*4** Count five names the Jackson Township Police Department, Chief Kunz and Fictitious Defendants John Does 6–10 and is captioned "Section 1983 Unlawful Policy, Custom, Practice/Inadequate Training ." It alleges that Jackson, Chief Kunz and/or John Does 6–10 failed to properly train Defendants Kunz, Decker, Conover, Candido, Cavallo, Reynolds, Vidalis and Fictitious Defendants John Does 1–10 and thereby approved of the unlawful conduct of the aforementioned Defendants. (Am. Compl. 8–11 ¶¶ 2–10.)

The sixth count is a § 1983 Demand for Prospective Injunctive Relief. It alleges that Plaintiffs are entitled to injunctive relief against all Defendants. This includes:

a) A permanent restraining order enjoining Defendants from "encouraging, teaching, promoting or training" other Jackson police officers from "falsely arresting, maliciously prosecuting, maliciously abusing process, and/or using excessive force against citizens and/or arrestees."

b) An order compelling Jackson to take corrective measures against the practices listed in part (a).

c) An order compelling Jackson to provide regular training sessions to its officers.

d) An order compelling Jackson to take action against officers who engage in unlawful activity.

e) An order permanently restraining Defendants Candido, Cavallo, Reynolds, Vidalis and Fictitious Defendants from "arresting citizens without probable cause, physically abusing and using excessive force against citizens and/or arrestees."

f) An order permanently restraining Jackson from employing Defendants Candido, Cavallo, Reynolds, Vidalis in a capacity whereby they would be able to effectuate an arrest; clerical "desk duty" is the only role Plaintiffs feel these officers are fit for.

g) Any other relief the Court deems proper and just.

(Am. Compl. 11–12 ¶¶ 1–2.)

Count seven alleges a supplemental state law claim of assault and battery against Defendants Candido, Cavallo, Reynolds, Vidalis and Fictitious Defendants John Does 1–5. Salvatore Day claims that the Defendants physically injured him without justification and as a result, he allegedly suffered permanent physical and emotional injuries. (Am. Compl. 12–13 ¶¶ 2–5.)

Count eight alleges the common law claim of abuse of process and names Defendants Candido, Cavallo, Reynolds, Vidalis and Fictitious Defendants John Does 1–5. It alleges that the Defendants maliciously used a legal process to accomplish an ulterior motive, for which Salvatore Day allegedly suffered. (Am. Compl. 13–14 ¶¶ 2–7.)

The ninth count alleges a violation of the New Jersey Civil Rights Act ("NJCRA"). It names Defendants Candido, Cavallo, Reyolds, Vidalis and Fictitious Defendants, alleging that through their excessive force and abuse of process, they deprived Salvatore Day of his rights under the NJCRA. N.J. Stat. Ann. § 10:6–1 et. seq. (Am. Compl. 14–15 ¶¶ 2–3.)

Day v. Jackson Tp., Not Reported in F.Supp.2d (2013)

2013 WL 394151

The tenth count is an intentional infliction of emotional distress ("IIED") claim and it names Defendants Candido, Cavallo, Reynolds, Vidalis and John Does 1–5. It alleges that the actions of these Defendants in their use of excessive force and assault and battery of Salvatore Day were "intentional, extreme and outrageous." (Am. Compl. 15–16 ¶¶ 2–5.)

**\*5** The eleventh count is a negligence claim and names Defendants Candido, Cavallo, Reynolds, Vidalis and John Does 1–5. It alleges that the Defendants had a duty to Salvatore Day to "not expose him to an unreasonable risk of injury" and that Defendants breached that duty, which was the proximate cause of his injuries in violation of New Jersey common law. (Am. Compl. 16 ¶¶ 2–7.)

The twelfth count is a derivative loss of consortium claim on behalf of Salvatore Day's wife, Joanne Day. (Am. Compl. 17 TO 1–3.)

**II. *Legal Standard***

Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A district court considers the facts drawn from the "materials in the record, including depositions, documents, electronically stored information, affidavits ... or other materials" and must "view the inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion." Fed.R.Civ.P. 56(c)(1) (A); *Curley v. Klem,* 298 F.3d 271, 276–77 (3d Cir.2002) (internal quotations omitted). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). More precisely, summary judgment should be granted if the evidence available would not support a jury verdict in favor of the non-moving party. *Id.* at 248–49. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

**III. *Analysis***

As an initial matter, the Court makes note of the Parties opinions as set forth on the record during oral argument. First, and as consented to by Plaintiffs' Counsel on the record, Plaintiffs have consented to the dismissal their § 1983 and Common Law Abuse of Process Claims. Therefore, Count Three and Count Eight are dismissed with prejudice. Next, and as also consented to by Plaintiffs' Counsel, Plaintiffs' Count Four, alleging a § 1983 Supervisory Claim against Defendants Decker and Conover, is also dismissed with prejudice. Finally, with Plaintiffs' consent, Count Eleven alleging negligence will also be dismissed with prejudice.

**A. The Officer Defendants' Motion for Summary Judgment**

**1) *Heck* does not Bar Plaintiffs' Claims**

The Officer Defendants argue that Salvatore Day's entrance into PTI for his resisting arrest and aggravated assault on a police officer charges bars his § 1983 claim for excessive force and failure to intervene. *See Heck v. Humphrey,* 512 U.S. 477, 486–87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). The Court declines to adopt the Officer Defendants' position.

**\*6** *Heck* held that a § 1983 claim is generally only permissible if termination of a plaintiff's underlying criminal charges were resolved in his favor. *Heck,* 512 U.S. at 486–47 ("a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus...."); *Hen drix v. City of Trenton,* No. 06–3942(FLW), 2009 WL 5205996, at \*3 (D.N.J. Dec.29, 2009) ("Further, a plaintiff generally cannot maintain a § 1983 action unless the 'termination of the prior criminal proceeding [was resolved] in favor of the accused.' ") (alteration in original) (quoting *Gilles v. Davis,* 427 F.3d 197, 210 (3d Cir.2005)). A § 1983 plaintiff may proceed, however, even if his underlying criminal case was terminated in a manner unfavorable to him, "if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against [him]...." *Heck,* 512 U .S. at 487.

2013 WL 394151

Regarding favorable termination, the Court must determine whether Salvatore Day's entrance and completion of PTI should be considered an unfavorable outcome. Although the Third Circuit has not ruled in a published opinion on this matter, the Court holds that entrance into and completion of PTI should be considered an unfavorable termination of Salvatore Day's underlying criminal charges.

See 📄 *Fernandez v. City of Elizabeth,* 468 F. App'x 150, 154 (3d Cir.2012) (holding that PTI is an unfavorable termination); 📄 *Gilles v. Davis,* 427 F.3d 197, 211 (3d Cir.2005) (plaintiff's entrance into Pennsylvania's Accelerated Rehabilitative Disposition Program, which *Fernandez* found to be substantially similar to PTI, held to be an unfavorable termination and triggering the *Heck* analysis); *Hendrix,* 2009 WL 5205996, at *5 ("participation in New Jersey's PTI program does not meet the favorable termination requirement of *Heck*").

The essential inquiry in this case, therefore, is whether a finding that the Officer Defendants used excessive force would necessarily invalidate or be inconsistent with Salvatore Day's entrance into PTI regarding his resisting arrest and aggravated assault on a police officer. Cases within the District and Circuit have held that a conviction/plea/PTI enrollment resulting from an assault on a police officer and/or resisting arrest are not an absolute bar to a plaintiff's 📄 § 1983 excessive force claim because a police officer can still be found to have used excessive force in such a situation.

In *Nelson v. Jashurek,* the Third Circuit held that the district court's grant of the defendant's motion to dismiss plaintiff's 📄 § 1983 excessive force claim because plaintiff had been convicted of resisting arrest was improper. 📄 109 F.3d 142, 145 (3d Cir.1997). The *Nelson* Court stated that a criminal defendant convicted of resisting arrest "was not necessarily barred from bringing a 📄 section 1983 excessive force action ... because 'it is possible for a finding that [the defendant] was resisting arrest to coexist with a finding that the police used excessive force to subdue him.' " 📄 *Id.* at 146 (quoting 📄 *Simpson v. City of Pickens,* 887 F.Supp. 126, 129 (S.D.Miss.1995)).

**\*7** This view has been echoed in other cases. In *Lora–Pena v. F.B.I.,* the Third Circuit held that "[w]e cannot agree with the District Court that [the plaintiff's] convictions for resisting arrest and assaulting federal officers bars his civil suit at the

Rule 12(b)(6) stage." 📄 529 F.3d 503, 506 (3d Cir.2008). The Court supported its reversal of the district court, stating that the plaintiff's "convictions for resisting arrest and assaulting officers would not be inconsistent with a holding that the officers, during a lawful arrest, used excessive (or unlawful) force in response to his own unlawful actions." *Id.*

The Honorable Freda L. Wolfson's ("Judge Wolfson") decision in *Hendrix, supra,* is also instructive to the Court. In addressing a defendant's motion to dismiss, Judge Wolfson found that a determination of whether the plaintiff's conviction for resisting arrest and assault on an officer would be invalidated by a successful 📄 § 1983 action was impossible because the "[d]efendant simply ha[d] not provided the Court with any facts regarding the incident at issue that were admitted to by [the plaintiff] before entering into the PTI program, other than the Indictment." *Hendrix,* 2009 WL 5205996, at *12. This paucity of facts regarding what the plaintiff admitted to as part of his entrance into PTI, was critical. In light of that, Judge Wolfson held that "even if [plaintiff] did use force on [defendant] during his arrest, it would not invalidate his disposition through the PTI program because a jury can still find that [defendant] used excessive force on [plaintiff] while effectuating his arrest." *Id.*

In *Garrison v. Porch,* the Third Circuit overturned the district court's grant of summary judgment to a defendant who claimed that the plaintiff's conviction for simple assault and purposefully resisting arrest was a bar to the plaintiff's 📄 § 1983 claim. 📄 376 F. App'x 274, 277 (3d Cir.2010). The defendant officer had argued that "because [plaintiff] pled guilty to assaulting the arresting officer, the force [defendant] used in taking [plaintiff] into custody could not have been excessive." 📄 *Id.* at 278. The *Garrison* court rejected that argument, stating that "the fact that [plaintiff's] threatened or attempted use of force was unlawful does not automatically mean that there is no use of force that [defendant] could have used in response which could have risen to the level of unreasonable and excessive." *Id.*

A final case deserves attention as well. In *Fernandez v. City of Elizabeth,* the Third Circuit affirmed the district court's dismissal of the plaintiff's 📄 § 1983 excessive force claim because of the plaintiff's participation in PTI after he was charged with aggravated assault on a police officer arising from the same incident underlying the complaint. 📄 468

Day v. Jackson Tp., Not Reported in F.Supp.2d (2013)

2013 WL 394151

F. App'x 150, 152–54 (3d Cir.2012). The *Fernandez* court assumed, as a matter of law, that if the plaintiff's participation in PTI constituted an unfavorable "termination of the criminal charges against him ... *Heck* precludes consideration of his § 1983 claim." *Id.* at 154.

**\*8** In light of the foregoing cases, the Court has decided to follow *Nelson, Lora Pena, Hen drix* and *Garrison,* as well as other district court cases,[3] for the proposition that an unfavorable termination of a resisting arrest or assault on an officer charge is not necessarily a *Heck* bar to a plaintiff's § 1983 claim alleging excessive force. While some of the above cases have slight procedural differences from this case, namely that they dealt with a defendant's motion to dismiss, the Court concludes that the rule underpinning those decisions applies just as logically to the motion currently before the Court. Following discovery, there are simply no undisputed material facts in this case which allow the Court to determine as a matter of law that Plaintiffs' excessive force claim will necessarily invalidate or be in conflict with Salvatore Day's resisting arrest and aggravated assault charges for which he entered PTI. As such, summary judgment on this matter is denied without prejudice.

### 2) Defendants are not Entitled to Qualified Immunity

The Officer Defendants argue that their actions arresting Salvatore Day are entitled to qualified immunity and that Plaintiffs' claim of excessive force and failure to intervene must therefore be dismissed. The Court disagrees.

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Two interests are balanced by the rule: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* The Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991).

A qualified immunity analysis requires consideration of two concepts. "First, a court must decide whether the facts that a plaintiff has alleged ... make out a violation of a constitutional right." *Pearson,* 555 U.S. at 232. "Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* The second prong is only met when it would be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Although the inquiry is normally considered in that order, it need not be. *Id.* at 236.

Whether a public official's conduct is subject to qualified immunity is an issue of law to be decided by a judge. *Curley v. Klem,* 298 F.3d 271, 279 (3d Cir.2002). However, "the existence of disputed, historical facts material to the objective reasonableness of an officer's conduct will give rise to a jury issue." *Id.* at 278 (citing *Sharrar v. Felsing,* 128 F.3d 810, 828 (3d Cir.1997)). Once those issues are resolved by a jury, for example by "special jury interrogatories[,] ... the court can then determine, as a matter of law, the ultimate question of qualified immunity." *Id.* at 279.

**\*9** Here, regarding the § 1983 excessive force and failure to intervene claims, there remain significant disagreements among the Parties regarding what actually occurred when the Officer Defendants responded to Salvatore Day's house and arrested him. An entirely different set of facts is alleged by each party. There simply are not enough undisputed facts for the Court to rely upon in order to determine if the Officer Defendants' actions were reasonable. As such, and according to *Curley,* the Officer Defendants' motion seeking a determination that they are entitled to qualified immunity on Plaintiffs' excessive force and failure to intervene claims must be denied without prejudice.[4]

### 3) Plaintiffs' State Law Claims

As noted in regards to Plaintiffs' § 1983 claims and the Officer Defendants' argument that they are entitled to qualified immunity, genuine and material issues of fact remain in this case. Those disputed facts require the Court to deny the Officer Defendants' motion for summary judgment

dismissing Plaintiffs' state law claims for assault and battery and IIED.

### B. Plaintiffs' *Monell* Liability Claim Against Jackson and Chief Kunz

Count Five of Plaintiffs' Complaint alleges § 1983/*Monell* liability against the Jackson Township Police Department and Chief Kunz for the unlawful policies, customs, practices and inadequate training provided by Jackson and Kunz. A claim brought against a municipality under § 1983 can only be successful where the "municipality *itself* causes the constitutional violation at issue." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (citing *Monell,* 436 U.S. at 694 ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.") Municipalities, rather, may only be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* A failure to train may also be the basis for § 1983 municipal liability. *Id.* at 387. The policy, custom or failure to train must be causally connected to the constitutional deprivation. *Id.* at 385, 391.

"A government policy or custom can be established in two ways." *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1480 (3d Cir.1990).

> Policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict. A course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well settled' as to virtually constitute law. In either of these cases, it is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom.

**\*10** *Id.* (internal citations omitted).

First, the Court agrees with Jackson and Kunz that Plaintiffs have failed to provide any evidence which demonstrates that it is the policy of the Township to violate the rights of its citizens when effectuating an arrest.

The issue of custom, however, is more complicated. Plaintiffs have proffered undisputed facts which demonstrate that the Jackson Police Department, in some instances, has failed to follow the New Jersey Attorney General Guidelines related to internal affairs investigations. For example, Plaintiffs contend that Jackson fails to interview all of the parties to excessive force complaints, as required by the Guidelines. Plaintiffs further allege that Defendants do not adequately track complaints lodged against individual officers and use that history as either a factor in subsequent excessive force investigation or as part of an "Early Warning System" that might alert the Department to the presence of officers with a propensity to use excessive force. Defendants reject those contentions as unsupported or based upon depositions taken out of context.

It has long been the law in this Circuit that in order "to sustain a § 1983 claim for municipal liability, the plaintiff must 'simply establish a municipal custom coupled with causation-i.e., that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to their injury.' " *Beck v. City of Pittsburgh,* 89 F.3d 966, 972 (3d Cir.1996) (citing *Bielevicz v. Dubinon,* 915 F.2d 845, 851 (3d Cir.1990)). "The custom must demonstrate a 'deliberate indifference' towards the class of person whom might suffer a constitutional injury as a result of the custom." *Simmons v. City of Philadelphia,* 947 F.2d 1042, 1070 (3d Cir.1991). " '[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson,* ––– U.S. ––––, ––––, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) (quoting *Bryan County,* 520 U.S. at 409). However, "[a]s long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *Bielevicz,* 915 F.2d at 851.

In *Beck,* for example, the question of whether the municipal defendant was deliberately indifferent as to a custom of excessive force by its officers, a single one in particular, was found to be a jury question. In that case, the officer in question had five excessive force reports filed against him in the course of five years. *Beck,* 89 F.3d at 972. Moreover, "these written complaints were sufficient for a reasonable jury to infer that the Chief of Police of Pittsburgh and his

2013 WL 394151

department knew, or should have known, of [the officer in question's] violent behavior in arresting citizens ...." *Id.* at 973.

**\*11** Here, when taking the facts in the light most favorable to Plaintiffs, as the Court must, Plaintiffs have stated a plausible claim that the customs of the Jackson Police Department, especially their allegedly lackadaisical internal affairs investigations related to excessive force, may have led to Salvatore Day's injuries at the hands of the Officer Defendants. *See Bielevicz, supra* (holding that as long as the causal link between a suspect custom and injury to the plaintiff is not "too tenuous," the issue is properly left to the jury). The Court acknowledges the distinctions between *Beck* and the case at bar, especially the greater frequency of complaints lodged against a single officer. The Court, however, taking the facts in the light most favorable to Plaintiffs, has determined that a reasonable jury could find that Jackson's Internal Affairs procedures were part of a custom which showed deliberate indifference to rights of those who might interact with its officers. *See White v. City of Trenton,* No. 06–5177(FLW), 2011 WL 6779595, at \*13 (D.N.J. Dec.27, 2011), *on reconsideration at,* 848 F.Supp.2d 497 (D.N.J.2012) (holding that the Trenton Police Department's failure to "fully implement a system to effectively track excessive force complaints" led to a situation in which police officers were "aware their conduct [would] most likely not be investigated and they [would] not be disciplined," and it therefore followed that the officers "may run roughshod over the constitutional rights of citizens...."). Plaintiffs' § 1983/*Monell* claim which seeks liability based upon a custom, will be allowed to proceed.

Failure to train may also constitute a § 1983 violation which a municipality may be held liable for. "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact." *Canton,* 489 U.S. at 388 (emphasis added). The focus is on the "adequacy of the training program in relation to the tasks the particular officers must perform." *Id.* at 390. The fact that "a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have

resulted from factors other than a faulty training program." *Id.* at 390–91. "Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct" because "adequately trained officers occasionally make mistakes [and] the fact that they do says little about the training program or the legal basis for holding the city liable." *Id.* at 391. "To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983." *Id.* In the end, "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* at 389.

**\*12** A plaintiff's claim is at its most "tenuous" when it "turns on [an allegation of] a failure to train." *Connick,* 131 S.Ct. at 1359. Unlike the evidence proffered regarding the existence of a custom, Plaintiffs have failed to provide any proof to the Court indicating that a failure to train exists which can be causally connected to the actions of the Officer Defendants. As such, Plaintiffs' § 1983/*Monell* claim based upon a failure to train is dismissed.

Plaintiffs' § 1983/*Monell* claim, alleging a custom or practice of excessive force, and lax internal investigations thereof, will be allowed to proceed to a jury when this matter goes to trial.

## IV. *Conclusion*

For the reasons set forth above, and for other good cause shown, it is hereby ordered that Defendants Motions are GRANTED IN PART and DENIED IN PART. Counts Three, Four, Eight, and Eleven are DISMISSED WITH PREJUDICE. Count Six, § 1983 Municipal Liability will be permitted to proceed to trial but only on the basis that it seeks to prove liability based on the presence of a custom or practice.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 394151

Day v. Jackson Tp., Not Reported in F.Supp.2d (2013)

2013 WL 394151

---

## Footnotes

1    Plaintiffs' motion to file his opposition to the Supervisors Defendants' motion for summary judgment under seal was granted in an order issued by the Hon. Tonianne J. Bongiovanni ("Judge Bongiovanni") on July 24, 2012. (ECF No. 37.)

2    The time frames covered by the use of force reports span slightly differing time periods. The difference is not material to this Opinion.

3    *See* *Weber v. Rodriguez,* No. 07–2097(RBK), 2011 WL 2555358, at *4 (D.N.J. June 27, 2011) (holding that "[b]ecause Plaintiff's conviction in state court [for resisting arrest and aggravated assault] is not inconsistent with a finding that [d]efendants used excessive force to arrest him, *Heck* does not bar Plaintiff's § 1983 claim" alleging excessive force, and thus, denying summary judgment); *Woodley v. Al–Ayoubi,* No. 09–1403(KSH), 2011 WL 4594204, at * 6 (D.N.J. Sept.2, 2011) (noting that a conviction for resisting arrest is "not inconsistent with a finding that Defendants used excessive force to arrest him" and upholding the plaintiff's § 1983 claim for excessive force); *Porter v. Dooley,* No. 09–6068(RBK), 2011 WL 4007690, at *3 (D.N.J. Sept.6, 2011) (denying defendant's motion for summary judgment in which it was argued that, based on the plaintiff's guilty plea to resisting arrest, *Heck* barred his § 1983 claim alleging excessive force).

4    This finding applies with equal weight to the Officer Defendants' motion seeking dismissal of Plaintiffs' claims under the NJCRA. Analysis of the NJCRA is subject to the same analysis as claims brought under § 1983. *See* *Trafton v. City of Woodbury,* 799 F.Supp.2d 417, 443 (D.N.J.2011) ("This district has repeatedly interpreted NJCRA analogously to § 1983."); *Sussino v. New Jersey Div. of State Police,* No. 09–6278(SRC), 2012 WL 5184582, at *8 (D.N.J. Oct.18, 2012). Because an issue of fact remains regarding qualified immunity, determination of Plaintiffs' NJCRA claim is not possible at this juncture.

---

**End of Document**      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT

# D

Lapella v. City of Atlantic City, Not Reported in F.Supp.2d (2012)

2012 WL 2952411

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by   York Group, Inc. v. Pontone,   W.D.Pa.,   May 22, 2013

2012 WL 2952411

Only the Westlaw citation is currently available.

United States District Court, D. New Jersey.

Samantha LAPELLA, Plaintiff,

v.

CITY OF ATLANTIC CITY, et al., Defendants.

Civil No. 10–2454 (JBS/JS).

|

July 18, 2012.

**Attorneys and Law Firms**

Jeremy Esakoff, Pasricha & Patel LLC, Edison, NJ, for Plaintiff.

Tracy L. Riley, Esq., Michael E. Riley, Esq., Law Offices of Riley and Riley, Mount Holly, NJ, for Defendants City of Atlantic City, Atlantic City Police Department, and Thomas Moynihan.

Patrick J. Wolfe, Esq., Sharlenn E. Pratt, Esq., Zarwin Baum Devito Kaplan Schaer & Toddy, PC, Philadelphia, PA, for Defendant John J. Mooney.

**OPINION**

SIMANDLE, District Judge.

**I. INTRODUCTION**

**\*1** This matter comes before the Court on a motion for judgment on the pleadings by Defendants City of Atlantic City ("Atlantic City"), Atlantic City Policy Department ("Police Department"), John J. Mooney, and Thomas Moynihan. [Docket Item 63.] Specifically, Defendants request judgment on the pleadings on Count VI of Plaintiff's Amended Complaint and the resultant dismissal with prejudice of Defendants John J. Mooney and Atlantic City Police Department pursuant to Federal Rule of Civil Procedure 12(c).[1] For the reasons explained below, the Court shall grant the motion for judgment on the pleadings. The principal issue presented is whether Count VI of the First Amended Complaint in this civil rights act case alleging excessive use of force in arrest, among other claims, states a

cognizable claim for municipal liability under 🚩 42 U .S.C. § 1983. The Court will dismiss the Atlantic City Police Department with prejudice by the consent of both parties, but will dismiss Count VI and Defendant Mooney without prejudice to Plaintiff's opportunity to request leave to file a curative amendment to provide a plausible basis for her claims of municipal liability within fourteen (14) days of this opinion and order.

**II. BACKGROUND**

In May 2010, Plaintiff brought this action arising from an incident that occurred at the "mur.mur" nightclub in the Borgata Casino (owned and operated by non-moving defendant Marina Development District) on February 7, 2009. (Am. Compl. ¶¶ 16–18 .) At this stage the Court is obligated to accept all of Plaintiff's allegations as true, and so will draw the facts of this dispute solely from Plaintiff's First Amended Complaint.

Plaintiff and her friends entered the mur.mur nightclub in the Course of a weekend trip to Atlantic City to celebrate a birthday. (*Id.* ¶¶ 16–18.) At some point during the evening, members of Plaintiff's party were asked by club staff to extinguish their cigarettes, which they immediately did. (*Id.* ¶ 22.) In the early morning hours of February 8, 2009, Borgata bouncers and Officer Thomas Moynihan entered the club. (*Id.* ¶ 23). The bouncers asked Plaintiff's party to leave the club. (*Id.* ¶ 24 .) Without allowing Plaintiff time to leave the club, Officer Moynihan and an unidentified bouncer "roughly grabbed her by the arms and began carrying her toward an exit." (*Id.* ¶ 26.) Officer Moynihan then allegedly punched Plaintiff in the face and dragged her through an exit, where he and another officer allegedly knelt on Plaintiff with their full body weight, handcuffed her, lifted her from the floor by her arms, and repeatedly slammed her face into a wall while she was unable to brace herself. (*Id.* ¶¶ 27–31.) Plaintiff was then taken to the Atlantic City Police Station and detained in a cell for several hours. (*Id.* ¶ 32). Officer Moynihan signed complaints charging Plaintiff with creating a disturbance, aggravated assault, and resisting arrest, though all charges were subsequently dismissed. (*Id.* ¶ 34.)

**\*2** Plaintiff brings suit against Officer Moynihan for use of excessive force, false imprisonment, and false arrest in violation of her constitutional rights. (*Id.* Counts 1–3.) Plaintiff further brings tort claims against Officer Moynihan for assault and battery, malicious prosecution, as well as a claim for civil conspiracy with the Borgata Casino. (*Id.*

Lapella v. City of Atlantic City, Not Reported in F.Supp.2d (2012)

2012 WL 2952411

Counts 7, 8, 13). Plaintiff brings tort claims against Atlantic City and the Police Department for negligent training and supervision and negligent hiring practices. (*Id.* Counts 4, 5.) Plaintiff also files suit pursuant to 42 U.S.C. § 1983 against Atlantic City, the Police Department, and Police Chief Mooney for the civil rights violations inflicted upon her by Officer Moynihan, incorporating by reference the claims of negligent training and supervision and negligent hiring practices contained in Counts IV and V. [2] (*Id.* ¶ 45 .)

Specifically, in Count VI, which is captioned "Municipal Liability," Plaintiff alleges that Atlantic City's policies and procedures in place at the time of her arrest were unlawful and improper. (*Id.* ¶ 66.) Plaintiff also alleges negligent training and supervision (Count IV) and negligent hiring (Count V), which she believes are incorporated into Count VI by reference. (Pl .'s Br. in Opp'n to Defs.' Mot. for J. on the Pleadings 10.) Finally, Plaintiff alleges in Count XV that Chief Mooney is vicariously liable for permitting Officer Moynihan's conduct to continue after he had knowledge of "the improper manner in which Defendant ... was discharging his duties." (Am. Compl. ¶ 111 .)

On January 16, 2012 Defendants Atlantic City, Atlantic City Police Department, Police Chief Mooney, and Officer Moynihan ("Moving Defendants") filed the instant Motion for Judgment on the Pleadings. *See* Fed.R.Civ.P. 12(c). Specifically, Moving Defendants assert that Count VI of Plaintiff's Amended Complaint is insufficiently plead and should be dismissed, and that as a result all claims against Defendant Mooney should also be dismissed. (Defs .' Mot. for J. on the Pleadings 4.) Moving Defendants further assert that the Police Department is not properly a party to this matter and should be dismissed as well. (*Id.* 21.)

## III. DISCUSSION

### A. **Rule 12(c)** Standard

Under Rule 12(c) of the Federal Rules of Civil Procedure, "[a ]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." While a Rule 12(b) motion to dismiss a complaint may be filed before responsive pleadings, a Rule 12(c) motion for judgment on the pleadings may be filed after the pleadings are closed. *Turbe v. Gov't of the Virgin Islands,* 938 F.2d 427, 428 (3d Cir.1991).

However, the differences between Rules 12(b)(6) and 12(c) are purely procedural, as the pleading standards of Rule 12(b)(6) are applied for both. *Id.* Thus, the Court must "accept all factual allegations as true" and construe the complaint "in the light most favorable to the plaintiff." *Phillips v. County of Allegheny,* 515 F.3d 224, 234 (3d Cir.2008) (quoting *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 374 n. 7 (3d Cir.2002)).

**\*3** Prior to 2007, the federal courts utilized a standard of notice pleadings and would dismiss complaints for failure to state a claim only when "it appear[ed] beyond doubt that the plaintiff [could] prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45 (1957). However, in 2007 the Supreme Court abandoned that standard in its decision in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007). In *Twombly,* the Court explained that:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than label and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

*Twombly,* 550 U.S. 555 (internal citations omitted). A complaint need not provide detailed factual allegations, but it must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id.* at 570. The Supreme Court elaborated on and clarified the *Twombly* standard in a subsequent decision, *Ashcroft v. Iqbal,* 556 U.S. 662 (2009). In *Iqbal,* the Supreme Court stated:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *[Twombly* ] at 570, 127 S .Ct.1955. A claim has facial plausibility when the plaintiff pleads factual content that allows the court

Lapella v. City of Atlantic City, Not Reported in F.Supp.2d (2012)

2012 WL 2952411

to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.,* at 556, S.Ct. 1955. The plausibility standard is not akin to a probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendants liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.,* at 557, 127 S.Ct. 1955 (brackets omitted).

Two working principles underlie our decision in *Twombly.* First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.,* at 555, 127 S.Ct. 1955.

*Iqbal,* 556 U.S. 662.

As such, when a Court is deciding a motion under Rule 12(c), it must look closely at the complaint to determine whether it states a facially plausible claim to relief, composed of factual content and not merely conclusory allegations reflecting the cause of action.

**B. The Monell Standard under 42 U.S.C. § 1983**
Plaintiff's municipal liability claims against Atlantic City, the Police Department, and Police Chief Mooney all arise under 42 U.S.C. § 1983, which reads:

> **\*4** Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable for redress ...

42 U.S.C.A § 1983 (1996). Municipal liability under § 1983 may not be proven under a respondeat superior theory of liability but must be founded on evidence that the government itself supported a violation of constitutional rights. *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690 (1978). Municipal liability exists only where execution of the municipality's policy or custom, whether made by lawmakers or decisionmakers whose edicts may fairly represent official policy, inflict the injury. *Id.,* at 694.

Not all state action rises to the level of a custom or policy. A policy is made "when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict." *Kneipp v. Tedder,* 95 F.3d 1199, 1212 (3d Cir.1996) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion)). A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." *Bd. of County Comm'rs of Bryan County, Okla. V. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). *Natale v. Camden Cnty. Correctional Facility,* 318 F.3d 575, 584 (3d Cir.2003). Once a policy or custom has been shown to exist, it must then be shown that the allegedly unconstitutional conduct causally results from that policy or custom.

There are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983. The first is where "the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy." *Bryan County,* 520 U.S. at 417, 117 S.Ct. 1382 (Souter, J., dissenting). The second occurs where "no rule has been announced as policy but federal law has been violated by an act of the policymaker itself." *Id.* Finally, a policy or custom may also exist where "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.' " *Id.* at 417–418, 117 S.Ct. 1382 (quoting *City of*

Lapella v. City of Atlantic City, Not Reported in F.Supp.2d (2012)

2012 WL 2952411

*Canton, Ohio v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ...

**\*5** *Natale,* 318 F.3d at 584. Thus, for a plaintiff to sufficiently allege municipal liability under § 1983, they must present facts to support a finding that a specific policy or custom caused the alleged harm.

**C. Dismissal of the Atlantic City Police Department**
As a preliminary matter, the Moving Defendants request that Plaintiff's complaint as to the Atlantic City Police Department be dismissed with prejudice. (Defs.' Mot. for J. on the Pleadings 22). Municipal departments are not separate legal entities from the municipality they serve, and therefore cannot be named parties in conjunction with the municipality. *See* N.J. Stat. Ann § 40A:14–118. *See, e.g., Adams v. City of Camden,* 461 F.Supp.2d 263, 266 (D.N.J.2006); *Caldwell v. Atlantic Cnty. Animal Shelter,* Civ. No. 08–4101, 2009 WL 1173645 at \*2 (D.N. J.2009); *Open Inns, Ltd. v. Chester County Sheriff's Dep't,* 24 F.Supp.2d 410, 416 n. 13 (E.D.Pa.1998). Plaintiff consents to the voluntary dismissal of the Police Department as a defendant in this matter. (Pl.'s Opp'n to Defs.' Mot. for J. on the Pleadings 1.) Consequently, the Court will dismiss the Police Department with prejudice.

**D. Judgment on the Pleadings for Count VI**
The parties dispute whether, in analyzing the sufficiency of Count VI's claims of municipal liability, Counts IV and V should be incorporated by reference. The Moving Defendants contend that Counts IV and V are state law claims that, in light of prior precedent and concepts of fairness, should not be considered in analyzing Count VI. Plaintiff, conversely, contends that Counts IV and V are properly incorporated and that the use of incorporation from prior counts allowed for efficient pleadings that still gave sufficient notice. [3] Plaintiff argues, and the Court agrees, that the allegations of Counts IV and V are reasonably interpreted as being incorporated into her theory of municipal liability in Count VI. Were Counts IV and V completely unrelated to the subject matter of Count VI, it would be unreasonable to assume that a broad incorporation by reference of all preceding allegations would be sufficient. However, *Monell* liability for failure to train and for hiring decisions is a common avenue under municipal liability theories, and the Court finds the link to be sufficiently obvious despite the confusing nature of Plaintiff's Amended Complaint.

**1. Count VI Standing Alone**
When a Plaintiff brings a complaint under *Monell* against a municipality, the offending custom, policy, or practice must be plead specifically in the complaint. *See McTernan v. City of York,* 564 F.3d 636 (3d Cir.2009); *Muller v. Bristol Twp.,* No. 09–1086, 2009 WL 3028949 (E.D.Pa. Sept. 17, 2009). "To satisfy the pleading standard, [a plaintiff] must identify a custom or policy and specify what exactly that custom or policy was." *McTernan,* 564 F.3d at 658 (citing *Philips v. County of Allegheny,* 515 F.3d 224 (3d Cir.2008)). Factual allegations must give notice not only "as to the alleged wrongdoing of the individual police officers," but also "as to the alleged policy and custom of the municipality at issue." *Muller,* 2009 WL 3028949 at 4.

**\*6** Count VI of Plaintiff's Amended Complaint, standing alone, does not give notice as to the alleged policy or custom of the municipality at issue. The relevant components of Count VI follow:

> 65. As chief of police, Defendant Mooney was responsible for establishing, implementing and enforcing departmental policies and procedures on behalf of Defendant Atlantic City, including those procedures and policies in effect at the time Plaintiff was attacked and falsely arrested by Defendant Moynihan.

> 66. Atlantic City's policies and procedures that were in place at the time of the Plaintiff's arrest were unlawful and improper as they permitted the conduct visited upon the plaintiff.

> 67. Plaintiff was injured at the hands of Defendant Moynihan as a consequence of Defendant Mooney and Defendant Atlantic City's (a) establishing improper policies, (b) implementing improper policies, and/or(c) failing to enforce proper policies with respect to the conduct of its police officers.

(Am.Compl.10.) The language of Count VI is insufficient to provide notice of what policy or custom is in question. All that can be gleaned from the language used is that (1) the policy or procedure in question is one that was in effect when Plaintiff was arrested, (2) the policy or procedure is allegedly illegal because it permitted the allegedly unconstitutional conduct to occur, and (3) that Plaintiff's injury was a result of these policies.

Lapella v. City of Atlantic City, Not Reported in F.Supp.2d (2012)

2012 WL 2952411

This Count gives no notice regarding what specific policy or procedure is alleged to be improper or illegal. Such allegations of a "policy of ignoring ... right[s]" are insufficient to allege a *Monell* claim. *McTernan,* 564 F.3d at 657. Nor does it demonstrate that Officer Moynihan's conduct was in any way resultant from those policies and procedures then in place, beyond the conclusory assumption that the incident that allegedly occurred could only happen if illegal policies and procedures were in place. Plaintiff, in short, fails to provide sufficient factual allegations in Count VI to give Defendants notice and to allow the Court to find her claim to relief plausible on its face.

**2. Count VI Incorporating Counts IV and V**

Incorporating the rest of Plaintiff's Amended Complaint does little more to remedy the pleading infirmities of Count VI. Defendants argue in their motion that Count IV alleges a state law claim against Atlantic City for negligent training and supervision and that Count V alleges a state law claim for negligent hiring. (Defs.' Mot. for J. on the Pleadings, 17–18.) Even so, Defendants argue that if Counts IV and V are accepted as *Monell* claims they are nonetheless insufficiently pled and thus subject to dismissal. (*Id.*) The Court agrees, and finds that the incorporation of Counts IV and V is insufficient to remedy Count VI's infirm pleadings, as now discussed.

**a. Count IV** [4]

To bring a claim of failure to train under § 1983, a Plaintiff must (1) identify the deficiency in training; (2) prove that the deficiency caused the alleged constitutional violation; and (3) prove that the failure to remedy the deficiency constituted deliberate indifference on the part of the municipality. *Malignaggi v. County of Gloucester,* 855 F.Supp. 74, 77 (D.N.J.1994) (citing *City of Canton v. Harris,* 489 U.S. 378, 391 (1989)). To prove the training deficiency caused the alleged constitutional violation, a close causal link must be shown.

**\*7** This requires first that a specific deficiency rather than general laxness or ineffectiveness of training be shown. It then requires that the deficiency or deficiencies be such, given the manifest exigencies of police work, as to make occurrence of the specific violation a reasonable probability rather than a mere possibility. That is, the specific violation must be "almost bound to happen sooner

or later" rather than merely "likely to happen in the long run."

*Spell v. McDaniel,* 824 F.2d 1380, 1390 (4th Cir.1987) (internal citations omitted); *see also City of Canton, Ohio v. Harris,* 489 U.S. 378, 390–93 (1989) (allowing municipal liability for deficient training only where the specific deficiency is identified, deliberate indifference on the part of policymakers is found, and causation between the deficiency and the injury suffered is shown); *Colburn v. Upper Darby Tp.,* 838 F.2d 663 (3d Cir.1988) (overruled in part on other grounds by *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168 (1993)) (implicitly endorsing failure to train liability); *Popow v. City of Margate,* 476 F.Supp. 1237, 1246 (D.N.J.1979). To satisfy *Monell* 's requirement that a particular policy be the moving force behind a constitutional violation, there must be an affirmative link between the training inadequacies alleged and the constitutional violation at issue. *See Oklahoma City v. Tuttle,* 471 U.S. 808, 824–25 n. 8 (1985).

To demonstrate deliberate indifference, a Plaintiff must present evidence of indifference on the part of a particular policymaker. *Simmons v. City of Philadelphia,* 947 F.2d 1042, 1060–61 (3d Cir.1991).

> [A] municipality's deliberately indifferent failure to train is not established by (1) presenting evidence of the shortcomings of an individual; (2) proving that an otherwise sound training program occasionally was negligently administered; or (3) showing, without more, that better training would have enabled an officer to avoid the injury-causing conduct.

*Id.* at 1060. Generally, deliberate indifference can be shown only by demonstrating "[a] pattern of similar constitutional violations by untrained employees," though a single incident can suffice in the rare case where the unconstitutional consequence of the failure to train is patently obvious. *Connick v. Thompson,* 131 S.Ct. 1350, 1360 (2011)

Lapella v. City of Atlantic City, Not Reported in F.Supp.2d (2012)

2012 WL 2952411

(quoting *Bd. of Cnty. Comm'rs v. Brown,* 520 U.S. 397, 409 (1997)).

Here, the Court finds Count IV is not sufficiently pled as a failure to train claim under § 1983. The relevant portions of Count IV read in part:

> 53. Defendant Atlantic City had a duty to train and supervise its agents and employees for the benefit of the residents of, and visitors to, Atlantic City.

> 54. On information and belief, Defendant Atlantic City had knowledge that Defendant Moynihan has a history of mistreating civilians and failed to implement effective measures to prevent his unlawful conduct.

> **\*8** 55. On information and belief, Defendant Atlantic City, as a matter of policy and practice, failed to properly train and supervise its officers to abide by the law and to respect the rights of the people they encounter, including Plaintiff, and thereby encouraged Defendant Moynihan in this case to engage in the unlawful and actionable conduct described above.

> 56. That negligence on the part of Atlantic City caused Plaintiff to suffer injuries at the hands of its untrained, uncontrolled and unsupervised agents and employees.

(Am.Compl.9). Plaintiff's complaint fails to allege any specific shortcoming in Atlantic City's training programs; at best it contains a conclusory allegation that the city "failed to properly train and supervise its officers to abide by the law and to respect the rights of the people they encounter." Plaintiff contends the Count is sufficient because it "identifies Atlantic City's custom of responding with indifference to its officers' routine disregard for the rights of civilians, including their use of unnecessary force, false arrest, and false imprisonment," noting that the language of paragraph 55 incorporates the factual claims of paragraphs 27–31 and 42. (Pl.'s Br. in Opp'n to Defs.' Mot. for J. on the Pleadings 7.) While alleging a custom requires a showing of indifference to a known illegal activity, it is insufficient to allege a custom of indifference. Indifference is not a custom, and merely alleging a "custom of indifference" is no less conclusory than alleging a "custom" itself.

Plaintiff further fails to plausibly allege how the deficiency caused her injury, merely alleging that the insufficient training "encouraged Defendant Moynihan in this case to engage in the unlawful and actionable conduct described above."

This allegation provides no factual support to establish the plausibility of a causal link between the allegedly insufficient training and the harm that befell Plaintiff.

Finally, Plaintiff must sufficiently allege deliberate indifference on the part of the decisionmaker. Here, Plaintiff alleges that Atlantic City knew of Officer Moynihan's alleged "history of mistreating civilians." However, Plaintiff fails to demonstrate that the resulting outcome is a result of municipal policy and not an officer's individual shortcomings. Furthermore, Plaintiff fails to allege sufficient facts to demonstrate that Officer Moynihan's alleged conduct was "almost bound to happen sooner or later" and that the Police Department deliberately ignored that risk. *Spell,* 824 F.2d at 1390. In fact, Plaintiff fails to allege any factual basis to support the conclusion Officer Moynihan had a history of mistreating civilians. While Plaintiff may be able to show negligence on the alleged facts, Count IV is not sufficiently pled as to support municipal liability under § 1983, as it does not plead sufficient facts to support the otherwise conclusory allegation that the city acted with deliberate indifference.

**b. Count V** [5]

**\*9** To bring a claim of deliberate indifference in hiring under § 1983, a plaintiff must be able to plausibly allege that "this officer was highly likely to inflict the particular injury suffered by the plaintiff" and that the decisionmaker was deliberately indifferent to that likelihood in hiring the offending party. *Bd. Of Cnty. Comm'rs,* 520 U.S. at 411. Plaintiff, however, again fails to allege sufficient non-conclusory facts to support this claim. Plaintiff's pleadings in Count V read:

> 59. Defendant Atlantic City had a duty to determine the character and moral fitness of all applicants for the position of police officer before hiring them.

> 60. Defendants Atlantic City had a duty to discharge those officers who demonstrate an inability or unwillingness to abide by the law and/or an inability to treat people with the respect and rights to which they are entitled by virtue of the applicable laws and constitutions.

> 61. On information and belief, Defendant Moynihan has been involved in other incidents that indicate a disregard for the rights of the residents and guests of Atlantic City.

Lapella v. City of Atlantic City, Not Reported in F.Supp.2d (2012)

2012 WL 2952411

62. The defendants failed to discharge their respective duties by hiring Defendant Moynihan and then by failing to terminate his employment.

(Am.Compl.10.) Plaintiff's allegation that Defendant Moynihan has been involved in incidents that indicate a disregard for the rights of others is not sufficient to demonstrate either that (1) Officer Moynihan had committed constitutional rights violations in the past or (2) that when Officer Moynihan was hired (and in the inverse continuously employed) Atlantic City knew or should have known that Officer Moynihan was highly likely to violate the constitutional rights of civilians through excessive use of force and false arrest. Nor does Plaintiff allege deliberate indifference on the part of Atlantic City. Within Count V, Plaintiff makes no allegation that Atlantic City knew Officer Moynihan was likely to cause harm similar to that herein.

Even incorporating Count IV, the fact Atlantic City had knowledge of a prior history of mistreating civilians (a conclusory restatement of the requirements of the cause of action) is not alone sufficient to prove deliberate indifference. Plaintiff provides no factual allegations that make it plausible that Officer Moynihan should have been discharged, that Atlantic City knew this, and that Atlantic City disregarded this with deliberate indifference. As such, the Court finds Count V is also insufficiently pled and cannot support a claim for municipal liability under § 1983. [6]

As Plaintiff fails to provide sufficient factual allegations that, if accepted as true, would create a plausible claim to relief under § 1983, the Court will grant judgment on the pleadings to the Moving Defendants on Count VI.

**E. Dismissal of Defendant Mooney**

Defendants also move for the dismissal of Police Chief Mooney from this case. Police Chief Mooney is only named in Counts VI and XV of the Amended Complaint. Count VI, which has been previously discussed, is dismissed for failure to state a claim. Thus, only Count XV remains against Police Chief Mooney. Defendants believe Count XV, entitled "vicarious liability," must be a state law claim under the New Jersey Tort Claims Act (NJTCA) as there is no vicarious liability available under § 1983. [7] (Defs.' Mot. for J. on the Pleadings 20.)

*10 Plaintiff, in turn, counters that Plaintiff does not allege Police Chief Mooney is liable as a supervisor, but rather as the Chief of Police responsible for establishing the policies that caused the injury to Plaintiff under *Monell*. (Pl.'s Opp'n to Defs.' Mot. for J. on the Pleadings 16.) Plaintiff's reply brief does not address any NJTCA claims Count XV may contain, nor why Count XV is entitled "vicarious liability" if it is indeed being pled as a *Monell* claim under § 1983 in which vicarious liability is disallowed. [8] As it is ambiguous what law forms the basis of Count XV in the Amended Pleadings, and as Plaintiff attests in her opposition brief that Count XV is pled under a theory of municipal liability and not a state law respondeat superior claim, the Court will accept it as such.

Incorporating Count XV into the prior analysis of Plaintiff's § 1983 claim does not change its conclusory nature. Count XV reads in part:

111. On information and belief, Defendant Mooney had actual knowledge of the improper manner in which Defendant Moynihan was discharging his duties as an Atlantic City police officer.

112. Defendant Mooney acquiesced in Defendant Moynihan's unlawful activities by permitting the conduct to continue.

113. As a consequence of Defendant Mooney's acquiescence, Plaintiff was injured.

This Count echoes Counts IV–VI, except as applied to Police Chief Mooney. "A supervisor may be personally liable ... if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.,* 372 F.3d 572, 586 (3d Cir.2004). The elements of the cause of action alleged are two-fold, that the supervisor have knowledge of the subordinates' violations and that the supervisor acquiesce in the subordinates' violations. Plaintiff alleges just that, that Police Chief Mooney had knowledge of and acquiesced in Officer Moynihan's conduct.

However, while Plaintiff alleges the elements of the cause of action, she provides no factual allegations to support a plausible basis for relief. Rather, Plaintiff recites the elements of the cause of action in legal boilerplate. This is insufficient under Rule 8 and this Count must be dismissed. [9]

#### F. Plaintiff's Request to Amend

Plaintiff requests that, if the Court is inclined to dismiss any part of the Amended Complaint, she be afforded an opportunity to amend the complaint to comply with the applicable pleading requirements. (Pl.'s Opp'n to Defs.' Mot. for J. on the Pleadings, 17.) It is the policy of the Third Circuit, when a complaint is vulnerable to Rule 12(b)(6) dismissal, to permit curative amendment unless such amendment would be inequitable or futile. *See Phillips v. County of Allegheny, 515 F.3d 224, 236 (3d Cir.2002)* (citing *Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir.2002)*).

*11 Plaintiff filed her original complaint on May 13, 2010. [Docket Item 1.] In its September 15, 2010 Scheduling Order the Court set February 1, 2011 as the deadline for amending pleadings. [Docket Item 19.] Plaintiff did not request to amend her complaint until her July 6, 2011 cross-motion, which was granted by the Court [Docket Item 40.] By the time Plaintiff filed her Amended Complaint, August 23, 2011, discovery in this case had been ongoing for some time.

The procedural situation is complicated by the fact that rather than challenging the pleadings at the outset Defendants waited until well into discovery to file the present motion for judgment on the pleadings. Defendants' delay pushes the limits of the requirement that motions for judgment on the pleadings are made "early enough not to delay trial". Fed.R.Civ.P. 12(c). Allowing Plaintiff to amend the Complaint could result in additional discovery, and could further delay the prompt resolution of this matter.

At this late stage in the pre-trial development of this case, the Court is disinclined to allow Plaintiff unlimited freedom to amend her complaint. However, the Court is cognizant of the fact the lateness of this motion is a result of Defendants' strategic decision to file a delayed motion under Rule 12(c) and not Rule 12(b)(6). Furthermore, the late stage at which this matter has arisen makes the Court especially wary of dismissing infirm pleadings that might not be beyond remedy.

The Court will therefore allow Plaintiff to separately file a succinct motion for leave to file an amended complaint, with a copy of the proposed amended complaint attached pursuant to Local Rule 7.1(f). To limit the prejudice to Defendants, Plaintiff's amended complaint is to address only those pleading infirmities at issue in the present motion and is not to materially change any of Plaintiff's causes of action, nor may Plaintiff attempt to add new parties in this two-year-old suit. Rather, Plaintiff's amendments are to focus on adding additional factual allegations to the complaint to render it compliant with the pleading standards set forth by *Twombly* and *Iqbal. See, e.g., Downey v. Coalition Against Rape and Abuse, Inc., 143 F.Supp.2d 423 (D.N.J.2001).* The Court shall grant Plaintiff fourteen (14) days from the entry of the accompanying order in which to file the motion for leave to file an amended complaint. If the motion is not received in that time, the Court will consider the dismissal of Count VI and the dismissal of Defendant Mooney to be with prejudice.

#### IV. CONCLUSION

For the reasons discussed above, the Court will partially grant Defendants' motion for judgment on the pleadings. By the consent of both parties, the Court will dismiss with prejudice all claims against the Atlantic City Police Department. The Court will dismiss Count VI of Plaintiff's Amended Complaint, and thus Plaintiff's theory of municipal liability under 42 U.S.C. § 1983, without prejudice. The Court will further dismiss Police Chief Mooney from this complaint without prejudice, as the only claim against him is the municipal liability claim embodied in Count VI. Plaintiff may file a motion for leave to amend the Complaint to cure the defects within fourteen (14) days consistent with this opinion. To protect against undue prejudice to the Defendants, Plaintiff may only amend her complaint with respect to the deficiencies addressed by the present motion. If Plaintiff fails to timely file a motion for leave to amend, then the dismissal of Count VI and Defendant Mooney will be with prejudice. The accompanying Order is entered.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2952411

**Footnotes**

Lapella v. City of Atlantic City, Not Reported in F.Supp.2d (2012)

2012 WL 2952411

1   Plaintiff, in her Reply Brief, states that the present motion requests "an order denying Plaintiff's motion to compel discovery responses." (Pl.'s Brief in Opp'n to Defs.' Mot. for J. on the Pleadings 1.) However, as Plaintiff herself admits the Defendants have not fashioned their application as an appeal of the Magistrate Judge Joel Schneider's order to compel, nor have they followed the procedures for such an appeal. (*Id.*) In analyzing the Defendants' submissions (including their sample order setting forth the requested relief), the Court can find no basis to conclude that Defendants request such an order, and therefore will not address that aspect of the present matter.

2   Plaintiff also brings claims against the Marina District Development Company, LLC (the Borgata) but as that defendant is not essential to the present motion those claims are not listed.

3   The Court notes Plaintiff's argument that such incorporation is required under Fed.R.Civ.P. 8's requirement of a "short, plain statement of claims." By incorporating all preceding allegations into each count, Plaintiff engages in shotgun pleadings that obfuscate her claims and defy the mandate of Rule 8, denying Defendants of the fullest extent of notice to which they are entitled. *See e.g.,* *Anderson v. District Bd. of Trustees of Cent. Florida Community College,* 77 F.3d 364 (11th Cir.1996); *Davis v. Coca–Cola Bottling Co. Consol.,* 516 F.3d 955 (11th Cir.2008) (denying attorneys fees due to shotgun pleadings); *Sikes v. Teleline, Inc.,* 281 F.3d 1350, 1356 n. 9 (11th Cir.2002). In the future, Plaintiff is advised to explicitly incorporate relevant counts rather than incorporating all prior counts, so as to more clearly elucidate what components of her claim are incorporated into each charge.

4   This analysis does not address or affect the merits of Plaintiff's state law claim of negligent training and supervision. As explained *infra,* Count IV is regarded only as a claim arising at state law under the New Jersey Tort Claims Act, which has not been attacked in the present motion.

5   This analysis does not address or affect the merits of Plaintiff's state law claim of negligent hiring. As explained herein, Count V is regarded as stating only a state law claim arising under the New Jersey Tort Claims Act which is not attacked in the present motion.

6   Further, Plaintiff has had ample opportunity to gather facts since February, 2009, and in discovery in this case, to set forth the required plausible factual basis for any municipal liability claim premised on failure to train or supervise Officer Moynihan as part of a municipal custom or policy. It is reasonable to expect that such allegations be plead within 14 days or that such a claim be lost.

7   For support of this proposition *see, e.g.,* *Iqbal,* 556 U.S. at 676 (recognizing that vicarious liability is inapplicable to § 1983 suits); *Monell,* 436 U.S. at 692 (denying the theory of respondeat superior in § 1983 actions).

8   In *Monell,* the Supreme Court examined the text and legislative history of § 1983 and concluded that Congress intended the statute to impose liability on "a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights." *Monell,* 436 U.S. at 692. The Court found that the statute was not intended to provide vicarious liability against government employers for the actions of employees, and recognized that such vicarious liability would be constitutionally problematic. *Id.* at 693.

9   To the extent Defendant Mooney is sued in his official capacity, the suit is in all respects other than name a suit against the entity of which he is an agent. *See* *Kentucky v. Graham,* 473 U.S. 159, 166 (1985); *Monell,* 436 U.S. at 690, n. 55.

---

**End of Document**                                      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   9