# MAZIE SLATER KATZ & FREEMAN, LLC

103 Eisenhower Parkway, Suite 207, Roseland, NJ  07068
Phone: (973) 228-9898 - Fax: (973) 228-0303
www.mazieslater.com

David A. Mazie*
Adam M. Slater*°
Eric D. Katz*°
David M. Freeman
Beth G. Baldinger
Matthew R. Mendelsohn*°
David M. Estes
Adam M. Epstein°

*Certified by the Supreme Court of
New Jersey as a Civil Trial Attorney

**Writer's Direct Dial & Email:**
973-228-0473
bbaldinger@mazieslater.com

Karen G. Kelsen°
Cory J. Rothbort*°
Michael R. Griffith°
Christopher J. Geddis
Samuel G. Wildman
Julia S. Slater°
Trevor D. Dickson

°Member of N.J. & N.Y. Bars

August 4, 2022

**VIA ECF ONLY**
Honorable Juan R. Sanchez, U.S.C.J.
United States District Court, Eastern District of Pennsylvania
James A. Byrne United States Courthouse
Room 14613
Philadelphia, Pennsylvania 19106-1797

    **Re:**    Xavier Ingram v. County of Camden, et al.
              Civil Action No.: 1:14-cv-05519

Dear Chief Judge Sanchez:

This letter is submitted in response to the August 4, 2022 letter filed by defendants' counsel William Cook, Esq. in which he opposes Mazie Slater Katz & Freeman, LLC's ("Mazie Slater") application for an attorney's fee.[1]  As set forth below, the Court should summarily reject Mr. Cook's assertions as they are completely frivolous and unsupported by any facts or case law. Rather, Mr. Cook's letter is simply his latest effort to mislead the Court by misrepresenting facts and law as part of his personal vendetta against our firm and Mr. Ingram.   As made apparent by their months- long effort to block consummation of the settlement, Mr. Cook and his client are

---

[1] Notably, Jay Blumberg, Esq. and Dean Wittman, Esq., counsel for the other defendants, have not joined in Mr. Cook's opposition.

Hon. Juan R. Sanchez, U.S.C.J.
August 4, 2022
Page 2

clearly displeased that they had to pay Mr. Ingram $10 million to settle this case. This is simply their last-ditch effort to frustrate and delay Mr. Ingram from receiving the funds that he desperately needs, as well as to delay payment to this firm. Defendants' latest missive should be summarily rejected as without merit.

### The June 13, 2014 Retainer Agreement is Valid and Enforceable

The Retainer Agreement between Mazie Slater and Xavier Ingram was properly executed and is fully enforceable. On June 13, 2014, Mr. Ingram granted his sister, Ashley Ingram Power of Attorney authorizing her to retain counsel and take legal action on his behalf as a result of Defendants beating and paralyzing him. (See, **Exhibit A hereto**, **Power of Attorney**, signed June 13, 2014, (I)… To commence [and] prosecute… all actions or other legal proceedings…"; and (J) To hire…attorneys at law….) Pursuant to this Power of Attorney, Ashley Ingram signed the Retainer Agreement engaging Mazie Slater to represent Mr. Ingram. Before these documents were signed, they were fully explained to both Mr. Ingram and his sister. (See, **Exhibit B**, **Certification of Xavier Ingram**, ¶¶ 3-8) As Mr. Ingram makes clear, both the Power of Attorney and the Retainer Agreement were signed in Mr. Ingram's presence -- with his full knowledge and consent. (Id).

### Xavier Ingram Was Mentally Competent to Grant the Power of Attorney and Authorize the Engagement of Mazie Slater

Without a scintilla of proof, Defendants now for the first time in this case, falsely accuse Mr. Ingram of being "incapacitated on June 13, 2014" and that "he could not have freely and voluntarily delegated his power to [his sister]." This is simply not true and a great insult to Mr. Ingram. Although Mr. Ingram was **physically** incapacitated after Defendants beat him within an inch of his life, he was not **mentally** incapacitated on June 13, 2014, nor at anytime afterwards.

Hon. Juan R. Sanchez, U.S.C.J.
August 4, 2022
Page 3

(See, Exhibit B, Certification of Xavier Ingram, ¶ 8). Notably, at no time during the past 8 plus years this case has been pending did the Defendants ever claim that Mr. Ingram was mentally incompetent or otherwise unable to handle his affairs. In fact, just the opposite: in multiple depositions Defendants sought to elicit every communication Mr. Ingram had with his family -- including those on June 13th and the days that followed -- about what happened before and during his assault by the police on June 12, 2014 -- and then sought to use those communications against him. In fact, a finding of "mental incapacity" requires "rigorous procedural safeguards…because the finding of incapacity results in an individual's loss of the right of self-determination". St. v. 1515 Broad Street, LLC, 241 N.J. 257, 280-81 (2020). The definition of a "mental incapacitated person" is a person "who is impaired by reason of mental illness or intellectual disability to the extent that the individual lacks sufficient capacity to govern himself and manage his affairs." Id., citing to N.J.S.A. 3B:1-2. In order to find someone to be "mentally incapacitated" there must be a guardianship complaint filed, along with a plenary hearing after which the court declares the individual to be "mentally incompetent". Id. No such allegation -- or proceeding -- ever occurred here because Mr. Ingram has always had his full mental capabilities. The Defendants' arguments are completely frivolous and should be summarily rejected.

In fact, Defendants had Mr. Ingram's complete medical records, had him examined by a psychiatrist of their choosing, and had many reports by his treating physicians. At no time did they or anyone else ever assert, much less prove that Mr. Ingram was ever "mentally incompetent." Likewise, they never sought to have a Guardian appointed, nor did they seek a Friendly Hearing for this settlement. Moreover, while Mr. Ingram has been under constant medical care and supervision for the past 8 plus years, at no time was he ever determined to be mentally incompetent. See, In re D.K., 204 N.J. Super. 205, 226 (Law Div. 1985) (Mental incompetency requires an

Hon. Juan R. Sanchez, U.S.C.J.
August 4, 2022
Page 4

adjudication by the court that 'the alleged incompetent is unfit and unable to govern himself or herself and to manage his or her affairs.'") (citation omitted))  To now come before this Court with a baseless claim that Mr. Ingram was "mentally incompetent" so as to try to invalidate the Power of Attorney and the Retainer Agreement is beyond improper and insulting. It is also disingenuous. As, in fact, Bill Cook, and Brown & Connery, LLP utilized and relied upon this Power of Attorney to obtain Mr. Ingram's medical records. (Annexed hereto as **Exhibit D** is an April 6, 2015 letter from Brown & Connery requesting medical records utilizing this Power of Attorney)  It is hypocritical for Defendants to challenge the validity of this Power of Attorney after they used it for their own benefit.

Scrambling for a back-up position, Defendants assert that even if the Power of Attorney was valid and the Retainer Agreement was properly executed, the contingency fee provision in the Retainer Agreement is invalid because, they contend, that Mr. Ingram was "mentally incapacitated". As Defendants point out, N.J. Ct. Rule 1:21-7(c)(6) can limit the attorney's fee on amounts recovered by an incompetent to 25%.  However, N.J. Ct. Rule 1:21-7(c)(6) also provides that the 25% limitation for mental incompetents <u>does not apply</u> where the matter proceeds to trial, and plaintiff opens to the jury and puts on a witness.  Thus, the 25% limitation would have no applicability even if Mr. Ingram was mentally incapacitated – which he is not and has never been.

In short, out of sheer vindictiveness -- and without any proof whatsoever -- Defendants desperately urge this Court to find that Mr. Ingram was 'mentally incapacitated' and that this entire issue should be addressed by a state court. There is no justification for such drastic relief. There has never been any question that Mr. Ingram is fully competent. Rather, this is nothing but an unconscionable attempt to delay Mr. Ingram and this firm from receiving the settlement funds.

Hon. Juan R. Sanchez, U.S.C.J.
August 4, 2022
Page 5

### The Retainer Agreement Fully Comports with N.J. Rule 1:21-7(c) as executed on June 13, 2014

Despite Defendants arguments, the Retainer Agreement between Mr. Ingram and Mazie Slater fully complies with Rule 1:21-7(c). Specifically, on June 13, 2014, Rule 1:21-7(c) set forth the amount of contingency fee which could be charged as follows:

> In any matter where a client's claim for damages is based upon the tortious conduct of another….an attorney shall not contract for, charge or collect a contingent fee in excess of the following limits:
>
> (1) 33 /13% of the first $500,000 net recovery
>
> (2) 30% of the next $500,000 net recovery;
>
> (3) 25% of the next $500,000 net recovery;
>
> (4) 20% of the next $500,000 net recovery;
>
> (5) On all amounts recovered in excess of the above by application for reasonable fee in accordance with the provisions of paragraph (f) hereof.

The Retainer Agreement between Mazie Slater and Mr. Ingram expressly incorporates this contingency fee schedule and makes clear that the attorney's fee on the net recovery exceeding $2 million will be determined by the Court. (See, Baldinger Letter Brief, Filed August 2, 2022, Exhibit A, Retainer Agreement).

Despite the fact that the retainer agreement expressly complied with the Court Rule in effect at the time the agreement was executed, Defendants argue that a subsequent amendment to the Rule requires that the retainer agreement be amended. That is simply untrue. The Rule was not amended until July 19, 2014, **with an effective date of September 1, 2014** – months **after** this Retainer Agreement was executed. In fact, the Note to the amended rule expressly states "amended July 22, 2014 **to be effective** September 1, 2014." (Emphasis added). (The Amended Rule is attached hereto as **Exhibit C**). Nevertheless, relying on Rudderow v. Bos. Sci. Corp. 2022

Hon. Juan R. Sanchez, U.S.C.J.
August 4, 2022
Page 6

WL 1500958 (D.N.J. May 12, 2022), Defendants assert that the subsequently amended Rule 1:21-7(c) should apply retroactively so as to limit the pending fee application to the net recovery over $3 million, in lieu of the $2 million. However, <u>Rudderow</u> is completely inapposite as that case involved the use of the prior version of the retainer agreement under Rule 1:21-7, even though the new Rule was already in effect (the Rudderow retainer was executed 2 years after the Rule change). In contrast, the Retainer Agreement signed by Mr. Ingram on June 13, 2014 incorporated the fee schedule which was in effect at the time. Defendants cite to no authority which requires application of the subsequent amendments to Rule 1:21-7(c)(6) after the retainer was signed, nor could they as the Rule expressly states its effective date to be September 1, 2014.

### **This Court Has Jurisdiction to Address the Pending Motion**

Lastly, Defendants seek to torpedo the pending fee application by quicky filing the Stipulation of Dismissal which they hope will divest this Court of jurisdiction to hear this motion. As the defendants have no stake in this application, their submission is further proof of their vindictiveness and spite. If Mazie Slater would be forced to submit this matter to state court, this would undoubtedly delay the final resolution of this matter for many months, if not longer. This would also impose this decision on a judge who has absolutely no knowledge of this case. It would also delay providing Mr. Ingram with the funds he desperately needs for the therapy and care he has not been able to receive.

As detailed in my letter brief on August 2, 2022, this Court has jurisdiction to address the pending fee application. This Court should not be divested of its jurisdiction to enter an Order resolving this fee application – regardless of when the Stipulation of Dismissal is filed. Defendants urge this Court to find that the pending fee application and the ancillary issues they now raise are outside this Court's jurisdiction and must be heard by a State Court. There is no merit to this

Hon. Juan R. Sanchez, U.S.C.J.
August 4, 2022
Page 7

position. Moreover, Defendants' reliance on In re Cmty. Bank of N. Virginia Mortg. V. Lending Pracs. Litig, 911 F.3d 666 (3d Cir. 2018) does not support this contention. In that class action, the District Court was found to have properly declined to exercise ancillary jurisdiction over a fee dispute between two attorneys in a state court action, where the court had no control over the funds and the fee-splitting dispute had no impact on the litigant's relief in the class action over which it did have jurisdiction. Id., 671 -72.  In contrast, the only issue that remains is approval of Mazie Slater's application for a fee for amounts recovered in excess of $2 million. Both parties to the contractual retainer agreement – Mr. Ingram and Mazie Slater – have asked this Court to decide the issue so that they can disburse the funds and Mr. Ingram can get on with his life. Defendants have no standing to object to the fee application, and their attempt to inject themselves in a private contract between Mr. Ingram and Mazie Slater is offensive to say the least.  Their malicious motives are clear and their "objection" should be summarily dismissed.

As Your Honor indicated, there is no reason for the Court to delay resolution of this meritorious fee application. Accordingly, for the reasons set forth herein and in our prior submissions, it is respectfully requested that this Court enter an Order approving the pending fee application.

Respectfully submitted,

**MAZIE SLATER KATZ & FREEMAN, LLC**
Attorneys for Plaintiff

*/s/ Beth G. Baldinger*
BETH G. BALDINGER, ESQ.

cc:   Counsel of Record
      Xavier Ingram (Via Email)